# Exhibit C

Marlayna G. Tillman                           89

1  while you were working at Pepsi?
2    A.  Yes.
3    Q.  Please tell me about that.
4    A.  I was in one of the Pepsi trucks and upon
5  exiting the vehicle I I guess twisted a tendon in my
6  calf and it tore in a couple places.
7    Q.  Okay.  Did you miss any work as a result of
8  that?
9    A.  Yes.
10   Q.  How long were you out of work?
11   A.  From November '03 to April '04, I believe.  I
12 don't know the exact date.
13   Q.  Did you file a worker's compensation claim in
14 relation to that injury?
15   A.  Yes.  I initially did, I believe, and it was
16 denied and from that point I had to file a
17 short-term disability claim.
18   Q.  Did you file a short-term disability claim
19 related to that injury?
20   A.  Yes.
21   Q.  Did you receive money for short-term
22 disability while you were on that claim?
23   A.  Eventually, yes.
24   Q.  Did you receive worker's compensation for

1  that injury?

2  A.  I'm not really sure actually.  I don't know
3  the money that I received, I'm not sure under which
4  category it fell under.  My attorney would know.

5  Q.  What do you mean?

6  A.  I don't know what it was categorized as.
7  From what my attorney told me it was money that I
8  was entitled to.

9  Q.  Okay.

10         Tell me what your understanding of filing
11 a workman's compensation claim is.

12 A.  Actually I don't have an understanding of it
13 really.  It's quite vague to me.  I guess it's money
14 given to an employee that's injured on the job.
15 That's all I can --

16 Q.  During this period of time from November '03
17 to April '04, were you unable to work at Pepsi?

18 A.  No.

19 Q.  You were able to work?

20 A.  I was, at some specific point I did ask to
21 return to work under light duty.

22 Q.  So was there a period of time where you were
23 totally unable to work?

24 A.  Yes.

Marlayna G. Tillman                                   91

1   Q.   Okay. What was that period of time?
2   A.   I think it was from November to January.
3   Q.   What happened in January that you said
4   allowed you to be able to work in some capacity?
5   A.   My leg was getting better. I was able to
6   walk without crutches and I asked to come back in a
7   light duty capacity.
8   Q.   So you were not released to return to work,
9   fully released at full capacity; is that correct?
10  A.   Do you mean by my doctor?
11  Q.   Yes. Did the doctor say you could return to
12  work on full duty and you said in January?
13  A.   No, I didn't say he released me at that time.
14  Q.   No, that's what I'm asking you.
15  A.   You know what, I don't know the exact date
16  when he actually released me to light duty.
17  Q.   Do you remember the conversation, the
18  appointment? I want you to tell me what you
19  remember about it.
20  A.   I don't remember too much about it, honestly.
21  Q.   Who was your attorney in that matter?
22  A.   Beverly Bove. She also had co-counsel, Eric
23  Grandell.
24          MS. CLEMONS:   Are we up to 10?

Marlayna G. Tillman                                92

1    COURT REPORTER:  Yes.
2              (Exhibit Tillman-10 was marked for
3    identification.)
4    BY MS. CLEMONS:
5       Q.  I'm going to show you what's been marked as
6    Tillman-10.  Please review the letter and the
7    attachment and let me know when you're ready to
8    answer questions.
9              (Pause.)
10      A.  I'm ready.
11      Q.  Have you ever seen this document or the
12   documents attached to it before?
13      A.  The only document I saw was Page 2.
14      Q.  Okay.
15              You saw the document at Page 2?
16      A.  Yeah.
17      Q.  You never saw the agreements and the receipt
18   of compensation at the end of these pages?
19      A.  No, I did not.  In fact, I was going to say
20   that Page 2 is a, an actual, an altered version of
21   what I saw meaning I saw the, had a check that was
22   made out to me, but it wasn't in this amount and it
23   was from, it was on my attorney's letterhead, so
24   this is like a different version of some of the same

Marlayna G. Tillman                                    93

1  information.
2      Q.  Okay.
3          So you didn't cash this check?
4      A.  Um, this one, no, because they made it out,
5  it was given to my attorney first.  My attorney
6  signed it on behalf of me and issued me another
7  check.
8      Q.  Okay.
9          So your attorney signed this check and
10 deposited it?
11     A.  I believe so, because this is not the check
12 that I got.
13     Q.  Did you give your attorney permission to sign
14 this check?
15     A.  I can't recall signing any documents that did
16 that, no.
17     Q.  So you're saying you did not cash this check?
18     A.  No.
19     Q.  And you never saw these two documents
20 attached at the end of this?
21     A.  Never saw it.
22     Q.  If you're telling me your attorney never
23 passed this on to you, will you give us permission
24 to contact your attorney, because this is clearly,

