# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARLAYNA G. TILLMAN,                          :
                    Plaintiff        :
                                   :   C.A. NO. 04-1314 - SLR

v.                                            :
                                   :

THE PEPSI BOTTLING GROUP, INC., and            :
TEAMSTERS LOCAL UNION 830                      :
                  Defendants         :

## APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANT, INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL UNION NO. 830'S MOTION FOR SUMMARY JUDGMENT

Clifford B. Hearn, Jr., Esquire
**CLIFFORD B. HEARN, JR., P.A.**
Odessa Professional Park, Suite 240
P.O. Box 521
Odessa, DE 19730-0521
(302) 378-4827

Marc L. Gelman, Esquire
**JENNING SIGMOND, P.C.**
510 Walnut St., 16th Fl.
Phila., PA 19106
(215) 351-0623

Date: December 15, 2006

## TABLE OF CONTENTS

Tillman Deposition, 12/13/05 ...................................................................................A1

Tillman Deposition, 10/11/06 .................................................................................A12

Collective Bargaining Agreement
(Pepsi-Teamsters Local Union No. 830, 1/1/00 to 12/31/04) .....................................A31

Merchandiser job posting..........................................................................................A69

Relief Driver job posting ..........................................................................................A70

Transport Driver job posting.....................................................................................A71

Grievance No. 489 ...................................................................................................A72

Grievance No. 662 ...................................................................................................A73

Grievance No. 663 ...................................................................................................A74

Grievance No. 665 ...................................................................................................A75

Grievance dated 11/21/02 .........................................................................................A76

Grievance No. 845 ...................................................................................................A77

Grievance No. 698 ...................................................................................................A78

Grievance No. 696 ...................................................................................................A79

McLaughlin correspondence, 5/21/03 ........................................................................A80

Grievance No. 2809 .................................................................................................A81

D'Elia correspondence, 11/30/04...............................................................................A82

Grievance Release....................................................................................................A83

Affidavit of Daniel Grace .........................................................................................A84

1

09:15:45AM  1

2                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
3
                        - - -
4
      MARLAYNA G. TILLMAN,      :  CIVIL ACTION
5            Plaintiff,         :

6            vs.               :

7     THE PEPSI BOTTLING GROUP,:
      INC., and TEAMSTERS LOCAL:
8     UNION 830               :
             Defendants.      :  No. 04-1314
9

10                      - - -

11              Wilmington, Delaware
             Tuesday, December 13, 2005
12                      - - -

13

14            Deposition of MARLAYNA G. TILLMAN,

15    taken pursuant to notice, at the law offices of

16    Ballard Spahr Andrews & Ingersoll, LLP, 919 Market

17    Street, 12th Floor, Wilmington, Delaware, on the above

18    date, beginning at 10:25 a.m., before Donna A.

19    Bittner, RMR-CRR.

20                      - - -

21

22
                DONNA A. BITTNER REPORTING
23         REGISTERED PROFESSIONAL REPORTERS
                   61 Penn Road
24         Voorhees, New Jersey   08043
                 (856) 768-6619

2

```
1    APPEARANCES:

2            LORI A. BREWINGTON, ESQUIRE
         Margolis Edelstein
3            1509 Gilpin Avenue
             Wilmington, Delaware  19806
4
                 Counsel for Plaintiff
5
         LUCRETIA C. CLEMONS, ESQUIRE
6        Ballard Spahr Andrews & Ingersoll, LLP
             1735 Market Street, 51st Floor
7            Philadelphia, Pennsylvania  19103

8                Counsel for Defendant
                 The Pepsi Bottling Group, Inc.
9
         MARC L. GELMAN, ESQUIRE
10       Jennings Sigmond
             The Penn Mutual Towers
11           16th Floor
             510 Walnut Street
12           Philadelphia, Pennsylvania  19106-3683

13               Counsel for Defendant
                 Teamsters Local Union 830
14

15   ALSO PRESENT:

16           SARA ALTMAN
         Human Resources Representative
17       The Pepsi Bottling Group, Inc.

18

19                   - - -

20

21

22

23

24
```

**DONNA A. BITTNER REPORTING**

3

Marlayna G. Tillman

1    (It is hereby stipulated and agreed by
2  and between counsel for the respective parties that
3  signing, sealing, filing and certification are
4  waived; and that all objections, except as to the
5  form of the question, are reserved until the time of
6  trial.)
7                    - - -
8      ...MARLAYNA G. TILLMAN, 497 Linden Boulevard,
9    Unit C-7, Brooklyn, New York, 11203, after
10    having been duly sworn, was examined and deposed
11    as follows...
12                    - - -
13    (Exhibits Tillman-1 through Tillman-4 were
14  marked for identification.)
15  BY MS. CLEMONS:
16    **Q.** Good morning, Miss Tillman.
17    **A.** How you doing?
18    **Q.** My name is Lucretia Clemons and I am an
19  attorney. I represent Pepsi Bottling Group in a
20  lawsuit that you've filed against them here in the
21  District Court of Delaware.
22        I'm going to start by asking you a few
23  preliminary questions and giving some instructions.
24    **A.** Okay.

4

Marlayna G. Tillman

1    **Q.** You should let me know if don't understand
2  any of the instructions that I give you.
3        Have you ever been deposed before?
4    **A.** No.
5    **Q.** Do you understand that the questions I ask
6  and the answers you give may ultimately be used in
7  trial?
8    **A.** Yes.
9    **Q.** Do you agree to answer the questions only if
10  you fully understand them?
11    **A.** Yes.
12    **Q.** Do you agree to tell me if you don't
13  understand a question?
14    **A.** Yes.
15    **Q.** If you don't say anything you should
16  understand that I will assume that you understood
17  the question.
18    **A.** Okay, yes.
19    **Q.** Do you agree to answer the questions fully
20  and to the best of your knowledge?
21    **A.** Yes.
22    **Q.** Are you taking any medications today?
23    **A.** No.
24    **Q.** Are you generally feeling fit to give the

5

Marlayna G. Tillman

1  deposition today?
2    **A.** Yes.
3    **Q.** During the deposition today I will ask you
4  questions and you will answer those questions. The
5  court reporter will take down the answers, therefore
6  your responses need to be verbal.
7    **A.** Right.
8    **Q.** Shaking the head doesn't elicit a response,
9  although she will probably type shakes head, and
10  also uh-huh and uh-uh sound exactly the same on a
11  transcript.
12    **A.** Right.
13    **Q.** So your answer should be yes or no.
14        And again because she's typing down
15  what we say, we can't talk at the same time, so I
16  will be respectful of you when you're talking and I
17  ask that you wait for me to finish the question
18  before you give an answer.
19    **A.** Okay.
20    **Q.** Please state your name for the record.
21    **A.** Marlayna G. Tillman.
22    **Q.** And what does the G stand for?
23    **A.** Georgette.
24    **Q.** Have you ever been known by any other name?

6

Marlayna G. Tillman

1    **A.** Marlayna Georgette Palmer.
2    **Q.** And tell me the circumstances under which you
3  were known by the name of Palmer.
4    **A.** My mother was married twice prior to me being
5  18, so my last name was changed before.
6    **Q.** What is your home address?
7    **A.** Currently it's 497 Linden Boulevard, Unit
8  C-7, Brooklyn, New York, 11203.
9    **Q.** Do you own or rent?
10    **A.** Rent.
11    **Q.** How long have you lived there?
12    **A.** The past year.
13    **Q.** Do you recall what date you moved? You can
14  approximate.
15    **A.** November of last year.
16    **Q.** I know you said you rent this property. Do
17  you own any other property?
18    **A.** No.
19    **Q.** What was your previous address?
20    **A.** 7 Colony Boulevard, Wilmington, Delaware,
21  19802.
22    **Q.** And how long did you reside at that address?
23    **A.** I'm going to say three years approximately.
24    **Q.** Okay. What is your date of birth?

A3

107

Marlayna G. Tillman

1  **Q.** Did you file a workers' compensation claim
2  for that injury?
3  **A.** No.
4  **Q.** Any other injuries?
5  **A.** Not that I can recall. You know what, now
6  that I'm thinking about it, this probably needs to
7  be on the record, when you are injured at work, at
8  Pepsi, you're required to call 1-800 Job Hurt, which
9  is a number that Pepsi gives for their employees to
10  call.
11       That can be what generates a claim and
12  probably that is because I physically don't recall
13  making any claim, but I do recall after having an
14  injury having to call 1-800 Job Hurt for any type of
15  injury sustained on the job. Now, that may be where
16  it originated from, but again because I'm not
17  familiar with the process I wouldn't know.
18  **Q.** But you don't recall filling out a workers'
19  compensation claim?
20  **A.** I don't recall.
21  **Q.** Okay.
22       When did you start working at Pepsi?
23  **A.** May of 2001.
24  **Q.** What position were you hired into?

108

Marlayna G. Tillman

1  **A.** Merchandiser position.
2  **Q.** How long were you in that position?
3  **A.** Until I think July 2002.
4  **Q.** What was the next position you assumed?
5  **A.** Warehouse position.
6  **Q.** How long were you in that position?
7  **A.** I guess in some form until November of 2004.
8  I mean, I'm sorry, September 2004, correction.
9  **Q.** What position did you apply for in September
10  of 2004?
11  **A.** A driver position, a transport driver
12  position.
13       MS. CLEMONS: I'm sorry, I missed
14  that, if you could just go back. We had the
15  merchandiser from May '01 through?
16       THE WITNESS: July 2002.
17       MR. GELMAN: What was the one after
18  that?
19       MS. CLEMONS: Warehouse person.
20       MR. GELMAN: And what were the dates?
21       THE WITNESS: July 2002 to I guess
22  September 2004.
23       MR. GELMAN: Okay, fine. My
24  apologies.

109

Marlayna G. Tillman

1  BY MS. CLEMONS:
2  **Q.** And what were your duties as a merchandiser?
3  **A.** To visit different locations, stores, retail
4  outlets, to make sure that the Pepsi product was on
5  the shelves, make sure that they have, you know,
6  sufficient quantities in their back stock.
7  **Q.** Anything else?
8  **A.** As far as merchandising, no.
9  **Q.** What about warehouse?
10  **A.** Warehouse was basically building pallets of
11  product. I was kind of like a floater. I did
12  several different things in the warehouse including
13  production work.
14  **Q.** What does that mean?
15  **A.** Basically, um, I guess where they actually
16  manufacture the soda, working on the bottle and can
17  lines, what else, operated a forklift, I loaded
18  trucks, loaded route trucks, loaded bulk trucks,
19  built bulk load, just about every facet of the trade
20  in the warehouse. But I would also like to back up
21  for a minute to my merchandising position.
22  **Q.** Miss Tillman, there is no question pending
23  about the merchandising position. I will get back
24  to it and I will let you answer, but right now I

110

Marlayna G. Tillman

1  want to talk about the warehouse.
2  **A.** Okay.
3  **Q.** Anything else you did in the warehouse?
4  **A.** I did whatever was asked of me in the
5  warehouse.
6  **Q.** What else was asked of you? What you need to
7  tell me is what job duties you performed while you
8  worked in the warehouse.
9  **A.** Like I said, anything that pertained to the
10  trade at some point I had to have my hands involved
11  in, so whether it was loading trucks or whether it
12  was loading bulk trucks, whether it was jockeying
13  trucks in the yard, whether it was, believe it or
14  not, cleaning the yard, cleaning the truck, whether
15  it was sanitation duties inside the warehouse, on
16  the production floor, again working the bottle line,
17  the can line, the can line filler, stacking shelves,
18  refilling $CO_2$ canisters, operating a forklift to
19  stack merchandise.
20  **Q.** You told me. Let me tell you what you've
21  told me. You tell me if there is anything else.
22  Building pallets, can line, can line filler,
23  forklift, loading trucks, jockeying trucks, cleaning
24  the yard, sanitation duties, stacking shelves and

A4

Case 1:04-cv-01314-SLR   Document 91-2   Filed 12/15/2006   Page 7 of 41

111

Marlayna G. Tillman

1 refilling CO2.
2   **A.** Um-hum.
3   **Q.** Anything else?
4   **A.** Cleaning the cage where we keep, you know,
5 what do you call it, raw goods.  Did we get
6 jockeying?
7   **Q.** Yes.
8   **A.** We got that.  Okay.  Jockeying trucks.  Oh,
9 what they call restock, which is like recirculation
10 of like damaged products.  Say if a product is out,
11 the casing falls off, we would take that product and
12 repackage it again, so like repackaging, and I don't
13 think there was too much of any part of the trade
14 that I didn't have some type of involvement in.
15   **Q.** Have you now told me everything you can
16 recall?
17   **A.** That's it.
18   **Q.** The same question for the driver position.
19 What were your duties?
20   **A.** The driver position was just to perform what
21 they call drop and hooks.  You pick up -- well, hook
22 to your, at your beginning plant, hook up to the
23 product in the trailer, transport it to another
24 facility and drop it there, pick up an empty

112

Marlayna G. Tillman

1 trailer, from that point drive it back to your
2 originating site, back it in the dock so that it can
3 be reloaded, and the same process goes over again
4 back and forth.
5          (Exhibit Tillman-13 was marked for
6 identification.)
7 BY MS. CLEMONS:
8   **Q.** I'm showing you what's been marked as
9 Deposition Exhibit 13.  Do you recognize this?
10   **A.** I've seen one of these before.  It's a job
11 posting.
12   **Q.** Does this job posting accurately reflect the
13 job duties of the merchandiser position?
14   **A.** I would say so, although it may not be what
15 was required at the time I was hired.  This is like
16 almost a year later.
17   **Q.** Well, what's that I'm asking you.  Is this
18 what you did?  If it's not, then I want you to tell
19 me that.
20   **A.** I did I'm sure all of that and then some.
21   **Q.** What is it that you did that was a job duty
22 that is not listed on this job description?
23   **A.** Let's see.  I did deliveries.
24   **Q.** Explain to me what you mean by you say you

113

Marlayna G. Tillman

1 did deliveries.
2   **A.** I did deliveries with the other Pepsi workers
3 in the conventional department.  I did what was
4 called cooler resets at different --
5   **Q.** Is that the same thing as you're saying did
6 deliveries or is that a different --
7   **A.** No, they're independent.
8   **Q.** Tell me what you mean when you say you did
9 deliveries.  Tell me what you would do.
10   **A.** Deliveries means I would ride with another
11 Pepsi employee to a location, say Saturn, Saturn,
12 the car manufacturing plant, and we would open up
13 the bays of the truck and pull off product and take
14 it into their location for use in their vending
15 machines, their cafeteria, wherever, you know, they
16 required it, the product to be at.  That's one thing
17 that I did.
18   **Q.** Okay.
19   **A.** I did cooler resets, which means you travel
20 to different stores, 7-Eleven, Wawa, mom and pop
21 stores.  You go into their cooler where our product
22 is kept and you pull everything out and reset the
23 shelves and put everything back in in an orderly
24 fashion based on what our core requirements were at

114

Marlayna G. Tillman

1 that time.
2   **Q.** Okay.
3   **A.** I did vending machine, full-service vending
4 machine refills, going to the different locations,
5 MBNA, going to the cafeteria, opening up the
6 machines, refill them with soda as part of my
7 conventional duties.  What else did I do?
8   **Q.** Is that not the same thing as one of the
9 primary job duties as set forth?
10   **A.** No, that's a little different.
11   **Q.** Merchandising a store?
12   **A.** Merchandising basically was supermarket work.
13 You go into a Pathmark or, you know, Shop Rite,
14 Super G, and you go to the back stock room and you
15 put all your soda on a cart and you roll it out to
16 the shelves and stock the shelves.
17   **Q.** That's what a merchandiser's basic primary
18 function was.  Like I said, I did that and then
19 some, which was what I just outlined before.
20   **Q.** So you told me about doing deliveries, doing
21 cooler resets and then full service vending
22 machines.
23          Anything else?
24   **A.** I'm sure there were other things.  Like I

A5

Tillman vs. The Pepsi Bottling Group, Inc., et al

Case 1:04-cv-01314-SLR    Document 91-2    Filed 12/15/2006    Page 8 of 41
Marlayna G. Tillman, 12/13/05

115

Marlayna G. Tillman

1 said, there were days where I was tapped to do I
2 guess like sanitation where we had to like clean
3 the -- clean the cage, throw stuff in the dumpsters
4 outside. I would have to go into the trailers that
5 were in the yard and clean out like old point of
6 purchase information, old coolers that were broken,
7 shelving, tubing, stuff that we didn't use anymore.
8 I guess that all falls under sanitation and that
9 does not fall under a merchandiser or a conventional
10 employee, but I was tapped to do that as well many
11 times.
12    Q. Anything else?
13    A. Not off the top of my head, no.
14    Q. I want to talk about the first thing you
15 said.
16         Doing deliveries with other drivers,
17 when did you perform those tasks?
18    A. From October '02 through May, I think May
19 of -- I'm sorry. Rephrase. October '01 until May
20 of 2002.
21    Q. How often did you do that?
22    A. I did it daily.
23    Q. Every day you went out on a truck with a
24 driver to stock?

