# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARLAYNA G. TILLMAN,       :
                             :
        Plaintiff,            :         C.A. Number:  04-1314
                             :
        v.                    :
                             :
THE PEPSI BOTTLING GROUP, INC.,  :
and TEAMSTERS LOCAL UNION 830  :
                             :
        Defendants.       :

## VERIFICATION OF SARA (SWARTZ) ALTMAN

I, Sara (Swartz) Altman, pursuant to 28 U.S.C. § 1746, state the following based

upon my personal knowledge:

1.      I was employed by Defendant Bottling Group, LLC ("PBG") as the
Human Resources Representative (or Coordinator) for PBG from November 7, 2003 until I
resigned on March 3, 2006.

2.      On or about May 8, 2001, PBG hired Plaintiff, Marlayna Tillman, as a
Merchandiser in its Wilmington, Delaware facility.

3.      The Merchandiser position is a non-union position.  Merchandisers
generally work in the Bulk department which primarily services large retail establishments like
grocery stores.

4.      In or around November 2001, Plaintiff was temporarily assigned to
perform merchandising duties in the Conventional department to assist with the Space Race
campaign.  The Conventional department primarily services convenience stores and small retail
establishments.  The "Space Race" campaign was an incentive program offered by PBG to its
convenience store customers.  Under the program, PBG provided incentives to customers in
exchange for enhanced product placement within their stores.  As part of the program, PBG
agreed to reset (clean and reorganize) and merchandise the coolers in customers' stores which
displayed Pepsi-Cola.

5.      A key position in the Conventional department is the Relief Driver
position, commonly called other names including extra man.  The Relief Driver position is
covered by the collective bargaining agreement between PBG and Teamsters Local Union 830
("the Union").  Relief Drivers cover for delivery drivers and are required to single-handedly sell
and deliver product to stores and other retail establishments.

6.    While performing merchandising duties in the Conventional department, Plaintiff expressed an interest in learning to drive a tractor trailer truck and obtaining a Class A Commercial Drivers License ("CDL-A license").

7.    Plaintiff took and failed the written test for a CDL-A in or about May 2002.

8.    Over the next few years, PBG offered Plaintiff additional opportunities to train for her CDL. Specifically, PBG offered Plaintiff the use of a PBG truck on the weekends to train. Plaintiff was also required to drive trucks in PBG's yard in the course of performing her duties. Additionally, PBG researched local truck driving schools for Plaintiff and agreed to permit her to take a leave of absence to attend one of the schools. Plaintiff declined this offer.

9.    In or around September 2004, Plaintiff obtained a CDL-A license. Shortly thereafter, Plaintiff bid for and was accepted for a driving position at PBG. On September 19, 2004, Plaintiff transferred to the position of Transport Driver.

10.    In or around July 2002, Plaintiff applied for and accepted a position as a Warehouse Person. Plaintiff was not transferred to the warehouse until approximately July 29, 2002. Between Memorial Day and Labor Day, the demand for PBG's products increases dramatically. As a result, Plaintiff's transfer was delayed slightly based on business needs. She was not the only employee so affected. Like Plaintiff, John Osciak (Caucasian Male), was awarded a job bid on May 27, 2002, but was not moved into his new position until August 6, 2002.

11.    Pursuant to the collective bargaining agreement between the Union and PBG, Plaintiff became a dues paying member of the Union when she transferred to the position of Warehouse Person. Also pursuant to the contract, Plaintiff's rate of pay at the time of transfer was $12.68 or 80% of the contract rate of $15.75. Two other employees who transferred to the warehouse at approximately the same time, Stan Coleman (Black male) and Bill Becker (Caucasian male), were paid at the same rate. Nevertheless, based on Plaintiff's request, and because Plaintiff, Mr. Coleman and Mr. Becker were all internal transfers, Phil Weber, plant manager at the time, agreed to retroactively pay all three employees the full union rate as of the date of transfer.

12.    On or about November 6, 2003, Plaintiff injured herself at work. As a result of this injury, Plaintiff was out of work until April 19, 2004.

13.    During this time, in March 2004, Plaintiff applied for and accepted employment with RJM Vending. Plaintiff did not advise PBG that she was working for RJM while still employed by PBG.

14.    On or about June 1, 2004, Plaintiff reaggravated her injury and was again out of work until June 24, 2004.

15.    Plaintiff began working for Cott Beverage. Plaintiff did not advise PBG that she was working for Cott Beverage while still employed by PBG.

16.    In or about December 2005, PBG discovered Plaintiff was working for yet another company, J.B. Hunt, while still employed by PBG.

17.    By letter dated January 5, 2005, I notified Plaintiff that PBG was terminating her employment retroactive to December 2, 2004.

18.    Among other things, Plaintiff alleged that she was subjected to disparate treatment based on her sex and race while employed by PBG.

19.    Specifically, Plaintiff alleged that she was verbally reprimanded by Thomas Riley and Glenn Mathews for: "walking the dog"; not being a team player; and leaving work without checking with her supervisor. "Walking the Dog" is the unsafe act of walking in front of motorized equipment (typically a forklift), which violates PBG's safety rules.

20.    Caucasian and/or male employees have been counseled for the same infractions.

21.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of December 2006.

Sara (Swartz) Altman