**3**

1

1

2          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE
3
                    - - -
4
MARLAYNA G. TILLMAN,        :   CIVIL ACTION
5          Plaintiff,        :

6          vs.               :

7   THE PEPSI BOTTLING GROUP,:   **ORIGINAL**
    INC., and TEAMSTERS LOCAL:
8   UNION 830               :
            Defendants.      :   No. 04-1314
9

10                   - - -

11              Wilmington, Delaware
              Tuesday, December 13, 2005
12
                    - - -
13

14          Deposition of MARLAYNA G. TILLMAN,

15   taken pursuant to notice, at the law offices of

16   Ballard Spahr Andrews & Ingersoll, LLP, 919 Market

17   Street, 12th Floor, Wilmington, Delaware, on the above

18   date, beginning at 10:25 a.m., before Donna A.

19   Bittner, RMR-CRR.

20                   - - -

21

22
                DONNA A. BITTNER REPORTING
23          REGISTERED PROFESSIONAL REPORTERS
                    61 Penn Road
24          Voorhees, New Jersey  08043
                  (856) 768-6619

2

1    APPEARANCES:

2           LORI A. BREWINGTON, ESQUIRE
            Margolis Edelstein
3              1509 Gilpin Avenue
               Wilmington, Delaware   19806
4
                  Counsel for Plaintiff
5
            LUCRETIA C. CLEMONS, ESQUIRE
6           Ballard Spahr Andrews & Ingersoll, LLP
               1735 Market Street, 51st Floor
7              Philadelphia, Pennsylvania  19103

8                 Counsel for Defendant
                  The Pepsi Bottling Group, Inc.
9
            MARC L. GELMAN, ESQUIRE
10          Jennings Sigmond
               The Penn Mutual Towers
11             16th Floor
               510 Walnut Street
12             Philadelphia, Pennsylvania  19106-3683

13                Counsel for Defendant
                  Teamsters Local Union 830
14

15   ALSO PRESENT:

16          SARA ALTMAN
            Human Resources Representative
17          The Pepsi Bottling Group, Inc.

18

19                     - - -

20

21

22

23

24

Marlayna G. Tillman                    28

1   two weeks or so.

2      Q.   Okay.

3              MS. CLEMONS:    Can we go off the record

4   for a second?

5              (Discussion held off the record.)

6   BY MS. CLEMONS:

7      Q.   Miss Tillman, do you have in your possession

8   your tax returns for the last few years?

9      A.   Actually I do not.  I have to get copies of

10  those.

11     Q.   Okay.

12     A.   I don't have those at hand.

13     Q.   How about any documents relating to the

14  income you received since you left Pepsi last year?

15     A.   Um, can you give me an example?  Are you

16  talking about pay stubs or something like that?

17     Q.   Any documents that reflect any income you've

18  had since you left work at Pepsi.

19     A.   I can get those documents, yes.

20     Q.   Okay.  Are those documents in the storage

21  facility?

22     A.   Some may be, not all of them.

23     Q.   I want you to take a look at number 7 in the

24  document request.

Marlayna G. Tillman                    40

1       A.    Well, after R & S Strauss there would have

2    been -- I have this written down, too.

3       Q.    Actually I want to ask you to tell me from

4    your memory.

5       A.    From my memory it would be J.B. Hunt, New

6    York Blood Services, RJM Vending and I think that's

7    all I recall from my memory.

8       Q.    Since May of 2001?

9       A.    Yeah.

10       Q.    When did you work for J.B. Hunt?

11       A.    November of 2004 until I believe February

12    2005.

13       Q.    New York Blood Services?

14       A.    August 2005.  No, let me back that up.  July

15    2005 through August 2005.

16       Q.    Did you work between February 2005 and July

17    of 2005?

18       A.    Yes.

19       Q.    Where did you go?

20       A.    There we go, Cardinal Logistics as a driver.

21       Q.    And what were your dates of employment there?

22       A.    That was from February to July of 2005.

23       Q.    Have you been working since July of 2005?

24       A.    Yes.

Marlayna G. Tillman                    41

1    Q.    Where have you been working?

2    A.    Coca-Cola, Bronx, New York.

3    Q.    And are you currently employed there?

4    A.    Yes.

5    Q.    When did you work at RJM Vending?

6    A.    I think it was in March of -- actually I

7    don't recall.  There is no point in me trying to

8    recall that.  I don't know.

9    Q.    Did you work for a company called Cott

10   Beverage?

11   A.    Yes.

12   Q.    When did you work for Cott?

13   A.    It was in June, June 2004, for a period of

14   three days.

15   Q.    Okay.  I want to start with RJM Vending.

16   Tell me what position you held for them.

17   A.    Um, basically it was like a full service

18   vending worker more or less to refill their

19   machines.  He had vending machines.

20   Q.    What position did you apply for?

21   A.    Full service I guess you would call it

22   technician, whatever.

23   Q.    Is that what the position was called?

24   A.    I think so.

Marlayna G. Tillman                42

1    Q.    What were your job duties?

2    A.    Basically just to restock the vending

3    machines.

4    Q.    And were you driving a company vehicle?

5    A.    Yeah -- yes.

6    Q.    Were you operating any other kind of company

7    machinery?

8    A.    No.

9    Q.    How long did you work there?

10   A.    Approximately a week.

11   Q.    Who was your supervisor?

12   A.    You know what, I don't recall his last name.

13   I believe his first name was Robert.  The letters in

14   the business name are his initials.  I think it's

15   Robert J. something.  I don't know his last name.

16   Q.    What was the reason you left?

17   A.    More or less I was still having problems with

18   my leg injury and it was kind of difficult for me to

19   get around.  My leg would like swell up if I was

20   standing on my feet for too long.

21   Q.    What was your salary?

22   A.    I don't recall.

23   Q.    Did you get paid?

24   A.    Yes, I did.  I know it was significantly less

Marlayna G. Tillman                    44

1    Q.   How long was it after your injury that you

2    started to receive short-term disability?

3    A.   It was quite a while, maybe like 10 or 12

4    weeks after.

5    Q.   When were you injured?

6    A.   November 6th, '03.

7    Q.   So that would put it some time in January;

8    correct?

9    A.   Possibly.   That's maybe like 10 weeks.

10   Again, I don't recall the exact dates, so --

11   Q.   I'm not asking you exactly.   You said you

12   thought it was between 10 and 12 weeks.   Do you

13   still think that?

14   A.   I think so.

15   Q.   Did you complete an application for RJM

16   Vending on March 16th of 2004?

17   A.   I really don't know.

18   Q.   Okay.

19   A.   I'm not sure.

20   Q.   Would it jog your recollection if I showed

21   you the application and it's dated March 16th, 2004?

22   A.   Sure.

23            MS. CLEMONS:   Would you mark that?

24            (Exhibit Tillman-8 was marked for

1    receiving short-term disability?

2        A.    Um, after.

3        Q.    So tell me how it is that you came to apply,

4    to work with them.

5        A.    Because I was instructed by my counsel at the

6    time to mitigate my losses and to make up the

7    difference between what I normally was paid at Pepsi

8    and what I was receiving currently, and again

9    because I also asked for light duty status at Pepsi

10   and I was denied that, I was also advised by my

11   attorney, my counsel, to seek other employment.

12       Q.    Were you given light duty status at RJM?

13       A.    I don't think they called it light duty

14   status.  It was a regular position.

15       Q.    Is that a no?  Did you apply for a light duty

16   job at RJM is the question?

17       A.    No.

18       Q.    Next I want to talk about Cott Beverage.

19             What dates were you employed by Cott

20   Beverage?

21       A.    I'm not sure of the exact date, but it was in

22   June of 2004.

23       Q.    And what were your job duties there?

24       A.    I was a switcher.

Marlayna G. Tillman                47

1      Q.   And what does that mean?

2      A.   Basically my job was to jockey the trailers

3    from the yard to the dock.

4      Q.   And what functions were you performing at

5    Pepsi at that time?

6      A.   I was performing no function at Pepsi at that

7    time.

8      Q.   You were employed by Pepsi; correct?

9      A.   Right.

10     Q.   You worked at Pepsi at some point in June of

11   2004; right?

12     A.   Yes.

13     Q.   Okay.  Were you not a transport jockey at

14   Pepsi during that time?

15     A.   Um, I was a floater.  I was in different

16   positions almost all the time.

17     Q.   And one of the positions you filled was a

18   transport jockey; correct?

19     A.   Yes, a yard jockey.

20     Q.   Was that position similar to the position

21   that you applied for at Cott Beverage?

22     A.   Yes.

23     Q.   What was your pay there?

24     A.   Where?

Marlayna G. Tillman                    48

1    Q.    At Cott Beverage.

2    A.    I actually don't recall.  I think it was --

3    it might have been 13 something.

4    Q.    Who was your supervisor?

5    A.    I don't recall his name.  I wasn't there long

6    enough.

7    Q.    What was the reason you left employment with

8    Cott Beverage?

9    A.    Actually they terminated me.

10    Q.    Why did they terminate you?

11    A.    Because I had missed a day during the -- my

12    probationary period.

13    Q.    Tell me how it is that you came to apply for

14    a position with Cott Beverage.

15    A.    If my recollection serves me, I was injured

16    or reinjured or reaggravated my injury to my leg.  I

17    asked for accommodation at work.  I was denied the

18    accommodation and I was told by my supervisor at the

19    time, which was Joe Rizzo, that I had to go out on

20    short-term disability again, so they basically

21    forced me out of work.

22    Q.    That's how you came to apply to work at Cott

23    Beverage?

24    A.    As far as I remember.

Marlayna G. Tillman              49

1    Q.   When did this reaggravation of your injury
2    happen?
3    A.   Some time in June.
4    Q.   You went back to apply at Cott Beverage a
5    month before that; isn't that correct?
6    A.   I don't know.  I don't recall.
7    Q.   Okay.
8              So tell me, did you apply before you
9    said you were forced out or was it after you say you
10   were forced out?
11   A.   As far as I know -- actually I don't recall.
12   Q.   Okay.
13   A.   I don't recall.
14   Q.   Is it fair to say that if you applied before
15   your alleged reaggravation you couldn't have applied
16   because you reaggravated your injury?
17   A.   Rephrase that, please.
18   Q.   You just said, and I can have the court
19   reporter read it back if you like, the reason that
20   you applied for employment at Cott Beverage is that
21   you were forced out of your current, of your
22   position at Pepsi Bottling Group.
23   A.   Um-hum.
24   Q.   Is that what you said?

Marlayna G. Tillman                    50

1     A.    I think so.

2     Q.    Okay.

3           And my question to you is, is that if

4     you in fact applied before this alleged date that

5     you claim you were forced out, one, the forcing out

6     could not have precipitated the actual application;

7     is that correct?

8     A.    I'm not -- I'm not really understanding what

9     you're asking.

10    Q.    If you applied in May --

11    A.    Right.

12    Q.    -- and you didn't get forced out according to

13    you until June, you couldn't have applied because

14    you were forced out; correct?

15    A.    I could not have applied because I was forced

16    out, no.

17    Q.    That's correct or it's not correct?

18    A.    Again, I'm not sure what you're driving at,

19    but --

20    Q.    I think you know exactly what I'm driving at

21    and I'd like an answer to my question.

22    A.    I don't think I know and you might have to

23    clarify a little bit more.

24    Q.    Okay.  Here is my question.

Marlayna G. Tillman                    51

1           If the application happened in May;
2    correct?

3    A.    That's the part we're not clear on.

4    Q.    I'm asking you.  Assume it for the purpose of
5    this question, it happened in May.  Okay?

6    A.    Okay.

7    Q.    You said you reinjured yourself in June;
8    correct?

9    A.    Um-hum.

10   Q.    And you said earlier that the reason that you
11   were applying for application or filled out an
12   application at Cott Beverage is because you
13   reaggravated your injury in June; right?

