# 24

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

MARLAYNA G. TILLMAN,       :

      Plaintiff,          :       C.A. Number:  04-1314

        v.             :

THE PEPSI BOTTLING GROUP, INC.,  :
and TEAMSTERS LOCAL UNION 830  :

      Defendants.       :

## PLAINTIFF'S  ANSWERS TO DEFENDANT PEPSI BOTTLING GROUP LLC.,

## FIRST SET OF INTERROGATORIES ADDRESSED TO PLAINTIFF

Plaintiff, Marlayna G. Tillman, by and through her undersigned counsel, hereby

propounds the following Answers to Defendant's First Set of Interrogatories, pursuant to Federal

Rule of Civil Procedure 33.

### INSTRUCTIONS

A.     "Document" or "documents" means any written, recorded, filmed or graphic

matter, whether produced, reproduced, or on paper, cards, tapes, films, electronic facsimile, E-

mail, computer storage devices or any other media, including but not limited to memoranda,

notes, minutes, records, photographs, correspondence, telegrams, diaries, bookkeeper entries,

financial statements, tax returns, checks, check stubs, reports, studies, responses to

questionnaires, charts, graphs, statements, notebooks, handwritten notes, applications,

agreements, books, pamphlets, periodicals, appointment calendars, notes, records, and recordings

of oral conversations, work papers, and also including but not limited to, originals and all copies

which are different in any way from the original whether by interlineation, receipt stamp,

notation, indication of copies sent or received, or otherwise, and drafts.

EXHIBIT
Tillman -6
12/13/05 DHR
PENGAD 800-631-6989

B.    The term "communication" means the transmission of any information, in any form, including but not limited to orally, in writing, by conduct, by gesture, by electronic or computerized transmission, whether communicated intentionally and/or knowingly or not, and specifically includes but is not limited to all conversations, meetings, telephone calls, tape recordings of telephone calls, facsimiles, letters, emails and writings of any kind.

C.    A request that you "describe in detail" or identify "the factual basis" of a matter means that you must describe that matter fully, by reference to underlying specific facts and specific times, places, people and actions.

D.    The term "identify" when used with reference to an individual person, business or other entity shall mean to state its full name (or if not known, provide sufficient description so that the person, business or other entity will be identifiable to the recipients of your answer), business affiliation, and last known business or home address and phone number.

E.    In answering the interrogatories, you must furnish all information that is available to you, including information in the possession of your attorneys, healthcare providers and/or any other person or entity subject to your direction or control. If, after exercising due diligence, you cannot answer an interrogatory in full, state that fact and answer to the extent possible.

F.    If you need additional space to respond to any interrogatory, you may attach additional pages as necessary, provided however that you must clearly identify the particular interrogatory to which the additional pages respond.

G.    If you claim any form of privilege or other protection from disclosure as a ground for withholding responsive information, set forth each and every fact or basis on which you claim a privilege with sufficient specificity to permit the court to make a determination as to whether the claim of privilege is valid.

H.    The interrogatories are continuing in nature and you have an affirmative obligation to promptly supplement your responses as required by any new or changed information.  You must produce all responsive information and documents as soon as they become known or available to you, and in all events prior to trial of this action.

## INTERROGATORIES

1.    Identify each and every person who has knowledge of the facts underlying your claims against PBG, describe the information about which the person has knowledge, and identify all documents in the person's possession, custody or control which are known to you and which relate to or support any claim in your Complaint.

**ANSWER:**

**Plaintiff believes the following individuals have knowledge of her claims against the Pepsi Bottling Group.  Plaintiff is unsure of the documents in such person's possession.**

a)    **Tracey Dryzwiecki, Pepsi Bottling Group**

b)    **Scott Steiger, Pepsi Bottling Group**

c)    **Sara Swartz, Pepsi Bottling Group**

d)    **Pete Kraus, Pepsi Bottling Group**

e)    **Dave Staib, Pepsi Bottling Group**

f)    **Daniel Grace, Local 830**

g)    **John D'Elia, Local 830**

h)    **Doug McLauglin, Local 830**

i)    **Scott Michelle, Local 830**

j)    **Employees of the Delaware Department of Labor**

k)    **Employees of Counsel for all parties**

2.    Identify each and every fact underlying your claims of discrimination against PBG of which you have personal knowledge and identify all documents in your possession, custody or control and which relate to or support any claim in your Complaint.

**ANSWER:**

**Plaintiff asserts that she was discriminated against by the Pepsi Bottling group based on her race and gender. Plaintiff feels she was not provided proper training, compensation, promotional opportunities, and was retaliated against by the Pepsi Bottling Group.**

**Please see documentation Plaintiff has provided in response to Pepsi Bottling Group's request for production of documents. Plaintiff will supplement her answers as additional documentation is obtained.**

3.    Identify every attempt you have made to secure employment or other service for remuneration from May 8, 2001 to the present and, with respect to each such attempt:

a.    identify every person or entity to which you applied to secure any such employment or other service for remuneration, the position for which you applied, the salary or payment for the position and the date and nature of each such attempt;

b.    identify each person or entity by which you were offered employment or other service for remuneration after May 8, 2001, whether or not you have identified the entity or person in response to paragraph (a) above, and for each such offer state whether the offer was for employment or for service for remuneration, the nature of the position, the date offered, the salary or rate of pay, all benefits, the date on which such offer was made, whether you declined any such offer and your reasons for declining the offer; and

c.    identify all documents that relate or refer to your attempts to secure employment or service for remuneration and all such offers and all persons with any knowledge of your attempts to secure employment or service for remuneration or all such offers.

**ANSWER:**

**Plaintiff has attempted to secure employment since May 8, 2001 with the following employers, however please note that Plaintiff is unsure of position descriptions, compensation and benefits offered:**

a)    **R& S. Strauss Auto, Wilmington, Delaware**

b)    **JB Hunt, New Brunswick, New Jersey**

c)    **Cott Beverages, Glen Mills, Pennsylvania**

d)    **RJM Vending, New Castle, Delaware**

e)    **Coca-Cola, Hawthorne, New York**

f)    **Pepsi Bottling Company, College Point, New York**

g)    **Tropicana Beverages, Jersey City, New Jersey**

h)    **New York Blood Center, New York, New York**

i)    **Cardinal Logistics, Dayton, New Jersey**

j)    **Coca-Cola Enterprises, Bronx, New York**

**Any documents related to these applications will be provided as they are obtained.**

4.    Identify all employment or other service for remuneration that you have had since May 8, 2001, with respect to each such employment held or service provided by you:

a.    identify each entity or person by which you were employed or for which you performed service for remuneration and describe in detail the nature of each such

employment or other service for remuneration, the salary or rate of pay, benefits, the dates during

which you were so employed or such services were performed, and, if applicable, the reason(s)

each such employment, service or business ended; and

                    b.      identify all documents that relate or refer to each such employment

or other service for remuneration and each person with any knowledge concerning each such

employment or service for remuneration.

**ANSWER:**

**Plaintiff was employed by the following employers since May 8, 2001:**

      a) **R & S Strauss, Wilmington, Delaware; employment began in October**
          **2001, Plaintiff can not recall the date of her resignation.**

      b) **Cott Beverages, Glen Mills, Pennsylvania; employed in June, 2004.**
          **Plaintiff was terminated.**

      c) **JB Hunt, New Brunswick, New Jersey; employed from November,**
          **2004 until February, 2005.  Plaintiff resigned.**

      d) **RJM Vending, New Castle, Delaware; Plaintiff resigned.**

      e) **Cardinal Logistics, Dayton, New Jersey; employed from February,**
          **2005 until July, 2005.  Plaintiff resigned.**

      f) **New York Blood Center, New York, New York; employed form July**
          **2005, until August, 2005.  Plaintiff resigned.**

      g) **Coca-Cola Enterprises, Bronx, New York; employed form August,**
          **2005 until present.**

5.    Identify and describe in detail the nature, amount and source of any monies, income, gifts, grants, compensation, or fringe benefits received by you, including, but not limited to, salary, wages, benefits, unemployment compensation, Social Security benefits, disability benefits, worker's compensation and welfare benefits from whatever source from May 8, 2001 to the present.

**ANSWER:**

**Since May 8, 2001 Plaintiff has received unemployment compensation from the Delaware Department of Labor due to a temporary layoff initiated by the Pepsi Bottling Group in September, 2002. Plaintiff has also received disability benefits due to a work-related injury suffered at the Pepsi Bottling Group on November 6, 2003. Plaintiff does not know the exact dollar figure of compensation received.**

6.    Please provide a detailed summary of the bases of all damages claimed. Describe in detail each element of any relief you intend to seek at trial; state the amount you seek for each element of relief, including an explanation of the manner in which you calculated the amount of any claim for damages or other monetary relief; state all facts relating to each element of any such relief; identify all documents relating or referring to each element of any such relief; and identity each and every person with knowledge of each element of any such relief.

**ANSWER:**

**Plaintiff is unable to determine an exact amount of damages at this time. When Plaintiff is**

in a better position to determine and/or approximate total damages for this matter, the information will be provided as a supplement to this Interrogatory.

7.    Identify each current or former employee of PBG with whom you have spoken or corresponded concerning the allegations contained in the Complaint and/or this litigation; describe in detail the substance of each correspondence or communication; and identify all documents that they supplied to you or you to them concerning the allegations contained in the Complaint and/or this litigation.

**ANSWER:**

**Plaintiff has spoken with the following individuals regarding the allegations contained in the Complaint. Those individuals whom Plaintiff has exchanged communications will be noted below:**

a) **Ron Flowers**

b) **Merrill Mathews**

c) **Ernest Turner**

d) **Michael Johnson**

e) **Leroy Lewis**

f) **Bernard Stewart**

g) **Rob Murdoch**

h) **Kathy Baltus**

i) **Crystal Green**

j)  Peyton Spencer

k)  Tracey Dryzwiecki; Plaintiff exchanged email and correspondence.  All documents in Plaintiff's control will be provided.

l)  Rhonda Curry; Plaintiff exchanged email and correspondence.  All documents in Plaintiff's control will be provided.

m)  Sara Swartz; Plaintiff exchanged email and correspondence.  All documents in Plaintiff's control will be provided.

n)  Scott Steiger; Plaintiff exchanged email and correspondence.  All documents in Plaintiff's control will be provided.

o)  John O'Barra; Plaintiff exchanged email and correspondence.  All documents in Plaintiff's control will be provided.

p)  Dave Staib; Plaintiff exchanged email and correspondence.  All documents in Plaintiff's control will be provided.

q)  Tom Riley; Plaintiff exchanged email and correspondence.  All documents in Plaintiff's control will be provided.

r)  Glenn Mathews; Plaintiff exchanged email and correspondence.  All documents in Plaintiff's control will be provided.


8.      Identify each and every doctor, psychiatrist, psychologist, or other health or mental health care professional or entity whom you have visited, consulted or sought treatment from at any time during the period from January 1, 1995 to the present.  For each individual or entity identified, give the date of each visit, consultation or treatment; the reason

for each visit, consultation or treatment; and the diagnosis given at each visit, consultation or treatment.

**ANSWER:**

**Plaintiff does not recall the exact dates of all visits or consultations with below named physicians.**

    a) **Dr. Andrew Nash, Wilmington, Delaware; general physician**

    b) **Dr Peter Bandera, Wilmington, Delaware; rehabilitation physician**

    c) **Dr. Jeffrey Meyers, Wilmington, Delaware; Pepsi Bottling Group physician**

    d) **Dr. Steven Hershey, Wilmington, Delaware; Specialist**

    e) **Dr. Katie Earnest, Wilmington, Delaware; OB/GYN**

    f) **Dr. M.R. OBeidy, Wilmington, Delaware, Psychiatrist**

    g) **Dr. Brenda Farside, Wilmington, Delaware; social worker**

        9.     State whether you have been a party in any other lawsuit or administrative claim, and if so, as to each such lawsuit or claim, state the case or claim caption, the court or agency involved, the court term and number, the nature of the lawsuit or claim, whether you were a plaintiff or a defendant, and the outcome of the lawsuit or claim.

