IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARLAYNA G. TILLMAN,  :   C.A. No.: 04-1314(SLR)
                        :
    Plaintiff,          :
                        :
                        :
        v.              :
                        :
THE PEPSI BOTTLING GROUP, INC.,  :
and TEAMSTERS LOCAL UNION  :
830,                    :
                        :
    Defendants.         :
                        :

**ANSWERING BRIEF OF PLAINTIFF, MARLAYNA G. TILLMAN
IN OPPOSITION TO DEFENDANTS, PEPSI BOTTLING GROUP, LLC'S
AND INTERNATIONAL BROTHERHOOD OF TEAMSTERS
LOCAL UNION 830'S MOTIONS FOR SUMMARY JUDGMENT**

Barbara H. Stratton, Esq.
KNEPPER & STRATTON
1228 North King Street
Wilmington, DE 19801
(302) 658-1717
Delaware Bar ID#2785
bhs@knepperstratton.net
Attorney for Plaintiff

Pro Hac Vice Counsel:

J. Stephen Woodside, Esq.
J. STEPHEN WOODSIDE, P.C.
One Montgomery Plaza
425 Swede Street, Suite 605
Norristown, PA 19401
(610) 278-2442

Dated: April 23, 2007

## TABLE OF CONTENTS

Page

I.    NATURE AND STAGE OF PROCEEDINGS ........................................ 1

II.   SUMMARY OF THE ARGUMENT ................................................... 2

II    COUNTER-STATEMENT OF FACTS ................................................ 3

IV    ARGUMENT ........................................................................... 15

    A. Legal Standard on summary judgment.................................. 15

    B. Plaintiff's claims under the Equal Pay Act survive summary judgment............ 17

        1. Tillman's work in the conventional department was substantially
           equal to work performed by the other men in conventional........................ 18

        5. Pepsi has failed to establish the absence of a triable issue of fact in
           dispute on Tillman's Equal Pay Act claim................................... 20

    C. Plaintiff's claim for unequal wages under Title VII survives
       summary judgment............................................................... 23

    D. Plaintiff's claims for failure to promote in violation of Title VII
       survive summary judgment.................................................... 23

        1. Plaintiff has exhausted her administrative remedies................... 25

        2. Plaintiff has established a *prima facie case* of discrimination for
           failure to promote.......................................................... 27

           a. Plaintiff was qualified for the positions she applied for, and timely
              applied for the positions......................................... 28

           b. Pepsi's denial of promotion occurred under specific circumstances
              giving rise to an inference of discrimination......................... 29

        3. Pepsi's non-discriminatory reasons for not promoting plaintiff to the
           jockey/transport or route loader positions are not legitimate, and pretext.... 31

        4. Pepsi's articulated reasons for not paying plaintiff at union level rates
           for her work in conventional, are pretext.............................. 32

i

E. Plaintiff's claim for retaliation survives summary judgment...........................33

F. Pepsi has proffered no evidence to support a fraud claim against plaintiff,
and summary judgment on its counterclaim must be denied..............................34

   1. Plaintiff made no false representations to Pepsi about her injury.................34

   2. Plaintiff was totally disabled for the stated period, and Pepsi has
presented no evidence to the contrary...........................................................36

G. Pepsi has proffered no evidence to support a claim of unjust enrichment
against plaintiff, and summary judgment on the counterclaim must be denied..38

V. CONCLUSION ...............................................................................................38

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page

Adickes v. S.H. Kress & Co., 399 U.S. 144 (1970)................................................. 15, 16

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)........................................... 16

Anderson v. McIntosh Inn, 295 F.Supp.2d 412 (D.De. 2003)............................... 25

Angelo v. Bacharach Instrument Co., 555 F.2d 1164 (3rd Cir.1977)..................... 18

Anjelino v. The New York Times Co., 200 F.3d 73 (3rd Cir.1999)......................... 25, 27

Antol v. Perry, 82 F.3d 1291 (3rd Cir.1996)........................................................... 25

Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358 (3rd Cir.1992)....... 16

Brobst v. Columbus Servs. Int'l, 761 F.2d 148 (3rd Cir.1985)............................... 18

Celotex Corp. v. Catrett, 477 U.S. 317 (1986)........................................................ 15, 16

Chitwood v. Feaster, 54 F.R.D. 204 (N.D.W.Va.1972) ......................................... 16

Corning Glass Works v. Brennan, 417 U.S. 188 (1974).......................................... 17

EEOC v. Delaware Dept. of Health & Human Servs., 865 F.2d 1408 (3d Cir. 1989).......... 17

Ezold v. Wolf Block et al., 983 F.2d 509 (3rd Cir.1993).......................................... 28

Fuentes v. Perskie, 32 F.3d 759 (3rd Cir.1994)....................................................... 23, 24

Hicks v. ABT Assoc., Inc., 572 F.2d 960 (3rd Cir.1978).......................................... 25

Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403 (3d Cir. 1999)........................... 23, 24

Kautz v. Met-Pro Corp., 412 F.3d 463 (3rd Cir.2005)............................................. 24

Lissak v. United States, 49 Fed. Cl. 281 (2001)....................................................... 37

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1972) ..................................... 23, 28

Miller v. Beneficial Management Corp., 977 F.2d 834 (3rd Cir.1992).................... 23

Mroczek v. Bethlehem Steel Corp., 126 F.Supp.2d 379 (E.D.Pa. 2001)............................ 25

Ostapowicz v. Johnson Bronze Co., 541 F.2d 394 (3rd Cir.1976)........................................ 27

Ryan v. General Machine Products, 277 F.Supp.2d 585 (E.D.Pa. 2003)........................ 17, 20, 23

Shesko v. City of Coatesville, 292 F. Supp.2d 719 (E.D.Pa. 2003)..................................... 27

Stanziale v. Jargowsky, 200 F.3d 101 (3rd Cir.2000)............................................................ 17, 18

United States v. Diebold, Inc., 369 U.S. 654 (1962)................................................................ 15

Weldon v. Kraft, Inc., 896 F.2d 793 (3rd Cir.1990)................................................................ 28

Woodson v. Scott Paper Co., 109 F.3d 913 (3rd Cir.1997)..................................................... 33

Young v. Pennsauken Township Sch. Dist., 47 Fed.Appx. 160 (3rd Cir.2002)..................... 27

## FEDERAL STATUTES AND RULES

42 U.S.C. §2000e-2(h)............................................................................................................. 23

42 U.S.C. §2000e-5(e).............................................................................................................. 25, 26

42 U.S.C. §2000e-5(f)(1) ........................................................................................................ 1

42 U.S.C. §1981 ....................................................................................................................... 1

42 U.S.C. §704(a) .................................................................................................................... 1

29 U.S.C. §201-219 ................................................................................................................. 1

29 U.SC. §206(d)(1) ................................................................................................................ 17

F.R.Civ.P. 56(c) ...................................................................................................................... 15, 16, 36

I.    NATURE AND STATE OF PROCEEDINGS

Plaintiff, Marlayna G. Tillman ("Tillman") is an adult African-American female formerly

employed both in the non-union and union departments of The Pepsi Bottling Group, Inc.

("Pepsi").

Plaintiff filed her complaint against defendants, Pepsi and Teamsters Local Union 830

("Local 830") on September 29, 2004, alleging that Pepsi and Local 830 discriminated against

plaintiff in her employment with Pepsi and violated federal and state wage laws.  Specifically,

plaintiff asserts claims for race and gender discrimination, retaliation and failure to promote

arising under Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. §2000e-(5)(f)(1));

Title I of the Civil Rights Act of 1991 (42 U.S.C. §1981, 42 U.S.C. §704(a)), and claims under

the Fair Labor Standards Act (29 U.S.C. §201-219) and the Equal Pay Act, 29 USC. §206(d)(1).

On August 30, 2005, on Pepsi's motion to partially dismiss the complaint, this court

entered an order dismissing plaintiff's sexual harassment claim, the claim under the Delaware

Wage Payment and Collection Act, and the claim for breach of covenant of good faith and fair

dealing.   Under the same order, the court denied Local 830's motion for a more definite

statement of claims.

