IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARLAYNA G. TILLMAN,                  :       C.A. No.: 04-1314(SLR)
                                      :
        Plaintiff,                    :
                                      :
            v.                        :
                                      :
THE PEPSI BOTTLING GROUP, INC.,       :
and TEAMSTERS LOCAL UNION             :
830,                                  :
                                      :
        Defendants.                   :
                                      :

**PLAINTIFF'S APPENDIX TO PLAINTIFF'S ANSWERING BRIEF
IN OPPOSITION TO DEFENDANTS, PEPSI BOTTLING
GROUP'S AND INTERNATIONAL BROTHERHOOD OF TEAMSTERS
LOCAL UNION 830'S MOTIONS FOR SUMMARY JUDGMENT**

                          Barbara H. Stratton, Esq.
                          KNEPPER & STRATTON
                          1228 North King Street
                          Wilmington, DE 19801
                          (302) 658-1717
                          Delaware Bar ID#2785
                          bhs@knepperstratton.net
                          Attorney for Plaintiff

Pro Hac Vice Counsel:

J. Stephen Woodside, Esq.
J. STEPHEN WOODSIDE, P.C.
One Montgomery Plaza
425 Swede Street, Suite 605
Norristown, PA 19401
(610) 278-2442

Dated: April 23, 2007

Pages i - B066

## <u>APPENDIX - TABLE OF CONTENTS</u>

| | |
|---|---|
| Verification of Merrill Mathews | B 001 |
| Verification of Ernest Turner | B 005 |
| Verification of Kimani Tillman | B 008 |
| Verification of Marlayna G. Tillman | B 010 |
| CDL-A learner's permit of Tillman | B 017 |
| Employee profile of Marlayna Tillman | B 018 |
| Employee profile of Christopher Eastlack | B 020 |
| Swartz email dated October 2, 2002 | B 022 |
| Charge of discrimination dated 08/28/02 | B 024 |
| Grievance filed 02/15/03 | B 030 |
| Charge of discrimination dated 04/22/03 | B 032 |
| Transport-Jockey/Replenishment job posting | B 034 |
| Candidates for Transport-Jockey position | B 036 |
| Handwritten notes of HR regarding transport-jockey position | B 039 |
| Tillman email to Swartz dated May 9, 2003 | B 040 |
| Candidates for route loader position in May, 2003 | B 042 |
| Collective Bargaining Agreement for 2000 through 2004 | B 047 |
| Pepsi's certified submission to DOL under 08/28/02 charge | B 085 |
| Tillman supplemental letter to DOL under 08/28/02 charge | B 089 |
| Excerpts of Sara Swartz's deposition | B 091 |
| Roster of Pepsi employees in Wilmington plant - 2001 | B 107 |

i

Roster of Pepsi employees in Wilmington plant - 2002          B 115

Roster of Pepsi employees in Wilmington plant - 2003          B 119

Roster of Pepsi employees in Wilmington plant - 2004          B 125

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARLAYNA G. TILLMAN,                    :      C.A. No.: 04-1314(SLR)
                                        :
        Plaintiff,                      :
                                        :
            v.                          :
                                        :
THE PEPSI BOTTLING GROUP, INC.,         :
and TEAMSTERS LOCAL UNION               :
830,                                    :
                                        :
        Defendants.                     :

## VERIFICATION OF MERRILL MATTHEWS

I, Merrill Matthews, pursuant to 28 U.S.C. §1746, state the following based on my personal knowledge:

1. I was employed by the Pepsi Bottling Group ("Pespi") at the Wilmington, Delaware facility from 1999 to 2004, when I voluntarily resigned.

2. I worked in the manufacturing department, performing jobs in the warehouse as route loader and bulk loader, and in production, performing a variety of duties, including training new employees in various jobs in both departments. All of my positions were bargaining-unit positions under the collective bargaining agreement between Pepsi and Teamsters Local Union 830, the bargaining unit representing and protecting all union employees at Pepsi in Wilmington.

3. During my employment, I was a union shop steward from late 2001 until approximately April, 2003. Gary DiProsperos and Ernest Turner were the other shop stewards. I represented many employees (including Marlayna Tillman) in their employment complaints and grievances against Pepsi, and am knowledgeable about the collective bargaining agreement and the application of its terms to union members' employment.

4. I personally know Marlayna Tillman from my employment at Pepsi. She began working at Pepsi in May, 2001 in an entry level sales position known as a "merchandiser". This was not a bargaining unit position, and merchandisers did not perform bargaining unit work under the union contract and were not members of the union or paid union rates.

5. Merchandisers used their own cars with a weekly mileage/expense stipend, and their only job was to pack out Pepsi product (soda) on shelves only in supermarket and large high-

1

volume grocery stores.

6. Marlayna Tillman wanted to advance her career at Pepsi, and obtain a CDL license and drive trucks. Early on she told me she wanted to transfer into a driver position, which would allow her to build her union seniority, which Pepsi was well aware of.

7. At some point in October, 2001, Ms. Tillman was assigned to work in what is known as the conventional department, which was in the sales department. Conventional department work is bargaining unit work, and completely different than merchandising work. Conventional drivers service retail stores (Target, K-Mart, Wal-Mart), convenience stores (Wawa, 7-11), mom/pop stores and local gas stations/food marts.

8. Conventional drivers drive route trucks (such as tractor trailers, vans, pick-ups), reset displays and store coolers, collect money, and service vending machines. They do not pack out supermarket shelves. There is no non-bargaining unit work in the conventional department, and the entire time I was a shop steward, except for Ms. Tillman, no merchandiser ever performed work in the conventional department.

9. When Ms. Tillman worked in conventional, she was just as valuable as all the other conventional workers who were paid the higher union rate. She drove the Pepsi vans and pick-up trucks and had a CDL-A permit to drive the tractor-trailers. She performed all the duties her conventional supervisors told her to perform, which was bargaining unit work. All the other conventional department workers were men, and were in the union.

10. Because Ms. Tillman was an "extra man" under the union contract, under Pepsi's employment policies with the Local 830, she should have been admitted into the union 30 days after starting her work in the conventional department.

11. In early 2002, and continuing throughout the time she was assigned to the conventional department, Marlayna complained to me that she was paid non-union wages even though she was performing all union work in the conventional department. Pepsi was not responding to her complaints but continued to assign her duties in merchandising on weekends, but took away the bulk of her mileage stipend.

12. Since Pepsi denied her entry into the union, I did not feel I could file a grievance, but referred her to shop steward Gary DiProsperos, and I believe Mr. DiProsperos filed a grievance in early 2003 over Marlayna's employment and issues of seniority for the time when she was working in the conventional department.

13. In 2002, Ms. Tillman, in order to access the parking lot at the end of her shift, she would walk past the warehouse office where the plant manager, Phil Weber, and plant supervisor, Tom Riley, had their offices. Warehouse workers, all male, would often make comments about her and sometimes say things to her.

B 002

14. On one such occasion, I was standing with Mr. Riley and Mr. Weber outside their offices when this happened. They did nothing, but looked to each other and Mr. Riley said to Weber "she will be a problem for us if she comes over to the warehouse. I do not want her in the warehouse."

15. During the entire time I worked at Pepsi, Marlayna Tillman was the only women working in the Wilmington plant in any union position, aside from a woman named Alice Fleming. Fleming had a short-lived tenure in production and one day she just seemed to vanish and I never heard why she left Pepsi.

16. Ms. Tillman made it clear from the time she was assigned to the conventional department that she wanted to train to drive trucks and get her CDL license, and advance at Pepsi through the union. I told Mr. Riley to "promote the situation" with Tillman, turn it around and make something positive out of it. I told him he could be the Pepsi manager who hired the first woman into transport or warehouse, and the publicity would be good for him and the company.

17. In response, Mr. Riley said virtually nothing, and as time went on he and Mr. Weber did nothing about it. I also overheard comments by supervisors Glenn Matthews and Bob Grundy, both who had hiring authority during this same time period, that they did not want Ms. Tillman working in the warehouse.

18. In late spring of 2002, Pepsi hired at least three other men from outside the company directly into the warehouse, Santos Robles, Chris Eastlack and Leroy Lewis, who as a result achieved seniority in their union positions ahead of Ms. Tillman, who was not awarded a warehouse position until after these men were hired, in the summer of 2002.

19. In 2003, I often rode to work with Gary DiProsperos, another union shop steward. In April, Mr. DiProsperos told me he had applied for a transport position in the transport department, along with several other men, and Ms. Tillman. Gary complained that while he was initially interested in the position, he withdrew his bid because he did not want to work the specific shift the position required.

20. From my work as shop steward, I know Ms. Tillman was qualified for the position based on her work experience. Because the others dropped out of the bid, she should have been awarded the position.

21. Mr. Riley was the hiring manager for the position, and Mr. DiProsperos complained to me that Mr. Riley forced him to take the position to avoid awarding Ms. Tillman the position, because he "did not want to deal with her".

22. In May, 2003, two route loader positions in the manufacturing department opened and were posted. Marlayna Tillman applied along with three other men: Messrs. Eastlack and Lewis, and someone from the West Chester facility. The positions were awarded to Eastlack and

3

Lewis, based on their seniority in the union in Wilmington, although Ms. Tillman was equally qualified. Ms. Tillman complained to me about the decision and asked that I look into it.

23.  Tom Riley was a manager who oversaw different areas of the plant including the manufacturing area, and made hiring decisions. The route loader position should have been awarded Ms. Tillman. Because management kept her out of the union until late summer, 2002 by calling her a "merchandiser" when she was assigned to conventional, she had less seniority than Eastlack or Lewis, and management was able to avoid awarding her the job.

24. Mr. Riley again succeeded in blocking Ms. Tillman's advancement at Pepsi, by keeping her out of the manufacturing department in the route loader position which paid her more money and would have advanced her career, and men who were not better qualified were awarded the positions.

25.  I further state under penalty of perjury that the foregoing is true and correct.

_Merrill Matthews_

Executed this / 'day of April, 2007

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARLAYNA G. TILLMAN,                              :        C.A. No.: 04-1314(SLR)
                                                  :
     Plaintiff,                                  :
                                                  :
         v.                                :
                                                  :
THE PEPSI BOTTLING GROUP, INC.,                   :
and TEAMSTERS LOCAL UNION                         :
830,                                              :
                                                  :
     Defendants.                                 :
                                                  :

## VERIFICATION OF ERNEST TURNER

I, Ernest Turner, pursuant to 28 U.S.C. §1746, state the following based on my personal knowledge:

1. I began working at Pepsi in the Wilmington, Delaware plant in September, 1992, and am currently employed by Pepsi.

2. I worked in the production department reporting to managers David Staib and Larry Clayton, in 2003, when Marlayna Tillman was assigned to the production department. All of my positions at Pepsi were bargaining-unit positions under the collective bargaining agreement between Pepsi and Teamsters Local Union 830.

3. I was also a union shop steward in 2003 and 2004, and withdrew my shop steward position because the Local 830 was not adequately representing Pepsi employees in various grievances, and I became frustrated in my efforts to help Pepsi union employees.

4. As shop steward, I represented many employees in their employment complaints and grievances against Pepsi, and am knowledgeable about the collective bargaining agreement and the application of its terms to union members' employment in all departments.

5. I personally know Marlayna Tillman from my employment at Pepsi. I have first hand knowledge that Dave Staib did not want Ms. Tillman working in production. There were no other women working in the production department and Dave Staib never had a woman reporting to him in production. I heard Staib say on many occasions: "I do not want her working here" and "I don't like her, there will be a problem, just wait" but he never gave any reasons for these statements.

1

6. I recall an incident in 2003 when Marlayna had just learned to jockey a truck and was new in her position, but she was doing her job perfectly. I was a depal operator at the time. Mr. Staib directly ordered me to take the vehicle from her, and I refused, explaining he should take it from her himself. Mr. Staib threatened me with my job, but Marlayna parked the vehicle and Mr. Staib did nothing more. I was not written up, and the only reason any of this happened was because Staib did not want Ms.Tillman working in production.

7. Larry Clayton was also a manager in production in 2003, when Ms. Tillman worked in production. Marlayna had injured her leg and was out for a period of time, but Pepsi forced her to return to work before her leg was completely healed, and assigned her to the can-line filler room in production. On different occasions, Larry Clayton said to me "I don't want her working in production" and "I just don't like her" but he never gave any reasons for these statements.

8. The can line filler job required Ms. Tillman to stand on her feet all day, and because her leg was not completely healed, it swelled up and was painful to work. Also, the can filler floor area was very greasy, and it was dangerous for someone with a weak leg to work in that location.

9. I brought this to manager, Dave Staib's attention, on Ms. Tillman's behalf, but Mr. Staib refused to change her duties or position, saying it was the only position available for her to work and "if she doesn't work this position, she will lose her job".

10. I am familiar with the job position known as "extra man" under the collective bargaining agreement between Pepsi and Local 830. If a route driver calls out sick, or volume is heavy in the conventional stores, an extra man would drive, or work to assist the driver in his duties, to get product to the stores.

11. I am familiar with the work Ms. Tillman did in the conventional department in 2001 and 2002, when Pepsi called her a "merchandiser" and had her doing merchandising duties on weekends. Merchandising work is non-union work, and is completely different than conventional work, which is union work paid at union rates.

12. Ms. Tillman's work in conventional was frequent and steady for a period of many months. Without question she should have been paid as an extra man at union rates under the bargaining agreement for this kind of work and after thirty days from starting this work, she should have entered the Local 830 union. I am aware that she complained to Pepsi and grieved the matter through shop steward Gary DiProsperos, but obtained no relief.

2

13. I further state under penalty of perjury that the foregoing is true and correct.

Ernest Turner

Executed this day of April, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARLAYNA G. TILLMAN,       :     C.A. No.: 04-1314(SLR)
                                  :
      Plaintiff,           :
                                    :
        v.               :
                                    :
THE PEPSI BOTTLING GROUP, INC.,  :
and TEAMSTERS LOCAL UNION    :
830,                           :
                                    :
      Defendants.      :

## VERIFICATION OF KIMANI TILLMAN

I, Kimani Tillman, pursuant to 28 U.S.C. §1746, state the following based on my personal knowledge:

1. I worked at Pepsi in the Wilmington, Delaware plant as a merchandiser, from approximately August, 2001 to April, 2002 when I voluntarily resigned my employment. I worked part-time, mostly on weekends, earning approximately $10.50 per hour. I worked 20 to 25 hours per week, depending on what my supervisor assigned to me.