Marlayna G. Tillman                                94

1  did you read the first letter?
2  A.  I never saw -- I didn't see this.  Eric
3  Grandell saw this.
4  Q.  What I'm saying is, you read this letter;
5  correct?
6  A.  Just now, yes.
7  Q.  And you're saying your attorney never
8  presented this information to you?
9  A.  Never presented this information to me.
10 Q.  Will you give us permission to talk to your
11 attorneys about this matter?
12         MS. BREWINGTON:  No, we're not going
13 to give permission for you to talk to them.
14         MS. CLEMONS:  If she's saying she's acted
15 on advice of counsel then we're going to have to go to
16 the Judge because she's basically saying her attorney
17 has committed fraud is basically what she's saying.
18         THE WITNESS:  I can't confirm or deny
19 that because I don't know what their intent was, but
20 I never saw this.
21         MS. CLEMONS:  This is a serious
22 allegation if you're saying your attorney did not
23 present this information to you.
24         THE WITNESS:  It's not an allegation,

1  that's a fact.

2              MS. BREWINGTON:  What she's saying is
3  this was not the check that was presented to her,
4  that her attorney presented her with another check.

5              MS. CLEMONS:  But you also see that
6  there is an agreement that explains what the
7  compensation is and a receipt for receiving it;
8  right?

9              THE WITNESS:  You don't see my
10 signature on there.

11             MS. CLEMONS:  Miss Tillman, I'm
12 talking to your attorney.  What I'm saying is it
13 explains exactly what it's for.  There are letters
14 back and forth from her attorney saying exactly what
15 the compensation was for and if her attorney did not
16 relay that to her, then that is an issue.

17             MS. BREWINGTON:  What is your
18 question?

19             MS. CLEMONS:  My question is did her
20 attorney relay the information contained in this
21 document to her and she's saying no.

22             THE WITNESS:  My answer is no.

23             MS. BREWINGTON:  What information are
24 you talking about?

1    MS. CLEMONS: About the amount of the
2  check, what it was for, what the agreement
3  contained, the information contained in this letter
4  and its attachments.
5    THE WITNESS: So the whole thing as a
6  whole, you're asking me did I see any of this?
7    MS. CLEMONS: I'm not asking if you saw
8  it. You said you didn't see it. I'm asking did the
9  attorney convey the information that's contained in
10 these documents and attachments to you?
11   THE WITNESS: As it's here, no.
12 BY MS. CLEMONS:
13   Q.   Did you give your attorney permission to
14 settle a worker's compensation claim for you?
15   A.   Um, again, I sought counsel from this
16 attorney and I retained this attorney. As to what
17 I, you know, actually gave her permission to do, um,
18 I'm unclear on that because I don't know what she
19 actually did, to be quite honest.
20   Q.   I'm not asking you what she did. I'm asking
21 you what you gave her permission to do.
22   A.   To represent me. I gave Beverly Bove
23 permission to represent me. I retained Beverly
24 Bove. She put Eric Grandell on the case.

Marlayna G. Tillman                                    97

1   Q. And what I'm asking you is, did they consult
2   you before they agreed to settle your claim?
3   A. In what capacity? I know that --
4   Q. About the terms of the settlement.
5   A. No.
6          MS. CLEMONS: I've got to go get
7   another document.
8          (Pause.)
9          (Exhibit Tillman-11 was marked for
10  identification.)
11  BY MS. CLEMONS:
12  Q. I'm showing you what's been marked as
13  Deposition Exhibit 11.
14         Miss Tillman, have you ever seen
15  Deposition Exhibit 11 before?
16  A. I believe I did see this.
17  Q. Tell me what it is.
18  A. It's an outline of settlement terms.
19  Q. How did you receive this letter?
20  A. I don't recall. I don't recall if I went
21  into the office for this or if it was mailed to me.
22  Q. Okay. So --
23  A. And I'm not sure if this is the exact
24  document. It may have been another document that

Marlayna G. Tillman                98

1  kind of outlined similar information.
2    Q.  Are you saying that in some way the
3  information contained in this letter was relayed to
4  you?
5    A.  In some of it, yes.
6    Q.  What was relayed to you?
7    A.  That they were investigating whether I paid
8  into a disability fund and that will determine
9  whether the amount of 7,700 was back owed by me or
10 if I was entitled to receive it because that was at
11 issue.
12   Q.  Anything else in this letter relayed to you?
13   A.  Not that I recall.
14   Q.  You don't recall that the information about
15 you were being paid workers' comp. for a period of
16 total disability from November of 2003 to April of
17 2004 was related to you?
18   A.  I'm sorry.  Rephrase that for me.
19   Q.  What was your understanding of why you were
20 receiving disability money?
21   A.  Again, that's the part that's unclear to me.
22 I don't know why I received that money.  My attorney
23 did not make that clear to me, did not specify to me
24 what that money was for.