116

Marlayna G. Tillman

1    A. To do several different things, yeah.
2    Q. Not to do cooler resets?
3    A. Oh, you know, another thing I did is
4 displays. I would have to go to different locations
5 like K-Mart, retail stores, Wal Mart, and build a
6 display with several pallets worth of product and
7 build, you know, displays. If we're having a sale
8 there and they need 40 pallets worth of soda, that
9 was my job, too, even though that doesn't fall under
10 merchandiser, but I had to do that.
11    Q. I'm going to go back to you saying you went
12 out on delivery trucks every day?
13    A. Yeah. For the most part, yes. I was with
14 another driver at some point because at that time I
15 only had a permit and I was --
16    Q. Isn't it true that most days you were out in
17 a Pepsi pickup truck going out to do resets with
18 other people --
19    A. Not when --
20    Q. Excuse me.
21         -- not out on a truck?
22    A. I don't think most days. I think that was,
23 if anything, if we want to be liberal, I'll say
24 fifty-fifty. It depended on what they needed to

117

Marlayna G. Tillman

1 have done that day. My point is I was tapped to do
2 it, whatever was extra. Whatever was needed to be
3 done, that was me, get Marlayna to do it, yes, and I
4 did use a Pepsi van, absolutely.
5    Q. When you went out to do cooler resets;
6 correct?
7    A. If I went to do cooler resets, yes.
8    Q. Tell me who you were going out with on a
9 truck. You said over --
10    A. I went out with Mike Smith. I went out with
11 Mike Shimmel. I went out with Rich Wyatt. I went
12 out with Kevin -- I can't -- Kevin Riley. Who else?
13 James Bell, Timmy Klein, Craig Nelson, my supervisor
14 at the time. I'm trying to think if there is
15 anybody I forget.
16         I would almost venture to say that
17 anybody that was in the conventional department I
18 rode with at least once or twice at least.
19    Q. So you're saying that between October and May
20 that you went out on a truck every day with one of
21 these people?
22    A. No, I just told you that I will be liberal
23 and say fifty-fifty. If they didn't need me to do
24 that, then no, they would find something else for me

118

Marlayna G. Tillman

1 to do which required me to drive the Pepsi van.
2    Q. So every other day then?
3    A. If you want to call it that. It was frequent
4 enough.
5    Q. I don't want to call it anything. I want you
6 to tell me how often you were out on the truck.
7    A. I can't quote you specific exact times, just
8 like I haven't been able to quote you anything
9 specific. You're asking me to remember stuff from
10 three years ago.
11    Q. You filed a lawsuit about these issues and I
12 have to ask you about them and so you have to tell
13 me, to the best of your recollection, what you
14 remember.
15    A. That's my recollection.
16    Q. So now you're saying it's not every day?
17    A. I said I will be liberal and say --
18    Q. Probably half the time?
19    A. Half and half if I wasn't out on a trip. I
20 might have been out on a trip Monday, Wednesday and
21 Friday and doing research on Tuesday and Thursday,
22 or it might have flipped and I was doing resets on
23 Monday, Wednesday and Friday.
24    Q. Anybody else you went out on a truck with

A6

187

Marlayna G. Tillman

1  **Q.** Please tell me which employees you contend
2  you were paid less than for the same work.
3  **A.** I was paid less than the people in the
4  conventional department and I was also paid less
5  than some of the merchandisers that are supposed to
6  have been there longer than I have been.
7  **Q.** First tell me who you're talking about when
8  you say you were paid less than other merchandisers.
9  **A.** Tim Reading is a person that I recall.
10  **Q.** Keep going. Anyone else?
11  **A.** With respect to the conventional
12  department --
13  **Q.** I'm asking first with merchandisers, was
14  there anyone else?
15  **A.** I think just Tim Reading, as far as I know.
16  **Q.** And he was a merchandiser?
17  **A.** I believe so.
18  **Q.** Isn't it true that he was an account rep, not
19  a merchandiser?
20  **A.** I'm not sure. I know he did merchandising
21  work as I did it with him.
22  **Q.** Tell me what you're talking about when you
23  say he did merchandising work.
24  **A.** He had to do the same thing that I did, go to

188

Marlayna G. Tillman

1  a store and pack out the product, bring the stuff
2  from the back room to the front, to the shelves.
3  **Q.** Tell me when you did this, when he did it,
4  what the circumstances were. You have to be
5  specific.
6  **A.** Well, I know that he came in from another
7  company. I believe he came in from Coca-Cola and I
8  think he came in from Coca-Cola and he was, like I
9  said, he was the person that was doing the same job
10  that I was because we worked the same stores, as far
11  as I know.
12  **Q.** And for what period of time are we talking
13  about, Miss Tillman?
14  **A.** It had to happen between I guess June '01 and
15  October '01, some time in that span.
16  **Q.** Didn't he have duties in addition to whatever
17  he was doing that were similar to what you were
18  doing?
19  **A.** I don't know. Not that I know of. I know we
20  did the same thing at the same stores.
21  **Q.** But you don't know what else he was doing?
22  **A.** No.
23  **Q.** Anyone else who was a merchandiser in your
24  estimation?

189

Marlayna G. Tillman

1  **A.** No, not that I know.
2  **Q.** You said people in the conventional
3  department. Tell me what you're talking about
4  there.
5  **A.** Basically I was doing bargaining unit work at
6  the time.
7  **Q.** Conclusions don't help me. Please tell me
8  what facts --
9  **A.** That's not a conclusion, that's a fact.
10  **Q.** Please tell me what facts you have that
11  support that allegation.
12  **A.** Which allegation are we talking about?
13  **Q.** The one you just made about you were doing
14  bargaining unit work. Tell me what you're talking
15  about. Giving me a summary doesn't help.
16  **A.** Cooler resets, which is what we already
17  discussed before, cooler resets, delivery of
18  merchandise to different sites, extra man work.
19  That's --
20  **Q.** Extra man is a position, so tell me what it
21  is that they do.
22  **A.** All that that I just listed, cooler resets,
23  delivery of product, whatever -- well, I guess
24  that's why they call it extra man, because whatever

190

Marlayna G. Tillman

1  extra is to be done, that's what you were to
2  perform. Full service vending duties, if necessary,
3  all of which I did.
4  **Q.** Anything else that extra men did?
5  **A.** Just what I mentioned before on the other
6  pages.
7  **Q.** Do you know what else they did besides these
8  things you just told me?
9  **A.** Whatever was required. That's why they call
10  it extra man.
11  **Q.** Doesn't that position require that you have a
12  CDL because you --
13  **A.** If they did they didn't mind when I didn't
14  have one because they sure enough put me in that
15  position.
16  **Q.** You were awarded a position as an extra man?
17  **A.** Yeah. I was doing extra man work.
18  **Q.** That's not what I asked you. I asked you,
19  did you apply for a position as an extra man?
20  **A.** No. I was put in that position.
21  **Q.** Miss Tillman, please answer the question I
22  ask you and not the question you want to answer.
23  **A.** That's not the question you --
24  **Q.** My question is, did you apply for a position

223

Marlayna G. Tillman

1  conventional department rather than lay you off, and
2  you said no.
3     **A.** No. I wasn't transferred out of the
4  merchandising department. That's my point.
5     **Q.** I didn't say merchandising department. I
6  said bulk and conventional.
7     **A.** Bulk is merchandising.
8     **Q.** Merchandiser position is merchandising. I'm
9  talking about in the merchandising position. The
10 position is called merchandiser; correct?
11    **A.** Bulk merchandiser.
12    **Q.** In the department called bulk; correct?
13    **A.** Um-hum.
14    **Q.** You were transferred from the bulk department
15 to the conventional department is your contention;
16 correct?
17    **A.** In addition to being in -- it wasn't instead
18 of. It was in addition to that.
19    **Q.** So your contention is that you were
20 performing duties in both departments?
21    **A.** Thank you. Yes.
22    **Q.** Tell me what your schedule was.
23    **A.** My schedule varied.
24    **Q.** Tell me what you remember.

224

Marlayna G. Tillman

1     **A.** It changed.
2     **Q.** It changed from what to what?
3     **A.** It changed on a daily basis. Whatever needed
4  to be done, if I needed to build a display at
5  Pathmark at 3:00 a.m., then I had to go to Pathmark
6  at 3:00 a.m. If I was supposed to report at
7  7:00 a.m., then I would have to come in at 7:00 a.m.
8  It just depended on what they had me doing for that
9  day.
10          On the weekends I could report at, you
11 know, 5:00 a.m. at a store.
12    **Q.** What days of the week did you work?
13    **A.** There wasn't a day that, you know, I didn't
14 work. That varied, too. I would usually work
15 Monday through Friday, but I also had weekends.
16 Sometimes I did Tuesday through Saturday and there
17 was definitely Sundays that I worked as well.
18    **Q.** Would you take a look at Paragraph 15? It
19 says, "Although you were moved to the conventional
20 department, a union eligible position." What
21 position is it that you contend was union eligible
22 that you were moved to?
23    **A.** I think most of the duties I performed fell
24 under extra man if you want to give it a title.

225

Marlayna G. Tillman

1     **Q.** It's not my lawsuit. You have to give it a
2  title. You have to tell me what position it is that
3  you contend that you were transferred to that was
4  union eligible.
5     **A.** My duties fell under several different --
6  different categories. Do you want to be specific?
7     **Q.** Yes, I do. This is what we're here for is to
8  be specific. Tell me what else.
9     **A.** They fell under extra man duties. They fell
10 under delivery driver duties. They fell under what
11 else, full service duties. They fell under I guess
12 the housekeeping duties. An extra man performs, you
13 know, some or all of those. So if you were to give
14 it a whole title, if you wanted to give it one, it
15 would probably be extra man.
16    **Q.** Do you know of any extra man who did not have
17 a Class A CDL?
18    **A.** Do I know?
19    **Q.** Yes.
20    **A.** No.
21    **Q.** Do you know of any person who was awarded an
22 extra man position without having first a Class A
23 CDL?
24    **A.** I don't know.

226

Marlayna G. Tillman

1     **Q.** Would you look at Paragraph 18? Read that to
2  yourself.
3     **A.** Okay.
4     **Q.** Did you receive overtime pay while you were
5  working in the conventional department?
6     **A.** Yes.
7     **Q.** So the statement that you were not receiving
8  any overtime pay is not a correct statement?
9     **A.** It needs to be adjusted.
10    **Q.** To what?
11    **A.** It should say that I wasn't receiving
12 overtime pay at the correct rate.
13    **Q.** And what is the correct rate?
14    **A.** Whatever extra man wages were.
15    **Q.** So you're not contending that you weren't
16 paid time and a half at your rate, you're contending
17 you weren't paid time and a half under the union
18 rate; correct?
19    **A.** Correct. And also that under the union guys
20 got double time for working on Sunday which I didn't
21 receive at all.
22    **Q.** Again at this time you were not a member of
23 the union; correct?
24    **A.** Right.

**DONNA A. BITTNER REPORTING**

A8

Tillman vs. The Pepsi Bottling Group, Inc., et al
Case 1:04-cv-01314-SLR   Document 91-2   Filed 12/15/2006   Page 11 of 41
Marlayna G. Tillman, 12/13/05

239

Marlayna G. Tillman

1 were agreed to a full and fair release of the
2 grievance having to do with this issue?
3    **A.** No. That was for something different and I
4 do distinctly remember there being a grievance that
5 was signed off on but not by myself. There was one
6 without my signature at all on it.
7    **Q.** I'm sure Mr. Gelman will get to the
8 grievances, but you don't recall that one of the
9 grievances you released had to do with this issue?
10    **A.** Not with this issue. I recall it being
11 something else.
12    **Q.** Any other times that you talked to Tracey or
13 anyone else in HR about back pay? Am I correct that
14 by back pay you mean being paid the union wage?
15    **A.** Yes.
16    **Q.** Did you talk to anyone else in Pepsi HR about
17 that issue?
18    **A.** It may have been brought up with Scott Steiger.
19    **Q.** First tell me what did Tracey tell you.
20    **A.** That I wasn't owed that money.
21    **Q.** And why did she say that? Did she give you a
22 reason?
23    **A.** I don't recall a reason actually.
24    **Q.** Didn't Tracey tell you that you needed to

240

Marlayna G. Tillman

1 have a CDL in order to get the position of an extra
2 man or a relief driver and that that's why you
3 weren't able to bid or apply for that job?
4    **A.** That might have been, yeah, in speaking of
5 applying for a certain job, yes, that she did
6 mention that, but that wasn't what was at issue for
7 me.
8    **Q.** Okay.
9    **A.** What was at issue was the fact that I was in
10 the conventional department, which was a union
11 position, performing union-based duties.
12    **Q.** Tell me what your basis is for believing that
13 every position in the conventional department is
14 unionized.
15    **A.** That's my knowledge. That's the knowledge I
16 have.
17    **Q.** Have you ever seen a document that says that
18 every employee of the conventional department is a
19 member of the union?
20    **A.** No. My recollection is that the positions
21 described, um, within the job description were
22 positions that I performed and those were union
23 positions, union duties.
24    **Q.** But were there duties on those descriptions

241

Marlayna G. Tillman

1 that you did not perform?
2    **A.** Um, not to my knowledge. As far as I know I
3 did a little bit of everything.
4    **Q.** Did you take orders from customers?
5    **A.** No. That's the sales department.
6    **Q.** I'm asking, did you take orders from customers?
7    **A.** No.
8    **Q.** Did you take money from customers for payment
9 for deliveries?
10    **A.** No.
11    **Q.** Did you keep a route book?
12    **A.** No.
13    **Q.** Did you drive a tractor-trailer alone?
14    **A.** Not alone.
15    **Q.** How often did you drive a tractor-trailer
16 with someone else?
17    **A.** I think we went over it, but it was
18 frequently. I can't count how many times.
19    **Q.** That you actually drove?
20    **A.** And they sat in the seat next to me as a
21 passenger, yes.
22    **Q.** To your knowledge was a CDL Class A license a
23 requirement of the delivery driver position?
24    **A.** Yes.

242

Marlayna G. Tillman

1    **Q.** Did you have a CDL at this period of time?
2    **A.** Which period of time?
3    **Q.** We are talking about, you said this is in
4 2002 --
5    **A.** No.
6    **Q.** -- when you were talking about receiving back
7 pay. I'm asking you about a conversation you had
8 with Tracey and what Tracey said. I said did Tracey
9 ever tell you that you needed to have a CDL in order
10 to get that position in order to get paid what you
11 wanted to be paid. You said yes.
12          I said did you have a CDL and you said
13 no; right?
14    **A.** Correct.
15    **Q.** Did you talk to Rhonda about the same issue?
16    **A.** Um, yeah, we talked about a couple things,
17 but my main topic with her was about getting the
18 actual training to get the CDL.
19    **Q.** Okay. And what did Rhonda tell you?
20    **A.** She more or less just reiterated the same
21 thing that Tracey said. It was that in order to
22 apply for the driver position you have to have the
23 CDL, and again part of my problem was that I
24 couldn't receive the training. I was trying to

**DONNA A. BITTNER REPORTING**

A9

247

Marlayna G. Tillman

1  who did not have a Class A CDL?
2  **A.** I don't know.
3  **Q.** So you don't know of anyone?
4  **A.** I don't know the answer. No, I don't have an
5  answer to that.
6  **Q.** So if there were other people who were denied
7  the ability to apply for the position who were white
8  men, would you have any basis to dispute that?
9  **A.** Say that again.
10  **Q.** Okay.
11      If there are white men who will testify
12  that they were not permitted to apply or bid on this
13  position because they did not have a CDL, would you
14  have any reason to dispute that?
15      MS. BREWINGTON:  I'm going to object,
16  calls for speculation, but you can answer.
17      THE WITNESS:  I don't even know how to
18  answer that.
19  BY MS. CLEMONS:
20  **Q.** I'm just saying, do you know of anything that
21  would contradict that?
22  **A.** I can't answer that.
23  **Q.** When did you get your CDL license?
24  **A.** September 2004.

248

Marlayna G. Tillman

1  **Q.** And how long after you got that license were
2  you awarded the bid for a driver position?
3  **A.** I think it was sometime also in September.
4  **Q.** Within a few weeks?
5  **A.** I think so.
6  **Q.** So why is it that you didn't previously
7  receive your CDL?
8  **A.** Because there was never an opportunity for me
9  to take the truck out again until then.
10  **Q.** Are you saying that you were not permitted to
11  use a truck to take your test and that's why you
12  never passed your CDL before September of '04?
13  **A.** Um, yeah, I'm saying that I was always given
14  like, you know, an excuse as to why, you know, there
15  were no trucks available or whatever.
16  **Q.** Anybody you know during that time who was
17  allowed to use a truck?
18  **A.** I don't think anybody else went for a license
19  at that time.  I'm not sure.
20  **Q.** Take a look at Paragraph 42.
21  **A.** Okay.
22  **Q.** What company policy are you referring to for
23  hiring within?
24  **A.** Well, I was always told that they have a

249

Marlayna G. Tillman

1  policy to hire from within, to promote from within
2  first.
3  **Q.** Who told you that?
4  **A.** It was like common knowledge.
5  **Q.** What do you mean by "common knowledge"?
6  **A.** Common knowledge, everybody knew that,
7  unspoken rule, whatever, that it was common
8  knowledge.
9  **Q.** Did you ever see a written policy about
10  hiring from within?
11  **A.** Um, I want to say that I did see something
12  like that.  I'm really not sure.
13  **Q.** Okay.
14      Did anyone in management ever tell you
15  that there was a policy for hiring from within?
16  **A.** No, not that I know of.
17  **Q.** So if someone from HR would testify that
18  there is no such policy, would you have any
19  information to dispute that?
20  **A.** Possibly.
21  **Q.** Tell me what it is.
22  **A.** I believe I have seen a document that says
23  Pepsi's policy to hire from within or to promote
24  from within.

250

Marlayna G. Tillman

1  **Q.** Tell me when and where you saw that.
2  **A.** I'm not sure.  I might have a document
3  referring to that.
4  **Q.** Would you look at --
5  **A.** I know that Tracey did tell me that one time
6  that when they hire drivers or when they look for
7  drivers they try to get somebody from inside the
8  company first before they actually go and post
9  outside, so I do recall her saying that.
10  **Q.** Is that based on the union contract that
11  you're talking about?
12  **A.** I don't know.
13  **Q.** Okay.
14  **A.** I don't know.
15  **Q.** But in union positions, don't the union
16  employees get to bid first before people from the
17  outside are permitted to apply for the jobs, to your
18  knowledge?
19  **A.** I think so.  They bid first, yes.
20  **Q.** Paragraph 44.
21  **A.** Okay.
22  **Q.** You talked about this issue earlier.  Have
23  you told me everything that has to do with the wage
24  of being paid 12.68 that you have knowledge of?

A10

275

Marlayna G. Tillman

1  about the accidents, the two accidents.

2  **A.**  Not that I'm aware of, no.

3       MS. CLEMONS:  Let's go off the record.

4       (Discussion held off the record.)

5       MS. BREWINGTON:  I just want to begin.

6  We have agreed to produce additional documents that

7  were in storage and referenced in this deposition by

8  no later than January 6th of 2006.

9       In addition, we're concluding this

10 deposition today, however we will schedule another

11 date for a deposition hopefully some time this week

12 for some time in January so that we can continue

13 this deposition beginning with Interrogatories.

14       We have agreed that we will not go --

15 go ahead.

16       MS. CLEMONS:  No, I was going to say

17 agreed that I, not Mr. Gelman.

18       MS. BREWINGTON:  Oh, okay.  I'm sorry.

19 I thought you wanted to say something.

20       We have agreed that Pepsi will not go

21 over anything that we have discussed today for the

22 deposition, however Pepsi will be able to ask

23 Miss Tillman any questions regarding the new

24 documentation that we intend to produce on or before

276

Marlayna G. Tillman

1  January 6th, 2006.

2       MS. CLEMONS:  Or any topics to which

3  they relate.  I think that I'm willing to, I think

4  the stipulation is that we will not touch on topics

5  that were not stated in this deposition, that there

6  may be documents that she has in storage or topics

7  that come up as the result of the documents that she

8  produced, but any document that or any area that

9  Miss Tillman indicated that she might have documents

10 that refer to that area is basically fair game for

11 the continuation of the deposition.

12       MS. BREWINGTON:  And I will stipulate

13 to that.

14       MS. CLEMONS:  Okay.

15       And Mr. Gelman, go ahead.

16       MR. GELMAN:  And I guess inherent in

17 that is the fact that Local 830 will have the

18 opportunity to depose the deponent as they wish.

19       MS. BREWINGTON:  Okay.  Off the

20 record.

21       (Witness excused.)

22       - - -

23       (Deposition adjourned at 6:04 p.m.)