14   A.    Um-hum.

15   Q.    That's what you said.  So if you in fact
16   applied in May the reinjury could not have caused
17   the application; correct?

18   A.    Correct.

19   Q.    So why is it that you applied to work at Cott
20   Beverage?

21   A.    Because I was looking for a job.

22   Q.    So then why did you just tell me it was
23   because you reaggravated your injury?

24   A.    That's why I took the job at Cott.

Marlayna G. Tillman                    52

1    Q.    Okay.

2    A.    Because I was denied the opportunity to have

3    light duty and I was not accommodated by Pepsi.

4    Pepsi said that you cannot be here with your injury.

5    Q.    Pepsi said to you what?

6    A.    That I could not be in my position with my

7    injury, with my reaggravated injury.

8    Q.    And weren't you told to apply for short-term

9    disability?

10    A.    Yes.   They said that was something I had to

11    do.

12    Q.    Did you do that?

13    A.    No, because I was not claiming disability.

14    Q.    What do you mean you weren't claiming

15    disability?

16    A.    I wasn't disabled.   I was injured and I asked

17    to be accommodated by a chair or be able to use my

18    bumping rights to move someone else in another

19    position so that I could do another position,

20    fulfill another job position that would be more,

21    what's the word I want, I guess more, which would

22    help me not reaggravate the injury, for lack of a

23    better term.

24    Q.    And what happened?

Marlayna G. Tillman                54

1    A.    Yes.

2    Q.    Do you recognize it?

3    A.    Yes.

4    Q.    What is it?

5    A.    A job application.

6    Q.    Is it completed by you?

7    A.    Yes.

8    Q.    Is that your handwriting?

9    A.    Yes.

10   Q.    Do you see the date there at the top of the

11   application?

12   A.    Yes.

13   Q.    Is that May 1st, 2004?

14   A.    Yes.

15   Q.    Did you complete this application on that

16   date?

17   A.    Yes.

18   Q.    Okay.

19           Would you take a look where it says

20   "Position desired"?

21   A.    Yes.

22   Q.    And "Date available."  What does it say the

23   date available is?

24   A.    5/20.

Marlayna G. Tillman                    55

1    Q.    You were available to begin working at Cott
2    Beverage on 5/20/2004?

3    A.    I assume so.

4    Q.    And why was that?  That was again before you
5    reaggravated your injury; correct?

6    A.    Um-hum.

7    Q.    Explain that to me.

8    A.    Nothing to be explained.  I applied for
9    another job and told them that was my available
10   date.

11   Q.    So you were seeking to leave Pepsi in May of
12   2004?

13   A.    Not necessarily.

14   Q.    What do you mean "not necessarily"?

15   A.    I could have been seeking to supplement my
16   income.

17   Q.    I'm not asking what you could have, I'm
18   asking what you did.  There is a --

19   A.    And I said that's not what.

20   Q.    Well, that's why I'm asking you the questions.
21   Tell me why you said you were available on the 20th.
22   If you're telling me it's because you wanted to
23   supplement your income, say that, but don't say it
24   could be.

Marlayna G. Tillman                    58

1    beginning of this job?

2        A.    I'm pretty sure I did.

3        Q.    Was that before or after you were offered the

4    position?

5        A.    I don't recall.

6        Q.    When you went in on the day you had the

7    interview, did you sign any papers?

8        A.    I don't recall.

9        Q.    Do you recall signing any papers?

10       A.    The application I signed.

11       Q.    Tell me about J.B. Hunt.

12       A.    What do you need to know?

13       Q.    You told me the dates of your employment.

14   What were your job duties?

15       A.    More or less to move freight from one

16   location to another.

17       Q.    So you were a driver?

18       A.    Yes.

19       Q.    Does this position require a CDL?

20       A.    Yes.

21       Q.    And you said you were working out of New

22   York?

23       A.    No, New Brunswick, New Jersey.

24       Q.    New Brunswick.  When did you apply for this

Marlayna G. Tillman                    60

1   test and a road test, and if you passed that, then

2   they employ you.

3       Q.   Weren't you employed by Pepsi in November of

4   2004?

5       A.   Yes.

6       Q.   So how is it that you were holding two jobs

7   at the same time?

8       A.   As far as what?  I don't understand.

9       Q.   Let me back up.

10               Was the J.B. Hunt job a full-time job?

11      A.   Yes.

12      Q.   And what were the hours there?

13      A.   They changed also.

14      Q.   What position were you holding at Pepsi at

15  that time?

16      A.   The same position in transport.

17      Q.   So the job you had at Pepsi and the job you

18  had at J.B. Hunt were basically the same job?

19      A.   Yeah, you could say that.

20      Q.   And the job at Pepsi was a full-time job as

21  well?

22      A.   Um-hum.

23      Q.   Okay.  So how were you able to coordinate

24  those two schedules?

Marlayna G. Tillman                61

1      A.    Because I wasn't at Pepsi in November.

2      Q.    You resigned?

3      A.    No.

4      Q.    How is it that you were not at Pepsi in

5   November?

6      A.    I had a doctor's note releasing me from duty

7   with Pepsi.

8      Q.    What was the basis for that doctor's note?

9      A.    Stress leave, stress-related leave.

10     Q.    Stress-related leave from working at Pepsi

11   but not working anywhere else?

12     A.    Correct.

13     Q.    When you started working at J.B. Hunt how

14   long had you had your CDL license?

15     A.    Um, I guess maybe like two months.

16     Q.    Did you tell J.B. Hunt you had your license

17   28 months?

18     A.    28 months?  No, I don't recall that.

19     Q.    Okay.

20                 What is a straight truck?

21     A.    A straight truck is a truck that's not a

22   tractor-trailer meaning there is no -- there is no

23   cab and then a trailer that is linked to it.  A

24   straight truck is just a cab that has the full body

Marlayna G. Tillman                67

1      Q.   Did you receive unemployment since December

2   of 2004?

3      A.   Unemployment, no.

4      Q.   Have you ever received unemployment, well,

5   let's just say in the last five years?

6      A.   Yes.

7      Q.   When?

8      A.   I believe when I was laid off from Pepsi.  I

9   think it was for approximately four weeks, I think I

10  received unemployment from the Department of Labor.

11  I don't know the exact dates.

12     Q.   Were you eventually paid those four weeks

13  through a grievance proceeding by Pepsi?

14     A.   Yes, I was.

15     Q.   Did you pay back the unemployment you

16  received from the Department of Labor?

17     A.   No.

18     Q.   So you kept both the unemployment and the pay

19  for the same period of time?

20     A.   As far as I know.

21              MS. CLEMONS:   It's 12 o'clock.  Do you

22  want to take a break now or do you want to go on?

23              MS. BREWINGTON:   Do you need a break?

24              THE WITNESS:  No.

Marlayna G. Tillman                69

1    stress-related issues due to the job.

2        Q.    Okay.  When did you consult her?

3        A.    I don't recall the exact date.

4        Q.    But it's been some time within the last year?

5        A.    It was last year, I believe.  Oh, wait.

6    We're still in 2005.  Earlier this year.  You know

7    what, I don't even want to say that because I don't

8    know.  I don't know.

9        Q.    Where is Dr. Farside and Dr. Obeidy's office?

10   Where are their offices located?

11       A.    In I want to say Concord Common on Silverside

12   Road at Route 202.

13       Q.    So they're here in Delaware?

14       A.    Yes.

15       Q.    So you consulted them after you moved to

16   Brooklyn?

17       A.    No, I believe it was before I moved to

18   Brooklyn.

19       Q.    And you moved to Brooklyn in November of '04;

20   correct?

21       A.    Yes.

22       Q.    So this is pre, this is before December of

23   '04?

24       A.    Yeah, I believe so.  I don't know the date.

Marlayna G. Tillman                    88

1      Q.    That's fine.  Go ahead.  We can take a break.

2    You can talk to her.

3                     (Recess; 12:27 p.m.)

4                          - - -

5                     (Resumed; 12:29 p.m.)

6    BY MS. CLEMONS:

7      Q.    Miss Tillman, are you seeking any

8    out-of-pocket expenses that you have experienced as

9    a result of this litigation?

10     A.    I don't know how to answer that.

11               MS. CLEMONS:    Let's just have lunch.

12               (At 12:30 p.m. a luncheon recess was

13    taken.)

14                          - - -

15               (The deposition resumed at 1:20 p.m.)

16    BY MS. CLEMONS:

17     Q.    We're back from lunch, Miss Tillman.  I

18    want you to understand you're still under oath and

19    my instructions that I gave you this morning still

20    apply to the continuation of the deposition.

21               Do you understand that?

22     A.    Yes.

23     Q.    Okay.

24               Miss Tillman, were you ever injured

Marlayna G. Tillman                    89

1  while you were working at Pepsi?

2     A.    Yes.

3     Q.    Please tell me about that.

4     A.    I was in one of the Pepsi trucks and upon

5  exiting the vehicle I I guess twisted a tendon in my

6  calf and it tore in a couple places.

7     Q.    Okay.  Did you miss any work as a result of

8  that?

9     A.    Yes.

10    Q.    How long were you out of work?

11    A.    From November '03 to April '04, I believe.  I

12 don't know the exact date.

13    Q.    Did you file a worker's compensation claim in

14 relation to that injury?

15    A.    Yes.  I initially did, I believe, and it was

16 denied and from that point I had to file a

17 short-term disability claim.

18    Q.    Did you file a short-term disability claim

19 related to that injury?

20    A.    Yes.

21    Q.    Did you receive money for short-term

22 disability while you were on that claim?

23    A.    Eventually, yes.

24    Q.    Did you receive worker's compensation for

Marlayna G. Tillman                    90

1    that injury?

2    A.    I'm not really sure actually.  I don't know

3    the money that I received, I'm not sure under which

4    category it fell under.  My attorney would know.

5    Q.    What do you mean?

6    A.    I don't know what it was categorized as.

7    From what my attorney told me it was money that I

8    was entitled to.

9    Q.    Okay.

10         Tell me what your understanding of filing

11   a workman's compensation claim is.

12   A.    Actually I don't have an understanding of it

13   really.  It's quite vague to me.  I guess it's money

14   given to an employee that's injured on the job.

15   That's all I can --

16   Q.    During this period of time from November '03

17   to April '04, were you unable to work at Pepsi?

18   A.    No.

19   Q.    You were able to work?

20   A.    I was, at some specific point I did ask to

21   return to work under light duty.

22   Q.    So was there a period of time where you were

23   totally unable to work?

24   A.    Yes.

Marlayna G. Tillman                    91

1    Q.    Okay.  What was that period of time?

2    A.    I think it was from November to January.

3    Q.    What happened in January that you said

4  allowed you to be able to work in some capacity?

5    A.    My leg was getting better.  I was able to

6  walk without crutches and I asked to come back in a

7  light duty capacity.

8    Q.    So you were not released to return to work,

9  fully released at full capacity; is that correct?

10   A.    Do you mean by my doctor?

11   Q.    Yes.  Did the doctor say you could return to

12  work on full duty and you said in January?

13   A.    No, I didn't say he released me at that time.

14   Q.    No, that's what I'm asking you.

15   A.    You know what, I don't know the exact date

16  when he actually released me to light duty.

17   Q.    Do you remember the conversation, the

18  appointment?  I want you to tell me what you

19  remember about it.