**ANSWER:**

**Plaintiff has been a party in a small claims lawsuit involving Precision Auto Tune located in Wilmington, Delaware. Plaintiff was the initiating party and received a successful verdict. Plaintiff does not recall the claim caption number but upon information and belief**

it was heard in Justice of the Peace Court number ten.

10.    With regard to each person whom you may use as a witness at trial, identify the person and furnish a description of the testimony the person is expected to give.

**ANSWER:**

a)  Ron Flowers; work environment and climate and how it influenced Plaintiff

b)  James Felicetti; work environment and climate and how it influenced Plaintiff

c)  Peyton Spencer; comments made by Supervisor Tom Riley, regarding Plaintiff and work climate issues

d)  Merrill Mathews; work environment and climate and how it influenced Plaintiff

e)  Howard Laws; comments made by himself to Plaintiff

f)  Leroy Lewis; work environment and climate and how it influenced Plaintiff

g)  John Oziak; comments made by Howard Laws to Plaintiff in his presence

h)  Bernard Stewart; work environment and climate and how it influenced Plaintiff, and how Plaintiff was treated

i)  Ernest Turner; work environment and climate and how it influenced Plaintiff, and how Plaintiff was treated

j)  Eric Bling; Incident with Plaintiff and Supervisor Phil Weber , Bling was present.

k)  Jeffrey Felicetti; work environment and climate and how it influenced Plaintiff

l)  Mike Johnson; disparate treatment of Plaintiff

m) Jim McCormick; disparate treatment of Plaintiff

n) Cleavon Thomas; work environment and disparate treatment of Plaintiff

o) Crystal Green; the work climate for women at Pepsi Bottling Group and the disparate treatment of Plaintiff

p) Kathy Baltus; the work climate for women at Pepsi Bottling Group and the disparate treatment of Plaintiff

q) Larry Moody the work climate for women at Pepsi Bottling Group and the disparate treatment of Plaintiff

11.    Identify each and every person answering or providing information used in answering these Interrogatories.

**ANSWER:**

Plaintiff is the only person answering or providing information for use in these Answers to Interrogatories.

12.    Identify each and every person who has been interviewed by you, or who has made any oral or written statement concerning this litigation or the allegations in the Complaint to you or anyone acting on your behalf.

**ANSWER:**

No statements have been obtained at this time. If Plaintiff obtains a statement it will supplement its response to this Interrogatory.

**MARGOLIS EDELSTEIN**


Jeffrey K. Martin. (DE# 2407)
Lori Brewington, Esquire (DE# 4522)
1509 Gilpin Avenue
Wilmington, DE 19806
(302) 777-4680
jmartin@margolisedelstein.com
*Attorneys for Plaintiff*

DATED:      December 5, 2005

# IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF DELAWARE

MARLAYNA G. TILLMAN,       )
                               )
        Plaintiff,         )    **C.A. NO. 04-1314(SLR)**
                               )
        v.           )    **JURY TRIAL DEMANDED**
                               )
THE PEPSI BOTTLING GROUP, INC., )
and TEAMSTERS LOCAL UNION 830, )
                               )
        Defendants.      )

## CERTIFICATE OF SERVICE

I, Lori Brewington, do hereby certify that on December 5, 2005, two (2) true and correct

copies of the foregoing *Plaintiff's Answers to Defendant The Pepsi Bottling Group, Inc.'s First*

*Set of Interrogatories* were sent via courier service, to the following:

| William M. Kelleher, Esquire | Clifford B. Hearn, Jr. |
|---|---|
| Ballard Spahr Andrews & Ingersoll, LLP | Clifford B. Hearn, Jr. P.A. |
| 919 Market Street, 17th Floor | 606 Market Street Mall |
| Wilmington, DE 19801 | P.O. Box 1205 |
| | Wilmington, DE 19899 |

MARGOLIS EDELSTEIN

Jeffrey K. Martin. (DE#2407)
Lori Brewington, Esquire (DE#4522)
1509 Gilpin Avenue
Wilmington, DE 19806
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARLAYNA G. TILLMAN, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. NO. 04-1314(SLR) |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| THE PEPSI BOTTLING GROUP, INC., | ) | |
| and TEAMSTERS LOCAL UNION 830, | ) | |
| | ) | |
| Defendants. | ) | |

### CERTIFICATE OF SERVICE

I, Lori Brewington, do hereby certify that on December 5, 2005, two (2) true and correct

copies of the foregoing *Plaintiff's Answers to Defendant The Pepsi Bottling Group, Inc.'s First*

*Set of Interrogatories* were sent via U.S. Mail postage prepaid, to the following:

| | |
|---|---|
| Daniel Johns, Esquire | Marc. L. Gelman, Esquire |
| Lucretia C. Clemons, Esquire | Jennings Sigmond, P.C. |
| Ballard Spahr Andrews & Ingersoll, LLP | The Penn Mutual Street |
| 51st Floor | 510 Walnut Street |
| 1735 Market Street | Philadelphia, PA 19106 |
| Philadelphia, PA 19103 | |

MARGOLIS EDELSTEIN

Jeffrey K. Martin. (DE# 2407)
Lori Brewington, Esquire (DE# 4522)
1509 Gilpin Avenue
Wilmington, DE 19806
*Attorneys for Plaintiff*



# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARLAYNA G. TILLMAN,                    :
                                        :
    Plaintiff,                          :          C.A. Number: 04-1314
                                        :
    v.                                  :
                                        :
THE PEPSI BOTTLING GROUP, INC.,         :
and TEAMSTERS LOCAL UNION 830           :
                                        :
    Defendants.                         :

## VERIFICATION

STATE OF _Mu york_ )
                   ) SS.
COUNTY OF _Mu york_ )

    I, Marlayna G. Tillman, being duly sworn, state that I have reviewed the

foregoing *Plaintiff's Answers to Defendant The Pepsi Bottling Group, Inc.'s First Set*

*of Interrogatories* and that said answers are full and complete and true and correct to the

best of my knowledge, information and belief.

                                             _Marlayna G. Tillman_
                                            Marlayna G. Tillman

Subscribed and sworn before me on this __2__ day of ___Dec___, 2005.

                                      _ad Greebler_
                                      Notary Public

My Commission Expires: _____ ADAM GREEBLER
                   Notary Public State of New York
                     No. 0°GR5001894
                     Qualified in Queens County
                 Commission Expires Sept. 21 200_6_

**25**

RX Date/Time        11/01/2006 20:06                    3024789123
  11/01/2006  19:51    3024789123                                            P. 005
                                                                       PAGE  05

### *Mujib R. Obeidy, M.D. & Associates*

3519 Silverside Road, Concord Plaza
Ridgely Building, Suite 102
Wilmington, DE 19810
Phone: 302-478-5900
Fax: 302-478-9123

............................................................................

## Progress Note

7/7/04

Patient no showed for her last on 6/2/04 appointment. Ms. Tillman's insurance was cancelled, at her request, in September of 2002! This explains why she never gave us the information beforehand and brought the card in only on her last visit here. We have placed several calls to her but none have been returned to date.

Unfortunately, this calls into question her reliability in reporting her symptoms. With the potential of a large settlement from a large corporation, she has the motivation to exaggerate, if not outright lie, to make herself sicker than she actually is.

## Final Diagnosis:  Malingering

## Plan

Recommend a full neouropsychological battery
Close case
Send to storage

Mujib R. Obeidy, M.D.

**26**

5 2 1 2 8 2 7 2 5





Social Security Number: _521_ - _28_ - _2725_
Date of Birth (For MVR): _06/06/66_
Today's Date: _11-29-04_

J.B. Hunt Transport, Inc.  P.O. Box 859, Lowell, AR 72745  1-800-233-5706

# APPLICATION

J.B. Hunt Transport, Inc. is an Equal Opportunity Employer and does not discriminate on the basis of race, color, religion, gender, sexual orientation, national origin, ancestry, age, marital status or military status.

## Please print plainly and complete all blanks.

Referred By: _____

☐ J.B. Hunt Driver's Name _____    Alpha Code _____

This Application will be considered for thirty days from the date it is submitted. After that time, a new application must be submitted for employment consideration.

### Personal Information

|  | First | Middle | Last | Suffix | Nickname/Preferred |
|---|---|---|---|---|---|
| Name: | MARLAYNA | GEORGETTE | TILLMAN | ~~JR.~~ | JET |
| AKA/Alias: | MARLAYNA | GEORGETTE | PALMER |  | JET |

Do you have a legal right to work in the US?  ☑ Yes    ☐ No (if hired, proof of status will be required)

### Addresses

*Permanent (Require 3 years of permanent addresses)

| From | To | Street | County | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| 11'04 – | Present | 497 Linden Blvd C-7 |  | Brooklyn | NY | 11203 | USA |
| 2'02 – | 10'04 | 7 Colony Blvd #111 |  | Wilmington | DE | 19802 | USA |
| 3'93 – | 2'02 | 2017 S. 71st St |  | Philadelphia | PA | 19142 | USA |

*Current Mailing Address
☑ Same as current permanent address

| From | To | Street | County | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|
| 11'04 – | Present | 497 Linden Blvd C-7 |  | Brooklyn | NY | 11203 | USA |

Phone: ( 718 ) 791 - 2212    Cell Phone: ( 610 ) 457 - 9507    E-Mail: mgtillman@yahoo.com

### Driving School

| School Name | Location | Phone # | Hours | Graduation Date |
|---|---|---|---|---|
| N/A |  |  |  |  |

### Qualifying Questions (If yes answer is required, give full details below in a comment box)

| | YES | NO |
|---|---|---|
| † A. Have you ever had any driving license, permit, or privilege revoked? | ☐ | ☑ |
| * B. Have you ever been convicted for driving under the influence of drugs or alcohol or have a charge pending? | ☐ | ☑ |
| * C. Have you ever been convicted for possession, sale or use of a narcotic drug, amphetamine, or derivative thereof or have a charge pending? | ☐ | ☑ |
| * D. Have you ever been convicted of a crime or have a charge pending? | ☐ | ☑ |
| * E. Have you ever been convicted of an offense involving the use of drugs or alcohol? | ☐ | ☑ |
| * F. Have you ever tested positive, or refused to test, on any pre-employment drug or alcohol test administered by any company that you applied for, but did not obtain, safety sensitive transportation work covered by DOT agency drug and alcohol testing rules during the past 3 years? | ☐ | ☑ |
| * G. Have you ever tested positive on any drug test, or tested at 0.02 or greater on an alcohol test, or refused to take any drug or alcohol test at any previous employer? | ☐ | ☑ |

Explain yes answer: _N/A_

### Emergency Contact Information

| *Name | *Address | *Phone | Relationship |
|---|---|---|---|
| CAROLYN PALMER | 2017 S. 71st STREET PHILA PA 19142 | 215-729-2927 | mother |

### Personal References

| *Name | *Phone | Relationship |
|---|---|---|
| Kennedy Ross | (646) 872-2241 | fiancee |
| Nate Coleman, Jr. | (215) 888-0831 | cousin |

For Office Personnel Use Only    Date Received _____
Revised 8/2004

Driver Application

1 of 1

PBG 01095



Social Security Number: 521 - 28 - 2725

Today's Date: 11/29/04

J.B. Hunt Transport, Inc. P.O. Box 859, Lowell, AR 72745  1-800-233-5706

**Military**

| Military Branch | From | To | Highest Rank Achieved | Rank at Discharge |
|---|---|---|---|---|
| NO | | | | |

**Driving License Information (Previous 5 years)**

| | State | Number | Class | Expiration Date | Endorsements (Haz, Tank, Double/Triple, Passenger) |
|---|---|---|---|---|---|
| Current | DE | 1245004 | CDL-A | 6/6/2007 | Airbrake |
| Previous | | | | | |
| Previous | | | | | |
| Previous | | | | | |

**Traffic Convictions and Forfeitures (Past 5 years)**

Traffic Violations:

| Date | State | Charge Type | Vehicle Type | Penalty | Speed | Speed Limit |
|---|---|---|---|---|---|---|
| N/A | — | NONE | | | | |

**Accident Record (Past 5 years - List all regardless of severity)**

| Date | State | Vehicle Type | Company (if commercial vehicle) | Damage Amt | Inj | Fatal | Ticket? | Tows? |
|---|---|---|---|---|---|---|---|---|
| N/A | — | NONE | | $ | | | | |
| | | | | $ | | | | |
| | | | | $ | | | | |
| | | | | $ | | | | |

**Employment History (Past 3 years for all employment and past 10 years of commercial driving)**

Begin with your present or most recent job and work backwards in order. Be sure to list all employers for at least 3 years and at least 10 years of employers where you drove commercial motor vehicles. Include all full-time and part-time employment including military service, self-employment, and unemployment periods. Provide a supplemental sheet if all of your employment cannot be listed in the space provided. Telephone numbers are required for all employers.