Pepsi filed its answer and counterclaim to the complaint on October 14, 2005.  Local 830

filed its answer on October 19, 2005.  Pepsi's counterclaim asserts fraud and unjust enrichment

against Plaintiff stemming from her receipt of workers' compensation benefits.  Plaintiff initiated

significant discovery of Pepsi and Local 830.  On November 30, 2006 (prior to the close of

factual discovery), plaintiff filed her motion under Rule 37, to compel factual discovery and to

extend the deadline for fact-based discovery as to all defendants due to Pepsi's significant

discovery failures. (Document no. 87).  Factual discovery closed on December 1, 2006, under the court's August 21, 2006 scheduling order.

On December 15, 2006, defendants, Pepsi and Local 830 moved for summary judgment on all claims under Rule 56.  On January 16, 2007, plaintiff filed her response to the summary judgment motions under Rule 56(f).  On January 24, 2007, the court entered an order extending the deadline for specified factual discovery until February 28, 2007, denying defendants' pending motions for summary judgment, and granted other relief.  The court ordered dispositive motions to be filed on or before March 28, 2007.   Both defendants filed their motions for summary judgment timely.  On the same date, in a separate motion, defendant Pepsi moved for summary judgment on its counterclaim, relying on the same appendix and record filed in support of summary judgment on plaintiff's claims.  Plaintiff files this brief and appendix in opposition to both defendants' motions, and defendant, Pepsi's motion for summary judgment on its counterclaim against plaintiff.[1]

II.    SUMMARY OF THE ARGUMENT

1.  Plaintiff has established a *prima facie* case against Pepsi under the Equal Pay Act. Plaintiff's work in the conventional department of Pepsi was substantially equivalent in content to the work of the other men in that department.  Pepsi has failed to produce sufficient evidence upon which a reasonable factfinder could conclude that the proffered reasons could explain the wage disparity, or that the proffered reasons actually motivated the wage disparity.

---

[1]Plaintiff does not specifically address in this brief, the points raised by Local 830 in its motion. However, because several factual issues are joint and overlap between defendants, and portions of Local 830's record in appendix bear on several of the core facts involving plaintiff's claims against Pepsi, plaintiff opposes Local 830's motion on her record and  appendix submitted herewith, as requests equivalent relief against both defendants.

2. Because plaintiff has established a *prima facie case* under the Equal Pay Act, plaintiff has likewise established a *prima facie* Title VII case for unequal pay for equal work during her eight month tenure in the conventional department. Pepsi's articulated reasons for not paying plaintiff at union level rates for her work in conventional, under Title VII standards, are pretext.

3. Plaintiff has established a *prima facie* case under Title VII for Pepsi's failure to promote her to the jockey/transport position and a route loader position in 2003. Pepsi's failure to promote plaintiff to either position occurred under specific circumstances giving rise to a strong inference of gender discrimination.

4. Pepsi has offered no legitimate reason for not promoting plaintiff to the jockey-transport position. While Pepsi claims seniority was the reason for non-selection for the route loader position, Pepsi blocked plaintiff's advancement by assigning her to conventional and barring her entry into the union, and men hired from outside Pepsi directly into union positions, after Tillman was hired, were awarded the route loader positions.

5. Plaintiff has established a *prima facie* case for retaliation against Pepsi.

6. Pepsi has proffered no evidence to support a fraud claim against plaintiff, and its counterclaim for fraud and unjust enrichment must be dismissed. In the alternative, summary judgment must be denied. Sanctions are not warranted.

III. COUNTER-STATEMENT OF MATERIAL FACTS REQUIRING DENIAL
OF THE MOTION

1. Plaintiff, Marlayna Tillman, a female, began her employment with the Pepsi Bottling Group, Inc. ("Pepsi") on May 8, 2001, as a merchandiser working in the merchandising department. This was a non-union, entry level position paying an hourly rate of $10.58 per hour.

3

Her job as merchandiser was solely to pack out soda product on the shelves in supermarket and large-volume grocery stores. She used her own car for the job, and received a $150 per pay period mileage stipend. B 010; B 008.

2. Plaintiff wanted to advance her career at Pepsi, and early on made it known to Pepsi management she wanted to transfer into a driver position, which would allow her to build union seniority. Plaintiff, who was licensed to drive, obtained a CDL-A permit within several months of starting employment, which allowed her to drive with a CDL-A licensed operator in the truck. B 009; B 010; B 017.

3. After five months in the merchandising department in October, 2001, Plaintiff was assigned to work in the conventional department with no pay increase, where she worked regular and overtime hours at her merchandiser rate of pay. Pepsi continued to assign her work in the merchandising department on the weekends, where she also worked in excess of 8 hours per day. B 010.

4. The conventional department was bargaining unit work and part of the sales department under the collective bargaining agreement between Pepsi and Local 830. Except for plaintiff, the conventional department, like the entire union side of Pepsi, was made up of all male employees. B 008; B 010.

5. Conventional department work is completely different than merchandising work. Conventional drivers service retail stores (such as Target, K-Mart, Wal-Mart), convenience stores (such as Wawa, 7-11), and mom/pop stores and local gas stations/food marts. B 002; B 011.

6. Conventional drivers drive route trucks (tractor-trailers, vans and pick-ups) and deliver

4

soda product to the store, reset displays and store coolers, collect money, service and stock vending machines, and close sales. Conventional workers do not pack out supermarket shelves or clean display shelves. B 002; B 011.

7. During the entire eight months plaintiff worked in conventional, she did the exact same work as conventional drivers, including driving a Pepsi van and working the conventional stores by herself. On occasion, plaintiff drove the tractor-trailer with her CDL permit, to service the stores with the CDL-licensed driver in the right seat. Plaintiff was just as valuable a worker in the conventional department as any other worker. B 002; B 009; B 011.

8. As a conventional worker, plaintiff carried the soda from the truck or van to the store. Plaintiff worked on vending machines, store coolers, and reset displays. Many of the accounts were pre-sold and no money was involved or orders taken. As a van or pick-up truck driver, plaintiff was not required to keep a log book, and the tractor trailer drivers did not keep log books on their routes to conventional stores. B 009; B 011.

9. There were no non-union employees, and no merchandisers, working in the conventional department. Although Pepsi claims Matt Field, Mark Mauragus and Dave Zembala, all men, were merchandisers who worked as "helpers" in the conventional department at non-union rates, Pepsi has no information about how much time each worked as a merchandiser in the conventional department or what their rates of pay were. B 011; B 101.

10. Pepsi records show Fields worked a grand total of three weeks with Pepsi in 2001, and Dave Zembala worked only 11 weeks as a merchandiser in 2001. Mark Mauragus worked as a merchandiser at Pepsi for a number of years, beginning in December, 2001 only during the summer months in between his college years, and part time throughout the year. Mauragus never

5

worked in any position other than as merchandiser, and never worked in the conventional department as a merchandiser when Tillman worked at Pepsi. B 009; B 011; B 108; B 112.

11. According to Pepsi, the union positions in the sales department of Pepsi are: "bulk driver, conventional representative, extra men, full service driver and delivery driver". Everyone working in any union position in sales would fit into one of these categories. A delivery driver and an extra man work alongside the conventional representative to service the same type of work, i.e., conventional type of stores. B 063; B 096-097.

12. There is no conventional work or conventional job title in the non-union side of sales. The only non-union positions in the "sales department" are "merchandiser", "bulk account representative", and management positions of "merchandising manager, territory coordinator, territory sales manager, unit sales manager, area sales manager, dispatch, and sales administration", for the period of Plaintiff's employment at Pepsi. B 096.

13. The position of "extra men" under the union contract would be a person who would fill in for people who are out sick or doing "general duties the manager assigned to them". Plaintiff worked in this "extra men" position in conventional, but not was not paid the extra men wage, or any wage of her male co-workers in conventional, all who were members of the Local 830. B 002; B 006; B 011; B 095; B 063.

14. If a conventional representative had a particularly heavy day or an injury, a helper might be assigned to the driver on a temporary basis to assist the driver in his job duties for a short period of time, but not for a consecutive period of time over weeks or months. A helper on a conventional truck is a temporary helper only, and would not work every day. Tillman was not a helper in conventional. B 011; B 098-099.

6

15. Plaintiff was the only merchandiser assigned to the "space race" program which was a conventional department promotional program Pepsi claims it ran in 2001 and 2002. B 101. "Space race" had nothing to do with plaintiff's placement in the conventional department and it did not play any role in her re-assignment back to merchandising. Plaintiff's supervisor in conventional was Craig Nelson, who was a manager and territory coordinator. He was paid a management salary, not a union wage. B 011; B 101.