2. As a merchandiser, my job was to pack out soda products on supermarket shelves, and sometimes clean the shelves. I used my own car for work, and was paid mileage. I did not transport product to stores, or between stores, from the plant.

3. I never drove or rode in any kind of Pepsi truck on my job, and I never worked in any kind of store other than a supermarket, where the soda had already been delivered by Pepsi trucks and union men working in different departments at the plant, all unionized.

4. I never did any work at Pepsi outside of merchandising work, and was never ordered or requested to work in the conventional department, which I understood from my non-union job as merchandiser, was a union department paying union wage rates.

5. Merchandisers at Pepsi performed a completely different job than conventional workers, and from my experience at Pepsi, merchandisers did not work in the conventional department because this department was controlled by a union labor contract, and paid higher wages on a different scale.

1

6. In about October, 2001, Marlayna Tillman, to whom I am related, was moved by Pepsi from the merchandising department to the conventional department, where she started a different type of job, working on trucks and driving Pepsi trucks and vans delivering soda to conventional stores, not supermarkets.

7. I know she wanted to drive trucks, and the conventional department was a way she could start driving. She had a CDL-A permit and drove the Pepsi tractor trailers with it and she did the same work the driver did. In this new job, she carried the soda from the truck or van to the store and moving the product around inside the store, and working on vending machines, store coolers, and resetting displays. None of this work was merchandising work.

8. Up until this time, I had worked with her occasionally on weekends, when she was working overtime as a merchandiser. After she was assigned to conventional, Ms. Tillman was still assigned merchandising work on weekends where she continued to use her own car. I worked occasionally with her, up to the time I resigned, and she told me about her job and experiences in conventional.

9. I never heard of Pepsi merchandisers named Matt Fields or Dave Zembala. As a merchandiser, I had the opportunity to get to know all the employees who were merchandisers during the time I was at Pepsi, and I worked with many of them.

10. I knew a merchandiser named Mark Mauragus when I worked at Pepsi. Mr. Mauragus was in college at the time, and worked part-time during the year. I never heard he worked in the conventional department or on a truck and he never told me he did, although he frequently spoke with me about his merchandising work and how the part-time work as a merchandiser blended with his college studies.

11. I further state under penalty of perjury that the foregoing is true and correct.

_Kimani Tillman_
Kimani Tillman

Executed this 18 day of April, 2007

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MARLAYNA G. TILLMAN, | : | C.A. No.: 04-1314(SLR) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE PEPSI BOTTLING GROUP, INC., | : | |
| and TEAMSTERS LOCAL UNION | : | |
| 830, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## VERIFICATION OF MARLAYNA G. TILLMAN

I, Marlayna G. Tillman, pursuant to 28 U.S.C. §1746, state the following based on my personal knowledge:

1. I began my employment with the Pepsi Bottling Group, Inc. ("Pepsi") on May 8, 2001, as a merchandiser working in the Merchandising/Marketing department. This was a non-union, entry level position paying an hourly rate of $10.58 per hour. My job as merchandiser was solely to pack out soda product on the shelves in supermarket and large-volume grocery stores. I used my own car for the job, and received a $150 mileage stipend biweekly.

2. I wanted to advance my career at Pepsi, and early on I made it known to Pepsi management I wanted to transfer into a driver position, which would allow me to build union seniority. I obtained a Pennsylvania CDL class A permit within several months of transferring to conventional, which allowed me to drive with a CDL-A licensed operator in the Pepsi tractor-trailers. I later obtained my Delaware licenses.

3. After five months in the merchandising department, in October, 2001, I was assigned to work in the conventional department with no pay increase, where I worked regular and overtime hours at my merchandiser rate of pay. Pepsi continued to assign me work in the merchandising department on the weekends, where I often worked in excess of 8 hours per day.

4. The conventional department was bargaining unit work and part of the sales department under the collective bargaining agreement between Pepsi and Local 830. Although I was still called a "merchandiser", I was the only non-union employee working in the conventional department which, like the entire union side of Pepsi, was made up of all male employees.

1

5. Conventional department work is completely different than merchandising work. Conventional drivers service retail stores (such as Target, K-Mart, Wal-Mart), convenience stores (such as Wawa, 7-11), and mom/pop stores and local gas stations/food marts.

6. Conventional drivers drive route trucks (tractor-trailers, vans and pick-ups) and deliver soda product to the store, reset displays and store coolers, collect money, service and stock vending machines, and close sales. As a rule, conventional workers do not pack out supermarket shelves or clean display shelves. If no merchandiser is available on a particular day, a conventional worker might pack out a supermarket.

7. During the entire eight months I worked in conventional, I did the exact same work as the conventional drivers, including driving a Pepsi van and pick-up trucks and working the conventional stores by myself. I also drove tractor-trailers with my CDL permit, to service stores with the CDL-licensed driver in the right seat.

8. As a conventional worker, I carried the soda from the truck or van to the store. I worked on vending machines, store coolers, and reset displays. Many of the accounts were pre-sold and no money was involved or orders taken. As a van or pick-up truck driver, I was not required to keep a log book, and the tractor trailer drivers did not keep log books on their routes to conventional stores.

9. There were no non-union employees, and no merchandisers, working in the conventional department. Although Pepsi claims Matt Fields, Mark Mauragus and Dave Zembala were merchandisers who worked as helpers in the conventional department, I never heard of Fields or Zembala during the entire time I worked at Pepsi and I never heard of the term "helper".

10. Mark Mauragus worked as a merchandiser at Pepsi, beginning in December, 2001, only during the summer months between his college years. Mr. Mauragus never worked in the conventional department the entire time I worked at Pepsi, but did work with me on several weekends as a merchandiser.

11. Pepsi had many programs during my employment, and the "space race" program might have been one of them but it had nothing to do with my assignment to conventional for nearly eight months or my re-assignment back to merchandising in May, 2002. My supervisor in the conventional department was Craig Nelson, who was a manager and territory coordinator. I know from working with him he was not paid hourly, but was paid a management salary.

12. From what I was told by the Pepsi shop stewards, I was working as an "extra man" position during my eight months in conventional, and the wages, hours and conditions of the conventional work were controlled by the collective bargaining agreement between Local 830 and Pepsi. Under the agreement, Pepsi had thirty days after my assignment to make me a member of the union or return me to my original position in the company.

2

13. Pepsi and Local 830 refused to follow this procedure, and as I continued to work in both capacities (doing merchandising work on weekends), union employees working in the conventional department complained that my work in their department was causing them to lose union wages, as I was performing their work at a lower rate.

14. I complained to Human Resources, to no avail. Later, when I was finally admitted into the union, shop steward Gary DiProsperos filed a grievance for back pay and seniority, which was denied by the union. Because I now drove Pepsi vehicles during the week, Pepsi took away nearly all of my mileage stipend and still required me to use my personal vehicle on weekends when I performed merchandising work, further reducing my pay.

15. I worked both positions for eight months, starting October 13, 2001 and ending on or about May 28, 2002. Although I was performing union work during this period, Pepsi continued to pay me my non-union hourly rate of $10.58, which increased only to $10.87 in February, 2002. All other male employees in conventional were earning union rates of $16.63 per hour and higher.

16. Pepsi denied me back pay and refused my admittance into the Local 830 during this period. Instead, Pepsi responded by transferring me on May 28, 2002, back to merchandising at my same rate of pay, $10.87 per hour. It was within this period that I learned Pepsi hired three new male employees, Christopher Eastlack, Leroy Lewis and Santos Robles who had never worked for Pepsi.

17. When Pepsi told me I needed to be a member of the union in order to bid for any available driver position, I told Human Resources I wanted to transfer into an available position in the warehouse, or production, which would allow me to build union seniority for a driver position, and allow me eligibility for tractor-trailer training under Pepsi's arrangement with the union.

18. These three male employees were hired directly into positions in the warehouse, before my transfer to warehouse department was finalized, and were able to surpass me in seniority, particularly for "bumping rights" and ability to bid for positions and transfers, and promotions. Seniority became important later that year when I was laid off, and in 2003 when I applied for several openings to advance my career, and again in 2004 when I was injured.

19. My work in the warehouse department began approximately July 21, 2002. Almost immediately I was the subject of repeated sexual innuendo and harassment from male co-workers, because I was the only female in the entire union labor force working in the Wilmington plant, and the only woman working in the warehouse. I complained of the conduct to Human Resources and Pepsi management, but obtained no relief and no action was taken.

20. By August, 2002, all of my work became micro-managed, and my supervisors scrutinized me more than my male co-workers by singling me out for verbal discipline and threat

3

of written reprimands. On August 28, 2002 I filed my first charge of discrimination with the Delaware Department of Labor and EEOC, alleging race and sex discrimination. Shortly thereafter, I received a pay increase in my hourly rate.

21. I was laid off by Pepsi on September 18, 2002 along with other workers, all male, in my department. All of my co-workers were recalled to work in short order, but I was not recalled until October 19, 2002. Immediately upon my return, my supervisors started a disciplinary file on me. Every minor infraction was recorded, including "infractions" involving conduct no other employee was disciplined for. Prior to this, I had never been issued a written reprimand.

22. In April, 2003, while in the warehouse department, I heard a male supervisor, Joe Rizzo make racial and derogatory comments about African-Americans, Hispanics and women. I complained to Human Resources, and was assured investigation would ensue. No action was taken against this supervisor, but I was transferred to the production department and I found myself reporting to Joe Rizzo.

23. In April, 2003, Pepsi posted an opening in the transport department, for a third shift jockey/loader position paying a transport rate which was $.60 per hour increase for me. Tom Riley was the hiring manager. I applied timely, and was as qualified as the other candidates. All the other candidates withdrew their bids, except for Gary DiProsperos, who was also my union shop steward. A CDL license was not a requirement for this position.

24. In early May, 2003 I asked Mr. DiProsperos speak with Mr. Riley about why I was not selected. Riley said he was not required to train me and would not train me, even though training would have been through Rick Palmer in fleet and Palmer said I could easily be trained. I was already qualified to load trucks for this position. I sent an email to Ms. Swartz in Human Resources about this, and Human Resources ignored my complaints about Mr. Riley.

25. I asked shop steward Merrill Matthews to look into why I was not selected for the position. He told me Mr. Riley forced Mr. DiProsperos to take the position, even though Mr. DiProsperos declined the position and wanted his bid treated as withdrawn, because he did not want to work the shift required for the position. Mr. DiProsperos confirmed this with me later.

26. In May, 2003, Pepsi posted an opening for two route loader positions. These positions moved me closer to driving trucks in transport and would advance my career. I applied timely and was as qualified as the other candidates who were working in the warehouse. This was not a CDL-licensed position. I later learned from my shop stewards the positions were awarded to Chris Eastlack and Leroy Lewis, based solely on their union seniority dates.

27. I requested a transfer from human resources on at least three occasions, and even requested a transfer to Pepsi's West Chester, Pennsylvania plant. All were denied. I filed a second charge with DOL against Pepsi on April 23, 2003, alleging gender and race discrimination, and retaliation, against Local 830.

B 013

28. On November 3, 2003, I suffered a serious injury to my right knee and calf while climbing out of a truck and was placed on short term disability by Pepsi. I did not receive my disability check for many weeks, and therefore, had no income, because PBG did not process the claim. I hired an experienced workers' compensation attorney to file a claim.

29. I eventually received a lump sum short term disability check of less than $5,000 in mid-June, 2004. This check came long after I had returned to work on April 19, 2004 where I was assigned to the can-filler room, again reporting to Joe Rizzo, and I had a substantial income shortfall during my disability.

30. At about the same time, in June, 2004, my compensation attorneys settled my workers compensation case for a lump sum for temporary total disability payment. I signed a release and received a settlement check based on a formula and terminology I did not completely understand, and I relied on the advice of my experienced lawyers on this settlement.

31. I reserved my rights to contest the short term disability deduction. There was a legal question as to whether I was owed this money directly, based on whether I had paid into the premium, which the attorneys had to investigate. It was therefore appropriate at the time to reserve my rights on the release.

32. Because of the hostile questioning at my first deposition and my prior attorneys' unwillingness to prepare me, I was unclear about all of the specific details of this settlement, when Pepsi's counsel showed me some unsigned documents.

33. In March, 2004, I applied for a vending service position with RJM Vending, refilling vending machines. I was out on disability with Pepsi at the time, and my workers' compensation attorneys, Beverly Bove and Eric Grandell, told me I should attempt to mitigate my damages with some sort of work, because Pepsi denied me any light duty work Pepsi normally provided to injured employees. RJM Vending paid significantly less than my position with Pepsi.

34. I quit the RJM Vending job after only one week, because I could not do the work. I was still having problems with my leg from my November, 2003 injury. My leg swelled up when I was on my feet too long and became very painful.

35. When I returned to Pepsi from my leg injury in April, 2004, I was assigned to work in the can-line filler room, reporting to Joe Rizzo. I had to stand all day, and my leg would swell up and become painful. I repeatedly asked my supervisors, Rizzo, and Dave Staib, for an accommodation, or to exercise "bumping" rights so I could continue to work, which were denied.

36. By the end of April, 2004, I realized I would not be able to work the can-line filler job because of the constant standing. When my managers refused to give me light duty or let me transfer to other duty, I realized the managers were trying to get me to quit. I had been a "floater" throughout 2003 and 2004 and had experience working many different jobs in the plant that

5

would have been easier on my injured leg and light-duty work was available.

37. In early May, 2004, I had no choice but to start to look for work with a different company. I had applied for a job at Cott Beverage, and after the unpaid leave began, I actually started to work in early June, 2004 but was terminated after only three days after I missed a day of training because the pain in my leg had flared up.

38. On June 1, 2004, my injured leg was so aggravated that I called the injury hotline at Pepsi and reported my condition. I was told by my managers I had to go out on disability again, and I was forced to take leave for the entire month of June, 2004. I did not file a formal claim because I felt my injury did not warrant it and I repeatedly requested light duty. I was not paid for this time lost from work although I needed the pay and no light duty was assigned.

39. The DOL investigated and found cause on both my charges and EEOC issued two right to sue letters to me on July 1, 2004. I took three weeks vacation from August 8, 2004 to August 30, 2004. Upon returning to work, I was called into human resources to discuss my complaints. On August 12, 2004, I participated in a NAACP press conference about my conditions of employment at Pepsi.