24

277

1
2  WITNESS:                    PAGE
3  MARLAYNA G. TILLMAN
4       By Ms. Clemons ---------------- 3
5
6       - - -
7  EXHIBITS      DESCRIPTION           PAGE
8  Tillman-1   Charge of Discrimination   3
9  Tillman-2   EEOC Affidavit             3
10 Tillman-3   Discrimination Complaint   3
11 Tillman-4   Letter dated 8/6/03        3
12 Tillman-5   Complaint                  15
13 Tillman-6   Plaintiff's Answers to Defendant
14             Pepsi Bottling Group LLC First
             Set of Interrogatories Addressed
15           to Plaintiff            15
16 Tillman-7   Plaintiff's Answers to First
17             Request for Production of Documents
             of Defendant Bottling Group,
18           Inc.                   15
19 Tillman-8   Application for Employment 44
20 Tillman-9   Cott Beverage USA Application
             For Employment          53
21 Tillman-10  Letter dated June 14, 2004  92
22 Tillman-11  Letter dated May 21, 2004   97
23 Tillman-12  E-mail dated Jan. 8, 2004   100
24

**I N D E X**

278

1
2       I N D E X (CONTINUED)
3  EXHIBITS      DESCRIPTION           PAGE
4  Tillman-13  Internal Posting
5             Merchandiser            112
6  Tillman-14  Internal Posting
             Transport Driver        119
7  Tillman-15  Acknowledgment dated
             5/21/01             123
8
9  Tillman-16  Worldwide Code of Conduct 123
10 Tillman-17  E-mail dated May 22, 2003  166
11 Tillman-18  Letter dated 10/17/02      181
12 Tillman-19  Collective Bargaining
             Agreement           183
13 Tillman-20  Internal Posting
             Relief Driver - Sales   194
14
15 Tillman-21  Earnings Statements       202
16
17       - - -
18
19
20
21
22
23
24

A11

Page 280

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
 2
 3
 4    MARLAYNA G. TILLMAN,        : CIVIL ACTION
           Plaintiff,            :
 5                               :
        vs.                      :
 6                               :
      THE PEPSI BOTTLING GROUP   :
 7    INC., and TEAMSTERS LOCAL  :
      UNION 830                  :
 8         Defendant             : NO. 04-1314
 9
10                    -   -   -
11              Philadelphia, Pennsylvania
                Wednesday, October 11, 2006
12
13                    -   -   -
14            Continued Deposition of MARLAYNA G.
15    TILLMAN, taken pursuant to notice, at the law
16    offices of Ballard Spahr Andrews & Ingersoll, LLP,
17    919 Market Street, 12th Floor, Philadelphia,
18    Pennsylvania, on the above date, at approximately
19    11:00 a.m., before Terry Barbano Burke, RMR-CRR.
20
21              DONNA A. BITTNER REPORTING
22            Registered Professional Reporters
                      61 Penn Road
23             Voorhees, New Jersey  08043
                      (856) 768-6619
24
```

Page 281

```
 1   APPEARANCES:
                       --
 2      J. STEPHEN WOODSIDE, ESQUIRE
     Law Office of J. Stephen Woodside
 3      One Montgomery Plaza
        425 Swede Street, Suite 605
 4      Norristown, Pennsylvania  19401
 5           Counsel for the Plaintiff
 6   LUCRETIA C. CLEMONS, ESQUIRE
     AISHA M. BARBOUR, ESQUIRE
 7   Ballard Spahr Andrews & Ingersoll, LLP
        1735 Market Street, 51st Floor
 8      Philadelphia, Pennsylvania 19103
          Counsel for the Defendant
 9      The Pepsi Bottling Group, Inc.
10   MARC L. GELMAN, ESQUIRE
     Jennings Sigmond, P.C.
11      The Penn Mutual Towers'
        16th Floor
12      510 Walnut Street
        Philadelphia, Pennsylvania  19106-3683
13
           Counsel for the Defendant
14         Teamsters Local Union 830
15                    -   -   -
16
17
18
19
20
21
22
23
24
```

Page 282

```
 1              MARLAYNA G. TILLMAN,
 2        175 Willoughby Street, Unit 11 H,
 3        Brooklyn, New York, 11201, having first
 4        been duly sworn as a witness, was
 5        examined and testified as follows:
 6        MS. CLEMONS:  Usual stipulations?
 7        MR. WOODSIDE:  We'd like to sign, read
 8   and sign, please.
 9   BY MS. CLEMONS:
10     Q.  Good morning, Miss Tillman.
11          As you may recall, my name is Lucretia
12   Clemons and I am an attorney who represents Pepsi
13   Bottling Group in the matter which is currently
14   pending in the District Court of Delaware.
15     A.  Yes.
16     Q.  Since it has been nine months, or ten months
17   since the beginning of your deposition was taken, I
18   will go over the instructions again to refresh your
19   recollection.
20     A.  Okay.
21     Q.  First question, have you ever been deposed
22   before other than our meeting in December of last
23   year?
24     A.  No.
```

Page 283

```
 1     Q. Do you understand that the questions I ask
 2   and the answers you give my ultimately be used at
 3   trial in court?
 4     A. Yes.
 5     Q. Do you agree to answer my questions only if
 6   you feel you understand them?
 7     A. Yes.
 8     Q. Will you agree to tell me if you do not
 9   understand one of my questions?
10     A. Yes.
11     Q. And do you understand that if you do not say
12   anything, I will assume that you understood the
13   question?
14     A. Yes.
15     Q. Do you agree to give full and complete
16   answers to the best of your knowledge?
17     A. Yes.
18     Q. Are you taking any medication today?
19     A. No.
20     Q. Are you generally feeling fit to give the
21   deposition today?
22     A. Yes.
23     Q. Would you state your home address?
24     A. 175 Willoughby Street, Unit 11 H, Brooklyn,
```

Page 284

```
 1   New York, 11201.
 2     Q. How long have you lived at that address?
 3     A. Since February '06.
 4     Q. Prior to February '06 what was your address?
 5     A. 497 Linden Boulevard, Unit C 7, Brooklyn New
 6   York, 11203.
 7     Q. Do you own or rent on Willoughby Street?
 8     A. Neither, actually.
 9     Q. Would you explain that?
10     A. Basically I live with a roommate.
11     Q. Does your roommate own or rent?
12     A. I believe she owns it.
13     Q. Do you pay rent to her?
14     A. No.
15     Q. Have there been any changes in your marital
16   status since we last spoke?
17     A. No.
18     Q. I direct you to what was previously marked
19   Defendant's Exhibit 7.
20          Please take a look at Exhibit 7 and
21   let me know when you're ready to answer questions.
22     A. (Pause.)
23          MR. WOODSIDE: Ready?
24          THE WITNESS: Yes, I think I'm ready.
```

Page 285