20   A.    I don't remember too much about it, honestly.

21   Q.    Who was your attorney in that matter?

22   A.    Beverly Bove.  She also had co-counsel, Eric

23  Grandell.

24            MS. CLEMONS:    Are we up to 10?

Marlayna G. Tillman                    92

1              COURT REPORTER:   Yes.

2              (Exhibit Tillman-10 was marked for

3      identification.)

4      BY MS. CLEMONS:

5        Q.    I'm going to show you what's been marked as

6      Tillman-10.  Please review the letter and the

7      attachment and let me know when you're ready to

8      answer questions.

9              (Pause.)

10       A.    I'm ready.

11       Q.    Have you ever seen this document or the

12     documents attached to it before?

13       A.    The only document I saw was Page 2.

14       Q.    Okay.

15             You saw the document at Page 2?

16       A.    Yeah.

17       Q.    You never saw the agreements and the receipt

18     of compensation at the end of these pages?

19       A.    No, I did not.  In fact, I was going to say

20     that Page 2 is a, an actual, an altered version of

21     what I saw meaning I saw the, had a check that was

22     made out to me, but it wasn't in this amount and it

23     was from, it was on my attorney's letterhead, so

24     this is like a different version of some of the same

Marlayna G. Tillman                    93

1    information.

2      Q.   Okay.

3            So you didn't cash this check?

4      A.   Um, this one, no, because they made it out,

5    it was given to my attorney first.  My attorney

6    signed it on behalf of me and issued me another

7    check.

8      Q.   Okay.

9            So your attorney signed this check and

10   deposited it?

11     A.   I believe so, because this is not the check

12   that I got.

13     Q.   Did you give your attorney permission to sign

14   this check?

15     A.   I can't recall signing any documents that did

16   that, no.

17     Q.   So you're saying you did not cash this check?

18     A.   No.

19     Q.   And you never saw these two documents

20   attached at the end of this?

21     A.   Never saw it.

22     Q.   If you're telling me your attorney never

23   passed this on to you, will you give us permission

24   to contact your attorney, because this is clearly,

Marlayna G. Tillman                    94

1   did you read the first letter?

2     A.   I never saw -- I didn't see this.  Eric

3   Grandell saw this.

4     Q.   What I'm saying is, you read this letter;

5   correct?

6     A.   Just now, yes.

7     Q.   And you're saying your attorney never

8   presented this information to you?

9     A.   Never presented this information to me.

10    Q.   Will you give us permission to talk to your

11  attorneys about this matter?

12          MS. BREWINGTON:   No, we're not going

13  to give permission for you to talk to them.

14          MS. CLEMONS:  If she's saying she's acted

15  on advice of counsel then we're going to have to go to

16  the Judge because she's basically saying her attorney

17  has committed fraud is basically what she's saying.

18          THE WITNESS:  I can't confirm or deny

19  that because I don't know what their intent was, but

20  I never saw this.

21          MS. CLEMONS:   This is a serious

22  allegation if you're saying your attorney did not

23  present this information to you.

24          THE WITNESS:  It's not an allegation,

Marlayna G. Tillman                    95

1    that's a fact.

2              MS. BREWINGTON:    What she's saying is

3    this was not the check that was presented to her,

4    that her attorney presented her with another check.

5              MS. CLEMONS:    But you also see that

6    there is an agreement that explains what the

7    compensation is and a receipt for receiving it;

8    right?

9              THE WITNESS:    You don't see my

10   signature on there.

11             MS. CLEMONS:    Miss Tillman, I'm

12   talking to your attorney.    What I'm saying is it

13   explains exactly what it's for.    There are letters

14   back and forth from her attorney saying exactly what

15   the compensation was for and if her attorney did not

16   relay that to her, then that is an issue.

17             MS. BREWINGTON:    What is your

18   question?

19             MS. CLEMONS:    My question is did her

20   attorney relay the information contained in this

21   document to her and she's saying no.

22             THE WITNESS:    My answer is no.

23             MS. BREWINGTON:    What information are

24   you talking about?

Marlayna G. Tillman                96

1          MS. CLEMONS:    About the amount of the

2    check, what it was for, what the agreement

3    contained, the information contained in this letter

4    and its attachments.

5          THE WITNESS:    So the whole thing as a

6    whole, you're asking me did I see any of this?

7          MS. CLEMONS:    I'm not asking if you saw

8    it.  You said you didn't see it.  I'm asking did the

9    attorney convey the information that's contained in

10   these documents and attachments to you?

11         THE WITNESS:    As it's here, no.

12   BY MS. CLEMONS:

13   Q.    Did you give your attorney permission to

14   settle a worker's compensation claim for you?

15   · A.    Um, again, I sought counsel from this

16   attorney and I retained this attorney.  As to what

17   I, you know, actually gave her permission to do, um,

18   I'm unclear on that because I don't know what she

19   actually did, to be quite honest.

20   Q.    I'm not asking you what she did.  I'm asking

21   you what you gave her permission to do.

22   A.    To represent me.  I gave Beverly Bove

23   permission to represent me.  I retained Beverly

24   Bove.  She put Eric Grandell on the case.

Marlayna G. Tillman                    97

1    Q.   And what I'm asking you is, did they consult

2    you before they agreed to settle your claim?

3    A.   In what capacity?  I know that --

4    Q.   About the terms of the settlement.

5    A.   No.

6              MS. CLEMONS:   I've got to go get

7    another document.

8              (Pause.)

9              (Exhibit Tillman-11 was marked for

10   identification.)

11   BY MS. CLEMONS:

12   Q.   I'm showing you what's been marked as

13   Deposition Exhibit 11.

14              Miss Tillman, have you ever seen

15   Deposition Exhibit 11 before?

16   A.   I believe I did see this.

17   Q.   Tell me what it is.

18   A.   It's an outline of settlement terms.

19   Q.   How did you receive this letter?

20   A.   I don't recall.  I don't recall if I went

21   into the office for this or if it was mailed to me.

22   Q.   Okay.  So --

23   A.   And I'm not sure if this is the exact

24   document.  It may have been another document that

Marlayna G. Tillman                    98

1    kind of outlined similar information.

2       Q.   Are you saying that in some way the

3    information contained in this letter was relayed to

4    you?

5       A.   In some of it, yes.

6       Q.   What was relayed to you?

7       A.   That they were investigating whether I paid

8    into a disability fund and that will determine

9    whether the amount of 7,700 was back owed by me or

10   if I was entitled to receive it because that was at

11   issue.

12      Q.   Anything else in this letter relayed to you?

13      A.   Not that I recall.

14      Q.   You don't recall that the information about

15   you were being paid workers' comp. for a period of

16   total disability from November of 2003 to April of

17   2004 was related to you?

18      A.   I'm sorry.  Rephrase that for me.

19      Q.   What was your understanding of why you were

20   receiving disability money?

21      A.   Again, that's the part that's unclear to me.

22   I don't know why I received that money.  My attorney

23   did not make that clear to me, did not specify to me

24   what that money was for.

Marlayna G. Tillman                    107

1    Q.    Did you file a workers' compensation claim

2    for that injury?

3    A.    No.

4    Q.    Any other injuries?

5    A.    Not that I can recall.  You know what, now

6    that I'm thinking about it, this probably needs to

7    be on the record, when you are injured at work, at

8    Pepsi, you're required to call 1-800 Job Hurt, which

9    is a number that Pepsi gives for their employees to

10   call.

11            That can be what generates a claim and

12   probably that is because I physically don't recall

13   making any claim, but I do recall after having an

14   injury having to call 1-800 Job Hurt for any type of

15   injury sustained on the job.  Now, that may be where

16   it originated from, but again because I'm not

17   familiar with the process I wouldn't know.

18   Q.    But you don't recall filling out a workers'

19   compensation claim?

20   A.    I don't recall.

21   Q.    Okay.

22            When did you start working at Pepsi?

23   A.    May of 2001.

24   Q.    What position were you hired into?

Marlayna G. Tillman                     108

1    A.    Merchandiser position.

2    Q.    How long were you in that position?

3    A.    Until I think July 2002.

4    Q.    What was the next position you assumed?

5    A.    Warehouse position.

6    Q.    How long were you in that position?

7    A.    I guess in some form until November of 2004.

8    I mean, I'm sorry, September 2004, correction.

9    Q.    What position did you apply for in September

10   of 2004?

11   A.    A driver position, a transport driver

12   position.

13                 MS. CLEMONS:    I'm sorry, I missed

14   that, if you could just go back.  We had the

15   merchandiser from May '01 through?

16                 THE WITNESS:    July 2002.

17                 MR. GELMAN:    What was the one after

18   that?

19                 MS. CLEMONS:    Warehouse person.

20                 MR. GELMAN:    And what were the dates?

21                 THE WITNESS:    July 2002 to I guess

22   September 2004.

23                 MR. GELMAN:    Okay, fine.  My

24   apologies.

Marlayna G. Tillman                    109

1    BY MS. CLEMONS:

2        Q.    And what were your duties as a merchandiser?

3        A.    To visit different locations, stores, retail

4    outlets, to make sure that the Pepsi product was on

5    the shelves, make sure that they have, you know,

6    sufficient quantities in their back stock.

7        Q.    Anything else?

8        A.    As far as merchandising, no.

9        Q.    What about warehouse?

10       A.    Warehouse was basically building pallets of

11   product.  I was kind of like a floater.  I did

12   several different things in the warehouse including

13   production work.

14       Q.    What does that mean?

15       A.    Basically, um, I guess where they actually

16   manufacture the soda, working on the bottle and can

17   lines, what else, operated a forklift, I loaded

18   trucks, loaded route trucks, loaded bulk trucks,

19   built bulk load, just about every facet of the trade

20   in the warehouse.  But I would also like to back up

21   for a minute to my merchandising position.

22       Q.    Miss Tillman, there is no question pending

23   about the merchandising position.  I will get back

24   to it and I will let you answer, but right now I

Marlayna G. Tillman                    113

1    did deliveries.

2       A.    I did deliveries with the other Pepsi workers

3    in the conventional department.  I did what was

4    called cooler resets at different --

5       Q.    Is that the same thing as you're saying did

6    deliveries or is that a different --

7       A.    No, they're independent.

8       Q.    Tell me what you mean when you say you did

9    deliveries.  Tell me what you would do.

10      A.    Deliveries means I would ride with another

11   Pepsi employee to a location, say Saturn, Saturn,

12   the car manufacturing plant, and we would open up

13   the bays of the truck and pull off product and take

14   it into their location for use in their vending

15   machines, their cafeteria, wherever, you know, they

16   required it, the product to be at.  That's one thing

17   that I did.

18      Q.    Okay.

19      A.    I did cooler resets, which means you travel

20   to different stores, 7-Eleven, Wawa, mom and pop

21   stores.  You go into their cooler where our product

22   is kept and you pull everything out and reset the

23   shelves and put everything back in in a orderly

24   fashion based on what our core requirements were at

Marlayna G. Tillman                    114

1    that time.

2        Q.    Okay.

3        A.    I did vending machine, full-service vending

4    machine refills, going to the different locations,

5    MBNA, going to the cafeteria, opening up the

6    machines, refill them with soda as part of my

7    conventional duties.    What else did I do?

8        Q.    Is that not the same thing as one of the

9    primary job duties as set forth?

10       A.    No, that's a little different.

11       Q.    Merchandising a store?

12       A.    Merchandising basically was supermarket work.

13   You go into a Pathmark or, you know, Shop Rite,

14   Super G, and you go to the back stock room and you

15   put all your soda on a cart and you roll it out to

16   the shelves and stock the shelves.

17       Q.    That's what a merchandiser's basic primary

18   function was.    Like I said, I did that and then

19   some, which was what I just outlined before.