**Current Employer**
Current period: If unemployed provide dates: From _____ To _____ Did you receive benefits? Yes ☐ No ☐

Dates of Employment
To ~~_____~~ Present
   (month, year)
From 5/8/2001
   (month, year)

Name Pepsi Bottling Group                Supervisor Kim Bowman
Address 3501 Governor Printz Blvd. (DE)   Telephone (302) 761-4848
Position held transport driver   Rate of Pay 17.30 hr. # of States Driven 3
Months experience driving: Straight Truck 28  Tractor/Semi-Trailer 28  Doubles/Triples ____
   Flatbed ____  Tanker ____  Other ____
Reason for leaving/wanting to leave  haven't left / but need higher rate of pay

**2nd Last Employer**
Second period: If unemployed provide dates: From _____ To _____ Did you receive benefits? Yes ☐ No ☐

Dates of Employment
To _____
   (month, year)
From _____
   (month, year)

Name _____  Supervisor _____
Address _____  Telephone (____) ____
Position held _____  Rate of Pay _____ # of States Driven ____
Months experience driving: Straight Truck ____  Tractor/Semi-Trailer ____  Doubles/Triples ____
   Flatbed ____  Tanker ____  Other ____
Reason for leaving _____

**3rd Last Employer**
Third period: If unemployed provide dates: From _____ To _____ Did you receive benefits? Yes ☐ No ☐

Dates of Employment
To _____
   (month, year)
From _____
   (month, year)

Name _____  Supervisor _____
Address _____  Telephone (____) ____
Position held _____  Rate of Pay _____ # of States Driven ____
Months experience driving: Straight Truck ____  Tractor/Semi-Trailer ____  Doubles/Triples ____
   Flatbed ____  Tanker ____  Other ____
Reason for leaving _____

Driver Application

2 of 4

PBG 01096



Social Security Number: _521_ . _28_ . _2725_

Today's Date: _11/29/04_

J.B. Hunt Transport, Inc.  P.O. Box 859, Lowell, AR 72745  1-800-233-5706

**Fourth Last Period:** If unemployed provide dates – From ____ To ____ Did you receive benefits? ☐ Yes ☐ No

**4th Last Employer**
Dates of Employment
To _____
(month, year)
From _____
(month, year)

Name _____ Supervisor _____
Address _____ Telephone (___) _____
Position held _____ Rate of Pay _____ # of States Driven _____
Months experience driving: Straight Truck _____ Tractor/Semi-Trailer _____ Doubles/Triples _____
Flatbed _____ Tanker _____ Other _____
Reason for leaving _____

**Fifth Last Period:** If unemployed provide dates – From ____ To ____ Did you receive benefits? ☐ Yes ☐ No

**5th Last Employer**
Dates of Employment
To _____
(month, year)
From _____
(month, year)

Name _____ Supervisor _____
Address _____ Telephone (___) _____
Position held _____ Rate of Pay _____ # of States Driven _____
Months experience driving: Straight Truck _____ Tractor/Semi-Trailer _____ Doubles/Triples _____
Flatbed _____ Tanker _____ Other _____
Reason for leaving _____

**Sixth Last Period:** If unemployed provide dates – From ____ To ____ Did you receive benefits? ☐ Yes ☐ No

**6th Last Employer**
Dates of Employment
To _____
(month, year)
From _____
(month, year)

Name _____ Supervisor _____
Address _____ Telephone (___) _____
Position held _____ Rate of Pay _____ # of States Driven _____
Months experience driving: Straight Truck _____ Tractor/Semi-Trailer _____ Doubles/Triples _____
Flatbed _____ Tanker _____ Other _____
Reason for leaving _____

**Seventh Last Period:** If unemployed provide dates – From ____ To ____ Did you receive benefits? ☐ Yes ☐ No

**7th Last Employer**
Dates of Employment
To _____
(month, year)
From _____
(month, year)

Name _____ Supervisor _____
Address _____ Telephone (___) _____
Position held _____ Rate of Pay _____ # of States Driven _____
Months experience driving: Straight Truck _____ Tractor/Semi-Trailer _____ Doubles/Triples _____
Flatbed _____ Tanker _____ Other _____
Reason for leaving _____

List all remaining previous employers below in order (Remember – 3 years all employment and 10 years commercial driving):

| | From | To | Name | Address | Telephone | Reason for Leaving |
|---|---|---|---|---|---|---|
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | | | | | | |
| 15 | | | | | | |
| 16 | | | | | | |
| 17 | | | | | | |
| 18 | | | | | | |
| 19 | | | | | | |
| 20 | | | | | | |

Driver Application

3 of 4

PBG 01097

Social Security Number: _521_ - _28_ - _2725_

Today's Date: _11/29/04_

## J.B. Hunt Transport, Inc.  P.O. Box 859, Lowell, AR 72745  1-800-233-5706

### Driver Application - Certifications, Disclaimers, and Acknowledgements

1) **General Disclaimers:** I understand that J.B. Hunt Transport, Inc., hereafter "J.B. Hunt", is under no obligation to hire me, that any employment I am offered will not be for any specified period of time, that my employment is terminable by either party at will with or without notice or cause, and that no representative of J.B. Hunt has authority to enter into any agreement with me contrary to the foregoing. I understand that nothing contained in my employment application, or in granting of an interview, is intended to create an employment contract between J.B. Hunt and myself for either employment or for the providing of any benefit. I understand that none of the benefits or policies in any handbook issued to me by J.B. Hunt are intended by reason of its publication to confer any rights or privileges to any benefits or policies, or entitle me to remain employed by J.B. Hunt, or to change my status as an "at will" employee (as permitted by law). I understand that all statements and provisions in the handbook are procedural or are a guideline and that J.B. Hunt has the right to change any policy, benefit, or procedure at any time without notice.

2) **Notice of Drug and Alcohol Testing Requirements:** J.B. Hunt is concerned with the health and safety of its employees, as well as the safety of its customers and the motoring public. Therefore, the company requires, as one of the steps of the hiring process and according to Federal Motor Carrier Safety Administration regulations, that all otherwise qualified applicants for employment submit to a drug test. I understand I will be required to provide urine, hair, or other biological samples to be tested for the presence of controlled substances including, but not limited to, marijuana, cocaine, amphetamines, opiates, and phencyclidine. If employed, I will also be required to submit to drug and/or alcohol tests as required by J.B. Hunt's substance abuse policy and/or federal, state, or local regulations. I understand that J.B. Hunt may contract with a third party to assist in the administration of drug and alcohol testing and agree to this party being provided with all information to which J.B. Hunt is entitled and subject to the same confidentiality requirements as J.B. Hunt. I further understand that a confirmed positive drug or alcohol test, or a refusal to test, will disqualify me from consideration for employment or will result in my termination from employment. J.B. Hunt will report the results of drug and alcohol test results in accordance with regulatory requirements, including release to motor carriers and other third parties upon receipt of a properly executed release document. I also understand that a positive result or refusal on a post accident test may result in denial of any Workers Compensation claims I may make as a result of injuries sustained in the accident.

3) **Drug and Alcohol History Release Authorization:** Under the authority granted me by 49 CFR Parts 40 and 382, I hereby authorize and require my previous and/or current employers specifically listed as well as any other person or company provided by me in writing or by verbal interview by whom I was employed or to whom I applied for employment in the three year period preceding the date of this application to release the date, type of test and result of all drug and alcohol test taken by me, including the date and type of test for any refusals by me to take a drug or alcohol test, to the Vice President of Driver Personnel, or the Employment Placement Specialist assigned to process my application at J. B. Hunt. If I tested positive on any controlled substance test, had an alcohol test with a concentration of 0.04 or greater, or refused to take any drug or alcohol test, I also authorize the release of all information concerning my referral to a Substance Abuse Professional (SAP) including all records pertaining to my evaluation and treatment (if required by SAP). I authorize this release by whatever means is most expedient and agree to hold harmless any past employer or any person or company I applied with as well as their employees, agents, or representatives from all liability or damage that may arise from the release of the information specifically authorized here.

4) **Work Record and Consumer Reports Release Authorization:** I hereby authorize, without liability, any person or organization, including but not limited to any educational institution, training facility or any institution whose name I have given as a reference, or by whom I have been previously employed, to furnish J. B. Hunt any information they may have concerning my character, habits, ability, financial responsibility, job performance, reasons for leaving employment. Furthermore, there may be entities that J.B. Hunt does business with may request investigative reports or consumer reports which apply to my background. In this case, these reports would apply to my assignment to customer, permission to be on the customers' premises and to handle its products and other security concerns of the customer. I hereby release all such persons and organizations from any claims for damages of any kind, which may occur to me by reasons of furnishing such information. I hereby authorize any law enforcement agency or court of record to furnish J. B. Hunt information concerning Motor Vehicle Record, or any felony or misdemeanor of which I have been convicted.

5) **Applicant Rights (pursuant to 49 CFR Part 391.23(i) effective October 29, 2004):** I understand that I have the right to review information provided by my previous employers, to have errors corrected by the previous employers and re-sent to J.B. Hunt once corrected, and to have a rebuttal statement attached to any alleged erroneous information should my previous employer and I not agree on the accuracy of the information. I further understand that the information provided by me will be used in making employment determinations and that my previous employers will be contacted for the purpose of investigating my safety performance history information as required by paragraphs (d) and (e) or 49 CFR Part 391.23. Request to review previous employer information must be in writing and mailed to *Driver Personnel – Information Request; PO Box 599, Lowell, AR 72745.*

6) **Agreement to Follow Rules:** If employed, I agree to abide by and observe all company rules, guidelines, and regulations as published by the company or in publicly available regulations or publicly displayed postings. I understand that there is no expectation of privacy for any of my personal property on J.B. Hunt premises, including J.B. Hunt trucks. I consent to and agree that J.B. Hunt may search my personal property located on J.B. Hunt property, along with J.B. Hunt desks, lockers, toolkits, etc. for the purpose of investigating possible violations of company rules or violation of any local, state, or federal law.

7) **Medical Records Release Authorization:** I authorize J.B. Hunt to obtain any medical documentation or information concerning my past or present medical status. I release anyone with such records from any liability, claim, or damages for providing medical information concerning me to J.B. Hunt.

8) **Electronic Records:** I understand that J.B. Hunt uses electronic records and my original paper application will not be retained.

This certifies that this application was completed by me, and that all entries on it and information in it are true and complete to the best of my knowledge. Any falsification could result in denial of employment or termination of employment, if hired.

| | | |
|---|---|---|
| _MARLAYNA TILLMAN_ | _Marlayna Tillman_ | _11/29/04_ |
| Applicant Name (Printed) | Applicant Signature | Date |

PBG 01098

27

# THE PEPSI BOTTLING GROUP

January 5, 2005

Ms. Marlayna Tillman
7 Colony Boulevard
Wilmington, DE 19802

Sent via E-mail, Certified Mail and U.S. Mail

Marlayna,

I am replying to your e-mail regarding our telephone conversation on January 3, 2005.