16. The employee rosters of Pepsi for 2001 through 2004 reveal Tillman was the only woman working in any union position during her Pepsi tenure, except for a woman named Alice Fleming who worked briefly in the warehouse department from 06/07/01 through 01/31/02. Overall, Pepsi employed a mere 7% women in the total workforce of the Wilmington plant. B 003; B 108; B 107-131.

17. The wages, hours and conditions of the conventional work were controlled by the collective bargaining agreement between Teamsters Local 830 and Pepsi. Under the agreement, Pepsi had thirty days after her assignment to make plaintiff a member of the union or return her to her original position in the company. Both Pepsi and Local 830 failed and refused to follow this procedure. B 002; B 006; B 011; B 056.

18. Plaintiff complained to Pepsi's human resources about her rate-of-pay in conventional, as well as her non-admittance into Local 830, to no avail. Pepsi also took away the bulk of her mileage stipend of $150 per week and told plaintiff to use her personal vehicle on weekends when she performed merchandising work, which reduced her salary by nearly $150 per week. B 012.

19. Plaintiff worked in the conventional department for about eight months, starting

7

October 13, 2001 and ending on or about May 28, 2002.  Although Plaintiff was performing

union work during this period, Pepsi continued to pay her a non-union hourly rate of $10.58,

which increased only to $10.87 in February, 2002.  B 012; B 074.

20.  All other male employees in conventional were members of Local 830, earning union

rates of $16.63 per hour and higher.  The "extra men" rate also paid $16.63 per hour under the

union contract.  Some of the union employees in conventional complained that plaintiff's work in

that department was causing them to lose union wages, as plaintiff was performing their work at

lower rates.  B 002; B 012; B 074-075.

21.  Plaintiff demanded back pay and admittance into the Local 830 during this period,

which was repeatedly denied by Pepsi.  Gary DiProsperos, shop steward, assisted plaintiff in

filing a grievance in February, 2003 on the issues of back pay at union rates for her time in

conventional, and non-admittance into the Local 830, in violation of the union contract.  B 002;

B 012; B 030-031.

22.  In 2002, plaintiff, in order to access the parking lot at the end of her shift, she would

walk past the warehouse office where the plant manager, Phil Weber, and plant supervisor, Tom

Riley, had their offices. Warehouse workers, all male, would often make sexual comments about

her and sometimes say sexual things to her.  B 002.

23.  On one such occasion, Merrill Matthews was standing with Mr. Riley and Mr. Weber

outside their offices when this happened.  Messrs Riley and Weber did nothing, but looked to

each other and Mr. Riley said to Weber "she will be a problem for us if she comes over to the

warehouse.  I do not want her in the warehouse."  B 003.

24.  Mr. Matthews overheard comments by supervisors Glenn Matthews and Bob

8

Grundy, both who had hiring authority during this same time period, that they did not want Ms.

Tillman working in the warehouse. B 006.

    25.  Pepsi responded by transferring plaintiff on May 28, 2006, back to merchandising at

her current rate of pay $10.87 per hour.  Within this period, Pepsi hired three new male

employees, Christopher Eastlack, Leroy Lewis and Santos Robles directly into the warehouse,

who never worked for Pepsi.  At the time, plaintiff had already applied to enter the warehouse in

order to build union seniority, which would permit her to bid on union driver positions.  B 003; B

012; B 020-021; B 022.

    26.  These three male employees were hired before plaintiff transferred to the warehouse

department, and they were able to surpass plaintiff in seniority, particularly for "bumping rights"

and ability to bid for positions and transfers, and promotions.  Plaintiff complained to human

resources and Local 830, and no one responded to her complaints.  B 003-004; B 020-021;

B 022; B 064-065.

    27.  Plaintiff's work in the warehouse department began approximately July 21, 2002.

Almost immediately she was the subject of repeated sexual innuendo and harassment from male

co-workers, because she was the only female in the entire union labor force working in the

Wilmington plant, and the only woman working in the warehouse.  Plaintiff complained of the

conduct to Human Resources and Pepsi management, but no action was taken.  B 012.

    28.  On August 28, 2002 plaintiff filed her first charge of discrimination with the

Delaware Department of Labor and EEOC, alleging race and sex discrimination.  Shortly

thereafter, plaintiff received a pay increase in her hourly pay rate. B 013; B 024-029.

    29.  Plaintiff was laid off by Pepsi on September 18, 2002 along with other members (all

9

male) of her department. All of her co-workers were recalled to work on short order, but plaintiff

was not recalled until October 19, 2002. Immediately upon her return, plaintiff's supervisors

started a disciplinary file on her. Every minor infraction was recorded, including "infractions"

involving conduct no other employee was disciplined for. Prior to this, plaintiff had never been

issued a written reprimand. B 013.

    30. In April, 2003, while in the warehouse department, plaintiff heard a male supervisor,

Joe Rizzo make racial and derogatory comments about African-Americans, Hispanics and

women. She reported this to Human Resources, and was assured an investigation would ensue.

No action was taken against this supervisor, but plaintiff was transferred to the production

department and found herself reporting to Joe Rizzo. B 013.

    31. There were no other women working in the production department. One of the

managers, Dave Staib never had a woman reporting to him in production. Plaintiff's shop

steward, Ernest Turner, heard Staib say on many occasions: "I do not want her working here" and

"I don't like her, there will be a problem, just wait". B 005.

    32. Larry Clayton was also a manager in production in 2003, when Ms. Tillman worked

in production and Ernest Turner was her shop steward. Plaintiff had injured her leg and was

forced to return to work before her leg was completely healed, and assigned to the can-line filler

room in production. On different occasions, Larry Clayton said to Turner "I don't want her

working in production" and "I just don't like her". B 006.

    33. In April, 2003, Pepsi posted an opening in the transport department, for a third shift

jockey/loader position paying a transport rate which was $.60 per hour increase for her. Tom

Riley was the hiring manager. B 034-039. Plaintiff applied timely, and was told she was as

qualified as the other candidates. All the other candidates withdrew their bids, except for Gary DiProsperos, who was also one of plaintiff's union shop stewards. B 003; B 013; B 034-039.

34. In early May, 2003, Riley said he was not required to train plaintiff, and would not train the plaintiff even though training would have been through Rick Palmer in fleet and Palmer could easily have trained plaintiff. Plaintiff sent an email to Ms. Swartz in Human Resources about this, and Human Resources ignored her complaints about Mr. Riley. B 013; B 039; B 040-041.

35. Tom Riley forced Mr. DiProsperos into the jockey loader position, even though he declined the job and withdrew his bid, because he did not want to work the required shift for this position. B 003; B 013.

36. In May, 2003, Pepsi posted an opening for two route loader positions. Plaintiff, intending to advance her career, applied timely and was as qualified as the other candidates who were working in the warehouse. The positions were awarded to Chris Eastlack and Leroy Lewis, based solely on their union seniority dates, which were senior to plaintiff only because Pepsi refused to admit plaintiff into the union during her time in conventional. B 003-004; B 013; B 042-046.

37. Plaintiff requested a transfer from human resources on at least three occasions, and even requested a transfer to Pepsi's West Chester, Pennsylvania plant. All were denied. Plaintiff filed a second charge with DOL against Pepsi on April 23, 2003, alleging gender and race discrimination, and retaliation, against Local 830. B 013.

38. On November 3, 2003, plaintiff suffered a serious injury to her right knee and calf while climbing out of a truck and was placed on short term disability by Pepsi. Plaintiff did not

11

receive her disability check for many weeks, and therefore, had no income, because PBG did not process the claim. Plaintiff hired an experienced workers' compensation attorney to file a claim. B 014.

39.   Plaintiff eventually received a lump sum short term disability check of less than $5,000 in mid-June, 2004. This check came long after plaintiff had returned to work on April 19, 2004, where plaintiff was assigned to the can-filler room, again reporting to Joe Rizzo, and plaintiff had a substantial income shortfall during her disability. B 014.

40.   At about the same time, in June, 2004, plaintiff's compensation attorneys settled my workers compensation case for a lump sum for temporary total disability payment. Plaintiff signed a release and received a settlement check based on a formula and terminology she did not completely understand, and relied on the advice of her experienced lawyers on this settlement. B 014.