40. In September, 2004 I was awarded a driver position in the transport department, at the same time Pepsi and the Union expected my lawsuit to be filed in federal court. This was the same position I had bid on earlier in 2004 and was not awarded. I had been given a truck barely road-worthy to test in, and on one occasion after I started in transport I was reprimanded for an incident at the Allentown, Pennsylvania warehouse that did not occur, which I could never verify.

41. Right after I got the transport job, I was warned by co-worker, Leroy Lewis, to "watch my back" because "the company wants to get rid of me".

42. In late November, 2004, I was not feeling well from work-related stress. My regular doctor in Wilmington, Delaware determined I should be excused from work for one month, until late December, 2004 and wrote a prescription. Pepsi laid me off from work and was not paying me for the time off.

43. By this point, working as a transport driver, again as the only woman in the department, statements that management wanted to get rid of me and that I had to "watch my back" made the working environment difficult, and now my health was suffering.

44. I again looked for another driver job at the best wage I could find. Near the end of November, 2004, I applied for a job with J.B. Hunt driving freight in the northern New Jersey area. I told J.B. Hunt that I had not left my job with Pepsi. Hunt offered me a driver position with the company. Given the circumstances at Pepsi, I accepted the job and moved to New York.

45. I further state under penalty of perjury that the foregoing is true and correct.

6

*Marlayna G. Tillman*

**Marlayna G. Tillman**

Executed this 20 day of April, 2007

Pennsylvania Department of Transportation

ILP(122295)

**Congratulations on receiving your Pennsylvania Learner's Permit.**
**You, our customer, are important to us. Please drive safely.**

MARLAYNA GEORGETTE TILLMAN
2017 S 71 ST
PHILADELPHIA    PA 19142

Please sign this form in the signature block located below and carry it with you whenever you drive. When driving with a learner's permit you must be accompanied by a driver who is at least 21 years of age and has a valid driver's license for the class of vehicle you are driving. This person must sit in the seat beside you. This does not apply if you are driving a motorcycle or motor-driven cycle.

Before you go to take your driving test please check to see if your Driver License Center requires you to make an appointment. When you are ready to take the road test, go to the PennDOT Driver License Center nearest you. A list of Driver License Centers is enclosed.

To make sure you will be allowed to take the driving test, bring the following original documents (not copies) with you to the Driver License Center:

1. Your valid learner's permit (attached below).
2. The valid registration card for the vehicle you plan to drive for the test.
3. Proof that the vehicle is insured: an insurance identification card, declaration page of an insurance policy, valid insurance binder, or policy of self-insurance issued by PennDOT.
4. The valid driver's license of the person 21 years of age or older accompanying you to the Driver License Center.

The bottom portion of this form is your Pennsylvania Learner's Permit. Please do not alter any information or write on your permit. You may keep these instructions attached to your permit or you may detach your permit on the perforation. It can be folded to the size of a credit card.



Pennsylvania                              236002
CDL LEARNER'S PERMIT

MARLAYNA GEORGETTE TILLMAN
2017 S 71 ST
PHILADELPHIA    PA 19142
01344-6225-90782-6-001

| DRIVER / ID NUMBER | SEX | HEIGHT | EYES |
|---|---|---|---|
| 24 743 466 | F | 5 03 | BRO |

| BIRTH DATE | ISSUE DATE | EXPIRATION DATE |
|---|---|---|
| 06 06 66 | 121001 | 12 10 02 |

| CLASSES | ENDORSEMENTS | COMMERCIAL / MEDICAL RESTRICTIONS |
|---|---|---|
| A | -H--T | L/* |

B 017

Report ID: PCHREEPA

PeopleSoft
EMPLOYEE PROFILE

Page No.  1
Run Date 12/13/2005
Run Time 08:31:45

Empl ID: 01155487

Tillman,Marlayna G.

National ID: 521282725

**Home Address:** P O Box 658

Claymont DE  19703
USA
**Home Telephone:** 302/762-0415

**Mailing Address:**

---

### CURRENT EMPLOYMENT

| | |
|---|---|
| **Business Unit:** Mid-Atlantic BU | **Job Title:** Delivery Driver - Trlr/Trnsp |
| **Market Unit:** Delaware Valley MU | **Job Entry Date:** 09/23/2004 |
| **Work Location:** Wilmington, DE | **Band/Level:** HC2 |
| **Hire Date:** 05/08/2001 | **Orig Hire Date:** 05/08/2001 |
| **Union:** 830 | **Perf Rating:** |
| **Seniority Date:** | **Comp. Rate:** 16.95 Hourly |
| **Department:** 010477 Wilmington, DE | **Lead Pay:** |
| **GL Pay Type:** 0240 Wilmington DE | **Seniority Pay:** |
| **Account:** 77050003200 | **Shift Pay:** |
| **AC Function:** Operations | **Full-Part:** Full-Time |
| **Job Function:** S&D Selling and Delivery | **Empl Type:** Hourly |
| **Job Family:** DIR Direct | **FLSA Status:** Nonexempt |
| | **Reg/Temp:** Regular |

---

### SALARY ACTION/DATA HISTORY

| Eff Dt/ Status | Action/ Reason | Department/ Title | Perf Rating/ Full-part | Empl Type/ Reg/Temp | Band/ FLSA | Comp Rate/ Freq | Inc. %/ Curr | Std Hrs |
|---|---|---|---|---|---|---|---|---|
| 12/02/2004 Terminated | TER Job Aband | Wilmington Delivery Driver - Trlr | Full-Time | Hourly Regular | HC2 Nonexempt | 16.95 Hourly | 0 USD | 40 |
| 11/22/2004 Leave W/Py | PLA NMedNonOc | Wilmington Delivery Driver - Trlr | Full-Time | Hourly Regular | HC2 Nonexempt | 16.95 Hourly | 0 USD | 40 |
| 09/23/2004 Active | DTA ABBR Upda | Wilmington Delivery Driver - Trlr | Full-Time | Hourly Regular | HC2 Nonexempt | 16.95 Hourly | 0 USD | 40 |
| 09/19/2004 Active | PAY Lateral | Wilmington Delivery Driver - Trlr | Full-Time | Hourly Regular | HC2 Nonexempt | 16.95 Hourly | 3.67 USD | 40 |
| 05/01/2004 Active | DTA One / Plc | Wilmington General Labor/Ops | Full-Time | Hourly Regular | HC1 Nonexempt | 16.35 Hourly | 0 USD | 40 |
| 04/19/2004 Active | RPL RP Ben Lv | Wilmington General Labor/Ops | Full-Time | Hourly Regular | HC1 Nonexempt | 16.35 Hourly | 0 USD | 40 |
| 01/01/2004 Leave W/Py | PAY Pay Adjus | Wilmington General Labor/Ops | Full-Time | Hourly Regular | HC1 Nonexempt | 16.35 Hourly | 1.238 USD | 40 |
| 11/07/2003 Leave W/Py | PLA NMedNonOc | Wilmington General Labor/Ops | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |
| 09/23/2003 Active | DTA ABBR Upda | Wilmington General Labor/Ops | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |
| 07/07/2003 Active | PAY Lateral | Wilmington General Labor/Ops | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |
| 06/14/2001 Active | DTA PS Payrol | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |
| 03/25/2003 Active | PAY End T-Det | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |

PBG 00267



Report ID: PCHREEPR

PeopleSoft
EMPLOYEE PROFILE

Page No. 2
Run Date 12/13/2005
Run Time 08:31:45

Empl ID: 03155487                          Tillman,Marlayna G.                          National ID: 521282725

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 01/19/2003 | PAY | Wilmington | | Hourly | HC1 | | 16.15 | 0 | 40 |
| Active | Beg T-Dut | Warehouse Person | Full-Time | Regular | Nonexempt | Hourly | | USD | |
| 01/18/2003 | PAY | Wilmington | | Hourly | HC1 | | 16.15 | 0 | 40 |
| Active | End T-Dut | Warehouse Person | Full-Time | Regular | Nonexempt | Hourly | | USD | |
| 01/01/2003 | PAY | Wilmington | | Hourly | HC1 | | 16.15 | 2.54 | 40 |
| Active | Adj - H&C | Warehouse Person | Full-Time | Regular | Nonexempt | Hourly | | USD | |
| 12/27/2002 | PAY | Wilmington | | Hourly | HC1 | | 15.75 | 0 | 40 |
| Active | Beg T-Dut | Warehouse Person | Full-Time | Regular | Nonexempt | Hourly | | USD | |
| 10/20/2002 | RFL | Wilmington | | Hourly | HC1 | | 15.75 | 0 | 40 |
| Active | RF Ben Lv | Warehouse Person | Full-Time | Regular | Nonexempt | Hourly | | USD | |
| 10/09/2002 | DTA | Wilmington | | Hourly | HC1 | | 15.75 | 0 | 40 |
| Leave W/Py | ADDR Upda | Warehouse Person | Full-Time | Regular | Nonexempt | Hourly | | USD | |
| 09/23/2002 | PLA | Wilmington | | Hourly | HC1 | | 15.75 | 0 | 40 |
| Leave W/Py | Layoff Pd | Warehouse Person | Full-Time | Regular | Nonexempt | Hourly | | USD | |
| 08/26/2002 | DTA | Wilmington | | Hourly | HC1 | | 15.75 | 0 | 40 |
| Active | Conversio | Warehouse Person | Full-Time | Regular | Nonexempt | Hourly | | USD | |
| 07/28/2002 | PAY | Wilmington | | Hourly | HLY | | 15.75 | 48.909 | 40 |
| Active | Jb Chg-H& | Warehouse Person | Full-Time | Regular | Nonexempt | Hourly | | USD | |
| 12/31/2001 | PAY | Wilmington | | Excep Hrly | B | | 22,600.00 | 0 | 40 |
| Active | Pay Adjus | Merchandiser | Full-Time | Regular | Nonexempt | Annual | | USD | |
| 05/08/2001 | HIR | Wilmington | | Excep Hrly | B | | 22,000.00 | 0 | 40 |
| Active | New Hire | Merchandiser | Full-Time | Regular | Nonexempt | Annual | | USD | |

PRIOR WORK EXPERIENCE

| Employer | Start | End | Title |
|---|---|---|---|
| Net-X Communications | 04/01/1999 | | Installer |
| Suburban Cable TV | 03/01/1993 | 04/01/1999 | Dispatcher |

EDUCATION

| School | Major | Degree | Date |
|---|---|---|---|
| | | | |

LANGUAGES

| Language | Native | Speak | Read | Write |
|---|---|---|---|---|
| | | | | |

PBG 00268

Report ID:  PCHREEPR

The Pepsi Bottling Group
EMPLOYEE PROFILE

Page No.  1
Run Date 12/15/2003
Run Time 14:47:10

Empl ID:  01165020

Eastlack, Christopher T.

National ID:  136828072

---

| | |
|---|---|
| Home Address:    224 N. Main St. | Mailing Address: |
| Mullica Hill  NJ  08062 | |
| USA | |
| Home Telephone: 609/841-6210 | |

---

### CURRENT EMPLOYMENT

| | | | |
|---|---|---|---|
| Business Unit: | Mid-Atlantic BU | Job Title: | Warehouse Person |
| Market Unit: | Delaware Valley MU | Job Entry Date: | 05/06/2002 |
| Work Location: | Wilmington, DE | Band/Level: | HC1 |
| Hire Date: | 05/06/2002 | Orig Hire Date: | 05/06/2002 |
| Union: | 830 | Perf Rating: | |
| Seniority Date: | | Comp. Rate: | 16.15  Hourly |
| Department: | 010477  Wilmington, DE | Lead Pay: | |
| GL Pay Type: | 0240  Wilmington DE | Seniority Pay: | |
| Account: | 19050013001 | Shift Pay: | |
| AC Function: | Operations | Full-Part: | Full-Time |
| Job Function: | OPS Operations | Empl Type: | Hourly |
| Job Family: | DIR Direct | FLSA Status: | Nonexempt |
| | | Reg/Temp: | Regular |

---

### SALARY ACTION/DATA HISTORY

| Eff Dt/ Status | Action/ Reason | Department/ Title | Perf Rating/ Full-part | Empl Type/ Reg/Temp | Band/ FLSA | Comp Rate/ Freq | Inc. %/ Curr | Std Hrs |
|---|---|---|---|---|---|---|---|---|
| 09/23/2003 Active | DTA ABBR Upda | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |
| 07/07/2003 Active | DTA Cst Cente | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 0 USD | 40 |
| 06/14/2003 Active | DTA PS Payrol | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 2.54 USD | 40 |
| 01/01/2003 Active | PAY Adj - H&C | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 16.15 Hourly | 2.54 USD | 40 |
| 12/02/2002 Active | PAY Adj - H&C | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 15.75 Hourly | 11.072 USD | 40 |
| 10/09/2002 Active | DTA ABBR Upda | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 14.18 Hourly | 0 USD | 40 |
| 10/06/2002 Active | RPL RF Ben Lv | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 14.18 Hourly | 0 USD | 40 |
| 09/22/2002 Leave W/Py | PLA Layoff Pd | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 14.18 Hourly | 0 USD | 40 |
| 08/26/2002 Active | DTA Conversio | Wilmington Warehouse Person | Full-Time | Hourly Regular | HC1 Nonexempt | 14.18 Hourly | 0 USD | 40 |
| 08/07/2002 Active | PAY Adj - H&C | Wilmington Warehouse Person | Full-Time | Hourly Regular | HLY Nonexempt | 14.18 Hourly | 11.83 USD | 40 |
| 05/06/2002 Active | HIR New Hire | Wilmington Warehouse Person | Full-Time | Hourly Regular | HLY Nonexempt | 12.68 Hourly | 0 USD | 40 |

Margolis Edelstein
Tillman, Murhayna v. Pepsi
0183

B 020

Report ID:  PCHREEPR

The Pepsi Bottling Group
EMPLOYEE PROFILE

Page No.  2
Run Date 12/15/2003
Run Time 14:47:10

Empl ID:  01165020

Eastlack,Christopher T.