```
 1   BY MS. CLEMONS:
 2     Q. Are you ready to answer questions now?
 3     A. Yes.
 4     Q. What you have before you are your answers to
 5   a request for production that were served on you in
 6   October of last year.
 7     A. Uh-huh.
 8     Q. Have you now produced all the documents in
 9   your possession that are responsive to these
10   questions?
11     A. Yes.
12     Q. When we last met in December of last year,
13   you indicated that you had calendars which you kept
14   which had dates which are relevant to this
15   litigation?
16     A. Yeah.
17     Q. Do you still have those in your possession?
18     A. I haven't been able to locate them.  I don't
19   have them in my possession.  I haven't been able to
20   find them.
21     Q. You also indicated that you had copies of
22   your tax returns.  Do you have copies of your tax
23   returns for the last four years?
24     A. I think I turned in some tax return
```

**Tillman v Pepsi**                CondenseIt™                **Tillman - 10/11/06**

Page 316

1  a human resource meeting that I had. But they are
2  just issues, notes to myself.
3      Q. Turn to Page 248. Tell me what this document
4  is?
5      A. This is a list of union personnel at the
6  Pepsi plant.
7      Q. How did you obtain this document?
8      A. It was posted in the cafeteria that -- I'm
9  sorry, the break room that we had. And I obtained
10  it by taking a photo of it.
11      Q. And when did you do that?
12      A. I'm really not clear when I did that.
13      Q. 276 through 279. Look at those and let me
14  know when you are ready to answer questions.
15      A. Okay.
16      Q. Could you tell me what these are?
17      A. These are notes from a physical therapy
18  doctor that I was receiving treatment from for a
19  back sprain that I had. We're required to turn
20  this into the supervisor.
21      Q. You're what?
22      A. We're required to turn the notes into the
23  supervisor to let them know the status.
24      Q. Did you give them the original note or did

Page 317

1  you keep it?
2      A. I believe I kept the original and gave them a
3  copy.
4      Q. Turn to 306.
5      A. Okay.
6      Q. Did you maintain a copy of the settlement
7  agreement that you signed in the workers'
8  compensation case?
9      A. I don't recall if I did or not. I don't
10  recall.
11      Q. Did you maintain a copy of a check you
12  received in settlement of your compensation claim?
13      A. I don't recall if I did.
14      Q. Where would those documents be if you
15  retained them?
16      A. Probably still on file with the attorney.
17      Q. I'm asking you do you have a copy, not does
18  the attorney have a copy?
19      A. I don't recall if I kept a copy or not.
20      Q. Page 321.
21      A. Okay.
22      Q. Can you tell me what this is?
23      A. It's a doctor's note and it was a faxed
24  doctors' note to my attorneys' paralegal at the

Page 318

1  time.
2      Q. Is this correspondence to your attorney?
3      A. To his office, yes.
4      Q. It is clearly privileged and we shouldn't
5  have it.
6          MR. WOODSIDE: Could you give me a
7  minute with the client alone?
8          MS. CLEMONS: Sure.
9          MR. WOODSIDE: We will talk about it.
10          (Recess.)
11          MS. CLEMONS: Are you contending that
12  this document is privileged or non-privileged? If
13  you're contending it is privileged, I am prepared
14  to return the copies to you.
15          MR. WOODSIDE: Actually we will handle
16  it this way, just to be fair about it, because the
17  intention was to produce the doctor's report, the
18  report and/or the doctors note and it's in the
19  center of the page marked 2-24-04 and is certainly
20  relevant and that's discoverable and we will
21  produce it.
22          I would request that we ought to
23  redact the rest of it, because apparently Marlayna
24  is now writing something to Anthony, who I found

Page 319

1  out was a paralegal, and Jeff at the top is her
2  attorney. Notes at the top and bottom are
3  privileged. The center document is not.
4          Is that okay with you?
5          MS. CLEMONS: That's fine.
6          MR. GELMAN: What was that document?
7          MR. WOODSIDE: 321.
8  BY MS. CLEMONS:
9      Q. Take a look at the next document, 322.
10      A. 322, right?
11      Q. Correct.
12      A. Okay.
13      Q. Could you tell me what this is?
14      A. It is a bid posting from the company.
15      Q. Why did you retain a copy of this document?
16      A. Basically I retained copies of any jobs I was
17  interested in bidding on.
18      Q. Did you bid on this job?
19      A. Yeah, I did.
20      Q. I am sorry?
21      A. I believe I did.
22      Q. Do you know who was awarded this job?
23      A. I don't know if anybody was actually awarded
24  that job. I don't know.

Page 320

1      Q. Turn to the next page, 323. Would you tell
2  me what this is?
3      A. This is also a job notice, a bid notice for a
4  position.
5      Q. Did you apply for this position?
6      A. I believe I did.
7      Q. Did you retain the document where you bid for
8  the job or applied for it?
9      A. I don't know if I have that.
10      Q. Do you know who was awarded this position?
11      A. No, I don't.
12      Q. Do you know if the position was awarded to
13  anyone?
14      A. No, I don't know one way or the other.
15      Q. The next page, 324. Would you tell me what
16  this document is?
17      A. This is also a bid -- I'm sorry. Internal
18  posting.
19      Q. It's a what?
20      A. Internal posting. I'm sorry.
21      Q. Did you apply for this position?
22      A. I believe so.
23      Q. Would you take a look down at the job
24  eligibility requirements.

Page 321

1      A. Yes.
2      Q. Do you see the second bullet which
3  says, "must have a Class A CDL license"?
4      A. Yes.
5      Q. This opening is posted, I believe, in April
6  of 2002?
7      A. Yes.
8      Q. Did you have a valid CDL license at that
9  time?
10      A. I don't believe I did.
11      Q. So why did you post for the position when you
12  knew you didn't meet one of the criteria?
13      A. Well, I had a valid CDL permit at the time
14  and I know that Pepsi trains its drivers. And I
15  applied basically because I didn't want to lose the
16  opportunity to bid on it. And also I wanted to be
17  trained for the opportunity to get the position, so
18  I posted for it.
19      Q. When you say Pepsi trains, you mean trains
20  people who are in the bargaining unit?
21      A. I'm not sure. I believe that they have a
22  policy to train anybody, as long as they're in the
23  employ.
24      Q. You do? What's the basis of your belief?

**Donna A. Bittner Reporting - (856) 768-6619**

Page 400

1  position.
2  Q. But you knew you weren't physically still
3  working there; right?
4  A. I wasn't physically there, but I still had
5  the physical title.
6  Q. And where were you physically in January of
7  2005?
8  A. I know I was in New York. When you say where
9  was I physically?
10  Q. Were you working?
11  A. I guess I was at JB Hunt.
12  Q. Why did you exclude JB Hunt from your
13  employment history?
14  A. I don't know.
15  Q. Turn to the next page, the part that says
16  accident history.
17  A. Uh-huh.
18  Q. It lists here an accident in 3-05.
19  A. Uh-huh.
20  Q. Would you tell me about that.
21  A. I don't exactly remember where I was, but
22  there was like a low, I guess, low hanging limb
23  across the roadway, and as my trailer passed under
24  it, it hit it.

Page 401

1  Q. What happened after you hit the tree limb?
2  A. I knocked some wires down.
3  Q. Was there a police report?
4  A. I know the police were there. I think there
5  was a police report, I think. They took
6  information. I don't think I got a copy of it,
7  though. I think my employer might have got a copy
8  of it initially.
9  Q. And who were you working for at that time?
10  A. I think it was Cardinal.
11  Q. Didn't you have a couple accidents when you
12  were working at Pepsi in 2004?
13  A. Yeah. I had one that I know I had and the
14  second one is disputed by me, but yeah.
15  Q. Why didn't you list those on your
16  application?
17  A. I don't know.
18  Q. Did you forget about them at the time?
19  A. I actually don't know.
20  Q. Did the accidents you have in 2005 result in
21  a conviction?
22  A. Conviction?
23  Q. Yes. Did you get a ticket?
24  A. No.

Page 402

1      MS. CLEMONS: I have no further
2  questions at this time.
3      (Recess.)
4      MS. CLEMONS: The representation
5  regarding Dr. Ernest that she did not seek any
6  medical treatment --
7      MR. WOODSIDE: Let me have the form
8  again, please.
9      On the record, the plaintiff will
10  represent that she did not treat with Dr. Katie
11  Ernest, who is an OB/GYN doctor, at all in
12  connection with any of the claims that she is
13  making in her lawsuit against Pepsi Bottling Group
14  and the Local 830. The doctor was her personal
15  OB/GYN doctor and, quite frankly, I don't know
16  where the name came up in discovery. Therefore,
17  the plaintiff will not be signing the standard
18  HIPAA form that counsel presented to me just about
19  15 minutes ago.
20      Is there anything else you want me to
21  say?
22      MS. CLEMONS: No.
23  BY MR. GELMAN:
24  Q. Miss Tillman, good afternoon. We have met on

Page 403

1  a number of occasions. My name is Marc Gelman. As
2  you are aware, I represent Teamsters Local Union
3  No. 830. For purposes of this deposition, unless I
4  specify otherwise, when I refer or use the term
5  union, that is the entity to which I refer, Local
6  830.
7      And feel free to do the same, if you
8  are speaking at any point during today's deposition
9  about another union, another local teamster or
10  otherwise, please specify.
11      So if you do in response to my
12  question say union, I will assume that you're
13  talking about Local 830.
14  A. Yes, okay.
15  Q. I'll also remind you that everything that was
16  reviewed with you this morning with respect to
17  instructions, directions, and so forth, by
18  Miss Clemons are still in effect and that you are
19  still under oath from the pledge you took this
20  morning.
21      Do you have any questions with regard
22  to procedure or a refresher with respect to what
23  was reviewed with you this morning?
24  A. No, sir.

Page 404

1  Q. Are you currently a member or were you ever a
2  member of Teamsters Local Union 830?
3  A. Yes, I was.
4  Q. From what time period?
5  A. 2002 until, I would guess, January 2005.
6  That's my best estimate.
7  Q. So it's fair to say you are not currently a
8  member?
9  A. Correct.
10  Q. And I think we've established through prior
11  testimony your employment with Pepsi concluded in
12  November 2004?
13  A. Actually, I believe it was January of 2005.
14  Around that time.
15  Q. So I take it, then, upon the termination of
16  your employment with Pepsi, your affiliation with
17  the union occurred, or your disaffiliation with the
18  union occurred?
19  A. I believe so, yes.
20  Q. We will get into it in more detail in a
21  moment, but you say 2002. Would that be, once you
22  became, once you were assigned to the warehouse in
23  2002, that's when you officially joined the union?
24  A. I believe so.

Page 405

1  Q. I think we can all agree the union is an
2  entity?
3  A. Right.
4  Q. And I think we could also agree -- if your
5  counsel will allow me to lead a bit, if I could --
6  that there are certain individuals that are either
7  employed by or are considered to be agents of the
8  union?
9  A. Yes.
10  Q. You understand what I mean by that?
11  A. Yes.
12  Q. Could you please identify all affiliates, be
13  it employees or agents, of the union that you had
14  any contact with while you were employed by Pepsi?
15  A. Danny Grace, Doug McLaughlin, John D'Elia,
16  Scott Michelle, Merrill Matthews.
17  Q. I'm sorry, what was the first name?
18  A. Merrill, M-E-R-R-I-L-L. That's how it is
19  pronounced.
20      Gary DiProsperos. Ernest Turner.
21  Jeff Stanley. And I'm not sure if I'm recalling
22  everybody. I believe that to be the whole list.
23  Q. So to the best of your recollection, all the
24  individuals you just named, it is an exhaustive

Page 406

1 list of all of the agents or representatives of
2 Local 830 with which you had contact during your
3 time at Pepsi?
4  A. Yes.
5  Q. Let's start at the top of the list. Can you
6 tell me what your understanding of Danny Grace's
7 connection with the union to be?
8  A. I don't know his specific title, I'm sorry to
9 say. I believe he was the treasurer or president.
10 I really don't know his exact title.
11  Q. If you don't know, that's a perfectly
12 acceptable answer.
13       Doug McLaughlin, same question?
14  A. I believe that he had like a similar position
15 too. He was a business rep for the union.
16  Q. John D'Elia?
17  A. Same, business rep for the union.
18  Q. How about Scott Michelle?
19  A. Also the same.
20  Q. Merrill Matthews?
21  A. Was a shop steward at the Pepsi location.
22  Q. How about Gary DiProsperos?
23  A. Also a shop steward.
24  Q. Ernest Turner?

Page 407

1  A. Shop steward.
2  Q. And Jeff Stanley?
3  A. Shop steward.
4  Q. Would you know if the four shop stewards that
5 you just identified had any particular segment of
6 the Pepsi work force with which they serviced or if
7 there was any jurisdictional affiliation, or did
8 they just serve as general stewards for all Pepsi
9 union members?
10  A. I believe they served in a general capacity.
11 If you had a problem or issue, you could take it to
12 just about any shop steward as far as I know.
13  Q. I'm going to provide you a copy of what's
14 already been marked from the previous deposition as
15 Tillman Exhibit 5. It's a copy of the complaint in
16 this matter.
17       Do you recall seeing that document at
18 the last deposition?
19  A. I recall seeing the document. I'm not sure
20 if I saw this at the last deposition.
21  Q. That's fine. This is a document with which
22 you are familiar?
23  A. Yes.
24  Q. Would you represent that the allegations and

Page 408

1 claims contained in this complaint are true to the
2 best of your knowledge?
3  A. Yes, to the best of my knowledge.
4  Q. You didn't sign it, at least the copy that I
5 am in possession of, but your attorney did. Did
6 you have an opportunity to read it before your
7 attorney signed it?
8  A. I believe so.
9  Q. If you'd like to take a few minutes in case
10 you haven't seen it for awhile to review it, I'd be
11 more than happy to wait. Do you need time?
12  A. No, I don't think so.
13  Q. I am going to go through this document and
14 ask you some questions about some of the claims you
15 make against the union.
16  A. All right.
17  Q. If you could turn -- the pages aren't
18 numbered -- we will start off with Paragraph 16,
19 please.
20  A. Okay.
21  Q. Actually I want to direct you to 17. Read
22 that paragraph, please?
23  A. Silently?
24  Q. Yes, to yourself. And let me know when

Page 409

1 you're ready to discuss it.
2  A. (Pause.)
3       I'm ready.
4  Q. You note in here the plaintiff received no
5 union benefits for protection.
6       Could you explain -- actually, I'll
7 make it broader. You make a number of allegations
8 in that paragraph. Could you explain to me what
9 exactly you meant by the allegations made in that
10 paragraph?
11  A. It was in regard to working in the
12 conventional department. At some point I was
13 pulled from the merchandising department to work in
14 the conventional department to help out with an
15 influx of work and duties that had come about, and
16 while I was in that capacity, I was not paid union
17 wages even though the conventional department is
18 defined in the collective bargaining agreement as
19 being union work.
20  Q. So my understanding, then, is that the
21 entirety of the claims contained in Paragraph 17
22 relate to when you believed you were in the
23 conventional department?
24  A. Yes.

Page 410

1  Q. I guess that's perhaps up for dispute.
2       I guess now is as good a time as any,
3 and some of this was covered in your last
4 deposition, and I am going to try my best not to
5 have you repeat anything that you discussed there.
6 It serves no purpose. However, I suppose it would
7 be most helpful for today's deposition if we could
8 go back and try and create a time line.
9       What was the first position you held
10 with Pepsi?
11  A. Merchandiser.
12  Q. What was your date that you became a
13 merchandiser?
14  A. May 8th, '01.
15  Q. What was the next position you held at Pepsi?
16  A. That would be in the conventional department.
17  Q. And when did you attain this position?
18  A. Approximately October of '01. I would say,
19 my best recollection is October 13th of '01.
20  Q. And then at a certain point you left the
21 conventional department?
22  A. Yes.
23  Q. And where did you go after that?
24  A. Actually, I was returned back to the

Page 411

1 merchandising department.
2  Q. Do you recall the date?
3  A. I want to say May of 2002.
4  Q. At any point did you then leave the
5 merchandising department?
6  A. Yes. Let me make sure.
7       July, I believe July 2002 I was made a
8 member of the warehouse. So I got a position in
9 the warehouse.
10  Q. Some time thereafter you became a member of
11 the union?
12  A. Yes.
13  Q. When you were in the merchandising
14 department, and I'm not sure if you said
15 merchandising department or merchandiser, is it
16 fair to say your job title was as a merchandiser?
17  A. Yes.
18  Q. And do you contend that a merchandiser is a
19 position that was covered under the collective
20 bargaining agreement between the union and Pepsi?
21  A. The merchandising department is not.
22  Q. So from all of the time you spent in the
23 merchandising department until October of 2001, are
24 you claiming that you had any rights under the

A15

Tillman v Pepsi                           CondenseIt™                          Tillman - 10/11/06

Page 412

1  collective bargaining agreement at that time?
2  A. As a merchandiser, no, I'm not making
3  that claim.
4  Q. The conventional department, you noted that's
5  where you went. What was your job title while you
6  worked in the conventional department?
7  A. I don't know that I had a specific job title.
8  It was never discussed. When I was placed in the
9  conventional department, first of all, it was done
10 without my knowledge, without my consent. I
11 didn't have any say so about it. I reported to
12 work one day and my supervisor told me that I was
13 going to be working in conjunction with the
14 conventional department.
15        He didn't give me a title.
16 Q. Which supervisor told you this?
17 A. Bruce Wray.
18 Q. I am sorry, Bruce Wray?
19 A. Bruce Wray.
20 Q. And that was some time around October 2001
21 that he told you this?
22 A. Yes.
23 Q. And can you recall exactly what he said? You
24 just paraphrased his statement. If you are able.

Page 413

1  A. I am paraphrasing, but more or less he said
2  they are kind of like getting hammered in the
3  conventional department so we're going to, you
4  know, send you over and you'll be helping out over
5  there.
6  Q. Did he ever tell you that you were no longer
7  a merchandiser?
8  A. No.
9  Q. Did he ever tell you that you are no longer
10 affiliated or connected to the merchandising
11 department or sales?
12 A. No, because I actually still was affiliated
13 with the merchandising as well, in conjunction,
14 conventional.
15 Q. When you were a merchandiser -- and I'll need
16 some help here because I'm not sure how this
17 works -- when you reported to work in the morning,
18 where did you physically report?
19 A. To the supervisor's office, and they would
20 give you like handwritten notes as to, you know,
21 where they wanted you to go to or what stores you
22 might have to visit or things of that nature.
23 Q. When you say the supervisor's office, is that
24 the supervisor in the merchandising department or

Page 414

1  is that a general supervisor?
2  A. No, no. It was the supervisor in the
3  merchandising department, if you are specifically
4  talking about when I was a merchandiser.
5  Q. And I am, so I appreciate that answer.
6        And I assume you have had -- maybe I
7  shouldn't assume.
8        Who was your supervisor while you were
9  in the merchandising department?
10 A. Bruce Wray, W-R-A-Y.
11 Q. Was he your supervisor the entire time you
12 were in the merchandising department?
13 A. Yes, with a couple of exceptions. If he went
14 on vacation, obviously someone else was assigned.
15 Q. That's how you would start your day and you
16 would get your particular assignment while in the
17 merchandising department?
18 A. Yes.
19 Q. After October 1st, when you were doing, as
20 you say, conventional work, tell me how your day
21 would start, what would be the first thing you
22 would do?
23 A. Basically I would just do the same thing, but
24 I was reporting to a different supervisor. I was

Page 415

1  reporting to the supervisor of conventional.
2  Q. And what is that supervisor's name?
3  A. Craig Nelson.
4  Q. Was he the supervisor in the conventional
5  department from October until you, as you said,
6  moved back to merchandising?
7  A. Yes.
8  Q. As best you're able, and I'm not familiar
9  with the facility, as best you're able, could
10 you -- that's difficult. I'll strike that as well.
11       Is it fair to say that the
12 conventional and merchandising departments are
13 located in different locations?
14 A. They're in the same building, but they're in
15 different offices.
16 Q. I'm trying to avoid redundant testimony, but
17 the work you were doing in the conventional
18 department, was it work that you were able to do
19 without the benefit of possessing a CDL license?
20 A. Yes, it was work that I did not need to have
21 a CDL license for.
22 Q. And could you describe your duties and
23 responsibilities, the work we're talking about?
24 A. It required reset, which means you would

Page 416

1  travel not only to supermarkets to move the product
2  around to different locations within the store, but
3  you would also do resets in mom and pop stores,
4  retail stores, department stores, Wawa stores,
5  7-Eleven stores. Reset is just basically taking
6  the product from the location that it's currently
7  at and moving it to what they considered to be
8  either a better positioning location, somewhere
9  where -- they used to call it first position
10 because we wanted it to be in a position that when
11 customers came in, that would be like the first
12 name that they saw. So we wanted first position.
13       All these stores and different
14 locations and outlets where we had our product, we
15 tried to jockey for first position in any of these
16 places.
17       And once, you know, the sales
18 supervisors were able to, I guess, convince a
19 customer to give us first position, the reset team
20 would come in, remove our product from where it
21 usually was, and put it in the first position, a
22 better position.
23 Q. Are there other individuals in the
24 conventional department that were performing the

Page 417

1  same work that you just described?
2  A. Yes.
3  Q. By the way, I guess that question was
4  premature, what other duties were you performing in
5  the conventional department?
6  A. I was backup for like other conventional
7  employees that might have been like on vacation or
8  might have called out sick, if they had a store
9  that needed, you know, attention or whatever, if
10 they're not there, then I would have to go.
11       It required lots of little minor
12 duties as well. Shelving, point of purchase
13 fliers, banners, setting up and tearing down
14 displays. Working in, you know, freezers. You
15 name it.
16 Q. I guess now I can get to the question I
17 already asked you, what, if any, other individuals
18 were performing the same duty as you were that were
19 employed in the conventional department?
20 A. Specifically?
21 Q. Yes.
22 A. I mean -- okay. I was going to say anybody
23 that's in the conventional department would perform
24 the same duties, but off the top of my head, I'd

Page 418

1  say Mike Smith, Charlie Pyle, Jimmy Bell, Charlie
2  Rogers, Mike Shimmel. A whole host of guys.
3  Anybody who was in the conventional department we
4  all did the same thing.
5    Q. Any other names that come to mind?
6    A. Off the top of my head, no. Just the people
7  I named.
8    Q. Are there any, to the best of your knowledge,
9  are there any duties of which you are aware that
10  these, I believe they were all men, so these
11  gentlemen that you just named were performing the
12  conventional department different than those duties
13  which you just talked about that you were
14  performing? Do you understand my question?
15    A. No.
16    Q. My question is were they doing exactly what
17  you were doing or were they doing what you were
18  doing plus something else?
19    A. They might have been doing other things too,
20  but actually I didn't get a chance to really
21  finish, but I was also doing other things than what
22  I mentioned too.
23    Q. Were you doing merchandiser work?
24    A. Yes.

Page 419

1    Q. That begs my next question, did you have any
2  contact with Mr. Wray, David Wray --
3    A. Bruce, Bruce Wray.
4    Q. -- during this time you were in conventional?
5    A. No.
6    Q. But you were doing merchandiser work?
7    A. Yes.
8    Q. Who assigned you this merchandiser work?
9    A. Craig Nelson.
10    Q. Craig Nelson assigned you merchandiser work
11  and conventional work?
12    A. Yes.
13    Q. And how were you able to differentiate
14  between the two if they were both being given to
15  you by Mr. Nelson?
16    A. Because my duties as far as being a
17  merchandiser never changed. The days and the times
18  that I did it may have changed, but I was still
19  doing essentially the same thing.
20    Q. So if I understand you correctly, the duties
21  that you were performing prior to October 2001
22  never ended, you still continued to perform those
23  duties in their entirety?
24    A. Correct. Just on different days.

Page 420

1    Q. So everything you just talked about in
2  conventional were on top of?
3    A. In addition, in addition to merchandising.
4    Q. What was the month you said you were moved or
5  transferred back to being a merchandiser, or to the
6  merchandising department?
7    A. I believe that was in May 2002.
8    Q. How was that communicated to you?
9    A. I'm not sure. I believe Sara, Sara Swartz
10  told me I would be going back to merchandiser
11  because there was an incident where I was talking
12  with her and I was expressing that, you know, I'm
13  doing two job descriptions, and basically that
14  whole issue as far as whether I was going to be
15  able to become a union member kept coming into
16  play.
17      My position was that I should be
18  brought into the union as of November of '02
19  because I was performing union -- bargaining work,
20  collective -- work that was listed in the
21  collective bargaining agreement as being union
22  work.
23    Q. Did you mean to say November '01?
24    A. I'm sorry, yes, I did, November '01.

Page 421

1    Q. Okay.
2    A. And I reiterated my position to Sara, and I
3  believe at some point the decision was made to just
4  return me to my duties as a merchandiser because
5  apparently nobody was going to allow me to be in
6  the union based on the job that I was performing in
7  the conventional department.
8    Q. When you say a decision was made, are you
9  aware of the fact that a particular decision was
10  made or are you just assuming somebody made a
11  decision?
12    A. Well, somebody had to have made a decision.
13    Q. Why do you say that?
14    A. She wouldn't have told me now you are a
15  merchandiser now. Don't worry about the
16  conventional department. Now you are a
17  merchandiser. So I reported back to Bruce Wray.
18    Q. Could you, to the best of your ability, relay
19  exactly what she said to you?
20    A. More or less, again, I'm just paraphrasing,
21  but more or less I wasn't really going to be needed
22  or utilized in the conventional department any
23  more.
24    Q. Are there any documents that you are aware of

Page 422

1  which document your return, using your word, to the
2  merchandising department?
3    A. No.
4    Q. Sara didn't give you anything that day?
5    A. No.
6    Q. Similarly, are there any documents that you
7  are aware of that contain information with respect
8  to when you began your foray into the conventional
9  department in October of 2001, have you ever seen
10  anything?
11    A. No. Basically all the stuff was like
12  communicated verbally. Bruce told me when I was
13  leaving to go conventional and Sara told me when I
14  was coming back.
15    Q. The time period from October 2001 to
16  May 2002, did you communicate any concerns you
17  might have to any union representatives, any of
18  those gentlemen that you named earlier today?
19    A. I made it known to quite a few people. The
20  stop steward. I also made it known to Craig
21  Nelson, who was my supervisor at the time in
22  conventional.
23    Q. I will rephrase my question to make sure I'm
24  clear.

Page 423

1      Did you speak with any of the, either
2  Grace, McLaughlin, D'Elia, Michelle Matthews,
3  DiProsperos, Turner or Stanley between October 2001
4  and May 2002 about your problems or concerns in the
5  conventional department?
6    A. I'm not sure if I spoke with them directly,
7  but I know that I filed a grievance because of it,
8  with regard to it.
9    Q. You filed a grievance with regard to --
10    A. Actually being in the conventional department
11  and not being able to gain membership, entrance
12  into the union while I was there in that capacity.
13    Q. I'm sorry, when you were
14  there, do you mean you filed it while you were
15  there or the content of the grievance concerned
16  being while you were there? When did you file this
17  grievance? That's probably the easier question to
18  ask.
19    A. I think both. I filed the grievance I think
20  after they returned me to my position as
21  merchandiser.
22    Q. And this grievance was filed before you went
23  to the warehouse?
24    A. Before I went to the warehouse? You know

Tillman v Pepsi                 CondenseIt™                 Tillman - 10/11/06

Page 424

1  what? I'm not sure. I don't think it was. I'm
2  not sure of the date.
3      Q. I don't want to get too far afoot and leave
4  my other subject matter, but I guess logically I
5  should.
6          You testified earlier you didn't
7  become a union member, bargaining unit member until
8  you went, until you were placed in the warehouse?
9      A. Right. Which is --
10     Q. Do you have any understanding as to who is
11  eligible to file a grievance with respect to
12  members or non-members?
13     A. I think I have knowledge of it, but maybe --
14     Q. What is your understanding with respect to
15  non-members and their ability to file a grievance,
16  what's your knowledge?
17     A. I'm not sure. I would conclude that if
18  you're not a member, you wouldn't be able to file a
19  grievance because it is not pertinent.
20     Q. So if I ask you if you filed that grievance
21  before you went in the warehouse and you say yes,
22  do you have any understanding of how that could be
23  possible?
24     A. Well, again, I say I'm not sure when I filed

Page 425

1  it, but I would probably say that I would -- I
2  don't know. I guess I was a member of the union
3  when I filed it.
4      Q. So upon further reflection, is it fair to say
5  you filed that grievance after you went to the
6  warehouse?
7      A. Yes.
8      Q. Getting back, you said that you don't recall
9  ever speaking with any of those individuals prior
10  to May 2002 about your concerns in the conventional
11  department, is that a correct characterization of
12  your testimony?
13     A. Yeah.
14     Q. But you say you made it known. I just asked
15  you -- let me gather myself here.
16          You said you didn't speak to any
17  individuals. Did you provide any written
18  documentation to them, did you write them?
19     A. No. Basically I spoke, like I said, to my
20  supervisor, which is Craig Nelson. I spoke to some
21  of the shop stewards, Gary D being one, Merrill
22  Matthews being one. Basically saying that, you
23  know, hey, I'm like performing, you know, two jobs
24  at once.

Page 426

1      Q. I'm sorry, Gary was one and who was the
2  other?
3      A. Merrill Matthews.
4      Q. When did you speak to Gary?
5      A. Some time -- I can't give you an exact date,
6  but it was some time during that tenure, between
7  October and May. October 2001 and May 2002.
8      Q. And what did you say to Gary?
9      A. Basically that all I was trying to be is a
10  member of the union. Why can't I be a member of
11  the union if I'm performing bargaining work.
12     Q. And what did Gary say to you?
13     A. Basically he was just, you know, he'll check
14  into it and, you know, let me know.
15     Q. Is that a quote?
16     A. It's a paraphrased quote.
17     Q. Did you provide any documentation to Gary?
18     A. No.
19     Q. You don't recall exactly when this
20  conversation took place?
21     A. No. I know it was during my time of kind of