20       Q.    So you told me about doing deliveries, doing

21   cooler resets and then full service vending

22   machines.

23               Anything else?

24       A.    I'm sure there were other things.    Like I

Marlayna G. Tillman                    118

1   to do which required me to drive the Pepsi van.

2      Q.   So every other day then?

3      A.   If you want to call it that.  It was frequent

4   enough.

5      Q.   I don't want to call it anything.  I want you

6   to tell me how often you were out on the truck.

7      A.   I can't quote you specific exact times, just

8   like I haven't been able to quote you anything

9   specific.  You're asking me to remember stuff from

10  three years ago.

11     Q.   You filed a lawsuit about these issues and I

12  have to ask you about them and so you have to tell

13  me, to the best of your recollection, what you

14  remember.

15     A.   That's my recollection.

16     Q.   So now you're saying it's not every day?

17     A.   I said I will be liberal and say --

18     Q.   Probably half the time?

19     A.   Half and half if I wasn't out on a trip.  I

20  might have been out on a trip Monday, Wednesday and

21  Friday and doing research on Tuesday and Thursday,

22  or it might have flipped and I was doing resets on

23  Monday, Wednesday and Friday.

24     Q.   Anybody else you went out on a truck with

Marlayna G. Tillman                126

1  if he was absent, Bob Ziegler and Scott Johnson were
2  like fill-in supervisors.
3      Q.   What was Bruce Wray's position?
4      A.   I don't know his exact title.  I just figured
5  he was the merchandiser supervisor.
6      Q.   How about Craig Nelson?
7      A.   Craig Nelson was the conventional department
8  supervisor.
9      Q.   Do you know what his title was?
10     A.   No.
11     Q.   How about Bob Ziegler and Scott Johnson, do
12  you know what their titles are?
13     A.   They're the same as Bruce, I thought.  I
14  don't know.
15     Q.   How about while you were a warehouse person,
16  who was your supervisor?
17     A.   Tom Riley.
18     Q.   Anyone else?
19     A.   Sometimes we took direction from Glen
20  Matthews.
21     Q.   But he wasn't your supervisor or he was?
22     A.   I don't think he was because I didn't have
23  too much interaction with him.  It was usually with
24  Tom and if I was working nighttime it would be like

Marlayna G. Tillman                    128

1    A.    There were other people on the floor, but

2  more or less, we didn't like directly come in and

3  say, Oh, Tom, what am I going to do today.  We

4  already knew.  We would just come in.  Tom ran the

5  department during that time --

6    Q.    Okay.

7    A.    -- and we'd do our work.

8    Q.    Was there anybody who reported to Tom who

9  also gave you direction is what I'm trying to find

10  out.

11    A.    Sure.

12    Q.    Who?

13    A.    Those two people I mentioned, Glen Matthews,

14  John O'Barra, Lou Capelli, Bob Grundy.  It just

15  depended on what shift you were on.  These guys came

16  in and out different shifts.

17    Q.    So did Glen Matthews, John O'Barra, Lou

18  Capelli and Bob Grundy, did they hold the same

19  position?

20    A.    I don't know what their title was.  I know

21  they were supervisors.  I don't know what their

22  title was.

23    Q.    Those four people were supervisors?

24    A.    As far as I know, yes.

Marlayna G. Tillman                136

1    Q.    It's the Charge of Discrimination.

2    Q.    Do you have that now?

3    A.    Yes.

4    Q.    Starting at the beginning of the document it

5    says, "I am a black female individual who has been

6    employed by respondent since May 8th, '01."  Then it

7    says, "Since or about October 1, '01 and continuing

8    to present, the respondent has denied me various

9    promotional opportunities, particularly for driver

10   positions."

11             Please describe to me every promotional

12   opportunity that you contend you were denied while

13   working at Pepsi.

14   A.    There were several different driver

15   positions.  Delivery driver position was posted.

16   Q.    Tell me when they were posted and what the

17   positions were.

18   A.    I don't know the exact dates of when they

19   were posted.

20   Q.    Give me an approximation or something.  You

21   filed a claim saying you were denied a promotion.

22   We have to be able to defend that claim, therefore

23   we have to know what you're claiming you were

24   denied, so you have to tell me what it is that this

Marlayna G. Tillman                137

1   claim is based on.

2      A.   Again, there were driver positions that were

3   posted that --

4      Q.   Which year?  Around what time?  What position

5   were you in?  You have to give me something more

6   than positions that were posted.

7      A.   Okay.  Driver positions in 2001, 2002, 2003

8   and actually 2004.  Eventually we got to the part

9   where I did get the position.

10     Q.   Are these transport driver positions?.

11     A.   No.   There were some that were delivery

12  driver positions, also transport.  There were other

13  postings that I applied for during all those years.

14     Q.   I'm not talking about, I want to talk about

15  the driver positions one at a time.  Let's do it one

16  at a time.

17            You said delivery driver position?

18     A.   Um-hum.

19     Q.   When did you apply for that position?

20     A.   Again, I have that information, but I don't

21  have it at hand.

22            MS. BREWINGTON:   Can I interject?

23            MS. CLEMONS:   Yes.

24            THE WITNESS:  Do you want me to make it

Marlayna G. Tillman                    138

1    up?

2              MS. BREWINGTON:    No.   Would reviewing

3    the Complaint help refresh your recollection?

4              THE WITNESS:   No, because it's not

5    listed in there.   It's not listed.   But again, like

6    I said, there were positions posted in 2001, '2,

7    2002, 2003.

8    BY MS. CLEMONS:

9    Q.    Are you telling me you applied for every

10   delivery driver position that was posted in those

11   years?

12   A.    There were probably only two and I did apply

13   for them.   There was a full service vending position

14   that was posted.

15   Q.    I want to take it position by position.   I

16   need you to do it the way --

17   A.    That requires driving.

18   Q.    Is it considered a delivery?   You said a

19   delivery driver position.   Is that the title of the

20   position or is that just --

21   A.    Yes.   That's the title of one of the driving

22   positions, yes.

23   Q.    You say you think you applied for that job

24   twice?

Marlayna G. Tillman                139

1    A.    Yes.

2    Q.    You don't remember which of the four years we

3    just went through that you applied for those

4    positions?

5    A.    I think one was in 2001 and one was in 2002.

6    Q.    Okay.  How did you apply for the position?

7    A.    With a bid form.

8    Q.    In 2001 you applied with a bid form?

9    A.    I believe so.

10   Q.    Were you a member of the union in 2001?

11   A.    I should have been, but no, I wasn't.

12   Q.    My question was, were you a member of the

13   union in 2001?

14   A.    And my answer was I should have been, but I

15   was not.

16   Q.    Were you a dues paying member of the union?

17   A.    No, because I was not allowed to become one.

18   Q.    Did you pay any dues?

19   A.    No, because I wasn't allowed to become a

20   member of the union.

21   Q.    So you submitted a bid form in '01?

22   A.    Yes.

23   Q.    In what other year?

24   A.    I believe 2002.

Marlayna G. Tillman                    140

1    Q.    Any other position other than the delivery

2    driver that you applied for that you claim you were

3    denied a promotional opportunity?

4    A.    Full service vending driver.

5    Q.    When did you apply for that job?

6    A.    I believe that was in 2002.

7    Q.    And how did you apply for that job?

8    A.    Bid form.

9    Q.    By the way, who was awarded the delivery

10   driver positions?

11   A.    I don't know off the top of my head.

12   Q.    Were they people already within the union?

13   A.    I'm not sure.  It might have been.  I'm not

14   sure.

15   Q.    To your knowledge are jobs awarded based on

16   seniority in union positions?

17   A.    I believe so.

18   Q.    Any other jobs you applied for that you claim

19   you were denied promotional opportunity?

20   A.    I applied for, I'm not sure of the title, the

21   exact title, but I believe it was jockey.

22   Q.    In what year did you apply for that job?

23   A.    I think that was also 2002.

24   Q.    And how did you apply for that job?

Marlayna G. Tillman                    141

1     A.    Bid form.

2     Q.    Who was awarded that position?

3     A.    Gary DiProsperos.

4     Q.    Was he a member of the union?

5     A.    I believe so, yes.

6     Q.    Did he have more seniority than you?

7     A.    I don't know the answer to that only because

8  Gary was a transfer from a different Pepsi plant, so

9  I don't know what his status was or how many years.

10    Q.    Was he working at the plant when you began

11 working in the warehouse?

12    A.    I don't know if he came before or after me.

13 I don't know.

14    Q.    Any other positions?

15    A.    I applied for loader.  I'm trying to think.

16 Loader, I think that was it.

17    Q.    How many times did you apply for the loader

18 position?

19    A.    Um, I think that was posted twice actually.

20 That was a couple of times.

21    Q.    And in which years?

22    A.    I believe it was 2003.  I think both of them

23 were in 2003.

24    Q.    Who were awarded the positions?

Marlayna G. Tillman                    142

1      A.    I think -- you know, I can't be sure, but I
2    think it was Chris Eastlack and Leroy Lewis.
3      Q.    Did Mr. Eastlack and Mr. Lewis have more
4    seniority than you did?
5      A.    Yes.
6      Q.    Who was awarded the full service vending
7    position?  Did I ask you that?
8      A.    I think they brought somebody in from another
9    plant.  I think they brought in Mike Shimmel from
10   the West Chester location.  Actually I'm not a
11   hundred percent sure.
12     Q.    Was he a member of 830?
13     A.    I believe so.
14     Q.    Do you know if he had more seniority than you
15   did?
16     A.    I'm pretty sure he did.
17     Q.    Any other positions?
18     A.    Not that I can recollect right now.
19     Q.    You've told me about the delivery driver
20   which you said you applied for twice, the full
21   service vending driver, the jockey and the loader
22   which you applied for twice.
23           Anything else you can recall?
24     A.    Well, transport.  I applied for a transport

Marlayna G. Tillman          145

1    have been hired before got the job?

2        A.    No, I didn't say that.

3        Q.    Okay.   So then what are you telling me?

4    Because I'm asking you about these jobs and if you

5    filed a grievance in relation to your application

6    with any of these positions.

7        A.    I'll have to research my grievances.

8        Q.    I'm asking you.

9        A.    I'll have to research it.   I don't want to

10   quote something and not be clear on it.

11       Q.    Are you saying you don't recall if you did,

12   you don't know if you did?   Yes or no.   I mean,

13   either you did or you didn't or you don't remember.

14       A.    Relax.   Try decaf.

15             I will review my records and I'll let

16   you know.   Right now I don't recall.

17       Q.    Starting with the delivery driver position,

18   tell me what facts you have personal knowledge of

19   that would lead you to believe you were denied that

20   job based on your race or your sex.

21       A.    Basically just the fact that I was the only

22   female in that department and that I applied and I

23   had experience based on my work in the conventional

24   department and based on the fact that it was always

Marlayna G. Tillman                146

1    awarded to somebody else other than myself.

2       Q.    Anything else?

3       A.    No.

4       Q.    How about for the full service vending

5    position, what facts are you aware of that support

6    your contention that you did not receive that

7    position based on your race or sex?

8       A.    The same answer.

9       Q.    Because you were the only female in the

10   department, because you had experience and it was

11   awarded to someone else?

12      A.    Yes.

13      Q.    The same question, jockey position.

14      A.    Pretty much the same answer.

15      Q.    The loader position?

16      A.    The same answer.

17      Q.    An transport driver position?

18      A.    Same answer.

19      Q.    Are you aware of anyone else who would have

20   any knowledge of facts that would support your

21   contention that you were denied promotional

22   opportunities based on your race or sex?