As you know, on November 22, 2004, you provided PBG with a doctor's note stating that you were seen in the office on November 22, 2004. You represented to PBG that you were medically unable to work. Your doctor excused you from work for the time period of November 22, 2004 through December 22, 2004. An additional doctor's note was faxed to PBG on December 23, 2004 which also represented your inability to work and extended your absence from December 22, 2004 through January 22, 2005. The Wilmington, DE PBG Doctor's Note Policy states that in the event of an absence or personal injury that lasts more than seven (7) calendar days, an employee is required to contact the union to file a Short Term Disability claim. It is also noted that if an employee does not file a Short Term Disability claim, a doctor's note will not be accepted as medical certification. Tracey Drzewiecki reiterated this policy to you in a September 7, 2004 e-mail as a response to your absence from PBG from June 3, 2004 through June 24, 2004. You have been advised numerous times to apply for Short Term Disability if your absence exceeds the 7 day waiting period for Short Term Disability eligibility. As of today, January 5, 2005, you have not applied for Short Term Disability, and have not, therefore, been on an authorized disability leave.

On December 1, 2004, we received confirmation of your employment with J.B. Hunt. During our discussion on January 3, 2005, you acknowledged that you had been actively employed by, and receiving wages from, J.B. Hunt during your current absence from PBG.

It has also come to our attention that you have been actively employed during two previous leaves of absence from PBG which you represented were for medical reasons.

PBG 01555

During the past month and a half, you have provided PBG with two (2) separate doctor's notes excusing you due to your medical inability to work, however, you have not utilized the "out sick line" to report your absences; have not applied for Short Term Disability Leave; and have, in fact, been working somewhere else. At this point PBG considers this behavior job abandonment. If you do not wish to have PBG treat your alternative employment as a resignation, we are forced to terminate your employment for job abandonment and for misrepresentation related to your need for leave and ability to work.

I would like to respond to your comment that your involvement with local community organizations as well as your pending lawsuit provides motivation to treat you differently than other employees. On the contrary, any employee who misrepresented his/her ability to work and then abandoned his/her job to work somewhere else would be terminated. Even if the misrepresentation had not occurred, PBG does not give Personal Leaves to explore other employment opportunities. We are treating your situation absolutely as consistently as we would treat any other employee.

Marlayna, I have notified Danny Grace, your Business Agent for Teamsters Local 830, regarding your termination from PBG. I trust that you will determine your next steps.

Sincerely,

Sara Altman

CC: Terry Hatten
    Local 830

PBG 01556

**28**

Report ID:  PCHREEPR

PeopleSoft
EMPLOYEE PROFILE

Page No.  1
Run Date 12/13/2005
Run Time 08:31:45

Empl ID:  01155487

Tillman,Marlayna G.

National ID:  521282725

Home Address:  P O Box 688
              Claymont DE  19703
              USA
Home Telephone:  302/762-0415

Mailing Address:

### CURRENT EMPLOYMENT

| | |
|---|---|
| Business Unit: Mid-Atlantic BU | Job Title:  Delivery Driver - Trlr/Trnsp |
| Market Unit: Delaware Valley MU | Job Entry Date:  09/23/2004 |
| Work Location: Wilmington, DE | Band/Level:  HC2 |
| Hire Date: 05/08/2001 | Orig Hire Date:  05/08/2001 |
| Union: 830 | Perf Rating: |
| Seniority Date: | Comp. Rate:  16.95  Hourly |
| Department: 010477  Wilmington, DE | Lead Pay: |
| GL Pay Type: 0240  Wilmington DE | Seniority Pay: |
| Account: 77050013200 | Shift Pay: |
| AC Function: Operations | Full-Part:  Full-Time |
| Job Function: S&D Selling and Delivery | Empl Type:  Hourly |
| Job Family: DIR Direct | FLSA Status:  Nonexempt |
| | Reg/Temp:  Regular |

### SALARY ACTION/DATA HISTORY

| Eff Dt/ Status | Action/ Reason | Department/ Title | Perf Rating/ Full-part | Empl Type/ Reg/Temp | Band/ FLSA | Comp Rate/ Freq | Inc. %/ Curr | Std Hrs |
|---|---|---|---|---|---|---|---|---|
| 12/02/2004 Terminated | TER Job Aband | Wilmington Delivery Driver - Trlr | Full-Time | Hourly Regular | HC2 Nonexempt | 16.95 Hourly | 0 USD | 40 |
| 11/22/2004 Leave W/Py | PLA NMedNonOc | Wilmington Delivery Driver - Trlr | Full-Time | Hourly Regular | HC2 Nonexempt | 16.95 Hourly | 0 USD | 40 |
| 09/23/2004 Active | DTA ABBR Upda | Wilmington Delivery Driver - Trlr | Full-Time | Hourly Regular | HC2 Nonexempt | 16.95 Hourly | 0 USD | 40 |
| 09/19/2004 Active | PAY Lateral | Wilmington Delivery Driver - Trlr | Full-Time | Hourly Regular | HC2 Nonexempt | 16.95 Hourly | 3.67 USD | 40 |
| 05/01/2004 Active | DTA Out / Fle | Wilmington General Labor/Ops | Full-Time | Hourly Regular | HC1 Nonexempt | 16.35 Hourly | 0 USD | 40 |
| 04/19/2004 Active | RPL RP Ben Lv | Wilmington General Labor/Ops | Full-Time | Hourly Regular | HC1 Nonexempt | 16.35 Hourly | 0 USD | 40 |
| 01/01/2004 Leave W/Py | PAY Pay Adjus | Wilmington General Labor/Ops | Full-Time | Hourly Regular | HC1 Nonexempt | 16.35 Hourly | 1.238 USD | 40 |
| 11/07/2003 Leave W/Py | PLA NMedNonOc | Wilmington General Labor/Ops | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |
| 09/23/2003 Active | DTA ABBR Upda | Wilmington General Labor/Ops | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |
| 07/07/2003 Active | PAY Lateral | Wilmington General Labor/Ops | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |
| 06/14/2003 Active | DTA PS Payrol | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |
| 03/25/2003 Active | PAY End T-Dut | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |

PBG 00267

```
Report ID:  PCHREEPR                              PeopleSoft                              Page No.  2
                                                 EMPLOYEE PROFILE                         Run Date 12/13/2005
                                                                                          Run Time 08:31:45
Empl ID:  01155487                               Tillman,Marlayna G.          National ID:  521282725
```

| Date | Status | Action | Location | Job | Emp Type | Pay Group | Rate | | Std Hrs |
|------|--------|--------|----------|-----|----------|-----------|------|---|---------|
| 03/19/2003 Active | PAY Beg T-Dut | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |
| 01/10/2003 Active | PAY End T-Dut | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |
| 01/01/2003 Active | PAY Adj - H&C | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 2.54 USD | 40 |
| 12/27/2002 Active | PAY Beg T-Dut | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 15.75 Hourly | 0 USD | 40 |
| 10/20/2002 Active | RFL RF Ben Lv | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 15.75 Hourly | 0 USD | 40 |
| 10/09/2002 Leave W/Py | DTA ABSR Upda | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 15.75 Hourly | 0 USD | 40 |
| 09/22/2002 Leave W/Py | PLA Layoff Pd | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 15.75 Hourly | 0 USD | 40 |
| 08/26/2002 Active | DTA Conversio | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 15.75 Hourly | 0 USD | 40 |
| 07/28/2002 Active | PAY Jb Chg-H& | Wilmington Warehouse Person | Full-Time | Hourly Regular | HLY Nonexempt | 15.75 Hourly | 48.909 USD | 40 |
| 12/31/2001 Active | PAY Pay Adjus | Wilmington Merchandiser | Full-Time | Excep Hrly Regular | B Nonexempt | 22,600.00 Annual | 0 USD | 40 |
| 05/08/2001 Active | HIR New Hire | Wilmington Merchandiser | Full-Time | Excep Hrly Regular | B Nonexempt | 22,000.00 Annual | 0 USD | 40 |

### PRIOR WORK EXPERIENCE

| Employer | Start | End | Title |
|----------|-------|-----|-------|
| Net-X Communications | 04/01/1999 | | Installer |
| Suburban Cable TV | 03/01/1993 | 04/01/1999 | Dispatcher |

### EDUCATION

| School | Major | Degree | Date |
|--------|-------|--------|------|
| | | | |

### LANGUAGES

| Language | Native | Speak | Read | Write |
|----------|--------|-------|------|-------|
| | | | | |

PBG 00268

# 29



EXHIBIT
TILLMAN-36
8/11/06

| Name | Hire Date | Seniority Date | Union Seniority Date |
|---|---|---|---|
| **Operations** | | | |
| Silvia, Joseph | | | |
| Earl, Leon | 3/21/69 | 3/21/69 | 3/21/69 |
| Felton, James | 11/6/78 | 11/6/78 | 11/6/78 |
| McGuff, Brian | 12/1/78 | 2/3/82 | 12/1/78 |
| Saunders, Ronald | 9/19/83 | 9/19/83 | 9/19/83 |
| McCrone, William J. | 2/3/86 | 2/3/86 | 2/3/86 |
| Bowman, Kenneth D. | 6/22/87 | 6/22/87 | 6/22/87 |
| Sampson, Jr., John | 9/8/87 | 9/8/87 | 9/8/87 |
| Stanley, Jeffrey S. | 1/17/88 | 1/17/88 | 1/17/88 |
| Kamel, Stephen J. | 3/20/89 | 3/20/89 | 3/20/89 |
| Meadow, Robin | 4/3/89 | 1/8/90 | 1/8/90 |
| Cephas, Darrial A. | 2/5/90 | 2/5/90 | 2/5/90 |
| Finney, Howard L. | 1/2/90 | 2/26/90 | 2/26/90 |
| Demby, Marshall L. | 12/13/89 | 2/26/90 | 2/26/90 |
| Loper, Jr., Ernest | 7/9/90 | 9/24/90 | 9/24/90 |
| Faulkner, Louis H. | 6/21/90 | 9/24/90 | 9/24/90 |
| Henderson, Bruce L. | 5/22/90 | 9/24/90 | 9/24/90 |
| Laws, Howard M. | 3/24/80 | 7/8/91 | 7/8/91 |
| Spencer, Payton E. | 4/25/91 | 7/29/91 | 7/29/91 |
| Morrison, William C. | 4/12/91 | 7/29/91 | 7/29/91 |
| Flowers, Ronald A. | 12/8/86 | 5/1/ | |
| Hitchens, David | 8/11/90 | 11/16 | |
| Turner, Jr., Ernest S. | 7/8/91 | | |
| Coggins, Jr., Robert H. | 9/3/92 | 8/23/93 | |
| McClain, Jr., Charlie | 5/10/93 | 6/6/94 | 6/6/94 |
| Carson, David G. | 4/1/95 | 1/11/95 | 1/11/95 |
| Wright, Brent | 4/23/94 | 5/3/95 | 5/3/95 |
| Campbell, John R. | 5/25/95 | 5/25/95 | 5/25/95 |
| Williams, Sr., James K. | 4/20/99 | 7/31/95 | 10/12/93 |
| Miller, Daniel J. | 1/27/95 | 1/27/95 | 1/27/95 |
| Bing, Eric | 12/11/95 | 12/11/95 | 12/11/95 |
| McCormick, Jr., James J. | 5/31/96 | 5/31/96 | 5/31/96 |
| Roark, Michael S. | 6/10/96 | 6/10/96 | 6/10/96 |
| Abate, Patrick | 5/2/98 | 5/2/98 | 5/2/98 |
| Purdy, Harold A. | 2/26/95 | 3/30/98 | 3/30/98 |
| Corrigan, Jeffrey M. | 5/4/98 | 5/4/98 | 5/4/98 |
| Westenberger, Jr., Francis | 5/18/98 | 5/18/98 | 5/18/98 |
| Mathews, Merrill James | 5/18/98 | 5/18/98 | 5/18/98 |
| O'Hara, Shawn M. | 2/8/99 | 2/8/99 | 2/8/99 |
| Smith, Nathan | 4/26/99 | 4/26/99 | 4/26/99 |
| Wise, John | 8/24/90 | 2/28/00 | 2/28/00 |
| Stewart, Bernard T. | 4/20/00 | 4/20/00 | 4/20/00 |
| Pomorski, Joseph | 3/15/00 | 5/15/00 | 5/15/00 |
| Shemeld, Matthew | 2/31/99 | 8/7/00 | 8/7/00 |
| Stone, Vincent E. | 8/1/00 | 8/14/00 | 8/14/00 |
| Thomas, Cleavon | 1/30/01 | 1/30/01 | 1/30/01 |
| Capias, Dwight A. | 5/7/01 | 5/7/01 | 5/7/01 |
| Brister, Ronald Derrick | 5/23/01 | 5/23/01 | 5/23/01 |
| DiProspero, Gary | 6/17/86 | 9/17/01 | 9/17/01 |
| Cleary, II, James V. | 3/1/95 | 2/1/02 | 2/1/02 |
| Easlack, Chris | 1/4/02 | 1/4/02 | 1/4/02 |
| Lewis, Leroy | 5/6/02 | 5/6/02 | 5/6/02 |
| Robles, Santos | 5/17/02 | 5/17/02 | 5/17/02 |
| Tilman, Matthew | 7/8/02 | 7/8/02 | 7/8/02 |
| Fear, William | 5/8/01 | 8/5/02 | 8/5/02 |
| Baskon, William | 3/5/02 | | |
| | 11/31/88 | 3/25/02 | 3/25/02 |