41.   Plaintiff reserved her rights to contest the short term disability deduction. There was a legal question as to whether plaintiff was owed this money directly, based on whether plaintiff had paid into the premium, which the attorneys had to investigate, and plaintiff reserved her rights on the release. B 014.

42.   Because of the hostile questioning at her first deposition and her prior attorneys' unwillingness to prepare her, plaintiff was unclear about all of the specific details of this settlement, when Pepsi's counsel showed plaintiff some unsigned documents. B 014.

43.   In March, 2004, plaintiff applied for a vending service position with RJM Vending, refilling vending machines. She was out on disability with Pepsi at the time, and the workers' compensation attorneys, Beverly Bove and Eric Grandell, told her she should attempt to mitigate

her damages with some sort of work, because Pepsi denied her any light duty work normally provided to injured employees. RJM Vending paid significantly less than the position with Pepsi. B 014.

44. Plaintiff quit the RJM Vending job after only one week, because she could not do the work. Plaintiff was having problems with her leg from the November, 2003 injury. Plaintiff's leg swelled up when she was on her feet too long and became very painful. B 014.

45. When plaintiff returned to Pepsi from her injury in April, 2004, plaintiff was assigned to work in the can-line filler room, reporting to Joe Rizzo. Plaintiff had to stand all day, and her leg would swell up and become painful. She repeatedly asked her supervisors, Rizzo, and Dave Staib, for an accommodation, or to exercise "bumping" rights so she could continue to work, which were denied. B 014; B 006.

46. By the end of April, 2004, she could not work the can-line filler job because of the constant standing. Pepsi managers refused to give plaintiff light duty or transfer her to other duty. Plaintiff had been a "floater" throughout 2003 and 2004 and had experience working many different jobs in the plant that would have been easier on her injured leg and light-duty work was available. B 014-015; B 006.

47. In early May, 2004, plaintiff had no choice but to start to look for work with a different company. Plaintiff applied for a job at Cott Beverage, and after the unpaid leave began, plaintiff actually started to work at Cott in early June, 2004 but was terminated after only three days after plaintiff missed a day of training because the pain in her leg had flared up. B 015.

48. On June 1, 2004, plaintiff's injured leg was so aggravated that she called the injury hotline at Pepsi and reported her condition. She was told by her managers that she had to go out

13

on disability again, and was forced to take leave for the entire month of June, 2004. Plaintiff did not file a formal claim because she felt her injury did not warrant it and repeatedly requested light duty. Plaintiff was not paid for this time lost from work although she needed the pay and no light duty was assigned. B 015.

49. The department of labor investigated and found cause on both plaintiff's charges and EEOC issued two right to sue letters on July 1, 2004. Plaintiff took three weeks vacation from August 8, 2004 to August 30, 2004. Upon returning to work, Plaintiff was called into human resources to discuss her complaints. On August 12, 2004, plaintiff participated in a NAACP press conference about the conditions of employment at Pepsi. B 015.

50. In September, 2004, plaintiff was awarded a driver position in the transport department, at the same time Pepsi and the Union expected her lawsuit to be filed in federal court. This was the same position plaintiff bid on earlier in 2004 and was not awarded. Plaintiff had been given a truck barely road-worthy to test in, and on one occasion after she started in transport she was reprimanded for an incident at the Allentown, Pennsylvania warehouse that did not occur, which plaintiff could never verify. B 015.

51. Right after plaintiff got the transport job, she was warned by co-worker, Leroy Lewis, to "watch her back" because "the company wants to get rid of her". B 015.

52. In late November, 2004, plaintiff was not feeling well from work-related stress. Her regular doctor in Wilmington, Delaware determined she should be excused from work for one month, until late December, 2004 and wrote a prescription. Pepsi laid plaintiff off from work and was not paying her for the time off. B 015.

53. By this point, working as a transport driver, again as the only woman in the

14

department, statements that management wanted to get rid of her and that she had to "watch my back" made the working environment difficult, and now her health was suffering. B 015.

54. Plaintiff again looked for another driver job at the best wage she could find. Near the end of November, 2004, plaintiff applied for a job with J.B. Hunt driving freight in the northern New Jersey area. Plaintiff told J.B. Hunt that she had not left her job with Pepsi. Hunt offered plaintiff a driver position with the company. Given the circumstances, plaintiff accepted the job and moved to New York. B 015.

IV.    ARGUMENT

A.    Legal Standard on summary judgment

The party moving for summary judgment has the burden under Rule 56 of showing that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In carrying his burden, the moving party always bears the initial responsibility of informing the district court of the basis for his motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any", which he believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, supra, 477 U.S. at 323, Adickes v. S.H. Kress & Co., 399 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The party opposing summary judgment is entitled to have movant's Rule 56(c) material viewed in a light most favorable to him, with all reasonable inferences read in his (non-movant's) favor. Adickes v. Kress, supra, 398 U.S. at 157, 26 L.Ed.2d at 1608; United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). If the standard of proof on movant's

15

showing under Rule 56(c) is not met in the first instance, summary judgment must be denied. Adickes v. Kress, supra, 398 U.S. at 157; Celotex v. Catrett, supra, 477 U.S. 323.

The standard for summary judgment is akin to that of a directed verdict. As stated in Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-252, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986), "there is no issue for trial unless there is sufficient evidence favoring the non-moving party for the jury to return a verdict for that party. The [court] must ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair minded jury could return a verdict for the plaintiff [non-movant] on the evidence presented." (citations omitted).

"If the opponent [of summary judgment] has exceeded the "mere scintilla" of evidence threshold version of events and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of the opponent." See, Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3rd Cir.1992). In other words, the court will not try the case by affidavit. Chitwood v. Feaster, 54 F.R.D. 204, 216 (N.D.W.Va.1972).

Under the applicable standard, if the moving party in its motion presents evidence contesting the factual validity of a material element of the non-moving party's proofs, summary judgment must be precluded on the basis that a dispute of material fact has been raised. Rule 56(c)(requiring the *absence* of material facts in dispute). Anderson v. Liberty Lobby, supra, 477 U.S. 242, 247-48.

16

B.    Plaintiff's claims under the Equal Pay Act survive summary judgment

Claims under the Equal Protection Act[2] follow a two-step burden-shifting paradigm.

Stanziale v. Jargowsky, 200 F.3d 101, 107 (3rd Cir.2000). The plaintiff must first establish a

*prima facie* case by demonstrating that employees of the opposite sex were paid differently for

performing "equal work," which is work of substantially equal skill, effort and responsibility, and

performed under similar working conditions. Id. at 107, (citing EEOC v. Delaware Dept. of

Health & Human Servs., 865 F.2d 1408, 1413-14 (3d Cir. 1989)); Corning Glass Works v.

Brennan, 417 U.S. 188 (1974). In order to prove an EPA claim, a plaintiff need only establish

that she was paid differentially because of her sex with respect to a single male employee. Ryan

v. General Machine Products, 277 F.Supp.2d 585 (E.D.Pa. 2003).

The burden of persuasion then shifts to the employer to demonstrate the applicability of

one of the four affirmative defenses available under the EPA, which are: (1) a bona fide seniority

system; (2) a merit system; (3) a system which measures earnings by quantity or quality of

production; or (4) a differential based on any factor other than sex. EEOC v. Dept. of Health,

supra, 865 F.2d at 1414. Because the employer bears the burden of proof at trial, in order to

prevail at the summary judgment stage, the employer must prove at least one affirmative defense

"so clearly that no rational jury could find to the contrary." Id. Not only must the employer

---

[2]The Equal Pay Act, 29 U.S.C. § 206(d) (1) (the "EPA"), provides in relevant part:

No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

produce sufficient evidence from which a reasonable factfinder could conclude that the proffered reasons could explain the wage disparity, but the employer must produce sufficient evidence from which a reasonable factfinder could conclude that the proffered reasons actually *motivated* the wage disparity. Stanziale, supra, 200 F.3d at 108-9.

In every Equal Pay Act case, the courts look beyond job title to determine whether the jobs are substantially equal. Brobst v. Columbus Servs. Int'l, 761 F.2d 148 (3rd Cir.1985). "The relevant issue is not the name under which the position was classified but what was actually done". Id. at 155. For purposes of equating jobs under the Equal Pay Act, job content is controlling. Angelo v. Bacharach Instrument Co., 555 F.2d 1164 (3rd Cir.1977).