National ID:  136828072

PRIOR WORK EXPERIENCE

| Employer | Start | End | Title |
|----------|-------|-----|-------|
| Bally's Park Place Casino | 02/01/1998 | | Dealer |
| Delaware Val Wholesale Florist | 10/01/1991 | 02/01/1998 | Supervisor |

EDUCATION

| School | Major | | Degree | Date |
|--------|-------|--|--------|------|

LANGUAGES

| Language | Native | | Speak | Read | Write |
|----------|--------|--|-------|------|-------|

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0184
B 021

**Curry, Rhonda {PBG}**

From:       Swartz, Sara {PBG}
Sent:       Wednesday, October 02, 2002 5:39 PM
To:         Curry, Rhonda {PBG}
Subject:    hope this helps, if you need more info call my cell phone

Aug hours 2002.xls

robles start date     7/9/02
lewis start date      6/17/02
osciak start date     bid began   5/21/02
                      bid ended/awarded  5/27/02
                      began job   7/8/02


period 9 week 4 average

tillman  1.87
becker   1.91
robles   3.03

Pd 10 week one average
tillman  2.37
becker   2.53
eastlack 3.34
robles   2.89

pd 10 week one day by day

monday  9/9/02
tillman   1.92    23 builds     12 hours
becker    3.05    37 builds     11 hours
*had conversation with O'Bara that night about women being held to a lower standard

tuesday  9/10/02
tillman   off
becker    2.56
eastlack  3.60

wednesday 9/11/02
tillman   2.97    23 builds     7.75 hours
robles    3.20    24 builds     7.5 hours
eastlack  N/A
Becker    N/A

thursday  9/12/02
tillman   2.42    29 builds     12 hrs
becker    1.58    19builds      12 hours
eastlack  3.22    33 builds     10.25 hours
robles    2.93    33 builds     11.25 hours

friday  9/13/02
tillman   2.17    25 builds     11.5 hrs
becker    2.86    30 builds     10.5 hrs
eastlack  3.00    ?
robles    2.61    30 builds     11.5 hrs

saturday 9/14/02
tillman   2.71    19 builds     7 hrs
becker    2.38    19 builds     8 hrs
eastlack  N/A

1

PBG 01270

B 022

robles          2.44     22 builds       9 hrs

PBG 01271

2

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

**Delaware Department of Labor**

(State, or local Agency, if any)

ENTER CHARGE NUMBER

☐ FEPA  *0 2 0 9 6 13*

☐ EEOC  *17CA2 00627*

and EEOC

| NAME (Indicate Mr., Mrs., Ms) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Ms. Marlayna Tillman | (302) 762-0415 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| P.O. Box 688   Claymont DE 19703-0688  NCC | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one, list below.)*

| NAME | NO. OF EMPLOYEES OR MEMBERS 100+ | TELEPHONE NUMBER (Incl. Area Code) |
|---|---|---|
| Pepsi Bottling Group | | (302) 761-4848 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 3511 Governor Printz Boulevard, Wilmington, DE 19809 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☐ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
**EARLIEST** 10/1/2001
**LATEST** 8/27/2002
☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

I am a black female individual who has been employed by Respondent since 5/8/01. Since in or about 10/1/01, and continuing to the present, Respondent has denied me various promotional opportunities, particularly for Driver positions. Instead, I have been assigned to work in various departments, including, currently, the Warehousing Department, where I am subjected to disparate treatment with regard to terms and conditions of employment. My supervisors, Glen Matthew (white male) and Tom Riley (black male) hold me to a higher standard than my white male coworkers with regard to rules and regulations. As recently as 8/27/02 I was falsely accused of leaving my shift without checking with the Supervisor On Duty. Also, I am paid lower wages than my white male counterparts, although I am expected to perform the same work as they are.

I have been told that I could not get a Driver position because I am not in the union.

I believe I have been discriminated against in violated of the Civil Rights Act of 1964, as amended, and the Delaware Discrimination in Employment Act, because: I am the only female working in my classification, and I am paid lower wages than my male counterparts, denied promotional opportunities, and held to a higher standard. I have seen male coworkers who are not in the union, some with less tenure, obtain Driver positions and thereby become union members.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

| I declare under penalty of perjury that the foregoing is true and correct. | NOTARY - (When necessary to meet State and Local Requirements) |
|---|---|
| 8/28/02   *Marlayna Tillman* | |
| Date      Charging Party (Signature) | Subscribed and sworn to before me this date   (Day, month, and year) |

EEOC FORM 5
REV 6/92

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

# EEOC AFFIDAVIT

| Charge #: | Date:  8/28/02 |
|---|---|

## Charging Party Information

**Name:**  Ms. Marlayna Tillman

| **Street:**  P.O. Box 688 | **City:**  Claymont |
|---|---|
| **County:** NCC    **State:** DE | **Zip:**  19703-0688 |
| **Tel (H):** (302) 762-0415 | **Tel (W):** (302) 761-4848 |
| **DOB:**  6/6/1966    **Sex:**  Female | **Race:**  Black |
| **Nat'l Origin:** U.S. | **SSN:**  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 |

## Contact Person

**Name:**  Lisa Palmer
**Tel (H):** (302) 731-4528          **Tel (W):**
**Address:**

## Employment Information

Date of Hire: 5/8/01
Date of Termination:
Date of Alleged Violation: 8/27/02
Relief Sought: Promotion to route driver; lost wages; other damages.
Check One: ☒ working  ☐ not working  ☐ sought employment at

## Respondent Information

**Name:**     Pepsi Bottling Group
**Address:** 3511 Governor Printz Boulevard, Wilmington, DE 19809
**Type of Business:** Production/Manufacturing
**Size of Business:** 100+

## Basic Charge Data

| Receiving Office: 17C | Intake Unit: 1 |
|---|---|
| Accountable Office: 17C | Intake Officer: jkc |
| Initial Inquiry: 8/28/02 | Respondent Type: E |
| Received this Office: 8/28/02 | County: 003 |
| Source of Complaint: A | SMSA: 9160 |
| Federal Referral Transfer: | SIC: 208 |
| Alleged Basis: GF, RB | Federal Agency: |
| | Alleged Issues: A3, T2, P3, W1 |

## CONTINUATION OF AFFIDAVIT

1.  **COVERAGE/RESPONDENT'S BUSINESS:**
    Respondent is a processing/manufacturing plant.

2.  **RELEVANT WORK HISTORY:**
    I have been employed since May 2001 and have been placed in many different departments/capacities.

3.  **PERSONAL HARM:**
    See attached.

4.  **RESPONDENT'S EXPLANATION FOR THE ALLEGED HARM AND ITS POLICIES AND PRACTICES:**
    I have been told that I could not get a Driver position because I am not in the union.

5.  **DIRECT EVIDENCE:**
    Respondent will have copies of my bid forms.

6.  **WITNESSES:**
    See attached.

7.  **COMPARATIVE DATA:**
    My coworkers are all male.

8.  **CLASS HARM:**
    Not alleged.

9.  **REMEDY/RELIEF SOUGHT:**
    Promotion to Driver so I can get into the union; lost wages; other damages.

8/28/02

**DATE AND INITIAL**

PAGE #

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0110    B 026

CONTINUATION OF EEOC AFFIDAVIT

## SIGNATURE PAGE

**This Affidavit has been prepared by a representative of the EEOC in an official capacity as part of an investigation. It has been read by me and I agree with the contents. Where changes (if any) were necessary, I have initialed such changes.**

If affidavit is signed before a Notary Public, complete the following:

_Marlayna Tillman_
Signature of Interviewee

State of _____     My Commission expires _____

County of _____

Subscribed and sworn to before me on

This ____ day of _____ ,

20 ___ , at _____ .     _____
                            Signature of Notary Public

Sign below if affidavit is signed before an EEO Representative:

| DATE | SIGNATURE OF WITNESS | SIGNATURE OF EEOC REPRESENTATIVE | PAGE OF |
|------|----------------------|----------------------------------|---------|
| 8/28/02 | | _Julie Cutler_ | |

I declare under the penalty that the foregoing is true and correct.

**PRIVACY ACT STATEMENT:** (This form is covered by the Privacy Act of 1974, Public Law 93-579. Authority for requesting and uses of the personal date are given below.)

1.    FORM NUMBER/TITLE/DATE: EEOC FORM 133, EEOC AFFIDAVIT, August 1985.

2.    AUTHORITY: 42: USC 2000e(9), 29 USC 201, 29 USC 621.

3.    PRINCIPAL PURPOSES. Provides a standardized format for obtaining from the Charging Party, Respondent and Witness sworn statements of information relevant to a charge of discrimination.

4.    ROUTINE USES. These affidavits are used to: (1) make an official determination regarding the validity of the charge of discrimination; (2) guide the Commission's investigatory activity; and (3) in Title VII, Equal Pay Act, and Age Discrimination in Employment Act litigation, to impeach or substantiate a witness's testimony.

5.    WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION: Voluntary. Failure to provide an affidavit has no effect upon the jurisdiction of the Commission to process a charge. However, sworn statements submitted by the parties are, of course, relied upon more heavily than unsworn statements in making determination as to the existence of unlawful discrimination.

EEOC FORM 133 (8/85)

To Whom It May Concern:

This is a formal discrimination complaint.

I am an employee of the Pepsi Bottling Group, Wilmington DE facility, employed since May 2001. On Tuesday, August 27th 2002, I was summoned to the office by one of the warehouse supervisors, Glenn Matthews. Accompanied by Mr. Tom Riley, another supervisor from the warehouse department, Mr. Matthews blatantly accused me of leaving the facility the night before (8/26/02) without first checking with the supervisor on duty, Mr. Lou Papilli. I was also berated by Mr. Matthews for not being a "team player", allegedly for not coming to the assistance of other employees who were still working at the time I clocked out that evening. I was told I was being written up for the alleged infraction(s), and Mr. Matthews had the paperwork already prepared to do so at that meeting.

In my defense, I explained to Mr. Matthews that I DID, in fact, check out with the supervisor on duty, and was given the ok to depart for the evening, and had a witness to that end, a Mr. Karl Riley, a warehouse employee who checked out at the same time I did with the same supervisor, and who was given the ok to leave as well. Furthermore, I went on to detail how I DID, in fact, in the spirit of "teamwork", assist other workers on duty that evening before I left by helping to build product pallets for a worker who had not completed his product builds yet, and I had SEVERAL witnesses who could vouch for that fact, including Mr. Dave Hitchens, Mr. Stan Coleman and Mr. Karl Riley (incidentally, according to Karl Riley himself, upon further investigation into the matter, both Mr. Matthews and Mr. Tom Riley found that my account of how the events transpired had credence, and offered an apology to Karl Riley, but did not offer one to myself). On the Saturday prior to this incident, 8/25/02, supervisor Tom Riley threatened to terminate me for "walking the dog", a maneuver where a worker "walks" beside his forklift while it is in gear. It is a procedure that is so commonly used by the employees of the warehouse, I had no idea it was a supposedly forbidden practice. There were other workers who were doing the same thing that day but yet I was the only one who was called into the office and chastised for it. When I pointed out this observation to Mr. Riley, he, as an afterthought, called a brief meeting with all the bulk workers to reiterate what he had said to me. Since that day, I have personally observed workers who still use this technique with impunity, yet none have been reprimanded.

Although I have been an employee of Pepsi since May 2001, I have only recently been an employee of the Pepsi warehouse department since July 29th, 2002. I requested a transfer to the department months earlier because Pepsi is currently divided into two categories: union employees and non-union employees. I had made the personal decision that I wanted to become a union employee early in my tenure with the company, and a transfer to the warehouse department was the only avenue made available to me in which to begin accruing "union time" (on numerous occasions I had attempted to gain union status by applying for different positions within Pepsi, only to be arbitrarily denied, even though my ability to perform the job description(s) effectively had long since been demonstrated).

Prior to and since becoming an employee of the warehouse department in July, I feel I have been discriminated against by the Pepsi Bottling Group in that several key players in collusion have created and continue to cultivate a hostile work environment for me, because I am a black female (the only black female in my current department as well as the only black female in my prior department). As it stands now, I am poised to become one of the first female employees to become a union worker at the Wilmington, Delaware facility, and unfortunately, there are still those in this day and age who take exception to a milestone such as this. The fact that Mr. Matthews "conjured up" a scenario that did not have any basis in fact, and was prepared to act upon that scenario, lend credence to my suspicion that Pepsi is determined to assure that I do not receive equal or fair treatment in the areas of employment or advancement, and furthermore, will stop at nothing to ascertain that I do not achieve union status or any other form of long term tenure with the company. The incidents described herein are by no means the only incidents I have experienced since my tenure with the company commenced.

There are currently NO female employees at the Wilmington plant who have union status, much less women of color. Since transferring to the warehouse department, I have been inundated with a workload that is overwhelming and grossly unreasonable, and expected to finish it to completion, even though I

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0112    B 028

haven't been in the department for even a month yet, and even though proper training was not provided to me by the supervisors. I am expected to work twelve or more continuous hours each day with only a forty minute break during the entire shift. I am expected be up to the same "standards" as warehouse employees who have been in the department much longer than myself and who are also all males. I am expected to know all the standard rules and regulations of the warehouse environment, though none of them have been explained to me by the supervisors, nor offered in writing, so it is impossible to understand what is expected of you as an employee or if you are in violation of any particular policy, as there are no written policies in place. Lastly, I have noticed that I am the only person being unreasonably scrutinized by my superiors for any "infraction". Any violation of the "standards" results in an "occurance". Occurances can ultimately result in being denied union status and most likely termination, however, you are not informed that you have even received an occurance until it is time for you to find out if you have been granted access into the union. What it amounts to is a convoluted and difficult to understand process, designed specifically to give supervisors of Pepsi the leverage to permanently hire those employees they may have an affection for, (ie: male workers) while also giving them the ability to terminate those they do not wish to retain (ie: female workers) yet make the decision appear to be based on grounds other than discrimination.

I submit that Pepsi is merely "going through the motions" of being an equal opportunity employer, and this is my formal complaint to be filed for the record, as I fully expect retaliation by the company, whether by covert means, overt means, or both.

Filed this 28th day of August, 2002,     pm.