22  straddling the fence between two jobs.
23     Q. Your conversation with Merrill, with
24  Mr. Matthews, what did that consist of?

Page 427

1      A. Kind of similar. You know, basically my
2  whole goal was, you know, trying to become a member
3  of the union. I didn't understand why if I'm
4  performing, you know, union work, why I could not
5  be made a member of the union.
6      Q. Did you provide any documentation to
7  Mr. Merrill?
8      A. No. Because I wasn't a member of the union.
9      Q. And so, and I don't want to get too picky
10  here, but when you said my shop stewards, I
11  think --
12     A. The shop stewards at the time, I guess.
13          And I said also that I talked to Craig
14  Nelson, right?
15     Q. Yes.
16          Do you have any knowledge as to
17  whether Mr. Nelson approached the union about this
18  issue?
19     A. I have no knowledge of that.
20     Q. I guess we can get back to Paragraph 17 now
21  that we have enough of a background I think to
22  proceed.
23          I think that's actually covered, so
24  the factual scenario you just testified to, that's

Page 428

1  what's covered here in Paragraph 17? If you want
2  to go back and read it again, that's fine.
3      A. (Pause.)
4          Correct.
5      Q. Could you turn to Paragraph 19, please.
6          Take as much time as you need to read
7  that.
8      A. Okay.
9      Q. You reference in the first sentence the
10  union's bylaws where you say that according to the
11  bylaws once the plaintiff was transferred to the
12  conventional department, the defendants have
13  30 days to incorporate you, the plaintiff, into the
14  union and return her to her original position.
15          What specifically did the bylaws say
16  in this regard?
17     A. I would have to look at a copy of the
18  collective bargaining agreement at that time.
19     Q. I am sorry to interrupt you.
20     A. I think there are several versions of it, but
21  the one that was in place at that time.
22     Q. By the bylaws, are you identifying the
23  collective bargaining agreement, is that what you
24  mean?

Page 429

1      A. I believe so. Again, this was not written
2  personally by me, but probably my attorney at the
3  time, his knowledge of it.
4      Q. Well, I guess my question then is, are you
5  familiar with the union's bylaws?
6      A. Somewhat familiar.
7      Q. Have you seen the union's bylaws?
8      A. I'm not sure. I have seen the collective
9  bargaining unit.
10     Q. Again, just to clarify, and I have a copy in
11  my hand, I'm handing it to you, we can talk about
12  it for the rest of the day, but my question for you
13  is, before we get into the collective bargaining
14  agreement, what document is being properly referred
15  to here in Paragraph 19?
16     A. My understanding is the collective bargaining
17  agreement.
18     Q. Okay.
19          And that's exactly what I'm handing to
20  you. It has already been marked. It has already
21  been referred to in the December deposition marked
22  as Tillman Exhibit No. 19.
23          You can take as much time as you need
24  to review it or I can ask the question and then you

Donna A. Bittner Reporting - (856) 768-6619

Tillman - 10/11/06     CondenseIt™     Tillman v Pepsi

## Page 430

1 can review it. I guess that's what I'll do.
2    A. Okay.
3    Q. To what are you referring to Paragraph 19
4 with respect to what is contained in the bylaws,
5 which have established is actually the
6 collective bargaining agreement?
7    A. I believe it starts at Page 10 in the
8 agreement. Page 10.
9    Q. And I'll note for the record that this is the
10 agreement that covers the time period from
11 January 2000 through December 31, 2004.
12      Page 10?
13    A. Down at the bottom there is a title that
14 says, wages of unclassified employees and
15 transfers.
16      That particular paragraph there, would
17 you like me to read that out loud?
18    Q. No.
19    A. I just asked.
20    Q. That's fine. It is a perfectly reasonable
21 question for you to ask. It is the answer I'm more
22 concerned with.
23      The paragraph at the bottom of Page
24 10, wages of unclassified employees, transfers, is

## Page 431

1 that the portion of the contract that is referred
2 to in the first sentence of Paragraph 19?
3    A. I believe so.
4    Q. Can you show me where in this paragraph it
5 says once employees transfer to conventional, an
6 employee must be incorporated?
7    A. It doesn't say conventional. Basically I
8 think this is just something that my attorney wrote
9 for clarification, that I was in the conventional
10 department.
11      Conventional department falls under
12 union position so I think that's why they used --
13 that's why they used conventional, the word
14 conventional. So it doesn't say conventional
15 department. It doesn't refer to any department by
16 name, but it's covering anything that would be
17 considered union work. Whatever department that
18 is.
19    Q. And maybe the next paragraph will help
20 elucidate the matter. This procedure was not
21 followed by defendants thus violating defendants'
22 collective bargaining agreement.
23      Again, is that sentence referring to
24 this paragraph we are talking about or is there

## Page 432

1 anywhere else in the collective bargaining
2 agreement?
3    A. I think it is referring to the same
4 paragraph.
5    Q. My question for you is, who did you speak to
6 -- or here, this might be easier.
7      In addition to the conversations you
8 had with Gary DiProsperos and Merrill Matthews, did
9 you speak to any other union agents or
10 representatives about what you believed to be a
11 violation of Article 8 of the contract?
12    A. I know that I had a grievance hearing and I'm
13 just not sure of the date that I had that grievance
14 hearing, but we did discuss this very issue and I
15 did discuss that at the time with Dan Grace and
16 Doug, Doug McLaughlin.
17    Q. And this was already after you were a member
18 of the union?
19    A. That's where I'm getting kind of shaky. I
20 would say yes, I would say yes, it was after I
21 became a member of the union. Otherwise there's no
22 point in me sitting in the meeting with them. I
23 just don't recall a date.
24    Q. Not a problem.

## Page 433

1      Paragraph 23, please.
2      After reviewing that, I think that was
3 covered fairly thoroughly back in December. So I
4 won't waste our time.
5      I will direct your attention, however,
6 to Paragraph 42.
7      Could you please read that paragraph
8 for a moment.
9    A. Okay.
10    Q. Could you tell me the conduct that is being
11 addressed here in Paragraph 42, to what it refers?
12    A. Basically when I was in transition from the
13 merchandising department to go into the warehouse
14 department, there was a period of time where three
15 individuals were hired to work in the warehouse
16 prior to me being transferred into the warehouse.
17      These individuals were not part of the
18 Pepsi company at the time. They were basically
19 outside applicants, and they were installed in the
20 warehouse prior to me, even though I had expressed
21 interest to Sara Swartz and -- I'm trying to
22 remember his name -- Glenn Matthews that I wanted
23 to be transferred into the warehouse.
24      That was apparently in the works at

## Page 434

1 the time, but they hired these other three
2 individuals before me. So I remember talking to
3 Sara about it saying that, you know, why did they
4 get to go into the position before me when
5 basically you kind of already knew that was kind of
6 waiting to go in there, because now these three
7 guys are going to have seniority over me. So that
8 was kind of the issue there.
9    Q. Just to clarify, we're talking about some
10 time after May 2002, but prior to or probably right
11 around July 2002; is that right?
12    A. Yes, somewhere in between there.
13    Q. The individuals are those that are named in
14 the previous paragraph, Paragraph 41?
15    A. Yes.
16    Q. Did you make any complaint of this conduct or
17 of these, I guess it is the conduct of Pepsi, I
18 mean? Let me clarify.
19      Do you contest or do you suggest --
20 not contest. Do you suggest that the union plays
21 any role in the hiring of Pepsi employees, of PPG
22 employees?
23    A. No.
24    Q. So with respect to the conduct in Paragraph

## Page 435

1 42, do you allege that the union had anything to do
2 with --
3    A. Their hiring?
4    Q. Yes.
5    A. No.
6    Q. When you say you filed a complaint with the
7 union regarding these hires, could you tell me
8 about that complaint?
9    A. No. Basically it was me voicing, I guess, my
10 complaint.
11    Q. Who did you voice that to? We know Sara, you
12 just said that.
13    A. Sara. I was talking to Merrill and possibly
14 Gary. I think I may have talked to Gary about that
15 too.
16    Q. Are those the only two individuals that have
17 any affiliation with the union that you expressed
18 this belief to, if I could call it that?
19    A. Yes, I think so.
20    Q. Did you submit any documents or any writing?
21    A. No.
22    Q. Paragraph 58. Take a look at not just this
23 paragraph, but those before it, to give you an idea
24 of the time frame since we kind of skipped ahead.

Tillman v Pepsi                CondenseIt™                Tillman - 10/11/06

Page 448

1  Q. And there must have, either the union took
2  actions or failed to take actions which you believe
3  support your claim; is that true?
4  A. Correct.
5  Q. Back in 2003, you filed a complaint with the
6  Delaware Department of Labor against the union; is
7  that correct?
8  A. Correct.
9  Q. And in that complaint, you alleged
10 discrimination based upon race.
11 A. Okay, yes.
12 Q. Don't let me put words in your mouth. Is
13 that true?
14 A. Yes.
15 Q. And discrimination based upon gender?
16 A. Correct.
17 Q. And the basis of that complaint were certain
18 acts or omissions on the part of the union; is that
19 correct?
20 A. Yes.
21 Q. And the complaint, the Delaware Department of
22 Labor complaint is Exhibit T-35, that accurately
23 represents the entirety of the complaint; is that
24 correct? I mean there's no second page that's

Page 449

1  missing, is there?
2  A. Okay, yes.
3  Q. Right.
4  A. I got you. I'm with you so far.
5  Q. Is the answer yes?
6  A. Yes.
7  Q. And that's your signature at the bottom?
8  A. Correct.
9  Q. You lay out very specific conduct on the part
10 of the union that you feel is illegal.
11 A. Uh-huh.
12 Q. In the Delaware Department of Labor
13 complaint; correct?
14 A. Correct.
15 Q. So my question for you, is the conduct that
16 you feel entitles you to sue my client in Delaware
17 District Court, is the entirety of that conduct
18 contained in this Delaware Department of Labor
19 complaint or did they do more? Are there things
20 that they didn't do as of April 23, 2003 that were
21 discriminatory that are not contained in this
22 document?
23 A. Yes. I would say my answer to that question
24 is what is contained in here is accurate and it was

Page 450

1  ongoing from that point.
2  Q. Okay. Let's break that down. I appreciate
3  your response. Am I understanding you correctly
4  that all of the conduct in the complaint that has a
5  time frame that is prior to April 22, 2003, is part
6  and parcel of what's complained of in the Delaware
7  Department of Labor complaint?
8  A. Yes.
9  Q. And you're also alleging that there has been
10 conduct after that point in time?
11 A. Correct.
12 Q. Could you tell me specifically what conduct
13 has occurred after April 22nd, 2003, which you feel
14 was discriminatory on the part of the union, of
15 course?
16 A. Basically, in my opinion, I was, again, not
17 afforded the protection of the union. The
18 grievances were not heard. Basically the
19 grievances that were heard specifically, the one
20 where I was talking about actually working in the
21 conventional department and where I asked to be --
22 I asked for actual retro seniority, the union
23 actually sent a certified letter and said that they
24 were not interested and would not be representing

Page 451

1  me on that, and that was basically a moot point. I
2  felt that was discriminatory.
3  Q. Why would that be discriminatory?
4  A. Basically because I feel I have a valid claim
5  that when I was performing bargaining unit work,
6  that I was entitled to be a union member. And when
7  I was asking to be made a union member, I was not
8  allowed to, allowed to be a member.
9      I don't recall anyone else ever having
10 that problem besides myself.
11     When people came into the union --
12 excuse me, when people came into Pepsi,
13 specifically those three employees that were put in
14 the warehouse department before me, they were made
15 members of the union. There was no problems for
16 them.
17 Q. Did they come from the merchandising
18 department?
19 A. No. They came from outside. They actually
20 had it easier than me. I would figure it would
21 be easier for me seeing as though I was there
22 already.
23     MR. GELMAN: Off the record.
24     (Recess.)

Page 452

1  BY MR. GELMAN:
2  Q. Miss Tillman, are you ready to proceed?
3  A. Yes.
4  Q. When we last spoke, you were on the subject
5  of discrimination. I guess I will repeat the
6  question and make it more narrow and we will go
7  from there as kind of a starting point.
8      Could you please identify all conduct
9  on the part of the union that was discriminatory --
10 this is a better way to say it. Could you tell me
11 how, in your opinion, the union discriminated
12 against you on the basis of your sex as a female?
13 A. I guess the easy answer to that is the fact
14 that the male union members were not treated the
15 same way as I was, meaning if they filed a
16 complaint or a grievance, their grievance got heard
17 in a timely fashion. If I filed a grievance, it
18 may or may not have been heard.
19 Q. What do you mean by "heard"?
20 A. Meaning having like a union meeting, a
21 grievance hearing or meeting.
22 Q. First of all, in the statement you made
23 earlier you said you were the only black female
24 union member that you are aware of at PBG?

Page 453

1  A. Yes.
2  Q. By the way, are you aware of any other black
3  female union members outside of the company?
4  A. Outside of Pepsi?
5  Q. Yes.
6  A. No.
7  Q. Do you have any knowledge as to union makeup
8  outside of Pepsi?
9  A. No.
10 Q. So at Pepsi you are the only black female.
11 Are you the only female?
12 A. At Pepsi?
13 Q. Yes.
14 A. No. In the labor force, yes. Not overall.
15 You have secretaries, but they weren't doing labor.
16 Q. You're the only female union member at Pepsi?
17 A. Yes.
18 Q. At least during the time you worked there?
19 A. Yes.
20 Q. Were you the only black union member at
21 Pepsi?
22 A. Black union member? No.
23 Q. Could you estimate what percentage of the
24 union was African-American?

Donna A. Bittner Reporting - (856) 768-6619

Page 454

1    A. I don't know. Just a guess?
2    Q. Yes.
3        MR. WOODSIDE: That's no.
4    BY MR. GELMAN:
5    Q. Do you know what we can do, then, do you know
6    how many union members there were total?
7    A. No.
8    Q. We could get out that document that was
9    referred to earlier in the day.
10        MS. CLEMONS: Do you want the stack
11   she produced?
12        MR. GELMAN: Yes. Apparently a
13   picture was taken of a list.
14   BY MR. GELMAN:
15   Q. I am showing you a document that you
16   discussed earlier in your deposition and it's Bates
17   stamped as Document No. 248. It was provided to me
18   and to Miss Clemons by counsel in response to a
19   request for production of documents.
20        Do you recall looking at that document
21   before?
22   A. Yes.
23   Q. And I believe you testified that it was a
24   seniority list --

Page 455

1    A. Yes.
2    Q. -- of union members?
3    A. Yes.
4    Q. You actually took a picture of that list as
5    it was posted?
6    A. Yeah.
7    Q. Do you know what date you did that?
8    A. Actually, I don't recall.
9    Q. Do you recall was it when you were a member
10   of the union or before you were a member of the
11   union?
12   A. I was a member of the union.
13   Q. So that was some time between July 2002 and
14   November 2004; would that be correct?
15   A. Yeah.
16   Q. And could you tell us, could you review that
17   list for a moment and tell me, do you recognize the
18   names on that list?
19   A. Yes, I recognize it.
20   Q. Do you recognize all the names on that list?
21   A. Most of them.
22   Q. Do you have a personal connection or have you
23   met all of those individuals?
24   A. Most of them.

Page 456

1    Q. Could you tell me how many people are on that
2    list?
3    A. It looks about 56.
4    Q. Of those 56, to the best of your knowledge
5    and ability to ascertain, could you tell me how
6    many of those 56 are African-American?
7    A. Okay.
8        Including myself, it looks like 23.
9    Q. 23 of the 56?
10   A. Yes.
11        MR. GELMAN: Miss Clemons, do you mind
12   if I steal that from you and mark it and admit it.
13        That's 36.
14        (Tillman-36 was marked for
15   identification.)
16   BY MR. GELMAN:
17   Q. Do you know what a grievance is?
18   A. I have my personal knowledge of what I
19   believe a grievance to be.
20   Q. Please share that with us.
21   A. I guess basically it's a form that you can
22   file if you have an issue regarding your employment
23   if you're a union member.
24   Q. We covered this a little bit before, and I

Page 457

1    think you would agree with the statement that only
2    union members have the right or ability to file a
3    grievance?
4    A. I would agree.
5    Q. Would you also agree there is a grievance
6    procedure contained in the collective bargaining
7    agreement?
8    A. Yes. I don't know if I'm familiar with it,
9    but I would agree that there probably was one
10   there.
11   Q. You just answered my next question. I will
12   ask it anyway. What is your understanding of the
13   grievance procedure?
14   A. I don't think I've ever read anything
15   specifically on that, so I don't really have an
16   answer for that.
17   Q. What is your understanding of the union's
18   obligation once a grievance is filed?
19   A. My understanding -- this is strictly
20   layman -- that the union is supposed to represent
21   the employee, the best interest of the employee.
22   Q. We will take a step back. How is a grievance
23   filed?
24   A. To my knowledge, basically you request a form

Page 458

1    from your shop steward, fill out the form and
2    return it back to the shop steward and they turn it
3    into the union business rep.
4    Q. Does the grievant, the person who's got the
5    problem, always fill out the form?
6    A. Not necessarily.
7    Q. I guess I'll be more specific.
8        How many grievances have you filed, to
9    the best of your recollection?
10   A. I want to say at least about six.
11   Q. Have you always filled out the grievance form
12   personally?
13   A. No, because there were incidents where when I
14   went to the shop steward to file a grievance they
15   actually didn't have any forms. They were like out
16   of forms. So it was verbally communicated.
17   Q. To whom?
18   A. To the shop steward and then they would, in
19   turn, I guess forward the information to the
20   business rep.
21   Q. We will get to the specific grievances in a
22   moment.
23        Aside from the instances you gave, and
24   we will get specifics on those, where there was

Page 459

1    some type of verbal grievance filed, you talked
2    about a process you were aware of where the form
3    was forwarded from the steward to whom?
4    A. I guess whoever's in charge in the front
5    office. The business rep, like somebody like Danny
6    Grace or Doug McLaughlin.
7    Q. Or John D'Elia?
8    A. John D'Elia, Scott Michelle.
9    Q. What is your understanding of what they were
10   supposed to do with that grievance?
11   A. My understanding is they're supposed to, at
12   some point, I guess in a timely fashion, schedule a
13   grievance hearing so they can come down, sit down
14   with the union reps and the reps from Pepsi to hash
15   out a resolution to whatever issue.
16   Q. What happens after that?
17   A. I guess basically there's a discussion
18   between the union reps and the Pepsi reps as to
19   what the final conclusion was going to be with
20   regard to the issue.
21   Q. What are the possibilities of the final
22   conclusion?
23   A. I guess it is basic. It is either going to
24   be decided that the grievance has merit or it

A21

Tillman v Pepsi                                CondenseIt™                              Tillman - 10/11/06

Page 460

1  doesn't have merit.
2  Q. What if the parties don't agree, what's your
3  understanding of what happens next?
4  A. Again, this is just my understanding, that
5  the grievant can ask for a third-party arbitrator
6  if the two sides can't agree.
7  Q. The conduct that you're discussing on the
8  union's part, is there a document that exists which
9  says the union must do this or the union must do
10  that with respect to grievances? It says how
11  they're supposed to handle grievances? Are you
12  aware of such a document?
13  A. I think there's like some language in the
14  collective bargaining agreement. I'm not sure what
15  page.
16  Q. And outside the collective bargaining
17  agreement, are you aware of any other written
18  obligation guiding the union's conduct with respect
19  to grievances?
20  A. No.
21  Q. If you could turn, you still have it in front
22  of you, if you could turn to Page 21 of the
23  collective bargaining agreement. It appears as
24  though there's Article 21 of the contract guides,

Page 461

1  grievances and arbitrations. Do you see that?
2  A. Yes.
3  Q. Do you need some time to look it over?
4  A. Yeah. One second.
5  Q. Did you read that?
6  A. Yes.
7  Q. Are you aware of any legal obligation that
8  the union has with respect to grievances other than
9  what's contained here, other than what you just
10  read, other than Article 21?
11  MR. WOODSIDE: Objection to form.
12  BY MR. GELMAN:
13  Q. You can answer.
14  A. I am sorry, you asked me.
15  Q. Aside from what you just read, aside from the
16  contract, are you aware of any other document or
17  any other source of a legal obligation with respect
18  to grievances?
19  MR. WOODSIDE: Objection to form.
20  BY MR. GELMAN:
21  Q. Go ahead, you can answer.
22  A. No, I don't think I'm aware of anything.
23  Q. Getting back to the discrimination, I asked
24  you a little bit ago what evidence you have, what

Page 462

1  allegations you're making that the union
2  discriminated against you based upon sex, and you
3  said they didn't handle your grievances the way
4  they did for others in your sex.
5  Is that an accurate summation of your
6  position?
7  A. Well, I guess when I say others, it would
8  basically be my male co-workers.
9  Q. So you would agree they could handle anything
10  the same as they could other women; correct?
11  MR. WOODSIDE: Objection to form.
12  MR. GELMAN: I withdraw that question.
13  MR. WOODSIDE: Start over.
14  BY MR. GELMAN:
15  Q. Let's get into the specifics of your
16  grievances. Maybe that would make more sense.
17  You said you filed about six
18  grievances. Do you recall specifically what
19  grievances you filed?
20  A. I know there's a grievance about the incident
21  that I had with Phil Weber and the cell phone
22  incident.
23  Q. I will cut you off there just because it will
24  be more fair to walk you through these.

Page 463

1  A. Okay, good.
2  Q. I'm showing you what has been marked Tillman
3  Exhibit No. 24. Do you recognize this document?
4  A. Yes.
5  Q. Is that a grievance form?
6  A. Yes.
7  Q. You've referenced the form a number of times.
8  Is this the form we're talking about?
9  A. Yes.
10  Q. What's the form at the top right-hand
11  corner, what does that indicate?
12  A. 0489?
13  Q. Yes.
14  A. I guess it's the number of the form.
15  Q. Would you agree that every grievance has a
16  different number?
17  A. Yes.
18  Q. Is this your handwriting at the top?
19  A. No.
20  Q. Do you know who wrote this form, the top
21  portion at least?
22  A. I believe it was Merrill Matthews.
23  Q. And Merrill Matthews is the shop steward that
24  you referenced before?

Page 464

1  A. Yes.
2  Q. What's the nature of this grievance?
3  A. Basically I think I talked about it a little
4  before, but I was called in, or at least I was
5  scheduled to work on a certain day. I came in as
6  scheduled and then I was sent home by the
7  supervisor because they said they didn't need me,
8  so.
9  Q. And -- I'm sorry, I thought you were done.
10  A. So basically I just filed a grievance to get
11  paid for that day that I showed up.
12  Q. I see.
13  How did Mr. Merrill come to file this
14  grievance, did you have a discussion with him
15  around the time the grievance was filed with
16  respect to the subject matter of this grievance?
17  A. I don't recall it off the top of my head,
18  what type of discussion we had, but I know that at
19  some point I must have discussed it with somebody
20  because I know that that was something that I was
21  kind of anxious about because I wanted to get paid
22  for showing up for work.
23  Q. So this accurately reflects a problem you had
24  with the company and something you wanted redress

Page 465

1  for, is that fair to say?
2  A. Yes.
3  Q. What's the date of this grievance?
4  A. October 17th, '02.
5  Q. And when did you become a bargaining unit
6  member?
7  A. I guess August '02.
8  Q. Could you take a look at the bottom of the
9  page. Do you see some writing down there?
10  A. Yes.
11  Q. It seems as though that's a separate portion.
12  This is divided into quarters, this document. The
13  bottom quarter is noted as business agent report.
14  The company representative handling
15  the grievance, there are two names mentioned,
16  Tracey D and Phil W. Do you know who they signify?
17  A. Tracey Drzewiecki and Phil Weber.
18  Q. I believe you've testified a number of times
19  who they are, Tracey Drzewiecki is an HR
20  representative for Pepsi?
21  A. Yes.
22  Q. Who is Phil Weber?
23  A. He was the then plant manager.
24  Q. There's a signature at the bottom, business

**Page 466**

1 agent's signature. Do you know who that might be?
2 A. Actually, I don't. I can't really read this.
3 Q. If I told you it's Doug McLaughlin, would you
4 have any reason to doubt that?
5 A. No, I wouldn't have any reason to doubt that.
6 Q. And were you present at any meeting or
7 discussions with respect to this grievance?
8 A. I believe I was, yes.
9 Q. Was the issue raised before the company?
10 A. This particular issue?
11 Q. Yes.
12 A. Yes, it was.
13 Q. And did the union explain your position?
14 A. Yes, they did.
15 Q. And did the company have a response?
16 A. You know, I don't recall what their response
17 was.
18 Q. Well, it indicates on here that the grievance
19 was resolved. Is that an incorrect notation?
20 A. Here's where it gets sticky because my answer
21 to this would be yes and no. If you would want me
22 to specify?
23 Q. Yes, of course.
24 A. It says it was resolved. At the time we sat

**Page 467**

1 down to hear this particular grievance, I thought
2 it was resolved. But as I said earlier, I don't
3 have any evidence that I was actually paid out for
4 this, this grievance, meaning when you get a pay
5 stub, you have miscellaneous, you have an area for
6 miscellaneous payments or deductions or whatever.
7 I would expect that anything other
8 than my regular pay would state if I was paid for
9 something, not paid for something, had something
10 removed from my check for whatever reason.
11 Q. So you're not sure. Do you have any proof
12 that you were not paid?
13 A. Evidence like what? I'm not sure.
14 Q. Well, I don't know, you say you don't have
15 evidence that you were paid. Do you have any
16 evidence that you were not paid? That's all I'm
17 asking you.
18 A. I do not.
19 Q. Do you have a recollection of agreeing to
20 settlement of this grievance during this meeting?
21 A. Yes.
22 Q. I am going to show you next -- if you could
23 just give that to the court reporter -- Tillman No.
24 25. Take a look at that document.

**Page 468**

1 It is Grievance No. 662; is that
2 correct?
3 A. Correct.
4 Q. Who was this filed by?
5 A. Gary DiProsperos.
6 Q. Why do you say that?
7 A. Well, it's not my handwriting and that's his
8 name at the top, I think.
9 Q. Where it says shop steward, it says Gary
10 DiProsperos?
11 A. Yes.
12 Q. It says filed by, there are actually two
13 names. What are those names?
14 A. Okay. It says my name, and Doug, Doug
15 McLaughlin.
16 Q. What's the date of this grievance?
17 A. 11-20-02.
18 Q. And what is the nature of the grievance?
19 A. Some problems I was having in the warehouse
20 with Tom Riley and Glenn Matthews.
21 Q. How did this grievance come to be filed?
22 What I mean is, did you feel that you were being
23 harassed?
24 A. Yes.

**Page 469**

1 Q. Did you communicate that feeling to a union
2 representative?
3 A. Shop steward.
4 Q. To Mr. --
5 A. Gary D.
6 Q. Gary D, I'll gladly call him that.
7 A. Yes.
8 Q. The next thing you know this grievance was
9 filed, is that a fair way to lay it out?
10 A. Yeah. Again, because it wasn't written by
11 me, I'm not sure of the exact time it was filed
12 even though it has a date, but I wasn't present
13 when it was filed.
14 Q. Do you have any personal knowledge as to what
15 happened with this grievance after the filing date
16 of November 20th, '02?
17 A. It was part of a grievance hearing.
18 Q. Did you attend this grievance hearing?
19 A. Yes.
20 Q. Who else was there? I'm sorry to interrupt
21 you.
22 A. It was part of a, one of several grievances
23 that were all heard at one time in a meeting.
24 Q. Who was present at this meeting?

**Page 470**

1 A. Doug McLaughlin. I believe Dan Grace was
2 there. And I believe Merrill Matthews was there.
3 Q. Who was there for the employer?
4 A. Tracey Drzewiecki. I actually don't remember
5 Phil Weber being there.
6 Q. There is something, in the employer report,
7 the second quadrant of this document, there is some
8 writing.
9 Can you tell who the signature of
10 supervisor's name is?
11 A. No.
12 Q. You do agree there's writing there, it's just
13 due to the photocopying you're unable to read it?
14 A. Right. And there's a date there I can't
15 read.
16 Q. Yes, likewise.
17 Moving to the bottom, it indicates the
18 grievance is resolved. Is that your recollection?
19 A. Yeah, I guess so. I don't recall the exact
20 specific action that was taken, but, yeah, we
21 basically just, I guess, let that one go.
22 Q. Underneath, it's signed by Doug McLaughlin,
23 do you agree?
24 A. Yes.

**Page 471**

1 Q. Underneath that there's another signature.
2 Who's signature's that?
3 A. I don't know.
4 Q. That's not yours?
5 A. No.
6 Q. And under final disposition, what's the final
7 disposition?
8 A. Open door policy was established.
9 Q. Moving on to T-26.
10 Take a look at this document.
11 A. Yes.
12 Q. Is it fair to say this is Document No. 663?
13 A. Yes.
14 Q. What is the date of this grievance?
15 A. It looks like 11-20-02.
16 Q. That's actually --
17 A. The same as the other one.
18 Q. It's the same date as the other one; right?
19 A. Yes.
20 Q. It appears to be the same -- I will kind of
21 move this along, tell me if you disagree -- filed
22 by you, but it looks like Doug McLaughlin's name is
23 on there for you, and signed by Doug McLaughlin.
24 IPO, I assume that means in place of.

A23

**Tillman v Pepsi**                    CondenseIt™                    **Tillman - 10/11/06**

Page 472

1   A. Exactly.
2         MR. GELMAN: I have never seen that
3   before, actually.
4   BY MR. GELMAN:
5   Q. In any case, harassment by Tom Riley and
6   Glenn Matthews?
7   A. We're looking at two different things.
8   Q. I don't believe so. Look in the nature of
9   the grievance.
10  A. I'm looking at 663.
11  Q. I am sorry, I picked up 662 and continued to
12  look at it.
13        Again, everything I said was correct
14  except laid off out of seniority.
15  A. Correct.
16  Q. You actually testified to this before. Was
17  this the circumstance involving the four months?
18  A. Four weeks, yes.
19  Q. Four weeks, I'm sorry.
20        And what is the remedy requested?
21  A. What is the remedy? Oh, full back pay and
22  benefits.
23  Q. And if you look at the bottom, the grievance
24  was resolved, is that true?

Page 473

1   A. Yes.
2   Q. And it looks like Tracey D., Phil Weber, and
3   a signature that's unreadable. That looks like the
4   same as the other one.
5         And what was the final disposition of
6   this matter?
7   A. That they were agreed to pay the four weeks
8   and two days pay.
9   Q. All right. T-27. This is grievance 665, is
10  it not?
11  A. It is.
12  Q. What's the date of this grievance?
13  A. 11-20-02.
14  Q. And it's filed by you or by Doug McLaughlin
15  in your place, is that true?
16  A. Apparently.
17  Q. What's the nature of the grievance?
18  A. Performing bargaining unit work and the pay
19  rate.
20  Q. Is this the grievance you referenced earlier?
21  A. Uh-huh.
22  Q. This is the one that you felt was not handled
23  to your liking?
24  A. Right. It was not handled at all.