23      A.    I would have to say Peyton Spencer was a

24   person that offered some information regarding --

Marlayna G. Tillman                    152

1          MS. BREWINGTON:    Okay.    The question
2     has been asked and answered.
3                     MS. CLEMONS:    You've got to be kidding
4     me.
5                     THE WITNESS:    You've got to be kidding
6     me, too.
7     BY MS. CLEMONS:
8        Q.    Have you now told me all the facts and every
9     person you know who may possess facts that support
10    your claim that you were denied promotional
11    opportunities based on your race or sex?
12       A.    As far as I know, yes.
13       Q.    A little further down in your charge you say,
14    "My supervisors, Glen Matthews and Tom Riley, hold
15    me to a higher standard than my white male
16    co-workers with regard to rules and regulations."
17       A.    Uh-huh.
18       Q.    Tell me the basis for your allegation that
19    you were held to higher standards than your white
20    male co-workers.
21       A.    Because if you look at me --
22       Q.    Miss Tillman, I want you to testify from your
23    memory.    Okay?    Tell me what you remember.
24       A.    I remember being verbally reprimanded, called

Marlayna G. Tillman                153

1    into the office for a procedure called walking the

2    dog.  At the time this happened there were white

3    male co-workers doing the very same thing when I was

4    in the office being reprimanded, which I pointed out

5    to Tom Riley.

6              I was threatened with termination.

7    Nobody else got called up to the office for that,

8    even though you could look down on the floor and see

9    guys walking the dog.

10    Q.   Anything else?

11    A.   That's holding me to a higher standard, I

12    think.

13    Q.   Anything else?

14    A.   I was basically reprimanded for not being a

15    team player by Tom and Glen, more or less saying I

16    wasn't coming to the assistance of other employees

17    that needed help, and actually when they brought me

18    into the office to tell me this, they had forms

19    ready to write me up for that so-called infraction.

20    Q.   What so-called infraction?

21    A.   Not being a team player, not helping the

22    other guys out, walking the dog, whatever they were

23    going to write me up for.  They had paperwork

24    sitting right there on the desk because apparently

Marlayna G. Tillman                154

1    they had already decided that this was something

2    they were going to write me up for.

3        Q.    Anything else, Miss Tillman?

4        A.    Anything else you want to know?  That's about

5    it.

6        Q.    I want to know what the basis of your claim

7    is that you were held to a higher standard than your

8    white male co-workers and you've told me two things.

9            Is there anything else?

10       A.    When I requested a transfer I wasn't allowed

11   to have a transfer.

12       Q.    Requested transfers to who?

13       A.    To Tracey, whereas other employees have, you

14   know, come and gone and been able to go into

15   different positions in different areas when they

16   requested that, so --

17       Q.    Anything else?

18       A.    No, not off the top of my head.

19       Q.    This is the time.  This is the deposition.

20       A.    I can't think of anything now.

21       Q.    And it's our opportunity to ask you questions

22   about your lawsuit.  Is there anything else you

23   recall?

24       A.    Not right now.

Marlayna G. Tillman                    155

1    Q.    You said you were verbally reprimanded for
2    walking the dog.  Tell me about that.
3    A.    Basically I was, you know, building my
4    pallets and Tom Riley called me into his office and
5    he said that he observed me walking the dog and that
6    it was a safety hazard and if he ever saw me doing
7    it again he would terminate me right on the spot.
8    Q.    Anything else?
9    A.    Yeah.  I pointed out to him, we were looking
10   out of the window, overhead window, that there were
11   several people down on the floor at that time doing
12   the exact same thing.  That's where I learned the
13   technique from, from my co-workers, who did it all
14   the time.
15   Q.    Anything else happen in that conversation?
16   A.    Yeah.  After that Tom called a quick
17   conference because he wanted to explain to everybody
18   now that there was no more walking the dog, but
19   first he had to reprimand me first.
20   Q.    He called you into his office.  Was there
21   anyone else there?
22   A.    No.
23   Q.    Did he give you a formal written reprimand
24   for this?

Marlayna G. Tillman                    156

1    A.    No.  He was going to, but he did not.

2    Q.    How do you know he was going to?

3    A.    Because he had paperwork in his office, a

4    write-up, a pending write-up, and once I pointed out

5    to him that other people were doing it, I guess that

6    shot his plan.

7    Q.    Miss Tillman, did you see a write-up that was

8    written out with your name on it?

9    A.    Yes, I saw a write-up and then he got rid of

10   it.

11   Q.    Was there any change in your salary as a

12   result of this verbal, this conversation or incident

13   you just talked about?

14   A.    A change in my salary?

15   Q.    Yes.

16   A.    Not that I know of.

17   Q.    Was there a change in your hours?

18   A.    My hours always changed.

19   Q.    What I'm saying is, you said that he called

20   you in and gave you a verbal and told you not to do

21   this anymore?

22   A.    Um-hum.

23   Q.    As a result of that were your hours changed?

24   A.    I don't know how to answer that because again

Marlayna G. Tillman                  157

1    my hours, I don't know if it was changed as a direct
2    result of that.  My hours changed all the time.
3       Q.    Was there a change in your schedule?
4       A.    Yeah.  My hours changed all the time.
5       Q.    As a result of getting this --
6       A.    I don't know that.
7       Q.    Were you transferred from your position as a
8    result of this incident?
9       A.    You have to define transfer because I didn't
10   work in the same department all the time.  I could
11   be the next day in production and the next day I
12   could be, you know, back on the floor loading
13   trucks.  The next day I could be building pallets.
14   The next day I could be, you know --
15      Q.    So that happened all the time is what you're
16   saying?
17      A.    Yes.  So define transfer.
18      Q.    Were you told we're transferring you because
19   of this incident?
20      A.    No.
21      Q.    Did you lose any seniority as a result of
22   this incident?
23      A.    No, I don't think so.
24      Q.    Obviously, you weren't fired for this

Marlayna G. Tillman                    158

1   incident; right?

2       A.   No.

3       Q.   And you said that Tom called a meeting with

4   the rest of the warehouse?

5       A.   Yeah, as an afterthought, yes.

6       Q.   And what did he say at that meeting?

7       A.   He told all the guys that nobody else was to

8   walk the dog anymore.

9       Q.   Hadn't Tom said that in previous meetings

10  that no one should be walking the dog, as it's

11  called?

12      A.   Not in my previous meeting I was in.

13      Q.   Had you recently arrived at the warehouse?

14      A.   Yes.

15      Q.   So for all you know he had discussed it at

16  previous meetings?

17      A.   I don't know that he did, not at any meeting

18  I was at.

19      Q.   But he did tell the others in that meeting

20  that they should not be walking the dog; right?

21      A.   Afterwards, after he reprimanded me, yes, he

22  did.

23      Q.   Did anyone else hear him reprimanding you?

24      A.   No, nobody else.  He called me specifically.

Marlayna G. Tillman                    159

1    He picked me out of the crowd and brought me into

2    the office.

3        Q.    Okay.

4                And Tom is black; isn't that right?

5        A.    Yep.

6        Q.    Anything else about that incident you have

7    not told me?

8        A.    Not that I'm aware of.

9        Q.    I'm sorry?

10       A.    Not that I'm aware of.

11       Q.    And you did file a grievance about that

12   incident; isn't that correct?

13       A.    Um-hum.   No, no.   I filed a discrimination

14   complaint.

15       Q.    You didn't file a grievance about this issue

16   with Tom Riley?

17       A.    Um, no, I don't think I did.   I went straight

18   to the Department of Labor with that.

19       Q.    The next thing you told me about is you were

20   reprimanded for not being a team player.   Tell me

21   about that.

22       A.    More or less we were building bulk pallets

23   and, um, when you, you know, finish whatever your

24   allotted amount of builds are, you know, most of the

Marlayna G. Tillman                160

1   guys just go home or whatever, and I was told that,
2   you know, I left and didn't help anybody else, which
3   was totally false.  It was a falsehood.  I helped a
4   couple of people build pallets before I left for the
5   evening, and I explained that to Glen Matthews.
6       Q.   Okay.  Is that the entire incident?
7       A.   As far as that goes, for not being a team
8   player, yeah.
9       Q.   Where did this conversation occur?
10      A.   In the upstairs warehouse office.
11      Q.   So it was just you and Glen Matthews?
12      A.   Tom Riley was also there.
13      Q.   Did Tom say anything?
14      A.   Not when I was talking to Glen, no, because
15  Tom just kind of sat in.  He didn't really have
16  anything to say.
17      Q.   And what did you say?
18      A.   I told Glen more or less that, you know, he
19. had his facts wrong and that I was helping a couple
20  people on the floor before I left for the evening.
21      Q.   Did you receive any kind of formal reprimand
22  for this?
23      A.   No.
24      Q.   Was your salary changed?

Marlayna G. Tillman                161

1    A.    Not that I know of.

2    Q.    Was there any change in your hours that you

3    know of as a result of this reprimand?

4    A.    Again, I don't know if it was as a result,

5    but my hours always changed.

6    Q.    I'm asking you to your knowledge.  Every

7    question is to your knowledge.  Was your schedule

8    changed as a result of this incident?

9    A.    I don't know that it was or was not.

10   Q.    Okay.

11         Were you transferred as a result of

12   this incident?

13   A.    Again, we're going over the same issues.

14   Q.    This is a different question.  I asked you

15   that question about the previous incident and now

16   I'm asking you that question about this incident.

17   A.    But transferring, again, I worked in

18   different departments.  You could say that I was

19   transferred if they transferred me down to the

20   production room.  You could say I was transferred if

21   I was transferred out to do yard work, you know what

22   I mean, so --

23   Q.    I'm asking you, to your knowledge were you

24   transferred as a result of this incident?

Marlayna G. Tillman                162

1    A.    I can't --

2    Q.    If you don't know, then the answer is I don't

3    know, but that's my question.

4    A.    Well, I don't know.

5    Q.    Okay.  That's a perfectly acceptable answer.

6              Did you lose any seniority as a result

7    of this incident?

8    A.    Not to my knowledge.

9    Q.    The last thing you told me about was you said

10   there was a transfer request you made to Tracey.

11   Tell me about that.

12   A.    A couple of times.  I also made that same

13   request to Scott Steiger.

14   Q.    You said Tracey first, so tell me first about

15   when you made the request to Tracey.

16   A.    That's when Tracey first came to the

17   Wilmington facility.  She knew about some of the

18   problems that I was having with management and I

19   told her I just didn't feel comfortable being the

20   only female at the plant.  I felt like I was in a

21   hostile work environment.  I felt like I wasn't

22   wanted there and I wasn't wanted there by the

23   supervisors, and I asked her to visit the

24   possibility of me getting a transfer to anywhere,

Marlayna G. Tillman                163

1   any other Pepsi, just, you know, I just wanted to go

2   somewhere else where I wouldn't be the only female

3   in the department.

4       Q.   And you're saying this was during a

5   conversation with Tracey?

6       A.   Yes.

7       Q.   And what did Tracey say in response to that?

8       A.   That was something that she could look into.

9       Q.   You're saying this is when Tracey first

10  arrived?

11      A.   Yes.  And we had another conversation about

12  it also with Scott Steiger where we had a meeting

13  together.

14      Q.   Hold on.  Let's finish up the first

15  conversation with Tracey.

16          What did she say?  What did she say she

17  would do?  What was the result of the conversation?

18      A.   There was no result.  If you're talking about

19  an action, a course of action, there was none.  She

20  said she would look into it and she just never got

21  around to doing anything about it obviously because

22  I'm still there.

23      Q.   Did you apply for positions anywhere else?

24      A.   No, not -- well, you know what, I looked into

Marlayna G. Tillman                    164

1  going, the possibility of going to West Chester, and

2  I remember trying to set up something where I could

3  talk to John West, but that never came to fruition

4  either, so --

5      Q.   I'm confused by your answer.  Did you apply

6  for a position at West Chester?