**30**

USDC, District of Delaware
Civil Action No. 04-1314

Tillman v. The Pepsi Bottling Group, Inc., et al
Deposition of Sara Swartz Altman

Wednesday
February 28, 2007

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
 2                 CIVIL ACTION NO. 04-1314
 3
    MARLAYNA G. TILLMAN,
 4                    Plaintiff,
 5            vs.
 6    THE PEPSI BOTTLING GROUP, INC.
    AND TEAMSTERS LOCAL UNION 830,
 7                    Defendants.
 8
                    -------------
 9            WEDNESDAY, FEBRUARY 28, 2007
                    -------------
10
11            Oral sworn deposition of SARA SWARTZ
    ALTMAN, taken at the law offices of BALLARD, SPAHR,
12    ANDREWS & INGERSOLL, 1735 Market Street,
    Philadelphia, Pennsylvania, on the above date,
13    commencing at 10:00 a.m., there being present:
14
              J. STEPHEN WOODSIDE, ESQUIRE
15            One Montgomery Plaza, suite 605
              Norristown, Pennsylvania 19401
16            Attorney for Plaintiff.
17
                    - - - - - -
18
19
                    TATE & TATE
20          The Lexington Building, Suite 5
                 180 Tuckerton Road
21            Medford, New Jersey  08055
              (856) 983-8484 - (215) 735-9088
22
23
24
25
```

USDC, District of Delaware          Tillman v. The Pepsi Bottling Group, Inc., et al          Wednesday
Civil Action No. 04-1314            Deposition of Sara Swartz Altman                          February 28, 2007

Page 94

1   A.   Yes.
2   Q.   It is a non-union position?
3   A.   Merchandising?
4   Q.   Merchandising.
5   A.   Yes.
6   Q.   If it's not a department, what is it?
7   A.   It is a job title.
8   Q.   It is a non-union job title. The job title
9   is to describe what those duties are?
10           MS. CLEMONS: Objection. Asked and
11  answered.
12  Q.   It describes the duties.
13           MS. CLEMONS: Sara, you can answer
14  again, but you don't have to change the answer.
15  A.   I don't think a title describes the duties.
16  Q.   What do you think it describes?
17  A.   It is their title.
18  Q.   What's it describing?
19  A.   Their position.
20  Q.   And the position will, in turn, allow me to
21  know what that person's duties are, right?
22  A.   I don't know.
23  Q.   Well, if Miss Tillman is working in
24  merchandising, that's a non-union position. What's
25  her job title in merchandising by way of example?

Page 95

1   A.   Merchandising.
2            MS. CLEMONS: Objection.
3            MR. WOODSIDE: She is answering.
4            MS. CLEMONS: That's not what she
5   said. It's not a department. It is a job title.
6            MR. WOODSIDE: She is answering the
7   question.
8            MS. CLEMONS: She answered it three
9   times already. You keep asking her the same thing
10  over and over again.
11           MR. WOODSIDE: Well, when she is —
12           MS. CLEMONS: It is getting harassing
13  and ridiculous.
14  Q.   Whether she is in merchandising, we know
15  she is in merchandising.
16  A.   What do you mean by in merchandising?
17  Q.   She is working in merchandising in some
18  non-union position at Pepsi? You are shaking your
19  head no.
20  A.   No.
21  Q.   Before Miss Tillman entered the union you
22  need to tell me what her job was, what the title was
23  and what the duties were. Maybe we can straighten
24  this out.
25  A.   Okay. She worked in the sales department

Page 96

1   in sales.
2   Q.   Before she entered the union?
3            MS. CLEMONS: Let her finish her
4   answer. Go ahead, Sara.
5   Q.   Is that the sales department as it appears?
6            MS. CLEMONS: Let her finish her
7   answer. She wasn't done.
8   A.   She worked in the sales department with the
9   job title as merchandiser.
10  Q.   Was that the sales department that appears
11  on page 17 of Altman 9? She is in that department?
12  A.   She is not in the sales department as
13  defined here.
14  Q.   She is in some other sales department?
15           MS. CLEMONS: Objection.
16  Q.   What sales department is she in?
17  A.   It is a department that is not defined in
18  here because there are non-union jobs within the
19  sales department.
20  Q.   They just don't appear here, right?
21  A.   That's not part of the contract.
22  Q.   But it is part of the makeup of the
23  company's organization, right?
24  A.   Say that again.
25  Q.   She is part of the makeup of the company's

Page 97

1   organization? She is in sales doing work with a job
2   title as merchandiser working non-union — working
3   in a non-union capacity?
4   A.   Yes.
5   Q.   Is that on any kind of organizational chart
6   or document in anyway laying that out, that you are
7   aware of?
8   A.   Is what?
9   Q.   The job of merchandiser, at least job title
10  merchandiser as being part of sales but not part of
11  sales appearing in Altman 9, does that appear in any
12  kind of chart that you are aware of?
13  A.   A chart, no.
14  Q.   No kind of organizational or structure
15  chart of the plant would show that to me?
16  A.   I never did a chart for an hourly position.
17  Q.   You never saw one?
18  A.   No.
19  Q.   Who is the manager of the sales department
20  when Miss Tillman did the work with job title
21  merchandiser?
22  A.   Jack Crilley.
23  Q.   Spell it please.
24  A.   C-R-I-L-L-E-Y.
25  Q.   Who was the manager of the sales department

25 (Pages 94 to 97)

USDC, District of Delaware          Tillman v. The Pepsi Bottling Group, Inc., et al          Wednesday
Civil Action No. 04-1314          Deposition of Sara Swartz Altman          February 28, 2007

Page 98

1  when Miss Tillman was doing conventional work when
2  she had the job title merchandiser up until July of
3  2002, do you know?
4          MS. CLEMONS: Objection.
5  Q.    Do you know?
6  A.    Define what you mean by conventional work.
7  Q.    Maybe you have to because I thought you
8  took an affidavit. Did you take an affidavit?
9  A.    Yes.
10 Q.    On —
11         MS. CLEMONS: Objection. It's not an
12 affidavit.
13         MR. WOODSIDE: It's a verification.
14 It is the same thing. I would like you to explain
15 it.
16         MS. CLEMONS: I'm just saying for
17 clarification. I would think you would know the
18 difference between an affidavit and a verification,
19 Mr. Woodside.
20 Q.    Did you take a verification on December 14,
21 2006?
22 A.    Yes.
23 Q.    Without getting too tied down on this,
24 because it is later on, but you described Miss
25 Tillman temporarily assigned to perform

Page 99

1  merchandising duties in the conventional department,
2  right? You did that? You said that?
3  A.    I said that but department meaning sales
4  department, conventional meaning an area of sales.
5  Q.    So the merchandising duties that she is
6  performing as a non-union employee are in the sales
7  department, right?
8  A.    Yes.
9  Q.    And the conventional department duties that
10 you are saying she was working in beginning November
11 of 2001 or also in what department?
12 A.    Sales.
13 Q.    And that was not the — you are telling me
14 then that's not the conventional department
15 appearing as a sales department in Altman 9? It's
16 not that department?
17 A.    Can you repeat the question?
18 Q.    The conventional department that you
19 referenced that she was working, that she was
20 performing merchandising duties in beginning
21 November of 2001 is in the sales department and
22 that's not the sales department that the
23 conventional department appears in on Altman 9?
24         MS. CLEMONS: Objection.
25 Q.    Is that a different conventional

Page 100

1  department?
2          MS. CLEMONS: That's not what she
3  said.
4  Q.    I'm asking you, is that a different
5  conventional department?
6  A.    I said there were union and non-union rules
7  in the conventional if we want to call it area,
8  section of sales, whatever it may be.
9  Q.    So Altman 9 defines conventional in the
10 context of union work in sales, we know that, right?
11 A.    Yes.
12 Q.    Where could I go to find a definition of a
13 conventional work that would be taking place in
14 sales that would be non-union work? Where would I
15 go to find that description of the job?
16 A.    You would look at a job description.
17 Q.    A job description of what?
18 A.    Merchandiser.
19 Q.    Would that say what department this
20 merchandiser job title would be in?
21 A.    I don't think it says sales.
22 Q.    Does the employee know where the employee
23 is working when they are performing merchandising
24 duties? Do they know what department they are in?
25 A.    I'm not an employee. I mean I'm not —

Page 101

1  Q.    The context of what you know, because Miss
2  Tillman was — by what you say in that context,
3  would that employee know what department that they
4  are working in when they are working as a
5  merchandiser?
6  A.    An employee should know that they are part
7  of the sales department. Can I say that they know?
8  I can't speak for an employee.
9  Q.    What work is done under sales appearing on
10 page 17 of Altman 9?
11 A.    I don't know.
12 Q.    What work is on premises in the sales
13 department?
14 A.    Vending machines and what they call bag in
15 a box, a fountain. This is old and hasn't been
16 cleaned up. So combo is no longer part of this.
17 Q.    As of what year?
18 A.    I don't know.
19 Q.    Did it happen when you were there?
20 A.    No.
21 Q.    After you left?
22 A.    No.
23 Q.    When did it happen?
24 A.    Before I got there.
25 Q.    This contract is for the period January 1,

26 (Pages 98 to 101)

Page 126

1  A.    I'm not confused.
2  Q.    Are you confused about the date?
3        MS. CLEMONS:  Are you going to take
4  this tone?  Your tone is rude, condescending and
5  unnecessary.
6        MR. WOODSIDE:  Stop peppering up the
7  transcript like you always like to do.  I have done
8  nothing.
9        MS. CLEMONS:  If you don't change your
10 tone, we will not continue this deposition.  You
11 will not harass and you will not be rude to my
12 witness.  Do you understand me?
13       MR. WOODSIDE:  Listen, let me say
14 something before we go on.  You are not going to
15 pepper up and patronize the transcript by saying
16 misstatements and untruths, okay.  We have been very
17 kind and generous and considerate here.  I'm only
18 trying to get information.  You just have some
19 attitude about everybody.
20 Q.    Let's go back.  November of 2001, do you
21 know where you got the date from?
22 A.    Memory, something I would have put in my
23 notes.
24 Q.    Well, you are taking a verification.  That
25 means that you are declaring under penalty of

Page 127

1  perjury that the foregoing is true and correct?
2  A.    Yes.
3        MS. CLEMONS:  She said to the best of
4  her memory that's what she has.
5        MR. WOODSIDE:  I'm asking her about
6  paragraph 21.
7  Q.    Can you look at that.  Look at paragraph
8  21.  Is this the terms under which you signed this
9  document?
10 A.    Yes.
11 Q.    So you are saying under penalty of perjury,
12 you know what that is?
13 A.    Yes.
14 Q.    I mean that means something could happen --
15       MS. CLEMONS:  You know what, knock it
16 off with that.  Stop trying to intimidate my
17 witness.  You are trying to intimidate her and I'm
18 not going to allow it.
19 Q.    Did you sign?
20       MS. CLEMONS:  She said she signed it.
21 It says what it says and we're not going to keep
22 going over that.
23 Q.    Did you write this, Altman, Sara Swartz
24 Altman who signed it, did you write this
25 verification?

Page 128

1  A.    I don't know what you mean by write.
2  Q.    Did you write out this information or type
3  out this information yourself?
4  A.    No.
5  Q.    Who typed it?
6  A.    I don't know.
7  Q.    Well, did you --
8  A.    I don't know who typed it.
9  Q.    Did you provide this information to