        1.    Tillman's work in the conventional department was substantially equal to work performed by the other men in conventional

Tillman began her employment at Pepsi on May 8, 2001, as a merchandiser working in the merchandising department. This was a non-union, entry level position paying an hourly rate of $10.58 per hour. Her job as merchandiser was solely to pack out soda product on the shelves in supermarket and large-volume grocery stores. She used her own car for the job, and received a $150 mileage stipend biweekly. B 010. In October, 2001, Tillman was assigned to work in the conventional department with no pay increase, where she worked regular and overtime hours at her merchandiser rate of pay. B 010. Her mileage stipend was significantly reduced. Pepsi continued to assign Tillman work in the merchandising department on the weekends, where she was required to use her personal car. B 012. Tillman was the only non-union employee working in the conventional department which, like the entire union side of Pepsi, was made up of all male employees. B 002, B 008; B 010.

18

Conventional department work is completely different than merchandising work. Conventional drivers service retail stores (such as Target, K-Mart, Wal-Mart), convenience stores (such as Wawa, 7-11), and mom/pop stores and local gas stations/food marts. B 002; B 011. Conventional drivers drive route trucks (tractor-trailers, vans and pick-ups) and deliver soda product to the store, reset displays and store coolers, collect money on accounts not pre-sold, service and stock vending machines. As a rule, conventional workers do not pack out supermarket shelves or clean display shelves. B 002; B 011.

During the entire eight months Tillman worked in conventional, she did the exact same work as the conventional drivers, including driving a Pepsi van and pick-up trucks and working the conventional stores by herself. She also drove tractor-trailers with her CDL-A permit, which was valid for the entire year of 2002, to work the conventional stores with the CDL-licensed driver in the truck. B 002; B 009; B 011; B 017. As a conventional worker, Tillman carried the soda from the truck or van to the store. She worked on vending machines, store coolers, and reset displays. Many of the accounts were pre-sold and no money was involved or orders taken. As a van or pick-up truck driver, Tillman was not required to keep a log book, and the tractor trailer drivers did not keep log books on their routes to conventional stores. B 009; B 011. In her work in conventional, Tillman was just as valuable as the other conventional department workers, all who were paid the higher union rate. B 002.

Accordingly, if job content of Tillman's work in conventional is measured against the work of other conventional department workers, Tillman's work is equivalent work. It follows, based on this record viewed in light most favorable to Tillman, affording her every reasonable inference, it cannot be said no rational jury could find in her favor on her *prima facie* case for

19

unequal pay for equal work. Tillman has met her required burden on summary judgment.

       2.      Pepsi has failed to establish the absence of a triable issue of fact in
                    dispute on Tillman's Equal Pay Act claim

       Pepsi attacks Tillman's Equal Pay Act claim on the basis that because Tillman

was not *per se* a "relief driver" and did not do the work of a relief driver, she is not entitled to a

conventional union-level wage. Pepsi further claims the terms of the collective bargaining

agreement controls the content of the work. Because Tillman was labeled a "merchandiser" by

Pepsi when she worked eight months in conventional, Pepsi claims she is not entitled to a union

level rate of pay, again because she was not working in the job of a "relief driver" and the

merchandiser position is not a bargaining unit position. The evidence in the record does not

support either proposition as an explanation or *motivation* for the wage disparity, such that a jury

could find for Pepsi under a directed verdict standard. Ryan v. General Machine Products, supra,

277 F.Supp.2d at 596, 599.

       According to Pepsi, the union positions in the sales department of Pepsi are: "bulk driver,

conventional representative, extra men, full service driver and delivery driver". Everyone

working in any union position in sales would fit into one of these categories. A delivery driver

*and an extra man work* alongside the conventional representative to service the same type of

work, i.e., conventional type of stores. (emphasis supplied). B 096-097. The position of "extra

men" under the union contract would be a person who would fill in for people who are out sick

or doing "general duties the manager assigned to them". Tillman worked in this "extra men"

position in conventional. She worked on trucks, she drove trucks (using her CDL permit) and

vans and pick-up trucks (not requiring a CDL permit), and she did all the duties assigned to her

by her manager. The only real difference for the eight months Tillman did this work was she was not paid the "extra men" wage, or any wage of her male co-workers in conventional, all who were members of the Local 830.[3]  B 002; B 006; B 011; B 063; B 095.

Second, there is no conventional work or conventional job title in the non-union side of sales. The departments, and work, of merchandising and conventional do not mix or overlap, as Pepsi admits when it states this is the reason for the higher conventional department rate. Merchandisers do not work on trucks. B 008-009. The only non-union positions in Pepsi's "sales department" (where Pepsi claimed Tillman worked)  are "merchandiser", "bulk account representative", and management positions of "merchandising manager, territory coordinator, territory sales manager, unit sales manager, area sales manager, dispatch, and sales administration", for the period of Plaintiff's employment.  Pepsi does not identify a "conventional" job title or "conventional" sub-department in the non-union side of the company. B 096.

There were no non-union employees, and no merchandisers, working in the conventional department.  Although Pepsi claims Matt Fields, Mark Mauragus and Dave Zembala, all men, were merchandisers who worked as "helpers" in the conventional department at non-union rates, Pepsi has no information about how much time each worked as a merchandiser in the conventional department or what their rates of pay were. B 011; B 101.  Pepsi records show Fields worked a grand total of *three weeks* for Pepsi in 2001, and Dave Zembala worked only *11*

_____

[3]If a conventional representative had a particularly heavy day or an injury, a helper might be assigned to the driver on a temporary basis to assist the driver in his job duties for a short period of time, but not for a consecutive period of time over weeks or months.  A helper on a conventional truck is a temporary helper only, and would not work every day.   Tillman was not a helper and was never called a helper. B 011; B 098-099.

*weeks* as a merchandiser in 2001. Mark Mauragus worked as a merchandiser at Pepsi for a number of years, beginning in December, 2001 only during the summer months in between his college years, and part time throughout the year. Mauragus never worked in any position other than merchandiser, and never worked in the conventional department as a merchandiser when Tillman worked at Pepsi.[4] B 009; B 011; B 108; B 112. With no evidence in the record describing their putative "temporary assignment" in conventional or what work they were actually doing (if they worked there at all), these three men are not similarly situated to Tillman's work in conventional and the content of their employment cannot be compared to Tillman's employment in any department. On this basis, Pepsi cannot remotely support the vague idea that Pepsi had a non-union workforce working full time in the conventional department at non-union rates of pay, or that Tillman was part of that workforce.

Tillman's work was substantially equal to the full content of work of any conventional driver, working in the "extra men" position, also identified under the collective bargaining agreement. Moreover, just as job labels are not determinative of equal work under the Act, a label under the collective bargaining agreement alone is not dispositive of Tillman's pay claim under the Act, if Tillman is in fact performing equal work to other conventional workers. Addressing the standard on this motion, Pepsi's purported affirmative defense that Tillman was a "merchandiser" during her tenure in conventional or that Tillman was not a "relief driver" under

---

[4]Plaintiff was the only merchandiser assigned to the "space race" program which was a conventional department promotional program Pepsi claims it ran in 2001 and 2002. "Space race" had nothing to do with plaintiff's placement in the conventional department and it did not play any role in her re-assignment back to merchandising in May, 2002. Plaintiff's supervisor in conventional was Craig Nelson, who was a manager and territory coordinator. He was paid a management salary. B 101; B 011.

the bargaining unit contract, on the record submitted, are not proven so clearly that no rational jury could find to the contrary. Ryan v. General Machine Products, supra, 277 F.Supp.2d at 599. On Tillman's record, it cannot be said no rational jury could find Tillman should have been paid the same as all workers (all male) working in the conventional department at $16.23 per hour, either under the bargaining agreement in the "extra men" position or under the standards applicable under the Equal Pay Act itself. Summary judgment in favor of Pepsi on plaintiff's claims under the Equal Pay Act must be denied.

      C.      Plaintiff's claim for unequal wages under Title VII survives summary judgment

A violation of the Equal Pay Act constitutes a violation of Title VII, making a *prima facie* showing of an Equal Pay Act claim also a *prima facie* showing of a Title VII violation. 42 U.S.C.§2000e-2(h); Miller v. Beneficial Management Corp., 977 F.2d 834, 846 (3rd Cir.1992); Ryan v. General Machine Products, supra, 277 F.Supp.2d at 595 (standards for both as applied to salary discrimination are read harmoniously). Because Tillman has clearly made out a claim under the Equal Pay Act, section B, *supra,* Tillman has made out a prima claim under Title VII for unequal wages for equal work in the conventional department.