Sincerely,

Marlayna Tillman

Marlayna Tillman

Cc: Faye Cohen, Esq.
   Fox News

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0113    B 029



**TEAMSTERS LOCAL UNION NO. 830**
12298 TOWNSEND ROAD   PHILADELPHIA, PA 19154
(215) 671-9850
(800) 321-9850

Nᵒ  0696

## GRIEVANCE REPORT

Filed By: _M. TILLMAN_    Company: _PEPSI- WLM._ Dept.: _BULK/WAREHOUSE –_
Shop Steward: _GARY DIPROSPEROS_    Date Filed: _2-15-2003_
Nature of Grievance: _* See attached statement/enclosure *_

Remedy Requested: Including, but not limited to: _"RETRO"- SENIORITY FROM CORRECT DATE OF ELIGIBILITY:_
_(11-13-01) - barring that remedy, grievant requests arbitration._

Signature of Grievant: _Marlayna Tillman_ 2/15/03

## EMPLOYER REPORT

Date: _____    Supervisor Name: _____
Remarks: _____

Signature of Supervisor: _____

## SHOP STEWARD REPORT

Date Grievance Filed with Company: _____ with Supervisor: _____
Disposition
☐ Remedy Granted        ☐ Resolved          ☐ No Merit
☐ Denied                ☐ Withdrawn         ☐ Referred to Union
                                              Date:
Remarks: _R_ _____

Signature of Shop Steward: _____

## BUSINESS AGENT REPORT

Company Representative handling grievance: _Tracey D._

Disposition:
☐ Remedy granted          ☐ Grievance withdrawn       ☐ Grievance denied
☐ Grievance Resolved      ☒ No merit

**PBG 00310**

Remarks: _____

Final Disposition: _Grievance was Heard and Determined that MS Tillman,_
_was Not a Dues Paying Member During the time period_
_in Question_

Business Agent Signature: _____

NOTE: THIS GRIEVANCE RELATES TO THE INDIVIDUAL IDENTIFIED ABOVE AND ALL SIMILARLY- SITUATED
BARGAINING UNIT MEMBERS

( WHITE COPY: COMPANY    YELLOW COPY: MEMBER    PINK COPY: STEWARD    GOLD COPY: UNION )

B 030



2/15/03

### Grievance #0696

Based on the tenure (5/8/01 to present) with the Pepsi Bottling Group, Wilmington, DE (*hereafter referred to as "the company"*), and tenure worked for the company (10/13/01 through 5/28/02) in various positions defined as "bargaining unit work" as outlined in the Collective Bargaining Agreement between the Pepsi Bottling Group, Wilmington, DE, and the Teamsters Local Union No. 830, the grievant, Marlayna Tillman requests the immediate correction of her union eligibility date from 10-29-02 to the proper eligibility date of 11/13/01, as well as all "retro" seniority, privileges, pay and benefits that would have been accrued by grievant had she been awarded correct eligibility in the first instance.

Grievant is filing her claim based on published information in the current collective bargaining agreement between the company and Teamsters Local Union 830, and is relying on its content, specifically, page 10 article VIII, which states in part, "… the contract wage to which the temporary transfer is made, *shall apply to the employee so transferred*… and he/she *shall receive the higher rate* for the full day regardless of the number of hours worked in the higher-rated job classification". The language also goes on to state, "… a temporary transfer of more than one month may be renewed for an equal and additional period of time, after which time the vacancy filled by such temporary transfer *must be filled* in accordance with normal procedure *or abolished*." Page 4, Article III, with regard to hiring new employees, clearly mandates in part, "…union agrees to *admit to membership* all present employees of employer…" and goes on to decree, "… new employees *shall become members of the union after thirty (30) calendar days of employment* or the effective date of this agreement, whichever is later. If employment is continued after such thirty day period, *union agrees to accept such employees as members*."

Grievant asserts that because she was required by the company to perform bargaining unit work commencing on 10/13/01 and ending on 5/28/02 (approximately 7 ½ months), and position was not abolished as mandated in the time frame required by the Collective Bargaining Agreement, she earned union eligibility on or about 11/13/01 and is therefore entitled to all union-related benefits (including seniority) from 11/13/01 until present.

Article XVIII of the Collective Bargaining Agreement is also clear and convincing where it states, in part, "… the parties hereto agree not to… evade or frustrate compliance with the spirit and terms of this agreement…" and "… employer and union agree that the provisions of this agreement shall apply to all employees covered by the agreement *without regard* to race, creed, color, religion, national origin, sex, age, handicap or veteran status."

Therefore, in accordance with the terms outlined in the Collective Bargaining Agreement, grievant asks for immediate relief in the form of specific performance as well as affirmative relief going forward.

*Marlayna Tillman* 2/15/03

Marlayna Tillman, grievant

PBG 00311

B 031

| CHARGE OF DISCRIMINATION | ENTE. ⎵ARGE NUMBER |
|---|---|
| **CHARGE OF DISCRIMINATION**<br><br>This form is affected by the Privacy Act of 1974 | ☐ FEPA<br>☐ EEOC |

| **Delaware Department of Labor** | and **EEOC** |
|---|---|

(State, or local Agency, If any)

| NAME (Indicate Mr., Mrs., Ms)<br>Marlayna Tillman | HOME TELEPHONE NO. (Include Area Code)<br>(302) 762-0415 |
|---|---|
| STREET ADDRESS<br>P.O. Box 688   Claymont DE 19703   NCC | CITY, STATE AND ZIP CODE | **COUNTY** |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (*If more than one, list below.*)

| NAME<br>Teamsters Local Union 830 | NO. OF EMPLOYEES OR<br>MEMBERS 100+ | TELEPHONE NUMBER (Incl. Area Code)<br>215-671-9859 |
|---|---|---|
| STREET ADDRESS<br>12298 Townsend Road Philadelphia, PA 19154 | CITY, STATE AND ZIP CODE | |
| NAME | | TELEPHONE NUMBER (Include Area Code) |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | |

| ☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE<br><br>☒ RETALIATION   ☐ DISABILITY ☐ OTHER (Specify) | DATE DISCRIMINATION TOOK PLACE<br>**EARLIEST** 11/13/2001<br>**LATEST** 4/22/2003<br>☒ CONTINUING ACTION |
|---|---|

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

I am a black female who began working for Pepsi on 5/8/01 and became a warehouse worker on 7/22/02, a union eligible position. But I was not made an official member of Respondent union until 10/ 29/02. On or about October of 2001, I was removed from the Merchandising Department and became a member of the conventional team, which was a union position. This position would have made me eligible to become a union member on or about November 13, 2001. I was not made aware of this fact however, until December of 2001. Because Respondent did not inform me of this fact, I missed out on union benefits and job promotions and advancements. On or about May 2002, I was placed back in my original position, Merchandising by Ronda Curry, Human Resources Coordinator. Also about this time, Ms. Curry and Sara Swartz, Human Resources informed me that if I wished to become a member of the union I would have to work in the Warehousing Department. However, I constantly expressed interest in a driver position, but was told that I was not eligible because I was not a union member and because I did not possess a C.D.L. licence. The union bargaining agreement includes training program for union members but as I was not permitted to enter the union, I could not take advantage of this benefit. In addition, I obtained a C.D.L. permit in December of 2001 but I was still denied training. On July 22, 2002, I was transferred to the Warehousing Department, a union position where I was subjected to disparate treatment with regard to terms and conditions of employment. I have filed numerous grievances based on the ongoing disparate treatment and discrimination but as of this date, Respondent has refused to respond in any manner.

I believe that I have been discriminated and retaliated against in violation of the Civil Rights Act of 1964, as amended and the Delaware Discrimination in Employment Act based on my race (black) and my sex (female) because: Respondent did not inform me that I was in a union position from October 2001 until May 2002. In addition, I was denied promotional opportunities, pay, benefits and seniority because of the lack of information. I have reported the disparate treatement to both Pepsi and to the Respondent but Respondent has refused to represent me, grant rightful seniority based on my proper eligibility date, and has refused to demand and collect wages, despite grievances that I have filed requesting immediate relief.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT<br><br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>4/22/03   *Marlayna Tillman*<br>**Date**    **Charging Party (Signature)** | NOTARY - (When necessary to meet State and Local Requirements)<br><br>Subscribed and sworn to before me this date    (Day, month, and year) |

Margolis Edelstein<br>Tillman, Marlayna v. Pepsi<br>0019

B 032

INFORMATION QUESTIONNAIRE
OFFICE OF LABOR LAW ENFORCEMENT

Please answer the following questions. A representative who specializes in labor law enforcement will talk with you after you complete this form. Please print. Completion of this form does not constitute the filing of a Charge.    RECEIVED

FULL NAME: _MAALAYNA TILLMAN_

STREET ADDRESS: _PO BOX 688_                                    2003 APR -8 P 3: 12

CITY: _CLAYMONT_                STATE: _DE_        OFFICE OF
                                                  WORKERS CO ZIP: _19703_
                                                  STATE OF
TELEPHONE (HOME): _302-762-0415_   (WORK): _302-761-4848_   AGE: _____

BIRTHDATE: _6/6/66_  SOC. SEC. NO. _521282725_   SEX: _F_   RACE: _BLK._

COUNTRY OF BIRTH: _USA_

What employment action was taken against you? What harm has it caused your work situation as a result? _Since my tenure_ _commenced (5/8/01) thru present, I have been subjected to ongoing discrimination in the form_ _of lack of promotion and advancement opportunities, withheld wages owed, violations of_ _the Equal Pay Act and denial of proper seniority within the company. When I filed my_ _1st charge in August 2002, I was retaliated against by the company by being placed on_ _layoff for 4 weeks, even though others with less seniority than myself were allowed to_ _work. The treatment I have received since I filed my 1st charge has been progressively worse_ _and I feel the treatment I am receiving is due to my race and my gender, and my filing of charge._

I believe this action was taken against me because of (check all that apply):

☒ Race        ☐ Religion        ☐ Sex        ☐ Disability        ☐ Age
☐ National Origin    ☐ Marital Status        ☐ Genetic Information    ☒ Color

☒ Retaliation (explain) _I was laid off by the Pepsi Bottling Group (9/23/02 thru 10/21/02) for_ _4 weeks without notification of return, suspiciously, right after I filed a charge_ _alleging discrimination with regard to pay and advancement opportunities._

☒ Other (explain) _I am now enjoining my local union in this matter, because to date_ _they have refused to represent me in the manner in which they are sworn, and_ _have to date, done nothing in regard to collecting backpay and other wages owed_ _me by the Pepsi Bottling Group - they have also refused to hear or act upon my grievances_

This action was taken against me by (check all that apply):

☒ Employer        ☒ Labor Organization        ☐ Employment Agency

Company _PEPSI BOTTLING GROUP / TEAMSTERS LOCAL UNION 830_    Telephone # _(302) 761-4848 Pepsi_
                                                              _(215) 671-9859 Union_

Delaware Street Address _3501 Governor Printz Blvd / 12298 Townsend Rd_

City, State, Zip _Wilm DE 19802_         _PHILA PA 19154_

Number of Employees _100+_  Date(s) of employment _5/8/01 to present_   Date(s) of action _* ongoing SINCE tenure commenced_

_Maalayna Tillman_          Margolis Edelstein          _4/8/03_
Signature                Tillman, Marlayna v. Pepsi        Date
                              0034

B 033

*awarded to*
*Gary Diprospero*

| Internal Posting | External Posting *Gary Diprospero* |
|---|---|
| Date of Opening:  4/14/03 | Please turn all bids into Tom Riley |
| Date of Posting:    4/7/03 | |
| End Posting:        4/11/03 | |
| Hiring Manager:   Tom Riley | |
| Job Opening #: | |
| Hourly Rate:     Transport Rate | PBG is an equal opportunity employer. |

## Transport-Jockey/Replenishment
## Tuesday-Saturday  3AM-11AM

### JOB SUMMARY:

Move, stack and store a variety of product/material in the warehouse.  Load and unload transport as required.  Replenish pick areas as required.  Jockey transport trucks as required  Complete various tasks throughout the warehouse and production facilities using both forklift and manual labor and all other duties as assigned.

### PRIMARY JOB ACCOUNTABILITIES:

- Operate a forklift in a safe and orderly manner
- Restock pick areas
- Load/strip transport trailers as directed
- Receive and store incoming items according to established system
- Maintain a safe and orderly storage arrangement for all items handled
- Maintain cleanliness in assigned area (e.g. yard and warehouse)
- Maintain records of daily check list (pre-trip inspections)

### JOB ELIGIBILITY CRITERIA:

- Must be at least 18 years of age
- Must be able to pass Forklift Driving Skills test or currently possess Forklift Driving Certificate
- Must be able to pass Yard Jockey requirement
- Frequent lifting of 40-100 lbs.

PBG 01279

Altman 15
DEPOSITION
EXHIBIT
2-28-07

## Swartz, Sara {PBG}

| | |
|---|---|
| From: | Swartz, Sara {PBG} |
| Sent: | Friday, April 04, 2003 3:56 PM |
| To: | Goodwin, Denise {PBG}; Riley, Tom {PBG}; Clayton, Larry {PBG} |
| Cc: | Swartz, Sara {PBG} |
| Subject: | Job Bid Please Post |

Importance:    High

Transport-Jockey
replenishmen...

Hello,

Please post this job.

Sara

PBG 01280

1

B 035

 **THE PEPSI BOTTLING GROUP**

## BID FORM

EMPLOYEE: ___Jim McCornick___    DATE: __4/1/03__

PRESENT POSITION: __3rd Shift Jockey/Loader__

BIDDED POSITION: __3rd Shift Jockey/loader__

EMPLOYEE SIGNATURE: _____

SUPERVISOR SIGNATURE: _____

PBG 01281

Pepsi Bottling Group, 3501 Governor Printz Blvd., Wilmington, DE 19809

# THE PEPSI BOTTLING GROUP

## BID FORM

EMPLOYEE: _Gary DiProsperos_    DATE: _4-10-03_

PRESENT POSITION: _WHSE._

BIDDED POSITION: _Transport / Jockey_

EMPLOYEE SIGNATURE: _Gary DiProsperos_

SUPERVISOR SIGNATURE: _____

PBG 01282

Pepsi Bottling Group, 3501 Governor Printz Blvd., Wilmington, DE 19809

B 037


THE PEPSI BOTTLING GROUP

| BID FORM |
| --- |

EMPLOYEE: M. Tillman          DATE: 4/7/03

PRESENT POSITION: Warehouse (Bulk - 2nd shift)

BIDDED POSITION: 3rd shift transport / jockey loader

EMPLOYEE SIGNATURE: Marlayna Tillman

SUPERVISOR SIGNATURE: _____

PBG 01283

Pepsi Bottling Group, 3501 Governor Printz Blvd., Wilmington, DE  19809

McCormick most senior qualified person
    Qualified ... certified by Rick Palmer - if no
            CDL license

no posted training ...
        Madayna referenced wanting to
        learn transport jockey to

2x asked if she wants to train - Tom Riley - no
response. has never asked for training/practice

    Seniority
① Jim McCormick - passed qualifications/withdrew bid
② Andy Purdy - did not take test, withdrew
③ Gary Desprospers - currently doing position - qualified
④ Madayna Tillman

Andy Purdy - did not want to take test, did
not want to try, was told no training
offered, did not want to take test " I will
fail "

Gary DiProspers -

**PBG 01284**

## Drzewiecki, Tracey {PBG}

| | |
|---|---|
| From: | Drzewiecki, Tracey {PBG} |
| Sent: | Friday, May 09, 2003 2:17 PM |
| To: | 'mgtillman@yahoo.com' |
| Cc: | Swartz, Sara {PBG} |
| Subject: | RE: Transport-Jockey/Replenishment Posting |
| | |
| Importance: | High |

Marlanya,

I received your e-mail message from Sara and would like to meet with you when I in Wilmington on Monday, May 12 to discuss this issue. Please let me know when you are available, I will be in the facility all day and well into the evening. In the future, please send all correspondence directly to me to ensure your issues are addressed in a timely manner. Furthermore, Sara is the Human Resource Coordinator for the facility and is not in the capacity to address many of the union/employee issues. My e-mail address is:

tdrzewie@pepsi.com
phone: 215-961-4066

Thank you,
Tracey

———Original Message———
From: M Tillman [mailto:mgtillman@yahoo.com]
Sent: Wednesday, May 07, 2003 5:08 AM
To: Sara Swartz
Cc: sswartz1
Subject: Transport-Jockey/Replenishment Posting

Sara -

Perhaps you can give me the status of the above-mentioned job posting (posted 4/7/03)?  On Friday, 5/2/03, I spoke with Tom Riley about the status of this posting, and he gave me the impression that the position had been filled by shop steward Gary DiProsperos. I have first-hand knowledge from Gary himself that he did NOT want nor did he accept the position, and furthermore, withdrew his bid from consideration. I conveyed this information to Tom, who then informed me that the position would come down to a choice between myself and Andy Purdy, but it would require training to become "qualified" - through Rick Palmer, in fleet.