Page 474

1   Q. It appears from the bottom that Tracey D. was
2   the company representative in this matter; is that
3   correct? Is that at least what this form
4   indicates?
5   A. Yes.
6   Q. Do you have any personal knowledge with
7   respect to whether or not Tracey D. did in fact
8   handle this?
9   A. No. I'm of the opinion that she did handle
10  it.
11  Q. Well --
12  A. That's my opinion.
13  Q. What I'm saying here is Tracey D. is
14  indicated on this form. Do you believe that form
15  incorrectly states that Tracey D. was the company
16  representative handling this grievance?
17  A. No, I don't disagree.
18  Q. By handling it, you mean took care of it
19  properly?
20  A. The final outcome, yes.
21  Q. Rightfully or wrongfully, do you agree with
22  the fact that Tracey D. at least looked at this
23  grievance, whether or not she did to your liking?
24  A. Yes, she had knowledge of it.

Page 475

1   Q. There are a couple of signatures at the
2   bottom. Do you have any idea who they belong to?
3   A. No. None of them are mine.
4   Q. I have another document. Please read it.
5         Do you recognize this document?
6   A. Yes.
7   Q. Why do you recognize it?
8   A. Because I wrote it.
9   Q. And what is it dated?
10  A. 11-21.
11  Q. You wrote it, so I see it indicates your
12  signature, you actually signed that?
13  A. That's my signature.
14  Q. What's the nature of this grievance?
15  A. Basically it encompasses the altercation that
16  I had with the plant manager, Phil Weber and how he
17  basically treated me.
18  Q. Do you recall attending a grievance hearing
19  on this one?
20  A. Yes.
21  Q. Do you recall who was in attendance?
22  A. Tracey, Phil I believe was at this one.
23  Q. Who was there for the union?
24  A. Doug and Danny, I believe. And I'm not sure

Page 476

1   if a shop steward was there inside the actual, the
2   room with us. I'm not sure.
3   Q. There's an indication at the bottom that the
4   grievance was resolved; is that correct?
5   A. Yeah. It wasn't resolved to my liking, but
6   yes.
7   Q. The remedy was that, it says final
8   disposition, remedy resolved in Grievance 662.
9         Do you recall that being the case,
10  that 662 resolved this grievance as well?
11  A. I recall that there were a lot of issues I
12  had brought up. This is my case in point, a lot of
13  these grievances were filed by other people on my
14  behalf because basically, again, there were no
15  forms for me to fill out when I needed to fill them
16  out. So they just did them all in whole. Brought
17  them all in on one certain day and heard them all
18  at once.
19  Q. Why would the person who fills it out, why
20  would that have any bearing on when the grievance
21  is heard?
22  A. I don't know that it would. I'm just stating
23  for the record that that's what happened.
24  Q. Well, you don't dispute the fact that you

Page 477

1   filled out T-28?
2   A. I filled it out.
3   Q. You don't disagree with the fact that it was
4   heard; correct?
5   A. No, I don't disagree with that.
6   Q. You don't disagree with the fact that it was
7   resolved, do you?
8   A. No.
9   Q. And the disposition on 662, T-25, it was
10  resolved because no dicp -- which I believe stands
11  for disciplinary action -- D-I-C-P, taken. The
12  issues were tabled and discussed. An open door
13  policy was established.
14        Do you recall that being the
15  resolution for 662?
16  A. Yes.
17  Q. I am going to hand up two exhibits at once
18  because they are related. That would be Tillman
19  Deposition Exhibit No. 29 and Tillman Deposition
20  Exhibit No. 30.
21        Did you take a look at those
22  documents?
23  A. Okay.
24  Q. Do you recognize Document 29, Exhibit No. 29?

**Donna A. Bittner Reporting - (856) 768-6619**

**Tillman v Pepsi**                    CondenseIt™                    **Tillman - 10/11/06**

---

Page 496

1   and you fully understand those rights and options.
2          At the time you signed this document,
3   did you fully understand those rights and options?
4      A. I don't think I had any options, but, yeah, I
5   know what the paper says.
6      Q. It says on this paper that the signee -- that
7   would be you -- acknowledges that Local 830 has
8   fully and fairly represented me in all matters
9   pertaining to and relating to the grievances which
10  are noted below in your employment with PBG. Do
11  you dispute that fact?
12     A. Yes.
13     Q. Then why did you sign it?
14     A. I signed it all rights reserved. Basically
15  they wanted me to sign it because they were all
16  tired and wanted to get out of there. We were in a
17  similar situation to this. We were sitting there
18  all day and these guys wanted to go home, I guess.
19     Q. So if I asked you to sign something today and
20  you didn't want to sign it --
21     MR. WOODSIDE: Objection.
22  BY MR. GELMAN:
23     Q. Miss Tillman, are you or have you ever been a
24  member of a union other than Teamsters Local Union

---

Page 497

1   830?
2      A. Yes.
3      Q. What union?
4      A. You're not going to believe this, but I don't
5   remember. But I know I was a member of a union at
6   one time.
7      Q. What job? Would that make it easier?
8      A. Yes. R&S Strauss had a union.
9      Q. When did you work for that organization?
10     A. Actually I worked for them in 2001, I
11  believe. Briefly, but I was there. They had a
12  union, and I don't recall that union number.
13     Q. Did you hold any positions or offices within
14  that union?
15     A. No.
16     Q. I would hope not if you don't remember being
17  in it.
18     MR. WOODSIDE: I object to the form
19  and I don't think there's a question on the table
20  in that.
21     MR. GELMAN: You are sharp.
22     MR. WOODSIDE: Meanwhile, I'm not
23  really sure what you're doing. Are you thinking
24  out loud or are you asking her a question?

---

Page 498

1      MR. GELMAN: Off the record.
2          (A discussion was held off the
3   record.)
4   BY MR. GELMAN:
5      Q. Are there any documents in your possession
6   that relate to your claim that the union
7   discriminated against you on the basis of your sex?
8      A. I guess the only document is my charge that I
9   filed.
10     Q. The --
11     A. Department of Labor Charge.
12     Q. The Department of Labor charge, the one we
13  were looking at earlier?
14     A. Yes.
15     Q. Are there any documents in your possession
16  that relate to your claim that the union has
17  discriminated against you on the basis of your
18  race?
19     A. Only my charge.
20     Q. Same charge that you referenced a moment ago,
21  okay.
22          What conduct or omissions on the part
23  of the union do you allege were discriminatory and
24  based upon your sex?

---

Page 499

1      A. What conduct or omissions?
2      Q. Yes. What conduct or lack of conduct on the
3   part of the union.
4      MR. WOODSIDE: Let me object. Is that
5   a different question than the question you asked
6   earlier about the evidence?
7      MR. GELMAN: Yes, it is.
8      MR. WOODSIDE: How is it any
9   different?
10     MR. GELMAN: I will tell you.
11          The earlier question was just seeking
12  to determine if there were differences in the
13  conduct between the complaint, the federal
14  complaint and the Department of Labor complaint.
15  My question now is independent of the Department of
16  Labor complaint and essentially getting to the
17  heart of this matter, so this is a big question and
18  I think you're aware of that fact.
19          My question is, what evidence do you
20  have -- or not what evidence.
21          Upon what are you basing your
22  allegation, what conduct on the part of the union
23  are you basing your allegation that they
24  discriminated against you on the basis of your sex?

---

Page 500

1      MR. WOODSIDE: I am going to object
2   again. It was covered right before the break that
3   we took when we went out of the room for about
4   10 minutes. It was the last question that you had
5   on the table for her. It was covered for about
6   10 minutes. We came back and you got back into it
7   again for another five minutes, and then we went
8   into the grievances themselves.
9      MR. GELMAN: That's not my
10  recollection. You can answer. Your objection is
11  noted.
12     MR. WOODSIDE: It's noted. It is
13  exactly the way it went. You are doing it again.
14  BY MR. GELMAN:
15     Q. Miss Tillman, do you have an answer?
16     A. We're going to have to go one more time with
17  that.
18     MS. CLEMONS: Can the reporter read it
19  back?
20     MR. GELMAN: That would make my life
21  easier. Read the question back, please.
22          (The following question was then read
23  back by the reporter:
24     "Question: Upon what are you basing

---

Page 501

1   your allegation, what conduct on the part of the
2   union are you basing your allegation that they
3   discriminated against you on the basis of your
4   sex?")
5      MR. WOODSIDE: Same objection. It's
6   already been covered.
7      MR. GELMAN: Noted.
8      THE WITNESS: The only way I can
9   answer that is, my evidence is basically my
10  wholehearted belief that that's what occurred. I
11  don't know any way to answer that for you.
12  BY MR. GELMAN:
13     Q. Other than your belief -- that's not exactly
14  responsive to my question.
15     A. Then I'm not understanding.
16     Q. My question, again -- I apologize, it's been
17  a long day -- my question is not what evidence you
18  have, although that's my next question. My
19  question is what conduct supports, what alleged
20  conduct supports your allegations that there was
21  discrimination based upon your sex?
22     MR. WOODSIDE: I object. It has been
23  covered. It is the fifth time it has been covered.
24     MR. GELMAN: It hasn't been answered

---

**Donna A. Bittner Reporting - (856) 768-6619**

Tillman - 10/11/06                    CondenseIt™                    Tillman v Pepsi

Page 502

1 yet.
2 BY MR. GELMAN:
3   Q. Please, Miss Tillman.
4   A. I guess what supports it is the fact that to
5 my knowledge no other male union member was subject
6 to the type of treatment that I was with regard to
7 having grievances heard, resolved, especially in
8 the sense of being handled in a timely fashion.
9       Some of these issues came up in '02,
10 but yet we didn't sit down and have a meeting
11 until '03, which is the date that was on the
12 release.
13       It was my understanding that
14 grievances should be heard within, at least from
15 the shop steward, within two weeks of filing. That
16 never seemed to be the case in my situation. It
17 could drag on for months and some issues weren't
18 heard at all, and I don't know of any other member
19 of the union at Pepsi that was treated that way.
20   Q. Let's go there. The grievances that you
21 speak of, we talked about a number of grievances
22 here today?
23   A. Right.
24   Q. I failed to ask you, are there any grievances

Page 503

1 that we didn't review here today that you filed?
2   A. There could be only because, again, some of
3 these grievances weren't written down because there
4 was no form. As we discussed earlier, the ones
5 that you saw, the ones that we just discussed were
6 written by somebody else. The people who had the
7 forms. So it wasn't like there wasn't any
8 knowledge, because if I had a problem, I had no
9 problem voicing my concerns.
10   Q. My question is what grievance, if any, did
11 you file that was not heard that we did not discuss
12 today?
13   A. I don't know of any off the top of my head.
14   Q. Are there some that aren't on the top of your
15 head that you cannot recall?
16   A. That's the whole thing.
17   Q. Or do you have reason to believe that there
18 are others?
19   A. It's probable.
20   Q. It's probable. Do you know if there are
21 others? I guess that's a more fair question.
22   A. No, I don't know. That's it.
23   Q. So with respect to the grievances that we
24 discussed today, I guess we're going to have to go

Page 504

1 through them.
2       Starting with T-24, Grievance No. 489.
3   A. Uh-huh.
4   Q. You said you had a problem with the way the
5 grievances were heard, resolved, handled, in a
6 timely fashion. First of all, generally speaking,
7 with respect to all the grievances that we talked
8 about today, were any of those grievances not
9 processed? Let me rephrase. Process, you may not
10 know what I'm talking about.
11       Were there any of those grievances
12 that were not presented to the company, to a Pepsi
13 management employee?
14   A. Not to my knowledge. I'm really not sure.
15   Q. Well, you're not sure. Let's go through
16 them.
17   A. Not to my knowledge.
18   Q. It is either yes or no.
19       So we will have to go through them one
20 by one. Take a look at Grievance No. 489.
21   A. Uh-huh.
22   Q. Was Pepsi made aware of that grievance, was
23 that presented to Pepsi?
24   A. Yes.

Page 505

1   Q. Grievance 662, same question, was that
2 presented to Pepsi?
3   A. Yes.
4   Q. Grievance 663, same question, did Pepsi
5 participate, was that grievance presented to Pepsi
6 by the union?
7   A. Yes.
8   Q. Grievance 665, was that? That's T-28 or
9 T-27?
10   A. Yes.
11   Q. Grievance No. 2, which is handwritten in,
12 but that's Tillman Exhibit No. 28, was that
13 addressed by the company after being presented by
14 the union?
15   A. Yes.
16   Q. And T-29, that is 696, you presented that to
17 the company themselves; correct?
18   A. Yes, I did.
19   Q. And Grievance No. 845, Exhibit No. 31, did
20 the company receive that grievance?
21   A. Yes.
22   Q. So when I ask you whether or not all of the
23 grievances that were filed on your behalf were
24 submitted to the company, do you have an answer to

Page 506

1 that question?
2   A. Yes.
3   Q. And were they?
4   A. Yes.
5   Q. Were any of the grievances that I just noted
6 rejected or dismissed due to untimeliness that
7 you're aware of?
8   A. No, but there was one that says it was
9 withdrawn.
10   Q. That's not my question. Were any of them
11 dismissed, discharged --
12   A. Isn't withdrawn the same?
13   Q. No. Timeliness, for being untimely. Were
14 any of them rejected by the company for being
15 untimely?
16   A. Well, 845, it says right at the bottom,
17 claimant did not show for last grievance hearing
18 held and so there was no contract violation.
19   Q. Does that mean, do I interpret that to mean
20 that it was rejected because it was untimely?
21   A. I determined it to believe, to say that it
22 was rejected.
23   Q. That's not my question. My question is were
24 any of these grievances rejected because they were

Page 507

1 untimely?
2   A. No.
3   Q. You stated that you were not happy with the
4 way, it was discriminatory the way the grievances
5 were heard, the way they were handled in an
6 untimely fashion.
7       The way they were resolved, we went
8 through, I think we covered that the way they were
9 resolved?
10   A. Yes.
11   Q. Identify by name all male grievants who had
12 their grievances handled in a different manner?
13   A. Can you define different?
14   Q. Well, you allege that yours were handled in a
15 discriminatory manner because you were female.
16       So don't let me put words in your
17 mouth, but that means that the men had their
18 grievances handled differently than yours.
19       Is that what you mean by -- is that
20 how it relates to discriminatory?
21   A. I think what I said was to my knowledge that
22 the other union members' grievances weren't handled
23 in the way mine were.
24   Q. How so? How were they handled?

Page 502 - Page 507                    Donna A. Bittner Reporting - (856) 768-6619

A26

**Page 508**
1  A. I guess in a timely fashion. Meaning they
2  didn't have to wait months for a resolution,
3  whatever that resolution was.
4  Q. And tell me, identify specifically what
5  grievants you're referring to, what grievants or
6  grievant?
7  A. That's impossible for me to show what
8  grievant.
9  Q. You're making a claim that theirs were
10 handled differently, that some grievance out there
11 was handled differently than yours. I want to know
12 what grievant or grievants, rather?
13 A. I don't have that information.
14 Q. Do you know? Do you have that information
15 somewhere else?
16 A. I don't know. It's possible we're able to
17 find that out, though.
18 Q. So as of this point in time you have no
19 evidence with respect to how grievances were
20 handled concerning male members?
21 A. No.
22 Q. I have just come across an additional
23 grievance that you filed. We don't have copies yet
24 but we will make copies. I just want to get it

**Page 509**
1  marked before I forget.       ---
2         (Tillman-38 was marked for
3  identification.)
4  BY MR. GELMAN:
5  Q. I asked you questions, I probably should have
6  grouped them together, so I will ask you now,
7  Mr. Woodside get ready for your objection. What
8  allegations or what conduct are you alleging that
9  the union took that was discriminatory against you
10 based upon your race?
11        MR. WOODSIDE: Same objection for the
12 same reasons stated in the record before.
13 BY MR. GELMAN:
14 Q. Did you hear the question I just posed,
15 Miss Tillman? If you could put that down for a
16 second, my question has nothing to do with that
17 document.
18 A. Can you reask that question?
19        MR. GELMAN: Sure. Would you read it
20 back.
21        (The pending question was then read
22 back by the reporter:
23        "Question: I asked you questions, I
24 probably should have grouped them together, so I

**Page 510**
1  will ask you now, Mr. Woodside get ready for your
2  objection. What allegations or what conduct are
3  you alleging that the union took that was
4  discriminatory against you based upon your race?")
5        THE WITNESS: And again --
6  BY MR. GELMAN:
7  Q. Go ahead.
8  A. Again, I would just answer that the male
9  members of the union had their grievances heard in
10 a timely fashion.
11 Q. Actually this question concerns your race,
12 not your sex. I'm not sure that that's -- is that
13 still your response?
14 A. No. If you're talking about with regard to
15 race?
16 Q. Yes.
17 A. I don't have any evidence off the top of my
18 head.
19 Q. There's no evidence. What are you even
20 talking about, what is it, why did you sue my
21 client saying that he discriminated against you
22 based upon your race? What are you talking about?
23 What did they do?
24 A. Because it stands to reason that if I'm the

**Page 511**
1  only black female in my job classification, that if
2  I'm receiving treatment that's different from the
3  rest of the members, that's a logical conclusion to
4  draw.
5  Q. And what is this different treatment?
6  A. Well, I just explained.
7  Q. Is it --
8  A. Timely fashion.
9  Q. Is it the grievances being heard, resolved,
10 heard in a timely fashion?
11 A. Yes.
12 Q. Is that the conduct you're talking about by
13 filing this lawsuit?
14 A. No. Again, it gets back to the admission
15 into membership of the union back in October
16 of '01. I felt I was eligible to be a union member
17 and I was not allowed to become a member until
18 July -- August, I should say, 2002, even though I
19 was performing union duties and collective
20 bargaining of bargaining unit work.
21 Q. Let me ask you this: If the grievants had
22 been made aware and had filed a grievance when they
23 were performing bargaining unit work, do you
24 know -- if you don't, that's fine -- but do you

**Page 512**
1  know what such a remedy could or would be?
2        MR. WOODSIDE: Objection to form.
3  BY MR. GELMAN:
4  Q. Do you understand my question?
5  A. If they were made aware --
6  Q. Let's establish this. We have already
7  established that you couldn't file a grievance back
8  then because you weren't in the union; right?
9  A. Right.
10 Q. So what did you want the union to do?
11 A. I wanted the union to basically force Pepsi
12 to make me a member of the union.
13 Q. And how, through what mechanism?
14 A. Through the mechanism that's outlined in the
15 collective bargaining agreement. You have this
16 employee that's doing bargaining unit work and
17 she's done it for over a month, and their
18 obligation at that time, based on what I read, is
19 that they either have to put me in that position at
20 the wages specified or abolish the position, return
21 me back to wherever I was.
22        They did neither for eight months.
23 Q. I am sorry, go ahead if you have more.
24 A. That's basically the long and short of it.

**Page 513**
1  Q. So you're alleging they didn't file a
2  grievance not on your behalf, but just a grievance
3  concerning the bargaining unit work you were
4  performing?
5        MR. WOODSIDE: Objection to form.
6  BY MR. GELMAN:
7  Q. Is that your understanding?
8  A. Say that again?
9  Q. We agree they couldn't file a grievance on
10 your behalf because you weren't a member; right?
11        MR. WOODSIDE: Objection to form.
12 It's been asked and answered.
13 BY MR. GELMAN:
14 Q. Is that right?
15 A. I don't know that they couldn't have filed
16 something on my behalf. I don't know.
17 Q. Okay, fair enough.
18        Would you have any reason to disagree
19 with the fact that if a grievance was filed that a
20 non-bargaining unit member was doing bargaining
21 unit work, the only remedy possible would be
22 that they would have to cease from having you
23 perform bargaining unit work? Do you have any
24 reason to doubt this statement that that wouldn't

Page 514

1   put you in the union?
2        MR. WOODSIDE: Objection to form. The
3   witness is not going to answer the question.
4        MR. GELMAN: Why not?
5        MR. WOODSIDE: It's speculative. The
6   witness isn't going to answer it. It is just
7   wholly speculative. You're laying down two
8   different sets of facts that don't match up with
9   anything she said in this deposition. You're not
10  going to have her speculate about what would have
11  happened or should have happened or could have
12  under these documents.
13       MS. CLEMONS: It is a deposition. She
14  is allowed to speculate.
15       MR. GELMAN: You took the words out of
16  my mouth.
17       MR. WOODSIDE: She is not allowed to
18  speculate without foundation.
19       MS. CLEMONS: She is allowed in a
20  deposition in Federal court. Speculation is
21  allowed. It may or may not be admissible. It may
22  lead to admissible evidence. There is a ton of
23  case law.
24       MR. WOODSIDE: You can cite the case,

Page 515

1   but let me state, if we want to go down the road,
2   then you'll need a court order to do it because
3   you're going to take her down a road and we're just
4   going to speculate for the next however long you
5   feel like doing that, and I'm not going to allow
6   it. If you have a reasonable question based upon
7   her prior answers which are very extensive, I might
8   allow it.
9        You're going into an area that you
10  can't answer the question.
11       MR. GELMAN: I can answer that
12  question. Trust me. Off the record.
13       (A discussion was held off the
14  record.)
15  BY MR. GELMAN:
16  Q. Are you aware of any non-bargaining unit
17  member -- do you follow?
18  A. Yes.
19  Q. -- who had a grievance filed on their behalf?
20  A. Am I aware of that? No, I am not.
21  Q. By Local 830 at Pepsi?
22  A. No, I'm not aware of that.
23  Q. I'll take it one step further, but I probably
24  did this backwards. Are you aware of any

Page 516

1   non-bargaining unit member who had a grievance
2   filed on their behalf protesting the fact that they
3   were performing bargaining unit work?
4   A. No. And part of my contention is no one else
5   was tapped to do that. I was.
6   Q. Are you aware of anybody that's ever
7   performed non-bargaining unit work at Pepsi?
8   A. Non-bargaining unit work in a non-union
9   capacity?
10  Q. Yes.
11  A. Other than myself, no.
12  Q. Let me know when you're ready.
13  A. I'm ready.
14  Q. I'm showing you what's been marked Exhibit
15  No. 38, and it appears to be a Grievance No. 2808.
16  A. Okay.
17  Q. And the only reason, just a bit of
18  editorializing, the only reason I am showing it to
19  you now is not because it has any special
20  significance out of order, it is just because I
21  just realized I failed to kind of loop this in with
22  the other grievances.
23       That being said, who was this filed
24  by?

Page 517

1   A. Myself.
2   Q. What is the date?
3   A. 6-2-04.
4   Q. And who signed this document?
5   A. I signed the document.
6   Q. And what is the nature of the grievance in
7   your own words?
8   A. In my own words, basically I was assigned to
9   a specific function, and I didn't have the
10  privilege of using my bumping right, meaning if I
11  didn't want to perform that specific function, I
12  had the right to put somebody who had lower
13  seniority in that position and basically take their
14  position for the shift.
15       Several times --
16  Q. I'm sorry, go ahead.
17  A. A couple times I was forced to work in a
18  position that I didn't want to and there were, at
19  this time there were actually a couple of employees
20  who actually had lower seniority than me.
21  Q. Was this grievance heard by the company?
22  A. Yes. I'm not sure what day, though.
23  Q. And was the grievance resolved? Or what was
24  the resolution of this grievance?

Page 518

1   A. Yeah, it just says something about the union
2   will move to the next step.
3   Q. I'm sorry, I interrupted you once again.
4   A. I don't recall off the top of my head what
5   the next step was on this.
6   Q. Here, mystery solved. Take a look at Exhibit
7   No. 34, if you don't mind.
8        Have you seen this document before?
9   A. Yes.
10  Q. What is it?
11  A. I guess it's just a letter basically
12  referencing 2809 and their decision based on that.
13  Q. What was the decision?
14  A. That the grievant -- I'm sorry, the grievance
15  lacks sufficient merit to justify submitting it to
16  arbitration.
17       I don't recall ever asking that it go
18  to arbitration, but that's what they said.
19  Q. What were you hoping to gain from that
20  grievance if you didn't want to go to arbitration?
21  A. I didn't ask to go to arbitration. I asked
22  for them to qualify other union members that were
23  below me for the position so that I wouldn't be
24  once again the person that's forced into a position

Page 519

1   that I didn't want to perform.
2   Q. Well, if the union and the company aren't
3   able to reach an agreement, what happens to a
4   grievance?
5   A. I don't know if we didn't reach the agreement
6   on that or they didn't, rather.
7   Q. In any case, was there a grievance meeting on
8   this matter, looking back to T-38?
9   A. Yes.
10  Q. Were company representatives and union
11  representatives in attendance?
12  A. You know what? I'm not sure who was actually
13  at this particular hearing.
14  Q. Do you dispute the fact that Tracey
15  Drzewiecki addressed it for the company?
16  A. No, I don't dispute that.
17       MR. GELMAN: I believe that is all
18  that I have. Thank you, Miss Tillman.
19       THE WITNESS: Thank you.
20       MR. WOODSIDE: No questions.
21       MS. CLEMONS: I just have a couple
22  follow-up questions.
23  BY MS. CLEMONS:
24  Q. Miss Tillman, Mr. Gelman asked you some

Tillman v Pepsi                    CondenseIt™                    Tillman - 10/11/06

Page 520

1  questions about your desire to become a member of a
2  union?
3  A. Yes.
4  Q. And what Pepsi's role in that was, do you
5  remember that?
6  A. Yes.
7  Q. Is it your contention that it was Pepsi's
8  responsibility to make you a member of the union?
9  A. Responsibility? I think that Pepsi and the
10 union have some responsibility in the matter.
11 Q. Tell me on what you base your assertion that
12 Pepsi was somehow responsible for making you a part
13 of the union?
14 A. No, no. You're asking me did they make me a
15 part of the union?
16 Q. That's not what I'm asking you. You said to
17 Mr. Gelman Pepsi did not make me a part of the
18 union. In response to a question, you said to
19 Mr. Gelman, Pepsi did not make me a part of the
20 union; I wanted the union to make Pepsi make me
21 part of the union.
22        And what I said to you, my question
23 prior to this was, do you believe it was Pepsi's
24 responsibility to make you part of the union. And

Page 521

1  your response was, they both had some
2  responsibility. So now I'm asking you to detail to
3  me what you base this assertion that Pepsi had some
4  responsibility to make you part of the union?
5  A. Basically if they're asking me to perform
6  bargaining unit work, again, I'm basing my
7  assertion on the collective bargaining agreement
8  that was in effect at the time I was working.
9  That's what I planned throughout. That's what I'm
10 basing it on.
11 Q. Take a look at the collective bargaining
12 agreement, which is Exhibit 19, and tell me what
13 part of the agreement you believe requires or gives
14 Pepsi an obligation to make you a member of the
15 union?
16 A. I'm not sure that I actually used the word
17 make. I think I used the term allow. I was not
18 allowed to be a member of the union.
19 Q. So you're saying someone at Pepsi made a
20 decision to not allow you to be part of the union?
21 A. It seems apparent to me that it was in
22 collusion, both Pepsi reps, reps from Pepsi and
23 reps from the union.
24 Q. Tell me who you believed colluded to exclude

Page 522

1  you from the union?
2  A. Basically the human resource reps and --
3  Q. You have to tell me who, I'm asking you about
4  people.
5  A. Tracey Drzewiecki, Sara Swartz, and as far as
6  the union.
7  Q. What is the basis for your assertion that
8  they colluded with the union to keep you out, what
9  facts do you have?
10 A. The facts that right here in the collective
11 bargaining agreement says they have the right to
12 transfer employees from one department to another.
13 If that happens, then the person in the temporary
14 transfer have the right to the wages that that
15 position encompasses. And after a month period, at
16 that time they're either supposed to make me a
17 member of the union or they return me to my
18 original capacity. Neither of which happened in
19 this case.
20 Q. Tell me where here it says that it's Pepsi's
21 responsibility to make you a member of the union?
22 A. I don't see that wording. That wording is
23 not there.
24 Q. Or that Pepsi somehow participates in making

Page 523

1  you a member of the union?
2  A. The wording is not there.
3  Q. So what is the basis of your response to
4  Mr. Gelman's question that Pepsi did not make you a
5  member of the union?
6  A. I don't know what answer you're looking for.
7  I just gave you the answer to the best of my
8  ability.
9  Q. You made an allegation in this extensive
10 piece of litigation that is new and different that
11 I hadn't heard before just now that somehow Pepsi
12 didn't make you a member of the union. Let me ask
13 you this: How do people become members of the
14 union?
15       MR. WOODSIDE: Which question do you
16 want --
17       MS. CLEMONS: The last question I just
18 asked, Mr. Woodside. Please, let's get this done,
19 so stop interrupting me. It's a relevant question.
20 BY MS. CLEMONS:
21 Q. How are people made members of Teamsters 830,
22 to your knowledge?
23 A. When they come into the company they're
24 obviously in a position that is deemed to be

Page 524

1  under -- that falls under the collective bargaining
2  agreement, so they're performing a function that is
3  classified as being union work and after I believe
4  30 days, if they're still in that position, meaning
5  they haven't been terminated or laid off or let go,
6  they are not eligible to be members of the union
7  and the union with open arms welcomes these people
8  into the union.
9  Q. What role does Pepsi play in opening people
10 with welcome arms into the union?
11 A. Well, Pepsi is the one that initially does
12 the hiring for the bargaining unit.
13 Q. I'm sorry to interrupt you. Once they hire
14 someone, what else did they do?
15 A. Beyond that?
16 Q. Yes.
17 A. I'm not sure. If you're asking me about like
18 operations, I don't know. I don't know.
19 Q. Miss Tillman, I am asking you about your
20 assertion that Pepsi somehow did not make or failed
21 to make you a member of the union and the basis for
22 that. So that's why I'm asking you, are you aware
23 of how people become members of the union? And you
24 said Pepsi hires them. Does Pepsi do anything else

Page 525

1  in that process?
2  A. That's my understanding.
3        MR. WOODSIDE: That's a fair answer to
4  say you just don't know.
5        MS. CLEMONS: If that's her answer, it
6  is fair for her to say it, but not for you to put
7  it in her mouth. If she knows, she can say that.
8        MR. WOODSIDE: Do you have a question?
9        MS. CLEMONS: There's a question
10 pending and you're interrupting in the middle of a
11 question.
12       MR. WOODSIDE: Please.
13 BY MS. CLEMONS:
14 Q. Go ahead.
15 A. My answer is I don't know beyond what I just
16 stated. I don't know what they do beyond that.
17       MS. CLEMONS: I have no further
18 questions.
19       MR. WOODSIDE: No questions.
20       MR. GELMAN: Nothing.
21       (Witness excused.)
22       (The deposition concluded at 5:50 p.m.)
23
24

**Page 526**