7      A.   No, I didn't formally apply.  I was basically

8  just trying to get information on what was available

9  at the West Chester plant.

10     Q.   Did you ever meet with him?

11     A.   No.

12     Q.   So have you told me everything you recall

13 about this first request to Tracey for information

14 about a transfer?

15     A.   As far as I know.

16     Q.   Did you make any additional requests to

17 Tracey for information about a transfer?

18     A.   Not until we had a meeting with Scott

19 Steiger.

20     Q.   And when was that?

21     A.   I think it was some time in August, August

22 2002.  I'm not real clear on that.

23     Q.   And what happened at that meeting?

24     A.   Basically we were just discussing, you know,

Marlayna G. Tillman                    165

1      Q.    I want you to tell me what the conversation

2      was about transfer, what you said, what they said,

3      and if you don't know verbatim, that's fine, but

4      give me the gist of what the conversation was.

5      A.    As far as transfer goes?

6      Q.    Yes.

7      A.    I talked with Scott.  Tracey really didn't

8      have anything to say at that meeting, it was

9      basically Scott.

10                  Scott told me that he felt a transfer

11     was not needed, I just needed to resolve whatever

12     issues that I had at the Wilmington plant, and so

13     therefore, you know, a transfer wasn't really a

14     viable solution.

15     Q.    Did Scott tell you that you wouldn't be

16     permitted to transfer?

17     A.    No, but by the tone and the way he spoke to

18     me in the conversation it seemed like he was

19     alluding to that, you know, there was no chance for

20     me to get a transfer.

21     Q.    Did he ever tell you not to apply for

22     positions at other plants?

23     A.    No.

24     Q.    Did you ever --

Marlayna G. Tillman                    166

1       A.    But I never asked him could I either.

2       Q.    Did you ever apply for any other positions

3    outside of the Wilmington plant?

4       A.    No.   I applied for everything else inside the

5    plant, trying to get out of the warehouse.

6                    (Exhibit Tillman-17 was marked for

7    identification.)

8    BY MS. CLEMONS:

9       Q.    I'm showing you what's been marked Deposition

10   Exhibit 17.

11                    Take a minute and review that.

12                    (Pause.)

13      Q.    Have you had a chance to read the first

14   paragraph of this document, the paragraph titled

15   one, Miss Tillman?

16      A.    Um-hum, yes.

17      Q.    Does this refresh your recollection as to a

18   conversation you had with Tracey about moving to a

19   different facility?

20      A.    Yeah.   That was much later than the first

21   conversation, but yes.

22      Q.    So is this a separate conversation from the

23   two you've already told me about?

24      A.    Yeah.

Marlayna G. Tillman                      172

1    your race or sex?

2        A.    It was probably based on the claims that I

3    filed.   That's where the retaliation comes in.

4        Q.    So you --

5        A.    I believe I was denied promotions based on my

6    filings with the DDOL.

7        Q.    You were denied --

8        A.    Promotions.

9        Q.    We're talking about transfers right now.   Are

10   we talking about -- I want to talk about transfers.

11   If you want to tell me something about promotions,

12   we can go back and talk about promotions, but I

13   asked you to tell me everything that formed your

14   basis about your claim for promotions and you didn't

15   say anything about retaliation.   We can go back

16   there, but I'm asking you now about transfers.

17   Okay?

18                   Tell me what it is that you believe

19   that --

20       A.    I believe that because I filed the charges

21   that my work environment was made increasingly

22   hostile towards me.   Anything that I --

23       Q.    Conclusions don't help me.   I need you to

24   tell me the facts.   I'm asking you about facts.

Marlayna G. Tillman                    177

1    and regulations?

2    A.    As far as I know, yes.

3    Q.    In this charge you also claim that you were

4    paid lower wages than your white male co-workers for

5    the same work.

6                 Please tell me what the basis of your

7    claim is.

8    A.    Exactly that.  When I came into the

9    department I was making a lower wage than my white

10   male counterparts.

11   Q.    Which department?  You held three different

12   jobs, so tell me which jobs you're talking about,

13   what salary.

14   A.    The warehouse department.

15   Q.    Warehouse?

16   A.    When I was a union worker.  When I was in the

17   conventional department when I was a union worker

18   doing union work, I should say.

19   Q.    Okay.

20   A.    I still was held at the same rate as a

21   merchandiser.

22   Q.    Please tell me, you're talking about two

23   different times then?  You're saying when you were a

24   merchandiser and when you were in the warehouse?

Marlayna G. Tillman                    178

1      A.    Um-hum.

2      Q.    Let's start with when you were in the
3    warehouse.

4                   Tell me what facts you have that
5    support your claim.

6      A.    Pay stubs.

7      Q.    Tell me what you were paid versus what you
8    say your co-workers were paid.  Tell me who they
9    were and what positions they held.

10     A.    The Department of Labor did that
11   investigation.  They have that information on who
12   was paid what versus mine, my salary.

13     Q.    Miss Tillman, you made this allegation.  Tell
14   me who it is you contend that you were paid less
15   than.

16     A.    The warehouse workers.  Pick one.

17     Q.    You're saying all warehouse workers?

18     A.    Throw a dart at the dartboard.  Whose ever
19   name comes up run the payroll records.

20     Q.    You contend that you were paid less than all
21   your male counterparts the entire time you worked in
22   the warehouse?

23     A.    I didn't say the entire time.  You just said
24   that.

Marlayna G. Tillman                179

1    Q.    Then tell me what you're talking about.

2    A.    I just told you what I was talking about.

3    Q.    Tell me what period of time you contend while

4    you were working at the warehouse you were paid less

5    than your white male co-workers.

6    A.    As soon as I came into the warehouse.

7    Q.    Tell me when.

8    A.    If that's July 2002.  I don't know when my

9    level of pay changed.  They have that information.

10   I can dig it up.

11   Q.    What is the level of pay you're contending

12   that you were paid and they were paid?

13   A.    I was paid I think 12.68 and the warehouse

14   guys were between 15.75 and 16 something, 16.63,

15   whatever.

16   Q.    Are you contending you were the only

17   warehouse worker that was paid 12.68?

18   A.    At that time, yes.

19   Q.    What if I could show you documents that there

20   were two other male employees who were paid exactly

21   the same rate?

22   A.    Okay.

23   Q.    Would you contend then that it was based on

24   your gender or your race?

Marlayna G. Tillman                    180

1      A.    Yeah.

2      Q.    Why?

3      A.    Well, because again I was a union employee.

4  Whether, you know, anybody wants to acknowledge it

5  or not, I was doing union work way back when I was

6  in the conventional department, so my rate should

7  have reflected that way back then.

8      Q.    I'm asking you about the warehouse

9  department.  I want to talk about merchandiser when

10 we get there.  I'm talking about the warehouse.

11     A.    It doesn't matter.

12     Q.    We're talking about the warehouse position.

13 You just said when you came in July of 2002 you were

14 paid 12.68 and that the other members of the union

15 were paid at least 15.75.  That's what you said.

16     A.    Um-hum.

17     Q.    And I said to you what if there is evidence

18 that a black male and a white male were also paid

19 12.68 in July when they came into the warehouse.

20 Would you still contend that it was based on your

21 race or sex?

22     A.    Yeah, I think I would.

23     Q.    Why?

24     A.    Because again we go back to when I felt I

Marlayna G. Tillman                    184

1    Q.    Okay.  So beginning in August when you became
2    a member of the union were you paid at the 15.75
3    rate?
4    A.    I don't know when it was, but I eventually
5    did get 15.75, yeah.
6    Q.    And is that what the union rate says it
7    should be is 15.75?
8    A.    Yeah.
9    Q.    Are you contending that you were not paid in
10   line with this wage schedule?
11   A.    Yes, for some period of time, yes, that is
12   what I'm contending.
13   Q.    Why?  Tell me about that.
14   A.    Because I wasn't paid that rate when I
15   initially came into the warehouse.
16   Q.    You were not a member of the union for 30
17   days; isn't that correct?
18   A.    I was not a member of the union.
19   Q.    Correct.  Right?  You were not a dues paying
20   member of the union until you were actually brought
21   into the union 30 days later; correct?
22   A.    Yeah.
23   Q.    And doesn't the contract, we can pull out the
24   language, it provides for a period where you're paid

Marlayna G. Tillman                185

1    for 80 percent of the applicable rate?  Did you not

2    know that?  I mean if you want to go through the

3    contract, we can, but did you know about the

4    training rate of 80 percent?

5        A.    No, not in --

6        Q.    Let's find it.  On Page 29 do you see that

7    where it says Section 2, step rates?

8        A.    Yeah.

9        Q.    "Newly hired employees should be paid

10   according to the following step rate schedule."  Do

11   you see that?

12       A.    Um-hum.

13       Q.    Where it calls for someone who has been in

14   the union zero to 12 months gets 80 percent, 13 to

15   24 months, 90 percent, and 25 months thereafter 100

16   percent?

17       A.    Um-hum.  It also says they reserve the right

18   to waive the step rates at any time.

19       Q.    And they did that, right, by raising you to

20   that rate within a month of when you got there?

21       A.    Yeah, but they probably should have been

22   doing that about a year prior to that.

23       Q.    Okay.

24                    Are you aware that two other

Marlayna G. Tillman                    201

1      A.    Approximately, give or take.

2      Q.    I'm going to show you your earnings

3   statements.  Were you compensated for all the

4   mileage that you submitted?

5      A.    There were times when it was in question.

6      Q.    Tell me about that.

7      A.    Well, again when I went to the conventional

8   department I didn't receive the mileage anymore

9   because during the week I was driving the company

10  van, so that mileage was taken away from me, but it

11  was also taken away from me on the weekends, too,

12  because on the weekends I worked as a merchandiser.

13  I was holding down the same two positions.

14     Q.    When you say it was taken away from you, you

15  weren't actually driving your car; correct?

16     A.    Absolutely not.

17     Q.    So wasn't the mileage reimbursement --

18     A.    That was --

19     Q.    Hold on.  Wasn't the mileage reimbursement

20  for you driving your own personal car?

21     A.    Right.

22     Q.    So when you weren't driving your personal car

23  for work you didn't receive the mileage; correct?

24     A.    Yeah.  There were sometimes when I did drive

Marlayna G. Tillman                202

1    my car, like on the weekends, when I wasn't paid for

2    it, because they assumed that I was still driving

3    the van during the week.

4        Q.    So are you telling me you did not receive

5    mileage reimbursement while you were working in the

6    conventional department?

7        A.    Right.

8        Q.    Okay.

9                (Exhibit Tillman-21 was marked for

10    identification.)

11    BY MS. CLEMONS:

12        Q.    Miss Tillman, you now have a collection of

13    earnings statements in front of you.  Do these look

14    familiar to you?

15        A.    Yes.

16        Q.    Now, what were the dates you were in the

17    conventional department?

18        A.    October '02 -- I mean October '01 through May

19    '02.

20        Q.    So why don't you turn to where these start in

21    October and look through May and tell me every place

22    where you got reimbursed for mileage.