10 somebody who typed it out?
11       MS. CLEMONS:  Objection.
12 Attorney/client privilege.
13       MR. WOODSIDE:  You are asserting a
14 privilege?
15       MS. CLEMONS:  As a privilege as to who
16 she provided information to and who drafted this,
17 yes.
18 Q.    You are still signing this under penalty,
19 so therefore it's true and correct, right, this
20 information?
21 A.    Yes.
22 Q.    You say the plaintiff was temporarily
23 assigned to perform merchandising duties in the
24 conventional department.  I will ask you how long
25 was she temporarily assigned?

Page 129

1  A.    To the best of my knowledge, five or six
2  months.
3  Q.    That's a temporary assignment?
4  A.    Yes.
5  Q.    Can you think of any other employee who was
6  doing merchandising work like Tillman who was
7  temporarily assigned to perform these kinds of
8  duties in the conventional department that you have
9  described here?  Anybody else?
10 A.    Yes.
11 Q.    Who?
12 A.    Matt Fields.
13 Q.    Matt Fields?
14 A.    Uh-huh.
15 Q.    Spell his name please.
16 A.    F-I-E-L-D-S.
17 Q.    Where is he today?
18 A.    I don't know.
19 Q.    Is he with Pepsi?
20 A.    Not to my knowledge.
21 Q.    Do you know when he left?
22 A.    Maybe 2001.
23 Q.    Did he perform the same kind of duties you
24 are describing Tillman did here during the time
25 Tillman did it?

33 (Pages 126 to 129)

USDC, District of Delaware
Civil Action No. 04-1314

Tillman v. The Pepsi Bottling Group, Inc., et al
Deposition of Sara Swartz Altman

Wednesday
February 28, 2007

Page 130

1  A.    He did not do the space race.
2  Q.    Was Tillman the only one doing the space
3  race as you described here in paragraph four?
4  A.    What do you mean by as described?
5  Q.    Well, you described she is assisting with
6  the space race campaign. During the time Tillman
7  was temporarily assigned was she the only one?
8  A.    She was not the only person.
9  Q.    Matt Fields was there also?
10 A.    Matt Fields was not there.
11 Q.    Who else was doing the space race with Miss
12 Tillman?
13 A.    Craig Nelson.
14 Q.    Craig Nelson.
15        You gave me Craig Nelson as a sales
16 manager?
17 A.    Uh-huh.
18        MS. CLEMONS: You have to say yes or
19 no.
20 A.    Yes.
21 Q.    He was a sales manager?
22 A.    He was a territory coordinator.
23 Q.    He wasn't in the union, was he?
24 A.    No.
25 Q.    He was also a sales manager when he was

Page 131

1  assisting in space race?
2  A.    He was a territory coordinator. He
3  assisted in the space race.
4  Q.    Is this a manager?
5  A.    He managed others.
6  Q.    What was he managing himself when he was
7  performing in the space race?
8  A.    Was he managing himself?
9  Q.    Was he managing himself?
10 A.    I'm not sure what you mean by that
11 question.
12 Q.    Who was he managing union or non-union?
13. A.    He was managing both union and non-union.
14 Q.    In the space race, both union and non-union
15 at the time? Was he managing both union and
16 non-union at the time that he was working in space
17 race with Tillman?
18        MS. CLEMONS: Objection, compound.
19 Q.    Was he?
20        MS. CLEMONS: I don't understand what
21 the question is after all that.
22 Q.    Was he managing union and non-union
23 employees at the time that he was working space race
24 with Tillman or during the time she was working?
25 A.    Yes.

Page 132

1  Q.    Do you know whether the union complained
2  that a supervisor was performing union work at the
3  time?
4  A.    Do I know if?
5  Q.    Did that come up?
6  A.    I don't remember.
7  Q.    Does that violate any part of the
8  bargaining unit, do you know, if a supervisor who
9  was supervising union work or union employees would
10 be performing work that other union members should
11 be doing?
12        MS. CLEMONS: Objection. There is no
13 fact in evidence that it was union work. Where does
14 it say space race was union work? Where do you get
15 that?
16        MR. WOODSIDE: I'm getting there.
17        MS. CLEMONS: I think that's the
18 union's portion to assert, certainly not Miss
19 Tillman's.
20 Q.    At the time she is doing this for how many
21 months did you tell me she did it, five?
22 A.    I told you that she worked with Craig
23 Nelson's realm for approximately five months.
24 Q.    She was reporting to Mr. Nelson at the time
25 that she was working on space race?

Page 133

1  A.    I believe he was one of the people that she
2  reported into.
3  Q.    Who else was working with Miss Tillman who
4  would be on the non-union side of the sales work
5  force during the period she did space race?
6  A.    In an hourly capacity?
7  Q.    Hourly or salary.
8  A.    No one else that I can think of.
9  Q.    Was Nelson, could we call him a supervisor
10 during that time period?
11 A.    Yes.
12 Q.    He was also in that regard a manager,
13 right?
14 A.    He managed others.
15 Q.    Both union and non-union?
16 A.    Yes.
17 Q.    Did he work the entire five months that
18 Miss Tillman was working in space race?
19 A.    Did he work the entire five months?
20 Q.    Yes, in a similar capacity that Miss
21 Tillman would have been working space race?
22 A.    Are you asking if he was employed or are
23 you asking what job duty he held?
24 Q.    Was he doing the things that Tillman was
25 doing in space race during the same five months

34 (Pages 130 to 133)

Page 134

1  Tillman was doing it?
2  A.    Craig did a variety of things. He may have
3  helped out with the space race, but Craig did the
4  general territory coordinator responsibilities.
5  Q.    Now, you say she was performing
6  merchandising duties in the conventional department.
7  Do you see that? You are calling conventional a
8  department.
9  A.    It was a mistake. I tried to clarify it
10  earlier today.
11  Q.    Well, when you wrote this, what did you
12  mean? What did you mean by conventional department
13  when you wrote this?
14  A.    Section.
15  Q.    Conventional section?
16  A.    Of the sales department.
17  Q.    But when you wrote it, you weren't
18  accurate, is that what you are saying about
19  conventional department?
20        MS. CLEMONS: Objection. She said she
21  didn't write it.
22  Q.    You provided the information under
23  verification; is that right? You provided this
24  information?
25  A.    Yes.

Page 135

1  Q.    These are your words?
2  A.    I provided this information.
3  Q.    But the conventional department is used
4  here, those are your words?
5        MS. CLEMONS: Okay, we're done with
6  this. If you keep —
7        MR. WOODSIDE: Why?
8        MS. CLEMONS: She answered that
9  question four times. She will not answer it again.
10  You are being harassing. We're done with that
11  section.
12  Q.    When did you change your mind? This is
13  your verification, ma'am. I am trying to figure out
14  what you are writing, okay.
15  A.    Yes.
16  Q.    When did you change your mind about what
17  conventional department means here in paragraph
18  four?
19  A.    In the context of how you used it today.
20  Q.    Something I asked?
21        MS. CLEMONS: Let her finish.
22        MR. WOODSIDE: You don't need to yell.
23  Stop interrupting her.
24        MS. CLEMONS: You are interrupting
25  her.

Page 136

1  Q.    Go ahead, Sara.
2  A.    Today when we clarified what department
3  meant on the contract I want to be clear that
4  conventional is part of the sales department as you
5  outlined in the contract today and we agreed to call
6  it sub department or subsections, which is what the
7  conventional area is.
8  Q.    Well, I've got conventional rep.
9  A.    Okay.
10  Q.    And you were giving me all of the union
11  positions in the sales department and conventional
12  rep was the context that you used the word
13  conventional, right? Do you remember that?
14  A.    I gave you conventional rep and you asked
15  me to list union job positions, union job titles.
16  Q.    Right.
17  A.    For the conventional sub department. I
18  gave you that job title.
19  Q.    Conventional sub department is appearing in
20  the bargaining unit, right, on that one page?
21  A.    As we agreed to discuss.
22  Q.    That's the conventional, is that — that's
23  the conventional department you are referring to
24  here in paragraph four of Altman 11, right?
25  A.    What I was referring to was the

Page 137

1  conventional side, which is probably the best way I
2  can put it. The conventional side is the side of
3  the sales department that delivers to basically
4  anything but a grocery restore and it varies between
5  Wal*Mart and K-Marts and Sam's Club.
6  Q.    And that's union rate work, right?
7  A.    No.
8  Q.    It's both union and non-union rate work?
9  Is that what that is?
10  A.    What do you mean by rate?
11  Q.    You get a union rate if you are doing
12  conventional department work in the bargaining unit
13  as it appears and then you are telling me now there
14  must be some non-union rate that would also be
15  applicable to a merchandiser doing conventional
16  department work? Is that what you are saying now?
17        MS. CLEMONS: Objection. You are
18  mischaracterizing. You don't have to — explain it
19  to the best of your ability. You don't have to be
20  boxed in by his question.
21  A.    Okay. So what would you like me to explain
22  to you?
23  Q.    The conventional department here in
24  paragraph four is, that's both, is that all of the
25  conventional department work that would be union and

35 (Pages 134 to 137)

USDC, District of Delaware
Civil Action No. 04-1314

Tillman v. The Pepsi Bottling Group, Inc., et al
Deposition of Sara Swartz Altman

Wednesday
February 28, 2007

Page 142

1  Q.    Is that because —
2  A.    Maybe if you break it up into smaller
3  pieces.
4  Q.    I have a conventional rep on the sales, in
5  the sales department getting a union rate under the
6  bargaining unit agreement. That's a union job,
7  right?
8  A.    The duties I described are union job, the
9  conventional rep.
10  Q.    And for this limited period of time when
11  the rep can't do that work, I've got what you
12  described as a helper doing the same work that the
13  rep can't do because of some circumstance or injury
14  or temporary assignment, right?
15  A.    As I said before, they are not doing all
16  the duties.
17  Q.    But they are doing some of those duties.
18  They are doing the work the rep can't do. Let's
19  stick with that hypothetical, right?
20  A.    So hypothetically they are performing
21  duties that a restriction from the doctor says that
22  the rep can't do?
23  Q.    Well, or other reasons that you gave me
24  earlier about why there would be a helper needed,
25  right?

Page 143

1           MS. CLEMONS: It is your question,
2  frame it. Ask her a question.
3  Q.    Just follow me. We have a helper now who
4  is now doing the conventional rep work for whatever
5  reason, right?
6  A.    No.
7  Q.    No. He is doing some of the work the rep
8  can't do. You have told me that already.
9  A.    Yes, he is doing some of the work.
10  Q.    And so for the time period that person is
11  doing some of that work, for the length of that
12  assignment, have you ever known Pepsi to have that
13  helper go into the union or require that the worker,
14  that employee going into the union because of the
15  work that she or he is doing?
16  A.    Have I ever known Pepsi to require a
17  non-union helper to go into the union?
18  Q.    Because they are doing the work that the
19  rep can't do?
20           MS. CLEMONS: Objection. Same
21  objection.
22  Q.    Has that ever happened?
23  A.    I have never known, to the best of my
24  knowledge, of a non-union employee being a helper
25  and Pepsi required them to go into the union because

Page 144

1  they were helping.