      D.      Plaintiff's claims for failure to promote in violation of Title VII survive summary judgment

Failure to promote claims brought under Title VII are analyzed under the familiar burden-shifting framework the Supreme Court articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) ("the McDonnell Douglas analysis"). See, e.g., Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). As the Third Circuit Court has summarized, the McDonnell Douglas analysis proceeds in three stages.  Jones v. Sch. Dist. of

Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999). First, "the plaintiff must establish a *prima facie*

case of discrimination." Id. Second, "if the plaintiff succeeds in establishing a prima facie case,

the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the

employee's rejection." Id. (citation and internal quotations omitted). Finally, "should the

defendant carry this burden, the plaintiff then must have an opportunity to prove by a

preponderance of the evidence that the legitimate reasons offered by the defendant for the

unfavorable employment decision or action were not its true reasons, but were a pretext for

discrimination." Id. (citation omitted). The burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

See id. (Citation and internal quotations omitted).

To defeat summary judgment at this stage, the Plaintiff must either: (1) point to some

evidence that discredits the proffered reasons, either circumstantial or direct, and (2) adduce

evidence, circumstantial or direct, that discrimination was more likely than not a motivation or

determinative cause of the employer's action. Jones v. School Dist. of Phila., supra, 198 F.3d at

413 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3rd Cir.1994). Plaintiff must present evidence

contradicting the core facts put forward by the employer as the legitimate reason for its decision.

Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3rd Cir.2005). Plaintiff must demonstrate such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them

"unworthy of credence" and hence infer the employer did not act for the asserted non-

discriminatory reason. Fuentes, 32 F.3d at 765. The employee need not always offer evidence

sufficient to discredit all of the rationales advanced by the employer. The rejection of some

24

explanations may so undermine the employer's credibility as to enable the factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales. Id., 32 F.3d at 764, n.7.

      1.    <u>Plaintiff has exhausted her administrative remedies</u>

     Title VII requires the aggrieved employee to file a charge that puts her employee on notice of the claims against it. 42 U.S.C.§2000e-5(e). The exhaustion requirement is essential to the purpose of Title VII that federal courts cannot hear claims of workplace discrimination that a plaintiff did not first assert as part of her EEOC charge. <u>Mroczek v. Bethlehem Steel Corp.</u>, 126 F.Supp.2d 379 (E.D.Pa. 2001). The test for determining if a plaintiff has properly exhausted is whether the facts alleged in the subsequent Title VII action are fairly within the scope of the prior EEOC complaint or the investigation arising therefrom. <u>Antol v. Perry</u>, 82 F.3d 1291, 1295 (3rd Cir.1996).

     The standards as to whether a plaintiff may assert, in a Title VII lawsuit, claims that she never presented to the EEOC are well established in the Third Circuit: "[t]he parameters of a civil action in the District Court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occur during the pendency of the proceedings before the commission". <u>Anjelino v. The New York Times Co.</u>, 200 F.3d 73, 94 (3rd Cir.1999); <u>Anderson v. McIntosh Inn</u>, 295 F.Supp.2d 412, 423 (D.De. 2003). Thus, "the scope of the charge should be liberally construed." <u>Hicks v. ABT Assoc., Inc.</u>, 572 F.2d 960, 965 (3rd Cir.1978).

     Tillman filed her first charge of discrimination against Pepsi on August 28, 2002. B 013; B 024. In the charge, Tillman claimed she was "denied various promotional opportunities,

particularly [d]river positions" and that she was subject to disparate treatment by Pepsi in her conditions of employment, all because she was the only female working in a union position in the entire Wilmington plant. B 024-028. In her charge letter, Tillman further claimed, *inter alia*, that "Pepsi is determined to assure that I do not receive equal or fair treatment in areas of employment or *advancement*, and will stop at nothing to ascertain I do not achieve union status or any other form of *long term tenure* with the company." (emphasis supplied). B 028-029.

Several months later, as the investigation was underway, Tillman wrote to the Office of Labor Law Enforcement on October 17, 2002, to provide supplemental information on her charge. B 089. Tillman updated the department on her equal pay claim, and advised she was laid off in her position and not recalled for four weeks, while all of her male co-workers were recalled within one week. B 089. Tillman wrote: "*I believe I was laid off in retaliation* for filing my charge of discrimination and would like this issue *to be investigated* in conjunction with my original charge." (emphasis Tillman's). B 089. The department of labor investigated, and on July 1, 2004 issued right to sue letters under both charges. B 015. Between the time the charge was filed and the right to sue letter issued, Tillman suffered adverse employment action in her bid for the transport/jockey position, a route loader position (two were open), and her layoff and non-recall in September, 2002. Within the 300 days prior to her first charge (42 U.S.C. §2000e-5(e)), Tillman also suffered the adverse employment action of receiving unequal pay (as a woman) for equal work to that of the men in the conventional department, and non-admittance into Local 830 after 30 days from her start-date in conventional, when her position in conventional should have been eliminated if Pepsi intended not to unionize her. B 056.

Here, Tillman's bids and non-selection for the transport/jockey and route loader positions

26

arose after the charge was filed. Tillman's retaliation claim also first arose after the charge was

filed. It therefore would have been impossible for Tillman to have included these actions and

claims in her charge. Clearly, Tillman's charge encompassed both job positions under her failure

to advance or promote allegations, and the Department's investigation could have been expected

to grow out of these allegations. The Department as early as October, 2002 had information that

Tillman was suffering retaliation for filing her charge of discrimination and its investigation

would likewise reach this claim. Accordingly, Tillman's claims, as new acts which occurred

during the pendency of the departments proceedings and *before* her right to sue letter issued, are

not barred for failure to exhaust. Anjelino v. New York Times, supra, 200 F.3d at 96-97 (where

plaintiff's alleged retaliatory delistment occurred after plaintiff initially filed charge, and after

plaintiff filed complaint, citing Ostapowicz, 541 F.2d at 398, Third Circuit reversed the district

court's dismissal for failure to exhaust).

> 2.    Plaintiff has established a *prima facie case* of discrimination for
>        failure to promote

To establish a *prima facie* case for failure to promote, the plaintiff must show: (1)

that she belongs to a protected class; (2) that she sought and was qualified for the promotion; (3)

that despite her qualifications she was rejected; and (4) the failure to promote occurred under

circumstances "that give rise to an inference of unlawful discrimination" - i.e., a "non-member of

the protected class was treated more favorably." See, e.g., Jones, 198 F.3d at 410-11; Young v.

Pennsauken Township Sch. Dist., 47 Fed.Appx. 160, 161 (3rd Cir.2002); Shesko v. City of

Coatesville, 292 F. Supp.2d 719, 724 (E.D.Pa. 2003).

There is a low bar for establishing a *prima facie* case of employment discrimination.

Ezold v. Wolf et al., 983 F.2d 509, 523 (3rd Cir.1993)("In Title VII cases involving a dispute over subjective qualifications, we have recognized that the qualification issue should often be resolved in the second and third stages of the *McDonnell Douglas* ...analysis to avoid putting too onerous a burden on the plaintiff in establishing a prima facie case...Because the prima facie case is easily made out, it is rarely the focus of the ultimate disagreement.")(citations omitted). Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3rd Cir.1990)("The framework set forth in *McDonnell Douglas* was never intended to be a rigid, mechanized or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.")(citations omitted).

         a.     Plaintiff was qualified for the positions she applied for, and timely applied for the positions

In April, 2003, Pepsi posted an opening in the transport department, for a third shift jockey/loader position paying a transport rate which was $.60 per hour increase for her. Tom Riley was the hiring manager. Tillman applied timely, and she was as qualified as the other candidates. All the other candidates withdrew their bids, except for Gary DiProsperos, who was also one of plaintiff's union shop stewards. The position was awarded to DiProsperos, a male, under circumstances giving rise to a strong inference of intentional discrimination. B 002; B 003; B 006; B 012-13.

In May, 2003, Pepsi posted an opening for two route loader positions. Tillman, intending to advance her career, applied timely and was as qualified as the other candidates. The positions were awarded to Chris Eastlack and Leroy Lewis, both men, under circumstances giving rise to a strong inference of intentional discrimination. B 003-004; B 012-013.