On Monday, 5/5/03, however, I received information, again from shop steward Gary DiProsperos, that Tom Riley specifically told him that I was not qualified for the position, he WAS NOT required to train me, and that he WOULD NOT train me for the position. Gary also mentioned because of Tom's rigid stance in the matter, he was being "forced" into the position, even though he does not wish to be considered for the slot.

Sara, I am very disappointed and exasperated, quite frankly, at the evasiveness on the part of the

PBG 01154

1



Altman 16
DEPOSITION
EXHIBIT
2-28-07-ti

B 040

warehouse managers, specifically Tom Riley and Glenn
Matthews, with regard to ANY information I try to
obtain when it comes to advancing myself within the
company. It seems I can never get a straight or
honest answer from anyone. Meanwhile (in keeping with
the ongoing trend that has haunted me throughout my
tenure with the company), it appears that I am to be
passed over yet again for a position I have expressed
interest in, for reasons that I can only conclude are
race and/or gender-bias related.

Again, I would appreciate knowing the "status" of this
posting, ie: whether it is still available or not.
Your assistance would be greatly appreciated, as I
have lost all confidence in the integrity of warehouse
management.

Thank you,
Marlayna Tillman

Do you Yahoo!?
The New Yahoo! Search - Faster. Easier. Bingo.
http://search.yahoo.com

PBG 01155

2

B 041

# THE PEPSI BOTTLING GROUP

## BID FORM

EMPLOYEE: _Leroy Lewis_    DATE: _5-5-03_

PRESENT POSITION: _Bulk ( Warehouse )_

BIDDED POSITION: _Route_

EMPLOYEE SIGNATURE: _Leroy Lewis_

SUPERVISOR SIGNATURE: _Joe Tayler_



Pepsi Bottling Group, 3501 Governor Printz Blvd., Wilmington, DE 19809

PBG 01042

B 042


**THE PEPSI BOTTLING GROUP**

---

## BID FORM

---

EMPLOYEE: *Chris Eastlack*    DATE: *5/5/03*

PRESENT POSITION: *Bulk*

BIDDED POSITION: *Route*

EMPLOYEE SIGNATURE: *Chris Eastlack*

SUPERVISOR SIGNATURE: *T. Riley*

PBG 01043

Pepsi Bottling Group, 3501 Governor Printz Blvd., Wilmington, DE 19809

Ron Brister is Posting in Bib for WUM Warehouse Position

**JOB OPENING**   5/5/03

WUM   **PLANT**

WAREHOUSE   **DEPARTMENT**

ROUTE LOADER **POSITION**

**INTERESTED PARTIES CONTACT:**

_B Hill_
**Supervisor**

Ron Brister
**Print Name**

Ron Brister
**Signature**

PBG 01044

May-05-2003 18:11   From-PEPSI WEST CHESTER   +6104287030   T-025   P.002/002   F-061

**THE PEPSI BOTTLING GROUP**

| BID FORM |
| --- |

EMPLOYEE: _M- TILLMAN_          DATE: _5/1/03_

PRESENT POSITION: _BULK/WAREHOUSE_

BIDDED POSITION: _(4) ROUTE LOADER_

EMPLOYEE SIGNATURE: _Marlaynne Tillman_

SUPERVISOR SIGNATURE: _J. Riley 5-2-03_

PBG 01045

Pepsi Bottling Group, 3501 Governor Printz Blvd., Wilmington, DE 19809

B 045

**THE PEPSI BOTTLING GROUP**

---

## BID FORM

EMPLOYEE: Dwight CEPHAS   DATE: 5-2-03

PRESENT POSITION: Warehouse (General)

BIDDED POSITION: Route

EMPLOYEE SIGNATURE: Dwight Cephas

SUPERVISOR SIGNATURE:

1 – copy

Oct 200

## *COLLECTIVE BARGAINING*
## *AGREEMENT*

DEPT. OF LABOR

AUG 1 5 2003

INDUSTRIAL AFFAIRS
OFFICE OF LABOR
LAW ENFORCEMENT

### *BETWEEN*

### *THE PEPSI BOTTLING GROUP*

### *WILMINGTON, DE/WEST CHESTER, PA*

### *AND*

### *TEAMSTERS LOCAL UNION NO. 830*

*Affiliated with the International Brotherhood of Teamsters,
Chauffeurs, Warehousemen and Helpers of America*

### *COVERING THE PERIOD OF:*

### *JANUARY 1, 2000 TO AND
INCLUDING DECEMBER 31, 2004*



Artman 9
DEPOSITION
EXHIBIT
2-28-07

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0061

# TABLE OF CONTENTS

| ARTICLE | | PAGE |
|---|---|---|
| I | DECLARATION OF PURPOSE | 4 |
| II | UNION RECOGNITION: SCOPE OF AGREEMENT | 4 |
| III | UNION SHOP: HIRING OF NEW EMPLOYEES | 4 |
| IV | HOURS OF WORK | 5 |
| V | HOLIDAYS | 7 |
| VI | VACATIONS | 8 |
| VII | LUNCH RELIEF PERIODS | 10 |
| VIII | WAGES/NET REVENUE SALES COMPENSATION | 10 |
| IX | FLEXIBLE BENEFITS PLAN | 14 |
| X | MANAGEMENT'S RIGHTS | 14 |
| XI | DISCHARGES | 14 |
| XII | INJURIES AND ILLNESS | 16 |
| XIII | POLYGRAPH TEST | 16 |
| XIV | UNIFORMS AND EQUIPMENT | 16 |
| XV | LAYOFF | 17 |
| XVI | RECALL | 18 |
| XVII | JOB VACANCIES | 18 |
| XVIII | DISCRIMINATION AND UNION ACTIVITY | 20 |
| XIX | CHECK-OFF OF UNION DUES | 20 |
| XX | SEVERANCE | 21 |
| XXI | GRIEVANCE – ARBITRATION | 21 |
| XXII | STRIKES & LOCKOUTS | 22 |
| XXIII | PICKET LINES | 22 |
| XXIV | FUNERAL LEAVE | 22 |
| XXV | JURY DUTY | 22 |
| XXVI | MILITARY LEAVE | 22 |
| XXVII | STEWARDS | 23 |
| XXVIII | LEAVE OF ABSENCE | 24 |
| XXIX | TRAINING PROCEDURE | 24 |
| XXX | DRUG/ALCOHOL POLICY | 25 |
| XXXI | SEASONAL EMPLOYEES | 26 |
| XXXII | MERCHANDISING | 26 |
| XXXIII | RESETS | 27 |
| XXXIV | TERMINATION | 27 |

Margolis Edelstein
Tillman, Marisyna v. Pepsi
0062

B 048

**APPENDICES:**

| | | |
|---|---|---|
| A | WAGE SCHEDULE | 28 |
| B | MEMORANDUM OF AGREEMENT REGARDING | |
| | TOOL ALLOWANCE | 30 |
| C | PEPSI-COLA PENSION PLAN | 31 |
| D | INTENT OF CLASSIFICATION COMBINATION | 33 |

**LETTERS OF UNDERSTANDING**

| | | |
|---|---|---|
| 1. | SENIORITY FOR SELECTING VACATIONS | 34 |
| 2. | SELECTING VACATIONS | 35 |
| 3. | CR INVOLVEMENT IN PRICING, FEEDBACK | |
| | NET REVENUE | 36 |
| 4. | HANDLING OF PAYROLL MISTAKES | 37 |
| 5. | FLEXIBLE BENEFITS | 38 |

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0063

B 049

## ARTICLE I
## DECLARATION OF PURPOSE

The purpose of this Agreement is to insure industrial peace. The parties hereto recognize that without mutual understanding, harmony and cooperation among employees, between employees and Employer, and between Union and Employer, and without uninterrupted operation, it is impossible to conduct Employer's business with the economy and efficiency indispensable to its existence and to the best interest of its employees.

## ARTICLE II
## UNION RECOGNITION: SCOPE OF AGREEMENT

A.    The Employer recognizes the Union as the sole collective bargaining agency for all employees, at its existing plants located on 3501 Governor Printz Boulevard, Wilmington, Delaware and on 920 South Bolmar Street, West Chester, Pennsylvania, in the classifications covered in Schedule A attached hereto.

B.    This Agreement shall not be construed to extend to nor affect in any way executive or supervisory help or any other classification of employee not expressly covered in Schedule A. The terms "employee" or "employees" as used in this Agreement shall be construed to include only the classifications of employees covered in Schedule A and shall not be construed to include any employees expressly excepted under this Article.

## ARTICLE III
## UNION SHOP: HIRING OF NEW EMPLOYEES

A.    Except as herein expressly otherwise provided; Employer agrees, as to all classifications of employees specifically covered by this Agreement, to employ none but members in good standing of Union. Union agrees to admit to membership all present employees of Employer specifically covered by this Agreement.

B.    Employer shall have the right to secure new employees from any source. However, Employer will call Union to give it first opportunity to provide such employees. Employer reserves the right to reject any person referred by Union. New employees shall become members of the Union after thirty (30) calendar days of employment or the effective date of this Agreement, whichever is later. If employment is continued after such thirty (30) day period, Union agrees to accept such employees as members.

C.    Anything in the foregoing to the contrary notwithstanding, the first ninety (90) working days shall be considered a trial period, and during such trial period, Employer shall have the unqualified right to dismiss such new employees, the exercise of such right not being subject to arbitration.

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0064

B 050

D.     Any employee who is expelled or suspended from the Union because of nonpayment of dues shall be subject to dismissal seven (7) days after notification in writing to the Employer by the Business Agent, the President, or the Secretary-Treasurer of the Union; provided, however, where such suspension or expulsion is for nonpayment of dues and payment of such arrearages is made within such seven (7) day period, Employer shall not be required to dismiss such employee. When an employee has been dismissed by the Employer due to his/her suspension or expulsion by the Union, the Employer shall not be required to re-employ or reinstate such employee at any time.

E.     Where any discharge required by this Article III would result in working a hardship upon the Employer, the Employer shall be permitted a reasonable length of time to secure a new employee before making such discharge.

F.     Supervisors or management will not normally perform bargaining unit work (i.e. - Union-defined jobs) except for work being performed currently, training of employees, and emergency situations.

### ARTICLE IV
### HOURS OF WORK

A.     The regular workweek for all employees shall consist of five (5) days on an eight (8) hour basis or four (4) days on a ten (10) hour basis, Monday through Friday. The regular workday for hourly-rated employees shall consist of eight (8) hours on a five (5) day basis or ten (10) hours on a four (4) day basis.

The regular workweek for Bulk, Warehouse, and Vending Service employees shall consist of five (5) days on an eight (8) hour basis or four (4) days on a ten (10) hour basis Monday through Sunday with the following restrictions: 1. No more than two (2) Bulk Drivers and Warehouse employees with a Sunday work schedule by the end of 1991. No more than four (4) Bulk Drivers and Warehouse employees with a Sunday work schedule by the end of 1992. 2. No more than two (2) Service Department employees with a Sunday work schedule by the end of 1991. No more than four (4) Service Department employees with a Sunday work schedule by the end of 1992.

Any employee assigned a Saturday or Sunday workweek will receive a flex schedule premium pay of thirty cents ($.30) for all hours worked.

B.     Any hourly rated employee who reports to work at his/her scheduled reporting time shall be guaranteed with (8) hours of work or pay unless such employee has been notified by the company not to report to work at least two (2) hours prior to his/her scheduled start time.

C.     Any driver(s) paid a commission who reports to work at his/her scheduled reporting time and is not permitted to take out his/her route for any reason shall be guaranteed one days vacation pay unless such employee has been notified not to report to work at least two (2) hours prior to his/her scheduled start time.

Margolis Edelstein
Tillman, Mariayna v. Pepsi
0065

-5-

D.    For purposes of notification as required in Paragraphs B, C, and H of this Article, an employee shall be required to provide a telephone number at which he/she can be contacted for such notification. One (1) attempt to reach an employee at such number will be considered proper notification. Employer will not be held responsible for a message not communicated to the employee by third parties who answer the telephone at the number given by the employee. If the employee fails to provide a telephone number, the Employer shall have no responsibility for notification as required under this Article.

E.    Hourly-rated employees may be required by the Employer to work on the fifth (5th), sixth (6th) or seventh (7th) days and to work longer than their scheduled shifts in any day. No employee will be required to work longer than 12 hours in any one day.

F.    Overtime pay for any hourly-rated employee shall be time and one-half (1 1/2) times his/her regular straight time hourly-rate for work done over their regularly scheduled shift in any work day or over forty (40) hours in any workweek. Overtime pay for any hourly-rated employee who works on the seventh (7th) day in a workweek shall be double (2) his/her regular straight time hourly rate for all hours worked on that day.