```
INDEX
DEPONENT: MARLAYNA G. TILLMAN          PAGE
  Examination by Ms. Clemons      282, 520
  Examination by Mr. Gelman            402
         EXHIBITS
DEFENDANT'S DEPOSITION EXHIBITS      MARKED
Tillman-22  Application, PBG 01471 through  393
            PBG 01475
Tillman-23  Driver Application Form,    393
            PBG 01437
Tillman-24  Grievance Report No. 0489   393
Tillman-25  Grievance Report No. 0662   393
Tillman-26  Grievance Report No. 0663   393
Tillman-27  Grievance Report No. 0665   393
Tillman-28  Grievance Report,           393
            Margolis Edelstein 0030
Tillman-29  Grievance Report, No. 0696  393
Tillman-30  *2/15/03, Grievance No. 0696,  393
            Margolis Edelstein 0038
Tillman-31  Grievance Report No. 0845   393
Tillman-32  Letter dated May 21, 2003, from 393
            Doug McLaughlin to Ms. Tillman
Tillman-33  (Withdrawn)
Tillman-34  Letter dated November 30, 2004, 393
            from Mr. D'Elia to Ms. Tillman
Tillman-35  Charge of Discrimination    393
Tillman-36  Seniority List, No. 248     456
```

**Page 527**