23                Would you just tell me which, when you

24    get there, which period and how much mileage you got

Marlayna G. Tillman                      222

1    merchandisers were laid off at the time you were
2    transferred to the conventional department?
3         A.   I can't comment on that one way or the other.
4    I don't know.
5         Q.   Did anybody ever tell you, rather than being
6    laid off, we'll transfer you to the conventional
7    department?
8         A.   Nope.
9         Q.   Paragraph 15 --
10        A.   Because again I was still in the
11   merchandising department.  I still had my
12   merchandising duties, so they obviously still needed
13   help in merchandising.
14        Q.   My question was, you were in the bulk
15   department; correct?  You were on the bulk side
16   working for Bruce; right?
17        A.   Bulk merchandising.
18        Q.   Right.  My question was, did you know any
19   other merchandisers who worked in the bulk who got
20   laid off at the same time?
21        A.   No.
22        Q.   You said no.  Then I said did anyone ever
23   tell you that rather than lay you off they would
24   transfer you to do merchandising duty in the

Marlayna G. Tillman                    223

1    conventional department rather than lay you off, and
2    you said no.
3        A.   No.  I wasn't transferred out of the
4    merchandising department.  That's my point.
5        Q.   I didn't say merchandising department.  I
6    said bulk and conventional.
7        A.   Bulk is merchandising.
8        Q.   Merchandiser position is merchandising.  I'm
9    talking about in the merchandising position.  The
10   position is called merchandiser; correct?
11       A.   Bulk merchandiser.
12       Q.   In the department called bulk; correct?
13       A.   Um-hum.
14       Q.   You were transferred from the bulk department
15   to the conventional department is your contention;
16   correct?
17       A.   In addition to being in -- it wasn't instead
18   of.  It was in addition to that.
19       Q.   So your contention is that you were
20   performing duties in both departments?
21       A.   Thank you.  Yes.
22       Q.   Tell me what your schedule was.
23       A.   My schedule varied.
24       Q.   Tell me what you remember.

Marlayna G. Tillman                226

1      Q.   Would you look at Paragraph 18?  Read that to
2    yourself.
3      A.   Okay.
4      Q.   Did you receive overtime pay while you were
5    working in the conventional department?
6      A.   Yes.
7      Q.   So the statement that you were not receiving
8    any overtime pay is not a correct statement?
9      A.   It needs to be adjusted.
10     Q.   To what?
11     A.   It should say that I wasn't receiving
12   overtime pay at the correct rate.
13     Q.   And what is the correct rate?
14     A.   Whatever extra man wages were.
15     Q.   So you're not contending that you weren't
16   paid time and a half at your rate, you're contending
17   you weren't paid time and a half under the union
18   rate; correct?
19     A.   Correct.  And also that under the union guys
20   got double time for working on Sunday which I didn't
21   receive at all.
22     Q.   Again at this time you were not a member of
23   the union; correct?
24     A.   Right.

Marlayna G. Tillman                    239

1    were agreed to a full and fair release of the
2    grievance having to do with this issue?
3        A.    No.   That was for something different and I
4    do distinctly remember there being a grievance that
5    was signed off on but not by myself.   There was one
6    without my signature at all on it.
7        Q.    I'm sure Mr. Gelman will get to the
8    grievances, but you don't recall that one of the
9    grievances you released had to do with this issue?
10       A.    Not with this issue.   I recall it being
11   something else.
12       Q.    Any other times that you talked to Tracey or
13   anyone else in HR about back pay?   Am I correct that
14   by back pay you mean being paid the union wage?
15       A.    Yes.
16       Q.    Did you talk to anyone else in Pepsi HR about
17   that issue?
18       A.    It may have been brought up with Scott Steiger.
19       Q.    First tell me what did Tracey tell you.
20       A.    That I wasn't owed that money.
21       Q.    And why did she say that?   Did she give you a
22   reason?
23       A.    I don't recall a reason actually.
24       Q.    Didn't Tracey tell you that you needed to

Marlayna G. Tillman                240

1    have a CDL in order to get the position of an extra

2    man or a relief driver and that that's why you

3    weren't able to bid or apply for that job?

4        A.    That might have been, yeah, in speaking of

5    applying for a certain job, yes, that she did

6    mention that, but that wasn't what was at issue for

7    me.

8        Q.    Okay.

9        A.    What was at issue was the fact that I was in

10   the conventional department, which was a union

11   position, performing union-based duties.

12       Q.    Tell me what your basis is for believing that

13   every position in the conventional department is

14   unionized.

15       A.    That's my knowledge.    That's the knowledge I

16   have.

17       Q.    Have you ever seen a document that says that

18   every employee of the conventional department is a

19   member of the union?

20       A.    No.    My recollection is that the positions

21   described, um, within the job description were

22   positions that I performed and those were union

23   positions, union duties.

24       Q.    But were there duties on those descriptions

Marlayna G. Tillman                    241

1    that you did not perform?

2        A.    Um, not to my knowledge.  As far as I know I

3    did a little bit of everything.

4        Q.    Did you take orders from customers?

5        A.    No.    That's the sales department.

6        Q.    I'm asking, did you take orders from customers?

7        A.    No.

8        Q.    Did you take money from customers for payment

9    for deliveries?

10       A.    No.

11       Q.    Did you keep a route book?

12       A.    No.

13       Q.    Did you drive a tractor-trailer alone?

14       A.    Not alone.

15       Q.    How often did you drive a tractor-trailer

16   with someone else?

17       A.    I think we went over it, but it was

18   frequently.  I can't count how many times.

19       Q.    That you actually drove?

20       A.    And they sat in the seat next to me as a

21   passenger, yes.

22       Q.    To your knowledge was a CDL Class A license a

23   requirement of the delivery driver position?

24       A.    Yes.

Marlayna G. Tillman                243

1    receive the training through the company and at the

2    time they weren't making that available to me,

3    although they have made it available to other

4    people.

5        Q.   Tell me who it is that you contend received

6    company training in order to get a CDL.

7        A.   James Bell, Matt Casey, Charlie Rogers.

8    There are a couple other drivers.  Those are three

9    guys that I know of.

10       Q.   What training did they receive?

11       A.   They were allowed to use the company trucks

12   to go and take their CDL test.  In fact, Matt Casey

13   told me that he took it like three or four times

14   because he kept failing and they allowed him to go

15   back and keep retesting until he actually passed the

16   test.

17       Q.   Weren't you allowed to take the company truck

18   to go take your CDL?

19       A.   Actually I was one time given the truck,

20   however the day that I took the truck, um, I wasn't

21   aware that I had to take a written exam first, so

22   the day that I took the truck, um, I wasn't allowed

23   to use the truck.  I had to take the written exam

24   first.  Actually I failed that written exam, so

Marlayna G. Tillman                    245

1    A.    Not that I'm aware of.

2    Q.    Did she tell you in an e-mail that you could

3    use a truck to take on days off and that you could

4    use a truck to take the test, just to let her know

5    when you wanted to do that?

6    A.    Um, no, I don't recall that actually.

7    Q.    Okay.

8               How about Rhonda, didn't Rhonda tell you

9    that you could use a truck on your day off to learn

10   how to do it, to practice driving?

11   A.    No.  I think what they were telling me is

12   that's what other drivers did.  They did not tell me

13   that I specifically could do that.

14   Q.    Okay.

15              Did you ever do that?

16   A.    Um, the only driving I got in was when I was

17   actually out driving with the guys in the

18   conventional department or the -- I kind of learned

19   by doing some of the jockeying in the yard, but that

20   wasn't, you know, a requirement of some of the

21   positions that I was doing, so I kind of learned on

22   the fly, if that's what you mean.

23   Q.    And didn't Rhonda tell you that you should

24   bid into a union position so you could build

Marlayna G. Tillman                    247

1   who did not have a Class A CDL?

2      A.    I don't know.

3      Q.    So you don't know of anyone?

4      A.    I don't know the answer.  No, I don't have an

5   answer to that.

6      Q.    So if there were other people who were denied

7   the ability to apply for the position who were white

8   men, would you have any basis to dispute that?

9      A.    Say that again.

10     Q.    Okay.

11           If there are white men who will testify

12   that they were not permitted to apply or bid on this

13   position because they did not have a CDL, would you

14   have any reason to dispute that?

15           MS. BREWINGTON:   I'm going to object,

16   calls for speculation, but you can answer.

17           THE WITNESS:  I don't even know how to

18   answer that.

19   BY MS. CLEMONS:

20     Q.    I'm just saying, do you know of anything that

21   would contradict that?

22     A.    I can't answer that.

23     Q.    When did you get your CDL license?

24     A.    September 2004.

Marlayna G. Tillman                    248

1    Q.   And how long after you got that license were

2   you awarded the bid for a driver position?

3    A.   I think it was sometime also in September.

4    Q.   Within a few weeks?

5    A.   I think so.

6    Q.   So why is it that you didn't previously

7   receive your CDL?

8    A.   Because there was never an opportunity for me

9   to take the truck out again until then.

10    Q.   Are you saying that you were not permitted to

11   use a truck to take your test and that's why you

12   never passed your CDL before September of '04?

13    A.   Um, yeah, I'm saying that I was always given

14   like, you know, an excuse as to why, you know, there

15   were no trucks available or whatever.

16    Q.   Anybody you know during that time who was

17   allowed to use a truck?

18    A.   I don't think anybody else went for a license

19   at that time.   I'm not sure.

20    Q.   Take a look at Paragraph 42.

21    A.   Okay.

22    Q.   What company policy are you referring to for

23   hiring within?

24    A.   Well, I was always told that they have a

Marlayna G. Tillman                    252

1    incident came up and all that stuff.

2    Q.   Okay.

3            Anything else?

4    A.   No.

5    Q.   Did you tell Tom Riley and Glen Matthews that

6    you filed a complaint of discrimination?

7    A.   No.

8    Q.   To your knowledge, were they aware that you

9    filed a complaint of discrimination?

10   A.   Probably not until they were served with the

11   document.

12   Q.   Are you telling me they were served with the

13   specific complaint, Tom Riley and Glen Matthews?

14   A.   Actually I think Rhonda Curry was, but --

15   Q.   So I'm asking, to your knowledge, did you

16   ever tell them that you filed a complaint?

17   A.   No, I never told them.

18   Q.   Did they ever tell you that they knew you

19   filed a complaint?

20   A.   No.

21   Q.   Did anyone ever tell you that they knew you

22   filed a complaint?

23   A.   Did anyone ever tell me that they knew I

24   filed a complaint?

Marlayna G. Tillman                    253

1    Q.   Yes.

2    A.   No, not to my knowledge.

3    Q.   Okay.

4              Paragraph 52.

5    A.   Okay.

6    Q.   This is referring to the walking the dog

7    incident and you previously told me all the facts

8    you know about that incident; correct?

9    A.   Um-hum.   Yes.

10   Q.   Okay.

11             At the end of this paragraph it says,

12   "No individual in the department was reprimanded for

13   this activity."

14             Is that a true statement?

15   A.   No other individual in the department was

16   reprimanded in the manner that I was for that

17   activity, no.

18   . Q.   What do you mean by "in the manner that you

19   were"?

20   A.   Well, I was pulled aside solo and reprimanded

21   verbally and I was threatened with termination.   If

22   you're talking about the little afterthought

23   conference that Tom had with everybody else, they

24   weren't disciplined in the same manner that I was.

Marlayna G. Tillman                    254

1    Q.   I'm asking, do you have knowledge -- how

2    would you know if he ever pulled another employee

3    aside and told them the same thing?

4    A.   He didn't do it that day.

5    Q.   So you're talking about that day in reference

6    to this comment?

7    A.   Right.

8    Q.   So if other employees would testify at

9    different times on different days Tom Riley gave

10   them the same riot act that you say he gave you

11   about walking the dog, would you have any

12   information to dispute that?

13   A.   I wouldn't.

14   Q.   Paragraph 55.  Is it true that you were laid

15   off with no forecast for recall?

16   A.   Yes.

17   Q.   Paragraph 56.

18   A.   Okay.

19   Q.   Is that a true statement, that you were the

20   only individual not recalled to work two days later?