2  Q.    That's the reason why, they are helping?
3  A.    I have never known Pepsi to require to the
4  best of my knowledge, a non-union employee to go
5  into the union.
6  Q.    Well, when that non-union employee starts
7  doing bargaining union work under one of the many
8  categories, isn't that requirement required to enter
9  the union under the bargaining agreement between
10  Pepsi and the union?
11           MS. CLEMONS: Objection. Objection.
12  A.    If an employee is doing union work as
13  agreed upon by the union with the job description
14  then the employee is a union employee. I think we
15  said earlier the union may argue that if there is a
16  gray line there, but we don't require people, if you
17  are not in a union job description, we don't require
18  you to pay union dues.
19  Q.    Well, union dues is only one piece. You
20  require, the union would require entering the union
21  right? That's what the union would be taking the
22  position on?
23           MR. GELMAN: Let's go off the record
24  for a second.
25           (Discussion off the record.)

Page 145

1           (At which time a lunch break was
2  taken.)
3  Q.    We're back on and do you have Altman 11 in
4  front of you?
5  A.    Yes.
6  Q.    I just want to go over something you said
7  earlier. Aside from Matt Fields and Craig Nelson,
8  there were no other non-union employees in the
9  Wilmington plant working on the space race campaign
10  during the time that Miss Tillman worked on it?
11  A.    No.
12           MS. CLEMONS: Objection. Go ahead.
13  It misstates her previous testimony.
14  A.    Yes. When I was giving the list of names
15  with Matt Fields you asked me who else worked as a
16  helper that was non-union. To the best of my
17  knowledge, Marlayna Tillman was the only
18  merchandiser that worked in the space race.
19  Q.    What was Matt Fields' position?
20  A.    Merchandiser.
21  Q.    He was a non-union merchandiser?
22  A.    Yes.
23  Q.    And Craig Nelson is the other person that
24  we talked about, right?
25  A.    Yes.

USDC, District of Delaware    Tillman v. The Pepsi Bottling Group, Inc., et al    Wednesday
Civil Action No. 04-1314    Deposition of Sara Swartz Altman    February 28, 2007

---

**Page 146**

1  Q.    Those are the three people, three employees
2  in the Wilmington plant who worked the space race
3  campaign?
4        MS. CLEMONS: Objection. Misstates.
5  Q.    Who were non-union workers during the time
6  that Tillman was working?
7        MS. CLEMONS: Objection. Misstates
8  her testimony. Go ahead.
9  A.    No. Matt Fields did not work on the space
10 race. I said to the best of my knowledge Marlayna
11 Tillman was the only merchandiser that worked on the
12 space race.
13 Q.    What was Fields' department?
14 A.    Fields did not work space race.
15 Q.    But Fields worked -- where was Fields
16 working when you gave me his name along with Craig
17 Nelson? For the five months Tillman was working
18 space race you gave me Matt Fields' name and some
19 category. What was it?
20        MS. CLEMONS: Objection. Misstates
21 her testimony.
22 Q.    I just asked you a question.
23 A.    Can you repeat it?
24 Q.    You gave me Matt Fields as a name during
25 the five months that Marlayna Tillman was working

---

**Page 147**

1  space race as a merchandiser and non-union
2  merchandiser. What was Matt Fields' position and
3  was he union or non-union during that period of
4  time?
5        MS. CLEMONS: Objection. That's not
6  what she said.
7  Q.    I just asked you a question.
8        MS. CLEMONS: You can ask her a
9  question which doesn't state what she didn't say.
10 You are misleading her, but you can answer if you
11 understand, Sara.
12 A.    Again, I did not say Matt Fields worked on
13 the space race.
14 Q.    I know that. I wrote that down.
15 A.    He wasn't employed during those months. I
16 gave you the context of you asked me if other people
17 who were non-union that helped drivers.
18        MS. CLEMONS: She is one of the
19 people, you asked her for one person. She gave you
20 one person. There are others. Do you want to ask
21 her that.
22        MR. WOODSIDE: Why are you hitting the
23 table?
24        MS. CLEMONS: Why are you asking
25 questions not based on facts.

---

**Page 148**

1        MR. WOODSIDE: What's the matter over
2  there?
3        MS. CLEMONS: You know what,
4  Mr. Woods, asked your questions and move on.
5  Q.    Who else besides Matt Fields who was
6  helping conventional reps in their work in 2001,
7  2002, 2003, 2004?
8  A.    Mark Maragus.
9  Q.    Can you spell his name please?
10 A.    M-A-R-A-G-U-S. I could be wrong though.
11 Q.    Who else?
12 A.    Dave Zimbala. I can't remember how to
13 pronounce it.
14 Q.    Anybody else?
15 A.    That I can remember.
16 Q.    What department or job title did Mark
17 Maragus have?
18 A.    Job title, merchandiser.
19 Q.    Non-union?
20 A.    Yes.
21 Q.    What about Dave Zimbala?
22 A.    Non-union merchandiser.
23 Q.    Do you know what time period Mr. Maragus is
24 doing this work as helper?
25 A.    I don't remember the time period.

---

**Page 149**

1  Q.    How about Mr. Zimbala?
2  A.    I don't remember the time period.
3  Q.    Was it one of the four years that I gave
4  you?
5  A.    Yes.
6  Q.    Were they both paid at non-union rates?
7  A.    They were paid the merchandiser rate.
8  Q.    The same rate as Tillman?
9  A.    I don't know.
10 Q.    What did Pepsi establish as a seniority
11 date for a particular employee?
12 A.    It depends.
13 Q.    Are there different seniority dates for
14 different employment events?
15 A.    Well, if you want to clarify the question
16 what you mean by seniority.
17 Q.    Is your seniority on the non-union side in
18 the sales department?
19 A.    There would be for pension and vacation
20 purposes, there is time and job or hire date.
21 Q.    How about for applying for another position
22 at Pepsi, would there be seniority date for that
23 non-union employee?
24 A.    I don't know what you are asking.
25 Q.    Well, if a non-union employee applied for a

---

. 38 (Pages 146 to 149)

USDC, District of Delaware          Tillman v. The Pepsi Bottling Group, Inc., et al          Wednesday
Civil Action No. 04-1314                    Deposition of Sara Swartz Altman          February 28, 2007

Page 210

1  A.    Okay.
2  Q.    Is the conventional customer representative
3  rate or position appearing on section four under pay
4  rates, is that a job classification?
5         MS. CLEMONS: Same objection.
6  A.    I don't know.
7  Q.    You don't know?
8  A.    I don't know in the context of what you are
9  asking me.
10 Q.    I'm only asking you in the context of the
11 contract where it refers to a higher rated job
12 classification, you just told me what that was,
13 right. You understand what that means?
14 A.    I understand what a higher rate is.
15 Q.    Is the rates appearing on page 11 under
16 section four pay rates part of schedule A?
17 A.    I don't know.
18 Q.    Should it be part of schedule A?
19 A.    I don't know.
20 Q.    How about should it be part of the wage
21 schedule on Appendix A, do you know?
22 A.    That's not my decision.
23 Q.    Has it ever come up that it was never part
24 of Appendix A?
25 A.    No.

Page 211

1  Q.    On the second page of Appendix A, the wage
2  schedule I see effective upon ratification, the
3  following one time lump sum ratification bonus shall
4  be made. Right? Do you see that?
5  A.    Yes.
6  Q.    That's the conventional CR gets a certain
7  amount of money?
8  A.    Okay.
9  Q.    How much?
10 A.    $1,000.
11 Q.    Is that — and that conventional CR is
12 where Miss Tillman was performing the work for
13 merchandising work in the conventional department?
14         MS. CLEMONS: Objection.
15 Q.    During the space race program?
16         MS. CLEMONS: Asked and answered in
17 the prior testimony. You can answer it again, Sara.
18 A.    She was not performing conventional CR
19 work.
20 Q.    Well, she was doing the duties as a helper
21 with someone who is doing conventional CR work. We
22 know that, right?
23         MS. CLEMONS: Objection. Asked and
24 answered and misstates her prior testimony.
25 A.    She was not doing CR work.

Page 212

1  Q.    Were conventional CRs as appearing here on
2  the wage schedule doing the space race program work?
3  A.    No.
4  Q.    Were any union employees doing the space
5  race program work?
6  A.    I don't know.
7  Q.    The space race program that you identified
8  in your affidavit was being performed in what
9  department under this collective bargaining
10 agreement?
11 A.    The sales department.
12         MS. CLEMONS: Objection. Under the
13 collective bargaining.
14 A.    Yes, sorry. It wasn't part of the
15 collective bargaining agreement. It was part of the
16 sales department.
17 Q.    But you don't know whether union employees
18 were actually performing some of that work in the
19 space race program?
20 A.    I don't know.
21 Q.    Well, if they were driving, were there
22 people driving trucks in the space race program,
23 employees driving trucks?
24 A.    Employees were driving perhaps pickup
25 trucks, but they were never driving a truck that

Page 213

1  required a class A CDL.
2  Q.    You are sure about that?
3  A.    No, I can't be sure.
4  Q.    Tillman says she was working with employees
5  who were union employees driving trucks that would
6  have been paid as positions under the collective
7  bargaining agreement. That's what she says.
8  A.    Okay.
9  Q.    Do you know whether that's true or not?
10 A.    I don't know.
11 Q.    Did you ever look into it?
12 A.    No.
13 Q.    Well, if that's true, let's just speak
14 hypothetically, if that's true, the driver of that
15 truck, if they were driving the truck that would
16 match or be bargaining unit type work, that driver
17 would be paid a union rate, right?
18         MS. CLEMONS: Objection.
19 Q.    We know that. Is that right?
20 A.    If the driver was driving a truck, he would
21 be paid his normal rate?
22 Q.    Well, if it was a union, if it was a
23 position fitting onto one of these positions on the
24 wage schedule as a driver, that driver would be
25 getting a rate in accordance with the collective

# 31

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARLAYNA G. TILLMAN,
v.
THE PEPSI BOTTLING GROUP, et al.

**SUBPOENA IN A CIVIL CASE**
Case Number: 04-1314
District of Delaware

TO: Beverly Bove, Esq.
1020 West 18th Street
P.O. Box 1607
Wilmington, DE 19899

☐ · YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM – |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

**Any executed settlement agreements evidencing the settlement of Ms. Tillman's worker's compensation claim. Any notes regarding conversations about the settlement. Any letters sent to Ms. Tillman regarding, enclosing or communicating the terms of the settlement agreement and/or settlement agreemetns.**

| PLACE:<br>BALLARD SPAHR ANDREWS & INGERSOLL, LLP<br>1735 MARKET STREET, 51st FLOOR<br>PHILADELPHIA, PA 19103 | DATE AND TIME<br><br>November 14, 2006 at 9:00 A.M. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT):<br><br>Attorney for Defendant        W. KELLEHER | DATE<br><br>October 31, 2006 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
William M. Kelleher, Esquire
BALLARD SPAHR ANDREWS & INGERSOLL, LLP 919 Market Street, 12th Floor
Wilmington, DE 19801; (302) 252-4465
*You may contact the issuing attorney to set an alternative means of production.

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

DMEAST #9552605 v1

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| **SERVED** | | |
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| SERVED BY (PRINT NAME) | | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. They court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty and appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the

provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**32**

# BEVERLY L. BOVE

Attorney at Law                                          Member DE & PA Bars

BEVERLY L. BOVE
VINCENT J. X. HEDRICK, II

February 1, 2007

Lucretia C. Clemons, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103

> RE:   **Marlayna Tillman v. Pepsi Bottling Group**
> **IAB Hearing No.:**   **06175-00465**
> <u>**DOL: 11-6-03**</u>

Dear Ms. Clemons:

In response to your letter of January 26, 2007, I enclose a copy of the Agreement to Compensate, a copy of a letter documenting the settlement agreement on lost wages dated May 21, 2004 from Christine O'Connor to Eric Grandell of my office, a copy of the Distribution of Proceeds that Marlayna Tillman signed, a copy of a letter dated November 10, 2004 where we gave her a copy of her file and a copy of a letter dated December 1, 2004 acknowledging that Jessica Welch from Doroshow & Pasquale took over her representation. A copy of the entire file was given to Jessica Welsh and Marlayna and we have nothing further. I would suggest that any of the other documents that you need would be in Jessica Welch's file.

We got no other benefits for Marlayna Tillman because she discharged us before her permanency rating.

I hope this helps you.

Very truly yours,

Beverly L. Bove

BLB/jfb
Enclosures

PBG 01688

1020 W. 18th Street  •  P.O. Box 1607                    (302) 777-3500
Wilmington, Delaware  19806



JUN 28 2004

CASE FILE NO. _____
CARRIER FILE NO. A3_____

**STATE OF DELAWARE**
**OFFICE OF WORKERS' COMPENSATION**
**AGREEMENT AS TO COMPENSATION**

Employee __MARLAYNA TILLMAN__                     Employer __PEPSI BOTTLING GROUP__
Address __P.O. BOX 688__                               Address __3501 GOVERNOR PRINTZ__
__CLAYMONT, DE 19802__                                         __BELLEFONTE, DE 19809__

Insurance Carrier/Self-insurer __SEDGWICK CMS__           Third party Adjuster _____
Address __US STEEL TOWER__                                Address _____
__600 GRANT STREET, SUITE# 2944__
__PITTSBURG, PA 15219__

The above have reached an agreement in regard to compensation for the injury sustained by said employee and submit
the following statement of facts relative thereto:

Date of Injury ____11/06/03____                     Date Disability Began __11/06/03__
Cause/Place of Accident __SEE FIRST REPORT OF INJURY__
Nature/Part of Body __RIGHT KNEE & CALF__
Probable Length of Disability (if known) ____11/06/03- 4/18/04____

The terms of this agreement under the above facts are as follows:
This agreement is for (check all that apply) __X__ Total Disability ___ Temporary Partial Disability
___ Permanent Partial Disability __ Disfigurement __ Commutation __ Medical Only      *Credit is*
___ Salary In Lieu of Workers' Compensation                                          *disputed by*
**✗*** LESS A CREDIT OF $7,700.00 FOR SHORT TERM DISABILITY RECEIVED*****           *Claimant*

That the said __MARLAYNA TILLMAN__ shall receive compensation at the rate of __$440.00__ per week based upon an
average weekly wage of __$660.00__ and that said compensation shall be payable ___ weekly ___ bi-weekly __X LUMP
SUM__ monthly other (specify) from and including the 6th of NOVEMBER 2003 until APRIL 18, 2004.

**BENEFITS FOR TOTAL/PARTIAL DISABILITY, (LOST WAGES) SHALL REQUIRE YOU TO ADVISE
THE NAMED CARRIER/SELF-INSURED/THIRD PARTY ADJUSTER OF ANY CHANGE IN
EMPLOYMENT STATUS AND/OR DISABILITY. FAILURE TO NOTIFY A CHANGE OF STATUS IS
PUNISHABLE PURSUANT TO TITLE 18, DELAWARE CODE, CHAPTER 24, AND/OR TITLE 11
DELAWARE CODE, SECTION 913.**

Witness __Diana Gey__                          ✗ Employee __M. Tillman__  __6/30/04__
                (signature)                                      (signature)
Address: __1020 W. 18th St.__
__Wilmington De__
__19802__

                                          Adjuster/Attorney _____
                                                              (signature)

                                          Phone Number _____
                                          Date of Agreement _____

For Accounting Use Only:
Approved by: _____
Date of Approval: _____

PBG 01689

CASE FILE NO. 1242671
CARRIER FILE NO. A364618584

## STATE OF DELAWARE

### OFFICE OF WORKERS' COMPENSATION

### RECEIPT FOR COMPENSATION PAID

DATE: June 14, 2004

Received of SEDGWICK CMS the sum of $12,634.29*, making in all the total sum of $12,634.29

in settlement of compensation due for the TEMPORARY TOTAL * disability of MARLAYNA TILLMAN

which began on 11/06/03 , and terminated on 4/18/04 .

X _M. Tillman_ 6/30/04
Employee Signature

*28.71 weeks of benefits at a
compensation rate of $ 440.00
*** LESS A CREDIT OF $7,700.00 FOR SHORT TERM
DISABILITY RECEIVED***
** RIGHT KNEE & CALF

Claimant specifically reserves the
right to petition for the amount of
the above credit and disputes Employer's
claim to same

Address: _____

Your signature on this receipt will terminate your rights to receive the workers' compensation benefits
specified above on the date indicated. This form is not a release of the employer's or of the insurance carrier's
workers' compensation liability. It is merely a receipt of compensation paid. The claimant has the right
within five years after the date of the last payment to petition the Office of Workers' Compensation for
additional benefits.

PBG 01690

May-24-2004  04:27pm  From-MARSHALL DENNEHEY           +302 428 0085     T-818  P.002/003  F-058

A REGIONAL DEFENSE LITIGATION LAW FIRM

## MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN

A PROFESSIONAL CORPORATION    www.marshalldennehey.com

1220 N. Market St., 5th Floor, P.O. Box 8888 · Wilmington, DE 19899-8888
(302) 552-4300 · Fax (302) 651-7905

Direct Dial: 302-552-4321
Email: coconnor@mdwcg.com

May 21, 2004

VIA FACSIMILE & U.S. MAIL
Erik C. Grandell, Esquire
1020 W. 18th Street
Suite 2
P.O. Box 2207
Wilmington, DE 19802

Re:    Marlayna Tillman v. Pepsi Bottling Group
       Our File No.: 06175-00465
       IAB Hearing No.: 1242671
       DOL: 11/06/03

Dear Erik:

Please accept this letter as an outline of our settlement terms related to the above-referenced matter. My client has agreed to recognize Ms. Tillman's right calf and right knee injuries that were sustained at Pepsi on November 6, 2003. We also have agreed to pay temporary total disability benefits from November 6, 2003 through April 18, 2003. This translates into 28.71 weeks of benefits at the rate of $440.00 for a total of $12,634.29. You and I have agreed to address any average weekly wage calculation issue at a legal hearing in the future, if necessary. If it is found that Ms. Tillman requires an adjustment to her average weekly wage compensation rate, we will pay additional temporary total disability benefits accordingly.

You and I also discussed the fact that Ms. Tillman received short term disability benefits from November 12, 2003 through April 13, 2003. She was paid $350.00 per week for a total of $7,700.00. My client has asserted its right to take a credit against temporary total disability benefits that are due. You and I have agreed to investigate whether the claimant paid into her disability insurance premium and this will determine whether or not she is owed the $7,700.00 directly. For now, I will request a temporary total disability check in the amount of $4,934.29.

Finally, my client has agreed to pay expert witness fees in this case and I will need an invoice for Bandera's deposition from you at your earliest convenience. I will also be requesting a check in the amount of $3,790.29 for the 30% attorney's fee payment.

PBG 01691

May-24-2004 04:27pm    From-MARSHALL DENNEHEY                +302 428 8085        T-818   P.003/003   F-059

Erik C. Grandell, Esquire
May 21, 2004
Page 2

If your understanding of our settlement agreement is in any way inconsistent with mine, please contact me immediately. Thank you for your cooperation.

Very truly yours,

Christine P. O'Connor

CPO:klr

cc:    Christine Miller, Sedgwick Ins. (via facsimile & U.S. Mail)
       Claim No. A364618584

\\5_A\COMP\CPO\COIRR\222673\KXR\06175\00465

### DISTRIBUTION OF PROCEEDS
### MARLAYNA TILLMAN
### FILE NO. 03-0976

| | |
|---|---|
| **GROSS SETTLEMENT AMOUNT:** | **$ 4,934.29** |
| LESS Attorney Fee (1/3 per Agreement) | $   420.71 |
| Gross Settlement less Attorney fee | $ 4,513.58 |

LESS Costs Advanced:

| | |
|---|---|
| Administrative | $ 25.00 |
| Photocopies | $ 34.00 |
| Postage | $   4.53 |
| Fax charges | $ 11.00 |
| Medical records | $ 74.00 |
| Transcript | $169.50 |
| LexisNexis Research | $ 46.54 |

| | |
|---|---|
| **TOTAL COSTS** | $   364.57 |

| | |
|---|---|
| **RECOVERY DUE CLIENT:** | **$ 4,149.01** |

I have read the foregoing Distribution of Proceeds and I hereby approve the same. I acknowledge receipt of a copy of this Distribution of Proceeds sheet. I hereby authorize my attorney, Beverly L. Bove, to endorse all settlement drafts on my behalf. I agree that my attorney shall not be responsible to pay outstanding medical bills.

*Marlayna Tillman*
_____
MARLAYNA TILLMAN

6/30/04
_____
DATE

# BEVERLY L. BOVE

**Attorney at Law**                                        **Member DE & PA Bars**

---

**Beverly L. Bove**
**Erik C. Grandell**

November 10, 2004

**VIA HAND DELIVERY**
Marlayna Tillman
P.O. Box 688
Claymont, DE 19703

                    **RE:    Date of Incident:    November 6, 2003**

Dear Marlayna:

    Enclosed please find a copy of your file as requested. Also enclosed are invoices from Corbett & Associates in the amount of $181.00 and Scangineering in the amount of $35.69 copying charges of your file and transcripts.

Very truly yours,

Angela M. Wilson
Paralegal to Beverly L. Bove, Esq.

/amw
Enclosures

PBG 01694

---

1020 W. 18th Street • P.O. Box 1607          Fax (302) 777-3805
Wilmington, DE 19899

# BEVERLY L. BOVE
Attorney at Law                                           Member DE & PA Bars

BEVERLY L. BOVE
ERIK C. GRANDELL

December 1, 2004

Jessica L. Welch, Esquire
Doroshow Pasquale Krawitz
Siegel & Bhaya
1202 Kirkwood Highway
Wilmington, DE 19805

RE:    *Marlayna Tillman v. Pepsi Bottling Group*
IAB Hearing No.:    06175-00465
DOL:  11-6-03

Dear Jessica:

This letter is to acknowledge receipt of your letter indicating that Marlayna Tillman wishes for you to represent her in connection with he Workers' Compensation case. Ms. Tillman has an outstanding debt of $216.69. Please forward payment of these costs upon receipt of this correspondence.

I have spent approximately 21.5 hours to date handling this claim.

Please do not hesitate to call me if you have any questions about Marlayana's case. Thank you.

Very truly yours,

Erik C. Grandell

ECG/smb

PBG 01695

1020 W. 18th Street • P.O. Box 1607

**33**



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

SMALL BUSINESS/SELF-EMPLOYED DIVISION

**FEB 27 2007**

Lucretia C. Clemons
Ballard Spahr Andrews & Ingersoll LLP
1735 Market Street, 51st Floor
Philadelphia, MA  19103-7599

Dear Ms. Clemons:

This is in response to your request dated January 24, 2007, regarding Marlayna G. Tillman, received in our office on January 24, 2007.

We are enclosing eleven (11) pages of information returns transcripts for the tax years 2001, 2002, 2003 and 2004.  We found no record of returns filed by the taxpayer for the tax years 2001, 2002, 2003 and 2004.

Should you have any questions concerning this correspondence, you may contact Disclosure Specialist Cindy Brooks, ID # 08-00430, by calling 978-474-5617 or by writing to: Internal Revenue Service, Disclosure Office, MS -218, 310 Lowell Street, Andover, MA  01810.  Please refer to case number 01-2007-00914.

Sincerely,

*Cindy Brooks*

Fred Messuri
Disclosure Manager
Boston Office

Enclosures

PBG 01696