28

Tillman, a female, was in a protected class at Pepsi, and Pepsi admits as much. The employee rosters of Pepsi for 2001 through 2004 reveal Tillman was the only woman working in any union position during her Pepsi tenure, except for a woman named Alice Fleming who worked briefly in the warehouse department from June 7, 2001 through January 31, 2002. Overall, Pepsi employed a mere 7% women in the total workforce of the Wilmington plant. B 003; B 012; B 108; B 107-131.

Pepsi has proffered no evidence Tillman was not qualified for these positions, or that she did not apply or timely apply. Accordingly, Tillman has made out a *prima facie* case for the transport/jockey position and two route loader positions applied for in 2003.

> b.  Pepsi's denial of promotion occurred under specific circumstances
> giving rise to an inference of discrimination

When Tillman learned she needed to be a member of the union in order to bid for an available driver position, she sought transfer into any available position in the warehouse or production departments. B 012. While Tillman was still in conventional in 2002, plaintiff, in order to access the parking lot at the end of her shift, would walk past the warehouse office where the plant manager, Phil Weber, and plant supervisor, Tom Riley, had their offices. Warehouse workers, all male, would often make sexual comments about her and sometimes say sexual things to her. On one such occasion, Merrill Matthews was standing with Mr. Riley and Mr. Weber outside their offices when this happened. Messrs. Riley and Weber did nothing, but looked to each other and Mr. Riley said to Weber "she will be a problem for us if she comes over to the warehouse. I do not want her in the warehouse." Mr. Matthews also overheard comments by supervisors Glenn Matthews and Bob Grundy, both who had hiring authority during this same

29

time period, that they did not want Ms. Tillman working in the warehouse. B 002-003.

Pepsi responded to Tillman's desire for a warehouse position, by transferring her back to merchandising in May, 2002. During this period, Pepsi hired three new male employees, Christopher Eastlack, Leroy Lewis and Santos Robles directly into the warehouse, who never worked for Pepsi. B 020; B 022. These three male employees were hired before plaintiff transferred to the warehouse department, and they were able to surpass plaintiff in seniority, particularly for "bumping rights" and ability to bid for positions and transfers, and promotions. B 003-004; B 012. Plaintiff's work in the warehouse department began approximately July 21, 2002. Almost immediately she was the subject of repeated sexual innuendo and harassment from male co-workers, because she was the only female in the entire union labor force working in the Wilmington plant, and the only woman working in the warehouse. Plaintiff complained of the conduct to Human Resources and Pepsi management, but no action was taken. B 012.

When Tillman was assigned to work in production in 2003, there were no other women working in the production department. One of the production managers, Dave Staib, never had a woman reporting to him in production. Plaintiff's shop steward, Ernest Turner, heard Staib say on many occasions about Tillman: "I do not want her working here" and "I don't like her, there will be a problem, just wait". B 005-006.

All the other candidates withdrew their bids for the jockey/loader position, except for Gary DiProsperos, who was also one of plaintiff's union shop stewards. When Tillman was not selected for the jockey/transport job, she asked her shop stewards Matthews and DiProsperos to look into the matter. Both reported Tom Riley forced Mr. DiProsperos into the jockey loader position, even though he declined the job and withdrew his bid, because he did not want to work

the required shift for this position. Riley told the shop stewards he was not required to train

Tillman and would not train Tillman even though Rick Palmer in fleet could easily have trained

her. Tillman was already qualified to load trucks for this position. Human Resources ignored

her complaints about Mr. Riley. B 002-003; B 006; B 013; B 039-041.

        3.     Pepsi's non-discriminatory reasons for not promoting plaintiff to the
jockey/transport or route loader positions are not legitimate, and pretext

        Pepsi purports it had several legitimate non-discriminatory reasons for not

promoting plaintiff: she did not possess a CDL-A license, she did not apply for the positions

and/or had low seniority. These are not legitimate reasons. A CDL-A license was not required

to bid or fill the jockey/transport or route loader positions. B 013. Tillman clearly applied for

the positions. Tillman's seniority as the reason she was not awarded the jockey/loader position,

on the record submitted, is so plainly wrong it is not the real reason Tillman was not awarded the

position. Both Tillman's shop stewards looked into the matter and reported that her supervisor,

Tom Riley forced Gary DiProsperos to take the position even after DiProsperos declined the

position and withdrew his bid. Riley also said he did not have to train Tillman, and refused to

train her, even though Tillman would have been trained by someone in fleet, not Mr. Riley, and

Tillman was already qualified to load trucks for the position. B 002-003; B 006; B 013; B 040-

041. Tillman's seniority, measured against Mr. DiProsperos who was senior in the union to

Tillman, had nothing to do with her non-selection.

        Tom Riley's comments to plant manager Phil Weber that he did not want Tillman

working in the warehouse, viewed against the backdrop of sexual innuendo and comments

towards Tillman, raise a strong inference that gender discrimination motivated Riley's decision

31

not to promote Tillman or advance her career, or block her union seniority. Tillman suffered under the same gender disdain by her supervisors when she worked in production in 2003 (Tillman was a constant "floater" in Pepsi's plant), where Dave Staib and Larry Clayton both told Tillman's shop steward, Ernest Turner, they did not like her and they did not want her working in production, that there would be a problem with her.

While Pepsi claims seniority was the reason for non-selection for the route loader position, viewed against the strong inference of gender discrimination, Pepsi blocked plaintiff's advancement by assigning her to conventional and barring her entry into the union. At the same time, Eastlack, Lewis and Robles were hired from outside Pepsi directly into union positions, a year after Tillman was hired and performing union work. On seniority driven only by the gender discrimination Tillman suffered in 2002 and 2003, Eastlack and Lewis were awarded the route loader positions over Tillman in 2003. B 003-004.

4.    Pepsi's articulated reasons for not paying plaintiff at union level rates for her work in conventional, are pretext

For the reasons set forth in section B.2, *supra,* analyzing Tillman's Equal Pay Act claim under Title VII, Tillman has established pretext in Pepsi's attempt to produce sufficient evidence upon which a reasonable factfinder could conclude that the proffered reasons could explain the wage disparity, and that the proffered reasons actually motivated the wage disparity. In the alternative, given the record, Pepsi's evidence on its affirmative defense to the claim is not so conclusive that a reasonable jury could only find in favor of Pepsi on its proffered reasons. Accordingly, Tillman's claim for unequal pay for equal work under Title VII survives summary judgment.

32

E.    Plaintiff's claim for retaliation survives summary judgment

Pepsi attacks Tillman's claim of retaliation on the basis that any adverse employment action relating to the claim occurred after the charge was filed, and Tillman cannot show facts sufficient to withstand a directed verdict that Pepsi's supervisors to took the action knew of her charge or acted with bad motive. On the record, Pepsi's first argument fails. Tillman suffered adverse employment actions under strong evidence of intentional gender discrimination, in her non-selection for the jockey-transport position and the route loader positions in April and May, 2003. After the first charge was filed, Pepsi laid Tillman off and did not call her back for weeks after all men in her department were called back, which included Eastlack, Lewis and Robles, all hired directly into the warehouse before Tillman, permanently (and adversely) affecting her union seniority. Tillman amply meets the first two prongs of her *prima facie* claim for retaliation. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3rd Cir.1997).

As regards the element of causation, the record establishes a strong inference of gender discrimination against Tillman in 2002 and 2003, by plant supervisor Tom Riley (the hiring manager on the jockey position, and a multi-area plant supervisor, also in manufacturing, B 004). Tillman suffered under gender animus from her supervisors in production 2003 when Tillman applied for the route loader position, continuing into 2004 when Tillman was assigned to work the can-filler room when she was unable to stand.

Second, the record is clear Pepsi's own internal investigation by Human Resources in response to her first EEOC charge, as early as October, 2002, reached into Pepsi's management to investigate the conduct of Mr. Riley, Mr. Matthews, and plant manager Weber, evidenced by Pepsi's certified responses to Tillman's allegations of unequal pay and disparate treatment

33

contained in the charge. Tillman's charge expanded specifically to include retaliation in October, 2002, and put the Department on notice that Pepsi's management may retaliate towards Tillman's peers during the course of the investigation. B 085-090.