G.    Bulk Drivers shall be guaranteed 8 hours of work or pay on any day for which they are scheduled and report to work and did not receive notification not to report to work. Any Bulk Driver completing his/her scheduled deliveries prior to the end of their shift may be assigned to other duties within the Bulk Department, performing Conventional Relays or within the Transport Department so long as there are no Transport Drivers available to work due to DOT restrictions, and there are no Transport Drivers on Lay Off status.

H.    Employees other than hourly-rated employees may be required by the Employer to work on the fifth (5th), sixth (6th) or seventh (7th) days.

I.    An employee who is called in to perform work prior to but continuing up to his/her regular scheduled shift shall not have his/her regular scheduled shift suspended to avoid the payment of overtime.

J.    Absent emergency situations, the Employer shall give employees twenty-four (24) hours notice of required overtime work scheduled for the fifth (5th), sixth (6th), or seventh (7th) day in accordance with Paragraph (D) above. The Employer will post an "I agree to work overtime" list on a weekly/daily basis, prior to each shift for the purpose of employees making themselves available for available overtime. The purpose of this list is to determine who is interested in volunteering for available overtime. On a "bottom up" basis, senior qualified employees will be required to work if requested. In the event an insufficient number of employees sign the "overtime" list, the Employer may assign such overtime on a bottom-up basis in accordance with the needs of the Employer. This list applies only to Production/Warehouse employees. The Company will assign all overtime work based on seniority and qualifications. When assigning overtime work for machine operator positions (depal, filler, packer, palletizer), the job assignments will be based on seniority and the employee's regularly bidded position.

- 6 -

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0066

B 052

K.    There shall be no pyramiding of overtime pay. For example, overtime paid on a daily basis shall not be duplicated on a weekly basis nor shall overtime for the fifth (5th), sixth (6th) or seventh (7th) day and holiday work be duplicated on the basis of daily or weekly overtime hours. If the overtime pay requirements are met under more than one section of this Agreement, only that section yielding the higher payment will apply.

L.    Unscheduled overtime work at the end of a given shift may be required of the employee performing the required work on that shift and need not be offered to qualified employees on the basis of seniority.

## ARTICLE V
## HOLIDAYS

A.    The following named holidays are observed under this Agreement:

| | |
|---|---|
| **New Year's Day** | **Martin Luther King Day** |
| **President's Day** | **Easter Monday** |
| **Memorial Day** | **Independence Day** |
| **Labor Day** | **Columbus Day** |
| **Thanksgiving Day** | **Christmas Day** |

When any of these holidays fall on a Sunday and the next day is observed as the holiday, same shall be considered the holiday. Only employees who work both the scheduled full work day before and the scheduled full work day after any of these holidays shall be entitled to the benefits of this.

B.    Each employee who has been employed a minimum of ninety (90) calendar days prior the holiday and who does not work on a named holiday shall nevertheless be compensated as follows:

1.    Any hourly-rated employee shall receive eight (8) hours of straight time pay at his/her regular hourly rate. Any hourly-rated employee who works four (4) days at ten (10) hours shall receive straight time pay at his/her regular hourly rate.

2.    All hourly employees on a four (4) ten (10) hour day work week shall receive ten (10) hours straight time pay at his/her regular hourly rate if a holiday falls on his/her scheduled work day. If the holiday falls outside the employees' normal workweek, he/she shall be entitled to eight (8) hours regular pay at his/her hourly rate.

3.    Route Salesmen and Extra Drivers whose regular rate of pay includes a commission shall receive holiday pay equivalent to that of the daily vacation rate.

- 7 -

Margolis Edelstein
Tillman, Mariayua v. Pepsi
0067

C.    Each employee who works on a named holiday or in lieu thereof, on the day the named holiday is observed as set forth in A above shall be compensated as follows; provided, however, no employee shall receive holiday pay for working on both the named holiday and the day on which said holiday is observed:

      1.    Hourly-rated employees shall receive double (2) time for all hours worked on said holiday in addition to their straight time holiday pay.

      2.    If the holiday falls on a Saturday, all employees will receive holiday pay as calculated above in lieu of receiving the time off.

D.    When any of the holidays set forth in Paragraph A of this Article falls in the vacation week of an employee, such employee shall receive his/her holiday pay as provided in Paragraph B of this Article.

E.    Any employee placed on layoff in the workweek immediately prior to a holiday will be entitled to holiday pay.

F.    **Personal/Sick Days** - Each employee will be entitled to a maximum of eight (8) sick/personal days in each calendar year earned as set forth below.  When possible, sick/personal days must be mutually agreed to by the employee and Employer, so as not to interfere with the operation of any department.

When an employee has requested a personal holiday at least one (1) week in advance, the Employer agrees to notify the employee at least 48 hours prior to the requested personal day as to the status of the request.  Failure of the Employer to respond to a personal holiday request within the 48-hour period shall be deemed an approval of the requested personal holiday.  In the event an employee requests a personal day after the one (1) week notification period outlined above, the Employer agrees to notify the employee at least 24 hours prior to the requested personal day as to the status of the request.

Any earned personal/sick days not taken by an employee prior to December 15th of each year shall be paid by Employer no later than the last pay period prior to the Christmas holiday.

## ARTICLE VI
## VACATIONS

A.    Subject to Paragraph F of this Article, every employee who has been continuously in the employ of the Employer for one (1) year or more shall be entitled to two (2) weeks' vacation, consisting of consecutive days, with pay, as scheduled by Employer.  Every employee who has been continuously in the employ of the Employer for three (3) years or more shall be entitled to three (3) weeks' vacation with pay as scheduled by Employer.  Every employee who has been continuously in the employ of the Employer for eight (8) years or more shall be entitled to four (4) weeks' vacation with pay as scheduled by Employer.  Every employee who has been continuously in the employ of the Employer for twenty (20) years or more shall be entitled to five (5) weeks' vacation with pay as scheduled by Employer.  Subject to this Article, all vacations shall be taken in weekly increments..

- 8 -

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0068

B.    The vacation pay for a Route Salesman or Extra Driver whose regular rate of pay includes a commission for each week of vacation to which he/she is entitled shall be his/her average weekly earnings for the preceding year. Average weekly earnings shall be determined by dividing the employee's gross earnings as reported on his/her W-2 Form, minus any bonus monies, for the preceding year by the number of weeks he/she worked during that year.

C.    The vacation pay of an hourly-rated employee for each week of vacation to which he/she is entitled shall be forty (40) hours of straight time pay at the rate being received by the particular employee at the time he/she is given his/her vacation. This also includes Extra Drivers, if their average earnings do not exceed the utility rate.

D.    The length of the vacation to which an employee shall be entitled shall be computed on the basis of the anniversary date of such employee's employment.

E.    Vacations scheduled by the Employer shall be scheduled on the basis of Company seniority within a department (departments designated in Article XV). Once the vacation period has been selected and the vacation list posted, no changes will be permitted. Employer shall have the right to determine the number of employees who may take vacations within any period. The Employer will be reasonable in allowing as many employees as possible to take vacations as long as it does not hinder operations.

F.    Any employee with more than one (1) year's continuous employment who resigns and gives the one (1) week's notice provided in Article X shall be entitled to vacation pay on a pro-rata basis. Thus, such an employee will be entitled to one-twelfth (1/12th) of his/her normal vacation pay for each full month of employment since his/her last anniversary date.

G.    In the event an employee has selected vacation, and with two weeks notice before commencement of that vacation he requests to cancel that vacation, the company will open that week of vacation to bidding by other employees within that department. The company will then allow two additional bids on subsequent vacation weeks that results from the original cancellation of the first employees vacation (three bids in total).

Vacation cancellation requests with less than two weeks notice may be approved at the discretion of the company. If the company approves a cancellation request with less than two weeks notice, the company will make every effort to open that vacant week for bidding by other members of the department. No subsequent bids will be done in this instance.

H.    Subject to the Company's approval an employee with three (3) or more weeks of vacation may voluntarily sell back vacation time (in full week increments), but not below one week of eligibility. In the event an employee wishes to voluntarily sell back vacation time, he must notify the company of his intent to do so one month in advance of the commencement of such vacation. The Company will honor requests of less than one month on a case by case basis. A process for notification will be established by the Company to handle such requests. The Company will continue to handle requests of less than one month on a case by case basis.

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0069

B 055

## ARTICLE VII
## LUNCH RELIEF PERIODS

All employees covered by this Agreement shall be entitled to an unpaid lunch period of one-half (1/2) hour during each regular working day.  Manufacturing employees shall receive one (1) break period for each four (4) hours of work in a given shift.

### Budding Eights

All employees covered by this Agreement may be entitled to an unpaid lunch period of one-half (1/2) hour during each regular working day.  Operations employees may receive one (1) fifteen (15) minute break period for each four (4) hours of work in a given shift.

All Operations employees on an eight (8) hour schedule may receive two (2) twenty minute breaks with no lunch period.  Twenty-four (24) hour notice will be given prior to a change from or to a third shift operation.  Relief periods will not be started earlier than two (2) hours after the start of a shift.  If mutually agreed upon by the Company and the majority of employees, a team within a department can work a combination of two (2) twenty (20) minute breaks or one (1) forty (40) minute break.

### Overtime

2 Hour Shifts:  The employee will receive an additional ten (10) minute break period.

4 Hour Shifts:  The employee will receive an additional twenty (20) minute break period.

## ARTICLE VIII
## WAGES/NET REVENUE SALES COMPENSATION

The wage rates of all employees covered by this Agreement shall be set forth in Appendix A - Wage Schedule.  The compensation for Customer Representatives shall be in accordance with the provisions the Single Net Revenue Sales Compensation Plan.  Effective on or after April 16, 2000, the Company will transition to the Single Net Revenue Compensation Plan.

### Wages of Unclassified Employees; Transfers:

The Employer reserves the right temporarily to transfer employees from one department to another.  The Contract wage scale of the department to which the temporary transfer is made, shall apply to the employee so transferred, provided, however, that in case of such temporary transfer, a man's wage shall not be reduced below that which he/she has ordinarily been receiving, and he/she shall receive the higher rate for the full day regardless of the number of hours worked in the higher-rated job classification.  A temporary transfer of more than one (1) month may be renewed for an equal and additional period of time, after which time the vacancy filled by such temporary transfer must be filled in accordance with normal procedure or abolished.

Margolis Edelstein
Tillman, Mariayna v. Pepsi
0070

B 056

## NET REVENUE SALES COMPENSATION

The Single Net Revenue Compensation Plan shall be governed by the following provisions.

*Section 1. Net Revenue Measure.* The compensation plan shall pay commissions to the Customer Representative that shall be a percent of the net revenue sales dollars generated from the accounts on the Customer Representative's route.

The net revenue to be utilized for purposes of the compensation plan shall be calculated from the net price on invoice for products times the number of units sold. This would apply to all case and package sizes, fountain tanks, BIB, CO2, cups, lids, straws and/or any other similar item sold by the Customer Representative on his/her route. Any items which are not sold by the CR will not be compensated under this plan. Examples of such items not covered are deposits on cases, shells or pallets and taxes.

*Section 2. Definition of a Route.* A route shall be defined as a roster of accounts which may change from time-to-time in accordance with the provisions of this Agreement.

*Section 3. Definition of the Compensation Plan Year.* For purposes of this Article, all references to a year or an annual basis shall be deemed to be a year beginning with Week 1 of Period 1 and ending with the last week of Period 13.

*Section 4. Pay Rates.* The following schedule of rates shall be in effect for the full term of this Agreement:

❑ **Conventional Customer Representative**

❑ **Single Commission:**    5.51% of net revenue sales

*Section 5. Route Cuts.*
The Company reserves the right to unilaterally cut any account from any route and reassign it to any other route or delivery system covered by this Agreement. The Company may also add any account to any route. In the event that a CR's route is cut more than 10% in revenue (based on prior year's revenue) he shall be eligible for the following route cut protection:

> The average weekly earnings from base pay and/or commission for the thirteen (13) weeks following the route cut shall be no less than the average weekly earnings from base pay and/or commission for the thirteen (13) weeks immediately preceding the route cut. Any payments due the CR's shall be made at the end of the thirteen (13) week protection period.

No route cut protection payment shall be made to any employee as a result of route changes from a total facility reroute / rebid, nor upon the request of the CR to have an account removed from his route, nor if the Company has been instructed by a customer to not have the CR or service its account.

Margolis Edelstein
Tillman, Mariayna v. Pepsi
0071

B 057

In the event that one or more routes are realigned such that an account is added to a route simultaneously with an account being deleted from that route, the route cut shall be based on the *net effect* of such addition and deletion.

Nothing in this section shall be construed as a limitation on the Company's ability to determine the size and/or frequency of route cuts.

Within the Sales Departments, the Company will limit the number of total facility re-routes to three (3) times during the term of the agreement (three (3) for the Bulk Sales Department and three (3) for the Conventional Sales Department.

*Section 6. Ongoing Route Bidding.* During the course of a year, the following information shall be provided on the bid sheet for a route which has come open and is eligible for bid:

- ❏ The roster of accounts for that route (with prior year volume and net revenue for each account);
- ❏ The total net revenue that has been generated from that roster of accounts year-to-date;
- ❏ The total number of cases and gallons sold in that roster of accounts in the prior year.
- ❏ The total number of cases and gallons sold in that roster of accounts year-to-date.

The minimum revenue to be posted on any route will be $650,000 in revenue, including the projected revenue from anticipated new store openings on that route.

*Section 7. Establishing a New Permanent Route.* In the event that a new and distinct route is created during the course of a year, that route shall be posted for bid and the following information shall be provided on the bid sheet:

- ❏ The roster of accounts for that route (with year-to-date and prior year volume and net revenue for each account);
- ❏ The total net revenue generated from that roster of accounts year-to-date and in the prior year and the current year; and
- ❏ The total number of cases or gallons sold in that roster of accounts year-to-date and in the prior year.

*Section 8. Establishing a Single-day Route (Customer Representatives Only).* In the event that a number of accounts from different routes required single-day service, the Company shall have the right (but shall not be obligated) to aggregate those accounts onto a single route(s) or routes(s) for the purpose of accommodating the Single Day service need. The route(s) shall be posted for bid and the Customer Representative(s) who secures the bid shall be paid the Single Net Revenue Commission rate for the total net revenue dollars for those accounts for that day. However, no commission shall be paid to the Customer Representative who regularly services that account.

A CR shall always have first preference for servicing his own accounts on each such days.

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0072

B 058

A CR who is required to work a sixth day in the workweek shall receive $80 plus the appropriate net revenue percentages for sales on that day. For the seventh day in the work week, the CR who is required to work, shall receive $106 plus the appropriate net revenue percentage.