```
       EXHIBITS (CONT'D)
DEFENDANT'S DEPOSITION EXHIBITS      MARKED
Tillman-37  Grievance Release         489
Tillman-38  Grievance Report No. 2808  509
ERRATA SHEET/DEPONENT'S SIGNATURE  PAGE 527
CERTIFICATE OF REPORTER            PAGE 528
```

**Page 528**

```
        WITNESS SIGNATURE/CERTIFICATION PAGE




        I have read the foregoing transcript of
my deposition given on October 11, 2006, and it is
true, correct and complete, to the best of my
knowledge, recollection and belief, except for the
list of corrections, if any, attached on a separate
sheet herewith.




_____    _____
DATE                MARLAYNA G. TILLMAN
```

**Page 529**

```
        I HEREBY CERTIFY that the
proceedings, evidence and objections are contained
fully and accurately in the stenographic notes
taken by me upon the foregoing matter on Wednesday,
October 11, 2006, and that this is a true and
correct transcript of same.



        _____
        Terry Barbano Burke, RMR-CRR


        (The foregoing certification of
this transcript does not apply to any reproduction
of the same by any means, unless under the direct
control and/or supervision of the certifying
reporter.)
```

## COLLECTIVE BARGAINING AGREEMENT

DEPT. OF LABOR

AUG 1 5 2003

INDUSTRIAL AFFAIRS
OFFICE OF LABOR
LAW ENFORCEMENT

## BETWEEN

## THE PEPSI BOTTLING GROUP

## WILMINGTON, DE/WEST CHESTER, PA

## AND

## TEAMSTERS LOCAL UNION NO. 830

### Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America

## COVERING THE PERIOD OF:

## JANUARY 1, 2000 TO AND INCLUDING DECEMBER 31, 2004

Margolis Edelstein
Tillman, Marl
00

## TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| I | DECLARATION OF PURPOSE | 4 |
| II | UNION RECOGNITION: SCOPE OF AGREEMENT | 4 |
| III | UNION SHOP:  HIRING OF NEW EMPLOYEES | 4 |
| IV | HOURS OF WORK | 5 |
| V | HOLIDAYS | 7 |
| VI | VACATIONS | 8 |
| VII | LUNCH RELIEF PERIODS | 10 |
| VIII | WAGES/NET REVENUE SALES COMPENSATION | 10 |
| IX | FLEXIBLE BENEFITS PLAN | 14 |
| X | MANAGEMENT'S RIGHTS | 14 |
| XI | DISCHARGES | 14 |
| XII | INJURIES AND ILLNESS | 16 |
| XIII | POLYGRAPH TEST | 16 |
| XIV | UNIFORMS AND EQUIPMENT | 16 |
| XV | LAYOFF | 17 |
| XVI | RECALL | 18 |
| XVII | JOB VACANCIES | 18 |
| XVIII | DISCRIMINATION AND UNION ACTIVITY | 20 |
| XIX | CHECK-OFF OF UNION DUES | 20 |
| XX | SEVERANCE | 21 |
| XXI | GRIEVANCE – ARBITRATION | 21 |
| XXII | STRIKES & LOCKOUTS | 22 |
| XXIII | PICKET LINES | 22 |
| XXIV | FUNERAL LEAVE | 22 |
| XXV | JURY DUTY | 22 |
| XXVI | MILITARY LEAVE | 22 |
| XXVII | STEWARDS | 23 |
| XXVIII | LEAVE OF ABSENCE | 24 |
| XXIX | TRAINING PROCEDURE | 24 |
| XXX | DRUG/ALCOHOL POLICY | 25 |
| XXXI | SEASONAL EMPLOYEES | 26 |
| XXXII | MERCHANDISING | 26 |
| XXXIII | RESETS | 27 |
| XXXIV | TERMINATION | 27 |

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0063

A32

**..NDICES:**

|   | WAGE SCHEDULE | 28 |
|---|---|---|
| B | MEMORANDUM OF AGREEMENT REGARDING | |
|   | TOOL ALLOWANCE | 30 |
| C | PEPSI-COLA PENSION PLAN | 31 |
| D | INTENT OF CLASSIFICATION COMBINATION | 33 |

**LETTERS OF UNDERSTANDING**

| 1. | SENIORITY FOR SELECTING VACATIONS | 34 |
|---|---|---|
| 2. | SELECTING VACATIONS | 35 |
| 3. | CR INVOLVEMENT IN PRICING, FEEDBACK | |
|   | NET REVENUE | 36 |
| 4. | HANDLING OF PAYROLL MISTAKES | 37 |
| 5. | FLEXIBLE BENEFITS | 38 |

Margolis Edelstein
Tillman, Marlayna v. P...
006

A33

## ARTICLE I
## DECLARATION OF PURPOSE

The purpose of this Agreement is to insure industrial peace. The parties hereto recognize that without mutual understanding, harmony and cooperation among employees, between employees and Employer, and between Union and Employer, and without uninterrupted operation, it is impossible to conduct Employer's business with the economy and efficiency indispensable to its existence and to the best interest of its employees.

## ARTICLE II
## UNION RECOGNITION:  SCOPE OF AGREEMENT

A.    The Employer recognizes the Union as the sole collective bargaining agency for all employees, at its existing plants located on 3501 Governor Printz Boulevard, Wilmington, Delaware and on 920 South Bolmar Street, West Chester, Pennsylvania, in the classifications covered in Schedule A attached hereto.

B.    This Agreement shall not be construed to extend to nor affect in any way executive or supervisory help or any other classification of employee not expressly covered in Schedule A.   The terms "employee" or "employees" as used in this Agreement shall be construed to include only the classifications of employees covered in Schedule A and shall not be construed to include any employees expressly excepted under this Article.

## ARTICLE III
## UNION SHOP:  HIRING OF NEW EMPLOYEES

A.    Except as herein expressly otherwise provided; Employer agrees, as to all classifications of employees specifically covered by this Agreement, to employ none but members in good standing of Union.   Union agrees to admit to membership all present employees of Employer specifically covered by this Agreement.

B.    Employer shall have the right to secure new employees from any source. However, Employer will call Union to give it first opportunity to provide such employees. Employer reserves the right to reject any person referred by Union.   New employees shall become members of the Union after thirty (30) calendar days of employment or the effective date of this Agreement, whichever is later.   If employment is continued after such thirty (30) day period, Union agrees to accept such employees as members.

C.    Anything in the foregoing to the contrary notwithstanding, the first ninety (90) working days shall be considered a trial period, and during such trial period, Employer shall have the unqualified right to dismiss such new employees, the exercise of such right not being subject to arbitration.

Margolis Edelstein
Tillman, Mar
0i

A34

D.      Any employee who is expelled or suspended from the Union because of nonpayment of dues shall be subject to dismissal seven (7) days after notification in writing to the Employer by the Business Agent, the President, or the Secretary-Treasurer of the Union; provided, however, where such suspension or expulsion is for nonpayment of dues and payment of such arrearages is made within such seven (7) day period, Employer shall not be required to dismiss such employee.  When an employee has been dismissed by the Employer due to his/her suspension or expulsion by the Union, the Employer shall not be required to re-employ or reinstate such employee at any time.

E.      Where any discharge required by this Article III would result in working a hardship upon the Employer, the Employer shall be permitted a reasonable length of time to secure a new employee before making such discharge.

F.      Supervisors or management will not normally perform bargaining unit work (i.e. - Union-defined jobs) except for work being performed currently, training of employees, and emergency situations.

### ARTICLE IV
### HOURS OF WORK

A.      The regular workweek for all employees shall consist of five (5) days on an eight (8) hour basis or four (4) days on a ten (10) hour basis, Monday through Friday.  The regular workday for hourly-rated employees shall consist of eight (8) hours on a five (5) day basis or ten (10) hours on a four (4) day basis.

The regular workweek for Bulk, Warehouse, and Vending Service employees shall consist of five (5) days on an eight (8) hour basis or four (4) days on a ten (10) hour basis Monday through Sunday with the following restrictions:  1.  No more than two (2) Bulk Drivers and Warehouse employees with a Sunday work schedule by the end of 1991.  No more than four (4) Bulk Drivers and Warehouse employees with a Sunday work schedule by the end of 1992.  2.  No more than two (2) Service Department employees with a Sunday work schedule by the end of 1991.  No more than four (4) Service Department employees with a Sunday work schedule by the end of 1992.

Any employee assigned a Saturday or Sunday workweek will receive a flex schedule premium pay of thirty cents ($.30) for all hours worked.

B.      Any hourly rated employee who reports to work at his/her scheduled reporting time shall be guaranteed with (8) hours of work or pay unless such employee has been notified by the company not to report to work at least two (2) hours prior to his/her scheduled start time.

C.      Any driver(s) paid a commission who reports to work at his/her scheduled reporting time and is not permitted to take out his/her route for any reason shall be guaranteed one days vacation pay unless such employee has been notified not to report to work at least two (2) hours prior to his/her scheduled start time.

Margolis Edelstein
Tillman, Marlayna v. Pepsi

D.    For purposes of notification as required in Paragraphs B, C, and H of this Article, an employee shall be required to provide a telephone number at which he/she can be contacted for such notification. One (1) attempt to reach an employee at such number will be considered proper notification. Employer will not be held responsible for a message not communicated to the employee by third parties who answer the telephone at the number given by the employee. If the employee fails to provide a telephone number, the Employer shall have no responsibility for notification as required under this Article.

E.    Hourly-rated employees may be required by the Employer to work on the fifth (5th), sixth (6th) or seventh (7th) days and to work longer than their scheduled shifts in any day. No employee will be required to work longer than 12 hours in any one day.

F.    Overtime pay for any hourly-rated employee shall be time and one-half (1 1/2) times his/her regular straight time hourly-rate for work done over their regularly scheduled shift in any work day or over forty (40) hours in any workweek. Overtime pay for any hourly-rated employee who works on the seventh (7th) day in a workweek shall be double (2) his/her regular straight time hourly rate for all hours worked on that day.

G.    Bulk Drivers shall be guaranteed 8 hours of work or pay on any day for which they are scheduled and report to work and did not receive notification not to report to work. Any Bulk Driver completing his/her scheduled deliveries prior to the end of their shift may be assigned to other duties within the Bulk Department, performing Conventional Relays or within the Transport Department so long as there are no Transport Drivers available to work due to DOT restrictions, and there are no Transport Drivers on Lay Off status.

H.    Employees other than hourly-rated employees may be required by the Employer to work on the fifth (5th), sixth (6th) or seventh (7th) days.

I.    An employee who is called in to perform work prior to but continuing up to his/her regular scheduled shift shall not have his/her regular scheduled shift suspended to avoid the payment of overtime.

J.    Absent emergency situations, the Employer shall give employees twenty-four (24) hours notice of required overtime work scheduled for the fifth (5th), sixth (6th), or seventh (7th) day in accordance with Paragraph (D) above. The Employer will post an "I agree to work overtime" list on a weekly/daily basis, prior to each shift for the purpose of employees making themselves available for available overtime. The purpose of this list is to determine who is interested in volunteering for available overtime. On a "bottom up" basis, senior qualified employees will be required to work if requested. In the event an insufficient number of employees sign the "overtime" list, the Employer may assign such overtime on a bottom-up basis in accordance with the needs of the Employer. This list applies only to Production/Warehouse employees. The Company will assign all overtime work based on seniority and qualifications. When assigning overtime work for machine operator positions (depal, filler, packer, palletizer), the job assignments will be based on seniority and the employee's regularly bidded position.

- 6 -

K.     There shall be no pyramiding of overtime pay.  For example, overtime paid on a daily basis shall not be duplicated on a weekly basis nor shall overtime for the fifth (5th), sixth (6th) or seventh (7th) day and holiday work be duplicated on the basis of daily or weekly overtime hours.  If the overtime pay requirements are met under more than one section of this Agreement, only that section yielding the higher payment will apply.

L.     Unscheduled overtime work at the end of a given shift may be required of the employee performing the required work on that shift and need not be offered to qualified employees on the basis of seniority.

## ARTICLE V
## HOLIDAYS

A.     The following named holidays are observed under this Agreement:

**New Year's Day**            **Martin Luther King Day**
**President's Day**           **Easter Monday**
**Memorial Day**             **Independence Day**
**Labor Day**                **Columbus Day**
**Thanksgiving Day**         **Christmas Day**

When any of these holidays fall on a Sunday and the next day is observed as the holiday, same shall be considered the holiday.  Only employees who work both the scheduled full work day before and the scheduled full work day after any of these holidays shall be entitled to the benefits of this.

B.     Each employee who has been employed a minimum of ninety (90) calendar days prior the holiday and who does not work on a named holiday shall nevertheless be compensated as follows:

1.     Any hourly-rated employee shall receive eight (8) hours of straight time pay at his/her regular hourly rate.  Any hourly-rated employee who works four (4) days at ten (10) hours shall receive straight time pay at his/her regular hourly rate.

2.     All hourly employees on a four (4) ten (10) hour day work week shall receive ten (10) hours straight time pay at his/her regular hourly rate if a holiday falls on his/her scheduled work day.  If the holiday falls outside the employees' normal workweek, he/she shall be entitled to eight (8) hours regular pay at his/her hourly rate.

3.     Route Salesmen and Extra Drivers whose regular rate of pay includes a commission shall receive holiday pay equivalent to that of the daily vacation rate.

- 7 -

Margolis Edelstein
Tillman, Marlayna v. Dana

A37

C.      Each employee who works on a named holiday or in lieu thereof, on the day the named holiday is observed as set forth in A above shall be compensated as follows; provided, however, no employee shall receive holiday pay for working on both the named holiday and the day on which said holiday is observed:

      1.      Hourly-rated employees shall receive double (2) time for all hours worked on said holiday in addition to their straight time holiday pay.

      2.      If the holiday falls on a Saturday, all employees will receive holiday pay as calculated above in lieu of receiving the time off.

D.      When any of the holidays set forth in Paragraph A of this Article falls in the vacation week of an employee, such employee shall receive his/her holiday pay as provided in Paragraph B of this Article.

E.      Any employee placed on layoff in the workweek immediately prior to a holiday will be entitled to holiday pay.

F.      **Personal/Sick Days** - Each employee will be entitled to a maximum of eight (8) sick/personal days in each calendar year earned as set forth below.  When possible, sick/personal days must be mutually agreed to by the employee and Employer, so as not to interfere with the operation of any department.

When an employee has requested a personal holiday at least one (1) week in advance, the Employer agrees to notify the employee at least 48 hours prior to the requested personal day as to the status of the request.  Failure of the Employer to respond to a personal holiday request within the 48-hour period shall be deemed an approval of the requested personal holiday.  In the event an employee requests a personal day after the one (1) week notification period outlined above, the Employer agrees to notify the employee at least 24 hours prior to the requested personal day as to the status of the request.

Any earned personal/sick days not taken by an employee prior to December 15th of each year shall be paid by Employer no later than the last pay period prior to the Christmas holiday.

## ARTICLE VI
## VACATIONS

A.      Subject to Paragraph F of this Article, every employee who has been continuously in the employ of the Employer for one (1) year or more shall be entitled to two (2) weeks' vacation, consisting of consecutive days, with pay, as scheduled by Employer.  Every employee who has been continuously in the employ of the Employer for three (3) years or more shall be entitled to three (3) weeks' vacation with pay as scheduled by Employer.  Every employee who has been continuously in the employ of the Employer for eight (8) years or more shall be entitled to four (4) weeks' vacation with pay as scheduled by Employer.  Every employee who has been continuously in the employ of the Employer for twenty (20) years or more shall be entitled to five (5) weeks' vacation with pay as scheduled by Employer.  Subject to this Article, all vacations shall be taken in weekly increments..

Margolis Edelstein
Tillman, Marlayna v. Penci

B.    The vacation pay for a Route Salesman or Extra Driver whose regular rate of pay includes a commission for each week of vacation to which he/she is entitled shall be his/her average weekly earnings for the preceding year. Average weekly earnings shall be determined by dividing the employee's gross earnings as reported on his/her W-2 Form, minus any bonus monies, for the preceding year by the number of weeks he/she worked during that year.

C.    The vacation pay of an hourly-rated employee for each week of vacation to which he/she is entitled shall be forty (40) hours of straight time pay at the rate being received by the particular employee at the time he/she is given his/her vacation. This also includes Extra Drivers, if their average earnings do not exceed the utility rate.

D.    The length of the vacation to which an employee shall be entitled shall be computed on the basis of the anniversary date of such employee's employment.

E.    Vacations scheduled by the Employer shall be scheduled on the basis of Company seniority within a department (departments designated in Article XV). Once the vacation period has been selected and the vacation list posted, no changes will be permitted. Employer shall have the right to determine the number of employees who may take vacations within any period. The Employer will be reasonable in allowing as many employees as possible to take vacations as long as it does not hinder operations.

F.    Any employee with more than one (1) year's continuous employment who resigns and gives the one (1) week's notice provided in Article X shall be entitled to vacation pay on a pro-rata basis. Thus, such an employee will be entitled to one-twelfth (1/12th) of his/her normal vacation pay for each full month of employment since his/her last anniversary date.

G.    In the event an employee has selected vacation, and with two weeks notice before commencement of that vacation he requests to cancel that vacation, the company will open that week of vacation to bidding by other employees within that department. The company will then allow two additional bids on subsequent vacation weeks that results from the original cancellation of the first employees vacation (three bids in total).

Vacation cancellation requests with less than two weeks notice may be approved at the discretion of the company. If the company approves a cancellation request with less than two weeks notice, the company will make every effort to open that vacant week for bidding by other members of the department. No subsequent bids will be done in this instance.

H.    Subject to the Company's approval an employee with three (3) or more weeks of vacation may voluntarily sell back vacation time (in full week increments), but not below one week of eligibility. In the event an employee wishes to voluntarily sell back vacation time, he must notify the company of his intent to do so one month in advance of the commencement of such vacation. The Company will honor requests of less than one month on a case by case basis. A process for notification will be established by the Company to handle such requests. The Company will continue to handle requests of less than one month on a case by case basis.

Margolis Edelstein
Tillman, Ma
0

A39