21   A.   To my knowledge, yes.

22   Q.   If there were other employees who were not

23   called back two days later, would you have any

24   information to dispute that?  Do you have any

Marlayna G. Tillman                    255

1  documents or firsthand knowledge?

2      A.    No, only what I was told by an employee who

3  was called back.

4      Q.    So your knowledge that everybody was called

5  back was based on what somebody else told you?

6      A.    One of the affected group, yes.

7      Q.    And you filed a grievance about this;

8  correct?

9      A.    Yes, I did.

10     Q.    And you were paid for the entire four weeks

11 you were laid off, correct, as a result of that

12 grievance?

13     A.    Yes.

14     Q.    Paragraph 59.

15     A.    All right.

16     Q.    You said, "Plaintiff's supervisor started

17 creating a disciplinary file on plaintiff."

18            What are you referring to?  Did you see

19 a file of some sort?

20     A.    They had, I guess it's a file, it's a

21 document that shows you how many occurrences and

22 stuff that you have which prior to that I had never

23 seen anything like that before.

24     Q.    Okay.

Marlayna G. Tillman                256

1              Isn't it true that there was a new

2     attendance policy put into place around this time?

3     A.    I really couldn't tell you.

4     Q.    In this paragraph you talk about an

5     eight-minute acceptable window for tardiness.

6              What is that?

7     A.    Basically, it just refers to a window of time

8     that employees had to punch in without being, you

9     know, I guess reprimanded for it or without having

10    something put in their file.

11    Q.    Where did you learn about this eight-minute

12    window of time?

13    A.    Again, that was something that was like

14    common knowledge or custom or whatever.

15    Q.    Paragraph 60.

16    A.    Okay.

17    Q.    Tell me about this incident.

18    A.    I came into work.  I punched in.  I was

19    walking across the floor to my station.  My cell

20    phone, which was on my person, rang, and I answered

21    it and the plant manager, who was on the floor at

22    the same time, basically started screaming at me,

23    you know, you're not supposed to have your cell

24    phone, you're not supposed to answer cell phones,

Marlayna G. Tillman                257

1   there is no phones supposed to be in the plant, and
2   just basically yelling at me on the floor, and I was
3   actually on the phone and this guy was like
4   screaming in my ear, and there were a couple people
5   that, you know, were there.

6          It was just kind of embarassing that,
7   you know, he was yelling at me in front of people,
8   so, and he really didn't have to, you know, in my
9   opinion, didn't have to take that position.  He
10  could have just, you know, just pulled me to the
11  side or, you know, basically in a calm, cool,
12  collected fashion, you know, tell me, hey, that's,
13  you know, something that we don't do or whatever.
14  Q.   Hadn't another supervisor just the day before
15  told you not to use your personal cell phone on the
16  floor?
17  A.   I don't recall that.
18  Q.   Did this incident result in any change to
19  your salary?
20  A.   To my salary, no.
21  Q.   Your hours?
22  A.   Not as far as I know.
23  Q.   Your schedule?
24  A.   Well, again we talked about my schedule

280

ORIGINAL

1

2              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF DELAWARE

3                 —        —        —

4      MARLAYNA G. TILLMAN,              :   CIVIL ACTION
                    Plaintiff,           :
5
            vs.                          :
6
       THE PEPSI BOTTLING GROUP          :
7      INC., and TEAMSTERS LOCAL         :
       UNION 830                         :
8                   Defendant            :   NO. 04-1314

9                 —        —        —

10

11                  Philadelphia, Pennsylvania
                    Wednesday, October 11, 2006
12
                  —        —        —
13

14             Continued Deposition of MARLAYNA G.

15     TILLMAN, taken pursuant to notice, at the law

16     offices of Ballard Spahr Andrews & Ingersoll, LLP,

17     919 Market Street, 12th Floor, Philadelphia,

18     Pennsylvania, on the above date, at approximately

19     11:00 a.m., before Terry Barbano Burke, RMR-CRR.

20

21

22                  DONNA A. BITTNER REPORTING
                 Registered Professional Reporters
23                        61 Penn Road
                 Voorhees, New Jersey   08043
24                      (856) 768-6619

DONNA A. BITTNER REPORTING

281

APPEARANCES:

J. STEPHEN WOODSIDE, ESQUIRE
Law Office of J. Stephen Woodside
    One Montgomery Plaza
    425 Swede Street, Suite 605
    Norristown, Pennsylvania  19401

        Counsel for the Plaintiff

LUCRETIA C. CLEMONS, ESQUIRE
AISHA M. BARBOUR, ESQUIRE
Ballard Spahr Andrews & Ingersoll, LLP
    1735 Market Street, 51st Floor
    Philadelphia, Pennsylvania 19103
        Counsel for the Defendant
        The Pepsi Bottling Group, Inc.

MARC L. GELMAN, ESQUIRE
Jennings Sigmond, P.C.
    The Penn Mutual Towers
    16th Floor
    510 Walnut Street
    Philadelphia, Pennsylvania  19106-3683

        Counsel for the Defendant
        Teamsters Local Union 830

        -      -      -

DONNA A. BITTNER REPORTING

295

Marlayna G. Tillman

1   Pepsi Bottling Group, Inc.

2              MS. CLEMONS:  No.  The proper name of

3   Pepsi is Bottling Group, LLC.  It is doing business

4   as Pepsi Bottling Group.  In every pleading we

5   identify that as such.

6              MR. WOODSIDE:  Fine.  That's the

7   defendant no matter how they're captioned and

8   Document Request No. 24 Pepsi is asked for federal,

9   state and local tax returns, including W-2 forms,

10  and any and all schedules and attachments for the

11  years 1999 through 2004 and for future years as

12  they become available.

13             After consulting with the client,

14  reviewing this, and having seen this before and

15  having produced to Pepsi, as well as Local 830,

16  every document that we have in our possession

17  relating to any document request by any defendant

18  in this case, and Mr. Gelman has received copies of

19  everything as well, the plaintiff will agree to

20  produce her federal tax returns and any schedules

21  and attachments for the years for which she was

22  employed by Pepsi Bottling Group, which would be

23  2001, 2002, 2003, and 2004.  We will not produce a

24  tax return for 1999 and we will not produce any tax

296

Marlayna G. Tillman

1    returns relating to any income earned or for any
2    period after her employment with Pepsi ended, which
3    was, I believe, in November of 2004.  And we will
4    not produce any future returns as they become
5    available.
6                 They are highly irrelevant and the
7    objections are carried forward from our
8    interrogatory answers to this document request, and
9    this material will not be produced.  So with
10   respect to that statement on the record, counsel
11   for Pepsi has presented me with a form 4606 T,
12   request for transcript of tax return, and the
13   plaintiff has agreed to sign inasmuch as she cannot
14   locate any returns right now.  She will sign this
15   request transcript form for the years I just stated
16   on the record, and Pepsi can obtain them directly
17   from the IRS.
18                 The only position I have would be that
19   as regards any documentation received from the
20   Internal Revenue Service that the plaintiff be
21   served with any material received by Pepsi's
22   counsel.
23                 I think that should take care of
24   things for today.

410

Marlayna G. Tillman

1    Q.   I guess that's perhaps up for dispute.

2              I guess now is as good a time as any,

3    and some of this was covered in your last

4    deposition, and I am going to try my best not to

5    have you repeat anything that you discussed there.

6    It serves no purpose.  However, I suppose it would

7    be most helpful for today's deposition if we could

8    go back and try and create a time line.

9              What was the first position you held

10   with Pepsi?

11   A.   Merchandiser.

12   Q.   What was your date that you became a

13   merchandiser?

14   A.   May 8th, '01.

15   Q.   What was the next position you held at Pepsi?

16   A.   That would be in the conventional department.

17   Q.   And when did you attain this position?

18   A.   Approximately October of '01.  I would say,

19   my best recollection is October 13th of '01.

20   Q.   And then at a certain point you left the

21   conventional department?

22   A.   Yes.

23   Q.   And where did you go after that?

24   A.   Actually, I was returned back to the

411
Marlayna G. Tillman

1    merchandising department.

2        Q.    Do you recall the date?

3        A.    I want to say May of 2002.

4        Q.    At any point did you then leave the

5    merchandising department?

6        A.    Yes.  Let me make sure.

7                July, I believe July 2002 I was made a

8    member of the warehouse.  So I got a position in

9    the warehouse.

10       Q.    Some time thereafter you became a member of

11   the union?

12       A.    Yes.

13       Q.    When you were in the merchandising

14   department, and I'm not sure if you said

15   merchandising department or merchandiser, is it

16   fair to say your job title was as a merchandiser?

17       A.    Yes.

18       Q.    And do you contend that a merchandiser is a

19   position that was covered under the collective

20   bargaining agreement between the union and Pepsi?

21       A.    The merchandising department is not.

22       Q.    So from all of the time you spent in the

23   merchandising department until October of 2001, are

24   you claiming that you had any rights under the

DONNA A. BITTNER REPORTING

436

Marlayna G. Tillman

1     A.   Okay.

2     Q.   Tell me about this layoff that's referenced

3  in Paragraph 57 and 58.

4     A.   Well, as it says in Paragraph 53, basically I

5  filed a charge of discrimination based on treatment

6  I was receiving after I was awarded the position in

7  the warehouse.

8     Q.   So for all activities discussed in Paragraphs

9  53 through 58, were you a warehouse employee?

10    A.   Yes.

11    Q.   Were you a bargaining unit member?

12    A.   I believe I was, yes.

13    Q.   I'm sorry I interrupted you.  You were

14  explaining what you meant by 58?

15    A.   Yes.  After I filed my discrimination charge,

16  I got laid off shortly thereafter.  I believed it

17  to be in retaliation for filing the charge of

18  discrimination.  I base that on the fact that I was

19  not recalled in the same time frame as the other

20  people who were laid off.  The three gentlemen that

21  were named as being in the warehouse before me also

22  were laid off.  I guess due to business necessity

23  or whatever.  But they all got recalled, and I did

24  not.

**4**

| Internal Posting | External Posting |
|---|---|
| Date of Opening:    1/2/02 | For information on completing an |
| Date of Posting: 1/8/02 | Application contact: |
| End Posting:    1/18/02 | PBG's Job Line  302/761-8683 _ |
| Hiring Manager:  TBA | |
| Job Opening #:MD120-120401 | |
| Hourly Rate: $10.88  (weekend work required) | |

## MERCHANDISER – Wilmington, DE

JOB SUMMARY:

To provide customer support by maintaining shelf space, displays, etc. according to    Pepsi standards

PRIMARY JOB ACCOUNTABILITIES:

- Merchandise store shelving, coolers and displays with Pepsi products in accounts assigned by supervisor
- Utilize point of purchase in each account
- Keep back room stock in neat and orderly condition
- Communicate sales results to store and Pepsi management
- Build customer relationships at store level

JOB ELIGIBILITY CRITERIA:

- Previous grocery retail merchandising experience preferred
- Must be 18 years of age
- **Must have car or personal transportation to access multi-store locations within assigned shift**
- Proof of insurance
- **Valid Driver's License**
- No more than 1 moving violation i.e. reckless driving, speeding in excess of  15 miles above the posted speed limit within the past year
- **No serious motor vehicle violations such as DWI, DUI in the past year**
- No more than 2 moving violations or serious motor vehicle violations within the past 3 years
- Must be able to perform physical lifting of 40-50 lbs. or greater on a repetitive daily basis, reaching above shoulders and bending frequently, kneeling/squatting often



EXHIBIT
Tillman-13
PBGGO,004-631-6989
12/12/05 DFB