Tillman's retaliation claim must be viewed within the context that Pepsi's reasons for not promoting are pretext (if Pepsi offered any legitimate reason at all), under a strong inference of gender discrimination pervading the warehouse, production, manufacturing and transport areas of the Wilmington plant. Accordingly, under settled law, Tillman has offered evidence upon which a reasonable factfinder could conclude the decisions not to promote Tillman to the positions applied for in 2003 were motivated by the discrimination charge filed in August, 2003. Id. Summary judgment must be denied.

F.    Pepsi has proffered no evidence to support a fraud claim against plaintiff, and summary judgment on its counterclaim must be denied

Pepsi seeks summary judgment on its counterclaim asserting fraud and unjust enrichment against plaintiff. On evidence that raises triable issues of fact, rather than eliminates them, Pepsi putatively claims plaintiff falsely represented she was totally disabled and that she knew such representations (there were none) were false towards Pepsi. Further, on no showing of an absence of a triable issue of fact in the record, Pepsi claims because Tillman received money for her disability for her "false representations", she should pay the money back to Pepsi under an unprovable claim of unjust enrichment.

1.    Plaintiff made no false representations to Pepsi about her injury

On November 3, 2003, Tillman suffered a serious injury to her right knee and calf while climbing out of a truck and was placed on short term disability by Pepsi. Tillman did

not receive her disability check for many weeks, and therefore, had no income, because PBG did

not process the claim. Tillman hired an experienced workers' compensation attorney to file a

claim. B 014.

In March, 2004, near the end of Tillman's disability period and before the claim was

settled, applied for a vending service position with RJM Vending, refilling vending machines.

Tillman's workers' compensation attorneys, Beverly Bove and Eric Grandell, told her should

attempt to mitigate her damages with some sort of work, because Pepsi denied her any light duty

work normally provided to injured employees. RJM Vending paid significantly less than the

position with Pepsi. B 014.

Tillman quit the RJM Vending job after only one week, because she could not do the

work. Tillman was having problems with her leg from the injury. Her leg swelled up when she

was on her feet too long and became very painful. B 014.

When Tillman returned to Pepsi from her injury in April, 2004, plaintiff was assigned to

work in the can-line filler room, reporting to Joe Rizzo. Because Tillman's job in the filler room

required her to stand all day, and her leg continued to swell up and was very painful. Tillman

repeatedly asked her supervisors, Rizzo, and Dave Staib, for an accommodation, or to exercise

"bumping" rights so she could continue to work, which were denied. B 014.

In early May, 2004, still working in the can-filler room, Tillman had no choice but to start

to look for work with a different company. Tillman applied for a job at Cott Beverage. On June

1, 2004, plaintiff's injured leg was so aggravated that she called the injury hotline at Pepsi and

reported her condition. She was told by her managers that she had to go out on disability again,

and was forced to take leave for the entire month of June, 2004. Plaintiff did not file a formal

claim because she felt her injury did not warrant it and repeatedly requested light duty. Plaintiff was not paid for this time lost from work although she needed the pay and no light duty was assigned. B 015. The record in the notes of the carrier (incomplete in the form presented by Pepsi) demonstrate the existence of a current and prior injury, not that Tillman made any representations about her injury. (Pepsi's Ex.19).

In June, 2004, *after* the second period of unpaid leave began for her *same injury* from November, 2003, Tillman actually started to work at Cott Beverage but was terminated after only three days. Tillman had missed a day of training because the pain in her leg again flared up. B 015.

Pepsi has failed to present a single misrepresentation of Tillman concerning her injury or inability to work. Whatever evidence Pepsi presents about Tillman working in other employment, none of it demonstrates a material fact not in dispute, and Pepsi fails the applicable summary judgment standard requiring Pepsi to meet its burden under Rule 56(c) in the first instance.

    2.    Plaintiff was totally disabled for the stated period, and Pepsi has
          presented no evidence to the contrary

Pepsi's motion is further bottomed on unsupported allegations that Tillman *disputed* a credit to the settlement amount, and such *dispute contradicts* her own deposition testimony about the settlement, and somehow all of it points to *undisputed facts* amounting to a fraud. In other words, because Pepsi claims Tillman disputed her own settlement, Pepsi now has an undisputed fact in the record. It is well settled, where the moving party on summary judgment presents evidence contesting the factual validity of one or more elements of its claim, a dispute of material

fact is raised that itself precludes summary judgment. See, <u>Lissak v. United States</u>, 49 Fed. Cl. 281, 288 (2001).

In mid-June, 2004, Tillman received a lump sum short term disability check of less than $5,000 (after attorneys' fees) for her injury in November, 2003. This check came long after plaintiff had returned to work on April 19, 2004, where Tillman was assigned to the can-line filler room, again reporting to Joe Rizzo. Tillman had a substantial income shortfall during her disability. B 014.

At about the same time, in June, 2004, Tillman's compensation attorneys settled the workers compensation case for a lump sum for temporary total disability payment. Tillman signed a release and received a settlement check based on a formula and terminology she did not completely understand, and relied on the advice of her experienced lawyers on this settlement. B 014. The settlement agreement and release provided for a short term disability deduction. There was a legal question as to whether Tillman was owed this money directly, based on whether plaintiff had paid into the disability premiums, which the attorneys had to investigate. It was therefore appropriate for Tillman to reserve her rights on the release. B 014. Because of the hostile questioning at Tillman's first deposition and her prior attorneys' unwillingness to prepare her, Tillman was unclear about all of the specific details of this settlement, when Pepsi's counsel showed her some unsigned documents. B 014.

Pepsi's efforts to extract a fraud on the part of Tillman from a final settlement and release on a *proven* temporary work-related injury, is about as far-fetched as any fraud evidence imaginable. Evidence of fraud on summary judgment, spun out of vague conjecture and speculation, is neither competent or material to support such a motion. Pepsi has presented no

37

evidence Tillman knew she was not totally disabled for the period of temporary disability or that she falsely represented anything, through her experienced attorneys, to Pepsi. Under applicable law, and the well-settled standards on summary judgment, Pepsi's fraud claim must be dismissed. In the alternative, Pepsi has raised such material issues of fact in dispute on its counterclaim for fraud, that summary judgment must be denied.

G.    Pepsi has proffered no evidence to support a claim of unjust enrichment against plaintiff, and summary judgment on the counterclaim must be denied

For all the reasons set forth in section F, *supra*, defendant, Pepsi's counterclaim for unjust enrichment must be dismissed. In the alternative, Pepsi's motion for summary judgment on its claim for unjust enrichment must be denied. Sanctions are not warranted.

V. CONCLUSION

For all the foregoing reasons, defendants' motions for summary judgment on all claims must be denied. Defendant, Pepsi Bottling Group, LLC's motion for summary judgment on its counterclaim against plaintiff, and request for sanctions, must be denied.

Respectfully submitted:

KNEPPER & STRATTON

/s/ Barbara H. Stratton
Barbara H. Stratton, Esq.
1228 North King Street
Wilmington, DE 19801
(302) 658-1717
Delaware Bar ID#2785
bhs@knepperstratton.net
Attorney for Plaintiff

38

Pro Hac Vice Counsel:

J. Stephen Woodside, Esq.
J. STEPHEN WOODSIDE, P.C.
One Montgomery Plaza
425 Swede Street, Suite 605
Norristown, PA 19401
(610) 278-2442

Dated: April 23, 2007

## CERTIFICATION OF SERVICE

I, Barbara H. Stratton, hereby certify that on April 23, 2007, J. Stephen Woodside caused a true and correct copy of plaintiff's answering brief and appendix in opposition to defendants' motions for summary judgment to be served upon the following, by first class United States Mail, postage prepaid:

Lucretia Clemons, Esquire
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
51ST Floor
1735 Market Street
Philadelphia, PA 19103
(Attorney for The Pepsi Bottling Group, Inc.)

Marc L. Gelman, Esquire
JENNINGS SIGMUND, P.C.
510 Walnut Street
Philadelphia, PA 19106
(Attorney for Local 830)

KNEPPER & STRATTON

/s/ Barbara H. Stratton
Barbara H. Stratton, Esq.
1228 North King Street
Wilmington, DE 19801
(302) 658-1717
Delaware Bar ID#2785
bhs@knepperstratton.net
Attorney for Plaintiff

Pro Hac Vice Counsel:

J. Stephen Woodside, Esq.
J. STEPHEN WOODSIDE, P.C.
One Montgomery Plaza
425 Swede Street, Suite 605
Norristown, PA 19401
(610) 278-2442

Dated:   April 23, 2007