**Section 9. _Relief Customer Representatives._** When a Utility Driver runs a route for a day, he shall be paid the higher of the Single Commission rate times the total net revenue dollars generated from the accounts on that route that day or eight (8) times the extra man hourly rate per day, whichever is greater. When a Utility Driver runs a route for a week, he shall be paid the higher of the Single Commission rate times the total net revenue dollars generated from the accounts on that route that week or forty (40) times the Utility Driver hourly rate.

However, no commission shall be paid to the Customer Representative who regularly runs that route.

**Section 10. _Shortages._** When a Customer Representative is short at the end of a day, he shall be charged at the wholesale price for those cases that he is short.

**Section 11. _Product Returns._** If a Customer Representative is required to bring back products that are out-of-date, damaged, etc., he shall not be charged for that product if reasons for the product return were not the fault of the Customer Representative. Customer Representatives shall not receive any commission on product that is provided in exchange for out-of-date, damaged, etc. product.

**Section 12. _Bulk Assist._** When the Company provides additional deliveries to a CR's account (i.e., Bulk Assist) the CR shall receive commission on the net revenue generated by such delivery. The Company reserves the right to establish procedures for the use of bulk assist.

**Section 13. _Other Provisions_**

In the event that a CR is required to deliver free goods not associated with the sale of any other product he shall be compensated as if the goods were sold at the average net price for such product.

☐   The "time and one half" rate for CR's shall be $80 and the "double time" rate shall be $106 plus any commissions earned. CR's shall be compensated at the "double time" rate plus holiday pay for working on a holiday.

☐   In the event that an account is removed from a CR's route that CR and their Manager will meet to discuss the disadvantage and /or benefits of that accounts removal.

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0073

- 13 -

B 059

## ARTICLE IX
## FLEXIBLE BENEFITS PLAN

Effective on or after January 1, 1996 all employees will be enrolled in the Pepsi-Cola Flexible Benefit Plan. During the life of this Agreement the Company reserves the right to modify the plan design, level of benefits, employer and/or employee contributions.

"Effective with the implementation of Flex Benefits the age at which an Employee can retire with an undiscounted retirement will be reduced from age 65 to 62 and the discount factor for retiring prior to age 62 will be changed from 3% to 4%.

The Company will guarantee that it will, each year, devote at least 90% of the total year 2000 Flexible Benefits per employee cost to providing Health and Welfare benefits to employees. In the event that the actual cost is below the 90% level, the Company will pay the difference in a lump sum to each member of the bargaining unit. This guarantee shall no longer apply in the event of the enactment of any State or Federal legislation dealing with health care reform.

## ARTICLE X
## MANAGEMENT'S RIGHTS

☐ The Employer has the sole and exclusive right to manage the affairs of the business, to determine the products, methods and schedules of production, the type of manufacturing equipment, the locations of production and to direct the working forces of the Employer. Such functions shall include (but are not limited to) the exclusive right to maintain discipline of employees, including the right to make reasonable rules and regulations, to promote, demote or transfer employees for proper cause, to determine the amount of work needed, and to layoff because of lack of work.

☐ Promotion shall be made from within, provided the employees available have the qualifications and ability to perform the work. In cases of promotions, seniority shall be considered provided the employee has the prerequisite skills and abilities required. The Employer shall be the sole judge of an employee's qualifications and ability.

## ARTICLE XI
## DISCHARGES

☐ Employer may discharge employees for any reasonable cause. If an employee who has completed his/her probationary period is discharged or permanently laid off, due to economic considerations of the Employer, such as reduction-in-force or abandonment of route, Employer shall give such employee at least one (1) week's notice of its intention to dismiss him or permanently lay him off, or one (1) week's compensation in lieu thereof. In the event an employee desires to leave his/her employment for any reason whatsoever, such employee shall give the Employer at least one (1) week's notice of his/her intention to do so.

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0074

- 14 -

❑    Any employee who has been discharged by the Employer shall be entitled to a hearing provided that he/she requests the same within forty-eight (48) hours after discharge. At such hearing which shall be held at the Employer's place of business within forty-eight (48) hours after requested, the employee shall have the privilege of being represented by the Business Agent or other duly authorized representative of the Union. If the parties cannot agree upon final disposition of the matter, it may be submitted to arbitration by the Union as provided by Article XIX.

❑    Employees are required to make all stops assigned and pick up all empties as necessary. Failure to do so may subject employee to discipline, up to and including discharge.

❑    Employer must make the decision whether a route shall go our or not in the case of bad weather. Under no circumstances shall it be left to the discretion of the employees to determine whether work should be performed or not, especially as far as bad weather days are concerned.

❑    Any employee who receives disciplinary time off shall receive such time off within one (1) week after the notice of such suspension is given to such employee, except in the case of the suspension of two (2) or more employees in the same department, in which event the disciplinary suspension may be staggered.

❑    In imposing discipline on a current charge, the Employer will not take into account any prior infraction which occurred more than twelve (12) months previously unless mutually agreed to by the parties.

❑    In the event a Driver shall suffer revocation of his/her driver's license due to his/her negligence, his/her job and seniority shall be protected for one (1) year. A second revocation of his/her license within a five (5) year period will result in his/her termination. The employee must notify the Employer of an active revocation of license on the next scheduled workday after the revocation.

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0075

- 15 -

## ARTICLE XII
## INJURIES AND ILLNESS

❑  When an employee is absent because of illness or injury for a consecutive period of fifty-two (52) weeks or more or the length of his active seniority, whichever is less, he/she shall not be entitled to retain his/her position with the Employer, and at the expiration of such period, the Employer may dismiss such employee, but if the employee returns to work prior to the expiration of such period, and is physically able to carry on his/her duties, he/she shall return to his/her employment at the same rate of pay.  Where the injury is incurred by the employee in the line of duty, he/she shall be returned to his/her former position whenever he/she is physically able to carry on his/her duties, but in the case of any Driver who is also a Salesman, as distinguished from a Driver who delivers predetermined orders, whose former route is being operated satisfactorily by another employee at the time such Driver is prepared to return to work, the Employer may assign such returning Driver to a new route, provided that he/she does not return to work within twenty-six (26) weeks from the date of the commencement of his/her absence.

❑  The Employer may voluntarily provide compensation to the employee during any such period of absence, but shall not be required to do so.

❑  If an extra man is assigned a route in the middle of a work week due to the protracted illness or injury of another employee, the route in question will re-bid in the extra man pool on the following Monday.

## ARTICLE XIII
## POLYGRAPH TEST

Employer will not require an employee to take a polygraph or lie detector test; however, nothing herein shall prevent an employee from voluntarily taking such a test.

## ARTICLE XIV
## UNIFORMS AND EQUIPMENT

Where Employer requires any employee in a department to wear a uniform, all employees in that department, except probationary employees, shall be supplied with uniforms. For the purpose of this Article, there shall be two (2) departments: (1) Inside Plant employees and (2) Drivers and other outside employees. The Employer shall have the option to determine whether such uniforms shall be purchased outright or rented. The Employer shall purchase or pay the rental charge. The Employer shall post a notice to all employees two (2) times per year (Spring and Fall) informing employees where and when they may obtain replacement uniforms. The Employer shall have the right to discipline any employee for not being presentable and to discharge such employee for repeated violations.

- 16 -

Margolis Edelstein
Tillman, Marlaynx v. Pepsi
0076

The Employer shall supply wagons, trucks, or other necessary equipment (Service employees will be required to own and maintain the basic tools necessary for the job). Except in the case of his/her own negligence, an employee shall not be responsible for damage to equipment in his/her charge and control, but shall be obliged to furnish witnesses or evidence to fix other responsibility.

### ARTICLE XV
### LAYOFF

For the purposes of this agreement, departments will be defined as follows:

**Manufacturing**
- ❑ Warehouse
- ❑ Manufacturing Employees

**Sales**
- ❑ Conventional
- ❑ Combo
- ❑ On-Premise
- ❑ Bulk
- ❑ Extra Men

**Transport**

**Service (MEM)**
- ❑ Master Mechanic
- ❑ Mechanic

Any layoff or reduction-in-force will be accomplished by department by Company-wide seniority. In the event of a layoff or reduction in force the least senior person, with the least amount of accumulated department seniority in the affected department will be laid off. In the event of a layoff of any permanent employee, the employee will be given notice of one (1) week in advance of the layoff. Any employee who is laid off may, within forty-eight (48) hours of such lay-off, bump a junior person in another department provided that the employee possesses the necessary skills and ability. In the event such employee is determined by the Employer not to possess the necessary skill/ability to perform the job, the Company will provide affected employee and his/her Union Representative with an explanation as to why the employee was determined to be unqualified.

All active Fountain and Full Service Drivers hired prior to January 1, 1991 will not be laid off as a direct result of the combination of Retail and On-Premise routes.

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0077

B 063

## ARTICLE XVI
### RECALL

❑　When the Employer's workforce is permanently increased after a layoff, employees on layoff are to return to work according to seniority. Employees will retain recall rights for one (1) year from the date of layoff. In the event of a recall, the laid off employee shall be given notice of the recall by certified letter sent to the address last given to the Employer by the employee. Within ten (10) working days of the mailing of such letter, as indicated on the certified mail receipt, the employee must notify the Employer of his intent to return to work. In the event the employee fails to provide such notice, he shall lose all seniority rights under this Agreement and shall be considered as a voluntary quit.

❑　Selection of vacation by the employee is to be made in the proper order of seniority in the department where he/she is presently employed.

❑　Upon request, the Steward will be given an up-to-date seniority list, but not more often than once every three (3) months.

❑　Extra Drivers who are assigned to routes during a layoff in the extra man pool shall be entitled to return to the extra man pool when junior extra drivers are recalled.

❑　For the purpose of this Article, the departments are Sales, Manufacturing, Service (MEM) and Transport.

## ARTICLE XVII
### JOB VACANCIES

All job vacancies or new jobs created by the Employer in the bargaining unit will be posted for a period of five (5) work days in the department and throughout areas where employees work. In filling such vacancies, or new jobs, the Employer shall consider the senior interested employee who possesses the necessary skill and ability as determined solely by the Employer.

❑　**Posting**

Open or new jobs will be posted for five (5) working days in the entire bargaining unit prior to being filled from the outside. The posting will set forth the requirements of the job and the qualifications needed. Temporary or seasonal jobs will not be posted for bidding.

❑　**Bidding**

Employees wishing to be considered for a job opening must file a written bid form with the employee's immediate supervisor during the five (5) day posting period. Employees on vacation who feel qualified for possible job openings must inform their union steward and supervisor prior to going on vacation if they are to be considered for a bid.

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0078

- 18 -

B 064

❑    Filling Jobs

Preference in bidding will be given to employees in the Department in which the opening occurs.    The job will be awarded based on the employee having pre-requisite qualifications within the Department with further consideration of the employee's seniority.  For employees possessing equal skills and ability, the most senior employee shall be awarded the bid.  If no employee within the Department qualifies, candidates from other departments who are qualified will be awarded the job based on Company seniority.  In the Sales Department only Extra Driver Salesmen will be eligible to select temporary vacancies.  A temporary vacancy is defined as any approved absence where a regular full-time employee still retains a right to that bid.  All Extra Driver Salesmen will select temporary vacancies by seniority on a weekly basis every Monday except, however, when an Extra Driver Salesmen selects a temporary vacancy he shall remain in that position until the regular full time employee returns or the temporary vacancy is declared permanent and posted for permanent bid.

❑    Testing

The Company reserves the right to utilize testing and other evaluative measures to determine the relative skills and abilities of employees (i.e. – Service Department, etc.).  The testing will be performed in a uniform fashion and the employee's results reviewed with the employee, but in an effort to preserve its confidentiality, no copies will be issued.

❑    Trial Periods

During a trial period, the successful bidder in a classification may be reasonably disqualified from that job if he fails to perform it in a satisfactory manner.  If an employee is disqualified, he will return to his previous job/shift.  The trial period for an employee new to a classification will be a period up to four (4) weeks on the job in which to demonstrate his/her ability to permanently hold the position.

❑    Re-Bidding

A successful bidder who qualifies for an open position may not bid for any other position for one hundred and eighty (180) calendar days after he is placed in the job for which he bid. If a successful bidder is disqualified from a position after being awarded a bid, he may not bid for any position within the same job classification for one hundred and eighty (180) calendar days after he was placed in the job for which he bid.  This person could, however, bid into any other job classification.

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0079

- 19 -

B 065

The Company reserves the right to allow an employee to bid for a position requiring a CDL license when he does not possess a CDL license at the time of the bid. In such a case, if that employee is subsequently disqualified from the job because he fails to obtain his CDL, the Company will only award a bid to that person for CDL required positions after he receives his CDL license. Once the employee obtains his CDL, he may rebid for any CDL required position (other than the specific job for which he was disqualified) within the 180 days outlined above. Commissioned Drivers may have only two (2) successful bids in one (1) year, and may bid for those two opportunities without being restricted to the above 180 day time period outlined above.

## ARTICLE XVIII
## DISCRIMINATION AND UNION ACTIVITY

The parties hereto agree not to use any subterfuge, coercion, or intimidation, directly or indirectly, to evade or frustrate compliance with the spirit and terms of this Agreement. No employee shall engage in any Union activities on the Employer's premises or during working hours.

Employer and Union agree that the provisions of this Agreement shall apply to all employees covered by the Agreement without regard to race, creed, color, religion, national origin, sex, age, handicap or veteran status.

## ARTICLE XIX
## CHECK-OFF OF UNION DUES

On each weekly payday, Employer shall deduct Union dues, assessments, contributions to the Credit Union and special funds in an amount specified by the employee, in writing, and subscription costs to "DRIVE", on the first payday following the thirtieth (30th) day of employment for new employees, initiation fees, from the wages of all members of the Union who voluntarily sign authorizations for such actions which shall be irrevocable for the term of this Agreement or for one (1) year, whichever is less, and which shall be automatically renewable for a like period, and which shall be delivered by Union to Employer, and Employer shall promptly remit the sum of such deductions to the Secretary-Treasurer, or other duly authorized representative of the Union.

The Company agrees to make one voluntary check-off available for employee's to select optional long term disability insurance coverage and / or to participate in the UNION severance program.

The Union agrees to indemnify and hold harmless the Company for any and all actions it takes in complying with this Article.

- 20 -

Margolis Edelstein
Tillman, Marlayna v. Pepsi
0080