IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARLAYNA G. TILLMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 04-1314-SLR |
| | ) |
| THE PEPSI BOTTLING GROUP, | ) |
| INC., and TEAMSTERS LOCAL | ) |
| UNION 830, | ) |
| | ) |
| Defendants. | ) |

Barbara H. Stratton of Knepper & Stratton, Wilmington, Delaware.  Counsel for Plaintiff.
Of Counsel:  J. Stephen Woodside of J. Stephen Woodside, PC, Norristown,
Pennsylvania.

Clifford B. Hearn, Jr., Odessa, Delaware.  Counsel for Defendant Teamsters Local
Union 830.  Of Counsel:  Marc L. Gelman of Jenning Sigmond, PC, Philadelphia,
Pennsylvania.

Leslie Carol Heilman & William M. Kelleher of Ballard, Spahr, Andrews, & Ingersoll,
LLP, Wilmington, Delaware.  Counsel for Defendant The Pepsi Bottling Group, Inc.  Of
Counsel:  Daniel V. Johns, Lucretia C. Clemons & Aisha M. Barbour of Ballard Spahr
Andrews & Ingersoll, LLP, Philadelphia, Pennsylvania.

## MEMORANDUM OPINION

Dated:  March 19, 2008
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On September 29, 2004, Marlayna Tillman ("plaintiff"), an African-American

female, filed the present action against The Pepsi Bottling Group, Inc. ("Pepsi") and

Teamsters Local Union 830 ("the Union") (collectively, "defendants"). The complaint

charges defendants with racial discrimination, gender discrimination, retaliation,

discriminatory failure to promote, violation of the Fair Labor Standards Act of 1938

("FLSA"),[1] and violation of the Equal Pay Act of 1963 ("Equal Pay Act").[2] (D.I. 1 at ¶¶

72-110) On October 14, 2005, Pepsi filed a counterclaim for fraud and unjust

enrichment. (D.I. 25 at 16-28) Plaintiff requests monetary relief, in an amount to be

determined at trial.[3]

After the close of the discovery period, the Union filed a motion for summary

judgment. (D.I. 105) Pepsi filed two motions for summary judgment – one on plaintiff's

claims and another on its own counterclaims. (D.I. 109; D.I. 111) In addition, Pepsi

asks for sanctions for plaintiff's alleged bad faith conduct. (D.I. 109) These three

---

[1]The FLSA is codified at 29 U.S.C. §§ 201 et. seq. Specifically, plaintiff alleges violations of 29 U.S.C. §§ 206(d), 207, and 215(a)(2). Section 206(d) is referred to as the Equal Pay Act, passed as an amendment to the FLSA, in 1963. The court will discuss the FLSA and Equal Pay Act separately in keeping with the parties' chosen method of briefing, however, the Equal Pay Act is part of the FLSA. Id.

[2]The complaint included counts of sexual harassment, violation of the Delaware Wage Payment and Collection Act, and breach of the covenant of good faith and fair dealing. (D.I. 1 at ¶¶ 72-110) Pursuant to the court's order of August 30, 2005, these charges were dismissed.

[3]Plaintiff's claims for relief include a request for a court declaration that defendants violated her rights, appropriate back pay with pre-judgment interest, compensation for non-pecuniary losses, compensation for past and future pecuniary losses, punitive damages, and attorney fees. (D.I. 1)

motions are currently before the court. The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the following reasons, the Union's motion (D.I. 105) is granted, Pepsi's motion for summary judgment on plaintiff's claims (D.I. 111) is granted in part and denied in part, and Pepsi's motion on its counterclaims for fraud and unjust enrichment (D.I. 109) is denied.

## II. BACKGROUND

On May 8, 2001, plaintiff was hired as a merchandiser for Pepsi's sales department. (D.I. 113, ex. 3 at 107:22-108:1) The sales department includes multiple sub-departments and positions, some of which are union and others are non-union.[4] (Id., exs. 5, 6) "Merchandiser" is a non-union position within the sales department, not covered by the CBA.[5]  (Id.)  Plaintiff does not dispute that, while working as a merchandiser, she was neither a union member nor entitled to union wages or protections. (D.I. 115 at 3) As a merchandiser, plaintiff received an hourly rate of $10.57 and an occasional stipend to reimburse her for mileage incurred while using her personal car for company deliveries. (Id.)  Plaintiff received the same rate of pay as

---

[4]Union positions are governed by the collective bargaining agreement ("CBA") between Pepsi and the Union and are paid in accordance with the CBA. Non-union positions are not governed by the CBA and generally are paid a lower hourly rate than the union positions. (D.I. 113, ex. 5 at 28, ex. 7)

[5]The job summary of a merchandiser is "providing customer support by maintaining shelf space, displays, etc. according to Pepsi standards." (D.I. 107 at A69) A merchandiser's primary job responsibilities are "merchandising store shelving, coolers, and displays with Pepsi products in accounts assigned by [a] supervisor, utilizing point of purchase in each account, keeping [the] back room stock in neat and orderly position, communicating sales results to the store and Pepsi management, and building customer relations at [the] store level." (Id.)

2

other Pepsi merchandisers.[6]  (D.I. 113, ex. 7)

A few months after starting work, plaintiff sustained an injury when a wood chip entered her eye. (D.I. 1 at ¶ 13)  As a result of this incident, plaintiff missed two days of work.  (Id.)  Upon returning to work, plaintiff's supervisor, Bruce Wray ("Wray"), told her that she would not be paid for the two missed days.  (Id.)  Plaintiff reported the incident to Pepsi's human resources department ("HR"), requesting payment for the two missed days.  (Id.)  In October 2001, Wray told plaintiff that the convenience store department,[7] a sub-department of sales, was "getting hammered" and that she would be "helping out over there."[8]  (D.I. 107 at A16, 413:1-5)  From October 2001 through May 2002, plaintiff assisted the convenience store department by performing new duties in addition to her prior ones.  (Id. at A17, 115:16-117:24)

When assisting the convenience store department, plaintiff often engaged in deliveries.  (Id. at A6, 115:16-117:24)  Plaintiff's duties, usually performed with a permanent member of the convenience store department, included the following:  drive to a given store; perform cooler resets; and stock the coolers, vending machines, or

---

[6]Internal payroll records show that, as of December 31, 2001, Pepsi employed eight merchandisers, including plaintiff, all of whom were paid the same hourly rate. (D.I. 113, ex. 7)

[7]Throughout their submissions, the parties refer to plaintiff's time spent in the "conventional" department. The conventional department primarily services convenience stores and small retail establishments. (D.I. 113, ex. 3 at 113, ex. 30 at 136-37)  For clarity, the court refers to the "conventional" department as the "convenience store" department.

[8]The convenience store department instituted an incentive program referred to as the "Space Race" campaign, that Pepsi offered to its convenience store customers. (D.I. 113, ex. 8 at ¶¶ 4-5)  Employees in the convenience store department needed help from other Pepsi departments during the Space Race campaign.  (Id.)

appropriate storage area. (Id.) Plaintiff's duties were similar to the duties of a relief

driver.[9] (Id. at A7, 189:18-190:10) The relief driver position is a union position, covered

by the CBA, and is paid a significantly higher hourly rate than that of a merchandiser.[10]

(D.I. 113, ex. 5 at 28) Despite having similar responsibilities, plaintiff did not perform all

of the specified relief driver duties. Plaintiff did not sell products directly to customers,

collect sales revenues, or detail transactions in a route book. (Id., ex. 3 at 241:4-14) At

this point in time, plaintiff had not applied for a position as a relief driver or obtained a

valid "Class-A" Commercial Driver's License ("CDL-A"), a requirement for all relief

drivers.[11] (D.I. 107 at A7, 190:11-20, A70)

---

[9]A relief driver's job summary is to "act as a fill-in driver for the absence of a regularly scheduled driver by selling, merchandising and servicing customers on an assigned route (as well as fulfilling miscellaneous duties assigned by [a] manager)." (D.I. 107 at A70) A relief driver's primary job responsibilities are

selling and executing all promotions, services all scheduled customers by the end of [his or her] shift, merchandising all accounts to local standards, filling coolers, racks, displays and vendors as necessary, keeping accurate route books on assigned accounts, maintaining clean, well organized trucks, settling up using the correct procedures according to [company] policy, and delivering bulk loads if necessary.

(Id.)

[10]The union rate for relief drivers is $16.63 per hour or higher, while plaintiff made $10.87. (D.I. 116 at B012 ¶ 15, B075-B076)

[11]Plaintiff and Pepsi disagree as to what degree plaintiff was offered proper training or a realistic opportunity to obtain a CDL-A. Pepsi allowed plaintiff to train for her CDL-A by driving with licensed employees while working in the convenience store department. (D.I. 113, ex. 3 at 245:16-22) In May 2002, plaintiff took and failed the written test for a CDL-A. (Id., ex. 3 at 243:17-24) According to HR representative Sarah Swartz Altman ("Altman"), plaintiff had additional opportunities to train for the CDL-A over the next few years, including the option of using a Pepsi truck to train during her non-working hours. (Id., ex. 8 at ¶ 9) In contrast, plaintiff contends that Pepsi did not make training available to her to the same extent it did for other

4

Plaintiff complained to HR multiple times, requesting admission into the Union

because of the length of time she assisted the convenience store department and the

similarities between her "temporary" duties and the day-to-day duties of a relief driver.

(D.I. 1 at ¶¶ 34-35; D.I. 116 at B011 ¶ 12-B012 ¶ 13) Other merchandisers, in addition

to plaintiff, temporarily assisted the convenience store department. Three

merchandisers - Matt Fields, Mark Maragus, and Dave Zimbala - also aided the

convenience store department. (D.I. 113, ex. 30 at 145:14-20, 148:5-149:7) However,

Pepsi employment records indicate that plaintiff's assigned duties in the convenience

store department, paid at a merchandising rate, lasted for much longer than the similar

duties of these three employees.[12] (D.I. 117 at B108, B112)

While plaintiff assisted the convenience store department, HR told her that she

needed to become a union member before formally bidding for an available driver

position. (D.I. 116 at B012 ¶ 17) Plaintiff told HR she wanted a transfer to an available

warehouse or production position, either of which would allow her to become a union

employees and "does not recall" any offers to use a Pepsi truck to train during her non-
working hours. (Id., ex. 3 at 243:1-4, 245:2-7) Plaintiff says she was "always given . . .
an excuse as to why . . . there were no trucks available." (Id., ex. 3 at 248:13-15) In
her deposition, Altman also indicated that Pepsi researched local truck driving schools
for plaintiff and agreed to permit her to take a leave of absence to attend one of the
schools, an offer which plaintiff declined. (Id., ex. 8 at ¶ 9) Plaintiff does not dispute
that Pepsi gave her this offer.

[12]Matt Fields was employed by Pepsi for only three weeks. (D.I. 117 at B108)
Dave Zimbala worked for just eleven weeks at a merchandiser rate. (Id. at B112) Mark
Maragus, a summer employee who occasionally helped out during the year, worked
over five years at a merchandiser rate, occasionally assisting the convenience store
department. However, the amount of time Maragus spent assisting the convenience
store department is unclear. (D.I. 113, ex. 30 at 148:5-25) Plaintiff worked in this
capacity from October 2001 through May 2002 – a span of roughly eight months. (D.I.
107 at A6, 115:18-20)

member and begin building seniority for an eventual bid on the driver position. (D.I. 113, exs. 5, 8 at ¶ 11)

On May 28, 2002, plaintiff stopped assisting the convenience store department and returned to full-time merchandising. (Id. at B012 ¶ 15) Shortly thereafter, Pepsi hired three employees, Christopher Eastlack, Leroy Lewis, and Santos Robles, directly into the warehouse. These three individuals filled positions previously requested by plaintiff, despite their lack of previous employment with Pepsi. (Id. at B003 ¶ 18, B012 ¶ 16, B020-B022)

In June 2002, Pepsi granted plaintiff a union warehouse position. (Id., ex. 8 at ¶ 11) Plaintiff immediately complained to HR that she lacked proper union seniority[13] because Pepsi hired the three additional employees before transferring her to the warehouse, despite her previous requests to join the warehouse workforce.[14] (Id.)

Because Pepsi products are in high demand between Memorial Day and Labor Day, "business needs" did not allow plaintiff to be transferred from her old merchandising position to her new union warehouse position for a few weeks. (Id.) Other Pepsi employees experienced similar treatment. For instance, John Osciak, a Pepsi employee, won a job bid on May 27, 2002 but remained in his prior position until August 6, 2002. (Id.)

---

[13]The specific benefits of union seniority are an increased ability to bid for positions, transfers, and promotions. In addition, a union member with higher seniority may exercise "bumping rights," essentially the privilege of passing off less desirable tasks or duties to a union member with less seniority. (D.I. 115 at 9 ¶ 26)

[14]This complaint is based on plaintiff's understanding that Pepsi has a policy of filling positions from within before hiring new employees. (D.I. 1 at ¶¶ 40-43) However, the court finds no evidence of such policy.

6

On July 21, 2002, plaintiff became a dues-paying union member in accordance with the CBA. (Id., ex. 3 at 411:6-12) Pepsi transferred plaintiff to the warehouse along with two other employees – Stan Coleman and Bill Becker. (Id., ex. 8 ¶ 10) All three transferees received the traditional hourly rate for new union members, $12.68.[15] Based on plaintiff's requests and because all three transfers occurred internally, plant manager Phil Weber allowed all three transferees to be retroactively paid the full union rate of $15.75 as of their transfer date. (Id., ex. 8 at ¶ 12)

After a few weeks in the warehouse, plaintiff complained to HR that she was sexually harassed by other warehouse workers and subjected to frequent sexual innuendos.[16] After she submitted this complaint, plaintiff described "retaliatory behavior towards [her], in the form of excessive scrutiny."[17] (D.I. 1 at ¶ 51) On August 28, 2002, plaintiff filed a charge of discrimination against Pepsi with the Delaware Department of

---

[15]The CBA requires that new union members initially receive 80% of the traditional union hourly rate for a short period of time before receiving the full hourly rate, in this case $15.75. (D.I. 113, ex. 3 at 179, 184-85)

[16]Because plaintiff's sexual harassment count has been dismissed, the court declines to give a detailed description of the incidents.

[17]For instance, on August 27, 2002, Glenn Matthews and Tom Riley, two warehouse supervisors, reprimanded plaintiff for leaving the warehouse facility the night before without checking with Lou Papilli, the supervisor on duty. (D.I. 116 at B028) However, plaintiff and another warehouse employee, Karl Riley, had apparently been "given the ok" to leave. (Id.) Glenn Matthews also told plaintiff that she was not a "team player" because she did not assist other employees who were still working when she clocked out for the evening. (Id.) In response, plaintiff states that she assisted other employees before clocking out by helping them build product pallets. (Id.) On another occasion, Riley threatened to fire plaintiff for "walking the dog" – an unsafe procedure where a worker "walks" besides his or her forklift while it is in gear. (Id.) However, plaintiff was unaware that "walking the dog" was forbidden and observed several other employees routinely "walking the dog" without reprimand. (Id.)

Labor ("DOL"), alleging race and sex discrimination. (D.I. 116 at B024)  Plaintiff reported
to the DOL that Pepsi had denied her various promotional opportunities, particularly for
driver positions, subjected her to disparate treatment with regard to terms and conditions
of employment, and held her to a higher standard than her white male co-workers. (Id.)
Plaintiff also told the DOL that she was paid lower wages than her white male
counterparts, despite performing the same work. (Id.)

On September 18, 2002, Pepsi laid off plaintiff and eighteen other employees.
(D.I. 113, ex. 12)  The CBA provided that the union members should be laid off
according to their respective seniority. (Id., ex. 5 at 17)  Pepsi recalled plaintiff to work
on October 19, 2002, but did not intend to pay her for the four weeks she was without
work. (D.I. 115 at B013)  Upon plaintiff's recall, she filed a grievance with the Union to
obtain back-pay for the previous four weeks. (D.I. 107 at A74)  Plaintiff contends that
Pepsi failed to properly lay off and recall employees in accordance with seniority. (Id.)
After a grievance hearing on November 20, 2002, Pepsi agreed to pay plaintiff in full for
the time she was out of work. (D.I. 113, ex. 3 at 255:10-13)

Plaintiff's warehouse supervisors created a disciplinary file on her after she
returned from her time off. (Id., ex. 3 at 255:16-257:24; D.I. 115 at ¶ 29)  Plaintiff
contends that her supervisors recorded "every minor infraction . . . including 'infractions
involving conduct no other employee was disciplined for.'"[18] (D.I. 115 at ¶ 29)  On one
occasion, plant manager Weber verbally reprimanded plaintiff for answering her cell
phone while walking through the plant, a practice that was not banned by a formal

---

[18]Plaintiff claims that Pepsi wrote her up multiple times without her knowledge,
including when she came to work only a few minutes late. (D.I. 1 at ¶ 59)

8

written policy and that plaintiff witnessed other employees engaging in without reprimand.  (D.I. 1 at ¶¶ 60-61; D.I. 107 at A76; D.I. 113, ex. 3 at 256:18-257:17)

In April 2003, plaintiff complained to both Pepsi's local and corporate HR departments that Joe Rizzo ("Rizzo"), a supervisor in the production department, "ma[de] racial and derogatory comments about African-Americans, Hispanics and women" in plaintiff's presence.[19]  (D.I. 1 at ¶ 63, D.I. 116 at B013 ¶ 22)  After filing these two complaints, plaintiff noticed "an immediate change in Rizzo's attitude towards her."  (Id.) Shortly after this occurrence, Pepsi transferred plaintiff into the production department, where she assumed a position requiring her to report directly to Rizzo.  (Id.)  On three occasions, plaintiff requested a transfer to a position with a different supervisor, but Pepsi denied all three requests.  (Id.)

While in the production department, plaintiff unsuccessfully bid on three union positions – one in April 2003 for a jockey/loader position ("jockey position") in the transport department and two additional route loader positions in May 2003.  (D.I. 113, ex. 3 at 140:1-142:16; D.I. 115 at ¶¶ 33, 36)  The jockey position went to Gary DiProsperos ("DiProsperos"), an employee with more seniority than plaintiff who transferred from another Pepsi plant to the Wilmington plant.[20]  (D.I. 113, ex. 3 at 141:2-13, ex. 29)  The two loader positions went to Christopher Eastlack and Leroy Lewis, both

---

[19]There is no evidence before the court of any disciplinary action taken against Rizzo.

[20]Plaintiff claims that, despite her willingness for training, management did not train her and "forced" DiProsperos into the position despite his specific objections to working that particular shift.  (D.I. 116 at B040-041)

9

of whom had more seniority than plaintiff.[21]  (Id., ex. 3 at 142:1-5, ex. 29)

On November 6, 2003, plaintiff suffered an injury to her right knee and calf while climbing out of truck and Pepsi placed her on short term disability.  (Id., ex. 3 at 44:5-6, 88:24-89:12)  As a result of this injury, plaintiff missed work from November 6, 2003 until April 19, 2004.  (Id.)  Plaintiff alleges that she failed to receive any short term disability compensation from Pepsi until she resumed work in April 2004 because HR "forgot to file the paperwork."  (D.I. 1 at ¶ 65; D.I. 115 at ¶¶ 38-39)  Plaintiff subsequently received a total of $7,700 in short term disability payments.  (D.I. 113, ex. 17)  Plaintiff also filed a workers' compensation claim for this period of time, claiming "total disability" for the entire time she was out of work.  (Id.)  Plaintiff and Pepsi settled the workers' compensation claim on June 14, 2004 and plaintiff received an additional check for $4,934.29 as well as $3,790.29 in attorney fees.  (Id.)

Upon plaintiff's return, Pepsi assigned her to the can-line filler room in a position that again reported to Rizzo.  (D.I. 116 at B006, B014)  Rizzo and plaintiff's other supervisor, Dave Staib, told her that she must stand all day, despite her repeated complaints that her leg was swollen and painful.  (Id.)  Plaintiff asked both supervisors for an accommodation in the can-line filler room or a transfer to a more manageable position.  (Id.)  Plaintiff's supervisors denied her request even though plaintiff previously worked in other positions at Pepsi that placed less strain on her leg.  (Id.)  On June 1,

---

[21]While plaintiff concedes that Christopher Eastlack and Leroy Lewis had more seniority, she contends that the reason why they were ahead of her on the seniority list was because Pepsi inappropriately hired them directly into the warehouse before transferring plaintiff into the warehouse.  (D.I. 116 at B003 ¶ 18, B012 ¶ 16, B020-B022)

2004, plaintiff seriously aggravated her leg injury. (D.I. 113, ex. 3 at 48:15-49:3) Her

supervisors said that she must go on leave if unable to complete her assigned duties.

(Id.) Once again, Pepsi offered plaintiff no accommodations. (Id.) On June 1, 2004,

plaintiff went on leave until June 25, 2004.[22] (D.I. 1 at ¶ 66)

During this time, the DOL investigated plaintiff's claims of race and gender

discrimination against both Pepsi and the Union.[23] (D.I. 116 at B024, B032) On July 1,

2004, the DOL found cause on plaintiff's charges against both Pepsi and the Union and

issued two right-to-sue letters. (Id. at B015) Plaintiff took three weeks vacation time

from August 8, 2004 to August 30, 2004. (Id.) During this vacation time, plaintiff

---

[22]Plaintiff applied for and was denied workers' compensation related to the
aggravation of her injury. (D.I. 113, ex. 19)

[23]The "Notice of Reasonable Cause Finding" that the DOL issued to plaintiff
found that plaintiff received worse treatment than that of her co-workers. (D.I. 113, ex.
2) More specifically, the DOL found that the documentation Pepsi provided showed
that

> the same attendance records for her co-workers do not reflect the same
> amount of scrutiny on a regular basis as [plaintiff's] in regards to being less
> than five minutes late to work. Specifically, the punch detail reports reflect
> that there are male employees who are routinely late for work, but records
> disciplining these individuals in the form of written reprimands are not
> available.

(Id.)

The DOL also found that

> witnesses were contacted and asked about their schedules, the number of
> hours they are afforded each week, the disciplinary [action] received or not
> received regarding their work schedules and the use of personal cell phones
> on the job. The results of these interviews clearly revealed that [plaintiff's]
> male counterparts are treated more favorably than [plaintiff].

(Id.)

11

participated in a press conference sponsored by the National Association for the

Advancement of Colored Persons ("NAACP"), speaking about the negative employment

conditions she suffered at Pepsi.[24]  (Id.)

In September 2004, plaintiff secured a driver position in the transport department,

the same position she had unsuccessfully bid on earlier.  (D.I. 116 at B015)  On

November 22, 2004, plaintiff faxed Pepsi a note from her primary care physician stating

that she could not work because of stress.[25]  Plaintiff requested, and Pepsi granted, a

leave of absence based on the representations of her physician's note.  (D.I. 110 at ¶

14)  In December 2004, Pepsi discovered that plaintiff worked for another employer, J.B.

Hunt, during this leave of absence.  (D.I. 113, ex. 27)  Pepsi immediately fired plaintiff,

effective December 2, 2004, the day after her dual employment was discovered.  (Id.,

ex. 28)  On January 3, 2005, plaintiff admitted her employment and receipt of wages

from J.B. Hunt during her absence from Pepsi.  (Id., ex. 27)

### B.  Plaintiff's Employment History

From May 8, 2001 to November 6, 2003, plaintiff was an active, full-time Pepsi

employee.  (D.I. 116 at B012 ¶ 1)  On November 6, 2003, plaintiff was injured at work,

---

[24]In the complaint, plaintiff explains that the NAACP was "brought in to
investigate complaints by minority employees regarding disparate treatment and hiring
practices."  (D.I. 1 at ¶ 70)

[25]Pepsi received this note from Dr. Andrew Nash, a primary care physician.  (D.I.
113, ex. 24)  Several months earlier, plaintiff received treatment from a licensed
psychiatrist who "diagnosed" her with "malingering."  (Id., ex. 25)  The fourth edition of
the Diagnostic and Statistical Manual of Mental Disorders, a manual published by the
American Psychiatric Association, describes malingering as "the intentional production
of false or grossly exaggerated  physical or psychological symptoms, motivated by
external incentives . . . ."  American Psychiatric Association: Diagnostic and Statistical
Manual of Mental Disorders, 4th Edition (2000).

sustaining damage to her right knee and calf while climbing out of a Pepsi truck. (D.I. 113, ex. 3 at 88:34-107:20)  Because of her injuries, plaintiff went on short term disability leave until April 19, 2004. (Id.)  Plaintiff filed a workers' compensation claim and received monetary compensation in the amount of $8,724.58, including attorney fees, from Pepsi. (Id., ex. 17)  The settlement agreement indicates that plaintiff received the payment because she was totally disabled and unable to work from the time of her injury to the date of her return to Pepsi. (Id.)  However, plaintiff claims that her attorney at the time, Beverly Bove ("Bove"), handled all settlement negotiations and that plaintiff accepted settlement money based on the sole understanding that she "was entitled to it."[26] (Id., ex. 3 at 88:24-98:24)  When asked whether Bove explained that the workers' compensation was contingent on total disability, plaintiff said, "again, that's the part that is unclear to me.  I don't know why I received that money.  My attorney did not make that clear to me, did not specify to me what that money was for."  (Id.)

In March 2004, while on leave from Pepsi, plaintiff applied for and accepted employment with RJM Vending ("RJM").[27] (Id., ex. 18)  RJM hired plaintiff as a vending machine technician, a job that required driving a company vehicle and restocking vending machines. (Id., ex. 3 at 44:15-45:17)  Plaintiff resigned after just one week because her swollen leg did not allow her to adequately perform her job responsibilities. (Id., ex. 3 at 42:9-10)  In addition, plaintiff's RJM salary was significantly less than her

---

[26]Plaintiff does not recall giving her attorney permission to sign the settlement check on her behalf.  (D.I. 113, ex. 3 at 89-98)

[27]Plaintiff stated that Bove told her she should attempt to mitigate damages with some sort of work.  (D.I. 116 at B014)

salary at Pepsi. (Id., ex. 3 at 42, 46, ex. 8 at ¶ 14) Plaintiff never advised Pepsi of her
employment at RJM. (Id.)

Before returning to Pepsi, plaintiff applied for work with Cott Beverage Company
("Cott"). (Id., ex. 3 at 49:1-51:24, 54:5-55:24) Plaintiff returned to Pepsi in April 2004
and assumed a position in the can-line filler room. (D.I. 116 at B006, B014) Despite
plaintiff's requests for an accommodation to allow her to continue working at Pepsi, her
managers gave her the choice of either effectively performing her assigned duties or of
taking another leave of absence, which she did. (Id.) Six days after taking the leave of
absence, plaintiff started working for Cott as a switcher. (D.I. 113, ex. 3 at 46:15-24, ex.
20) The switcher position that plaintiff accepted at Cott had similar duties to those for
which plaintiff was responsible at Pepsi. (Id., ex. 3 at 47:1-24) Plaintiff's employment
with Cott was short-lived; Cott fired her after just three days for missing a training
session when "the pain in [her] leg flared up." (D.I. 116 at B015) Plaintiff briefly returned
to Pepsi until Pepsi discovered her active employment status with J.B. Hunt.[28] (D.I. 113,
ex. 8 at ¶¶ 17, 18) Pepsi proceeded to fire plaintiff. (Id.)

## C. Plaintiff's Relationship with the Union

After being transferred to a warehouse position on July 22, 2002, plaintiff officially

---

[28]On or about November 22, 2004, plaintiff faxed to Pepsi a doctor's note from
her primary care physician stating that she could not work due to stress. (D.I. 113, ex.
23) Pepsi granted plaintiff another leave of absence based on this note. (See id.)
During this leave of absence, plaintiff began working for J.B. Hunt ("Hunt"). (D.I. 116 at
B015 ¶ 44) Plaintiff applied for employment with Hunt on November 29, 2004, where
she performed duties similar to her then position at Pepsi as a transport driver. (Id., ex.
26; D.I. 113, ex. 3 at 60)

became a recognized member of the Union.[29]  (D.I. 1 at ¶ 44)  Plaintiff filed multiple

grievances with the Union after officially assuming union membership.  (D.I. 106 at 8-11;

D.I. 107 at A72-A82)  The grievances filed include the following:

- Grievance No. 489 (October 17, 2002).  Plaintiff protested a management
  decision that sent her home despite being scheduled to work a particular shift.
  Plaintiff, Pepsi's HR Director, Pepsi's Plant Manager, and a union agent attended
  a grievance hearing and settled the matter by mutual consent.  (Id.)

- Grievance No. 662 (November 20, 2002).  Plaintiff alleged that her supervisors
  sexually harassed her.  Plaintiff, Pepsi management representatives, and union
  agents attended a grievance hearing that resulted in the establishment of an
  "open door policy" of an unspecified nature.  (Id.)

- Grievance No. 663 (November 20, 2002).  Plaintiff alleged that, earlier in the year,
  Pepsi had not laid off employees according to seniority.  Plaintiff, Pepsi
  management representatives, and union agents discussed the matter in a
  grievance hearing and plaintiff received payment and benefits for the entire period
  she was out of work.  (Id.)

- Grievance No. 665 (November 20, 2002).  This grievance is the first of multiple
  grievances plaintiff filed to obtain retroactive union seniority and back-pay for the
  work she performed in the convenience store department between October 2001
  and May 2002.  Because other grievances address the same issue, plaintiff

---

[29]Plaintiff contends that she held a "union-eligible" position in the convenience
store department much earlier; thus, she believes she is entitled to receive union pay-
rates and benefits from November 2001 forward.  (D.I. 1 at ¶¶ 15, 17)

withdrew this grievance. (Id.)

- Grievance without assigned number (November 21, 2002). Plaintiff again alleged that a supervisor harassed her. Plaintiff, Pepsi management representatives, and a union agent held a grievance hearing and settled the matter through mutual agreement. (Id.)

- Grievances Nos. 698, 696, and 845 (February 15, 2006). These grievances collectively addressed plaintiff's claim for retroactive seniority because of her previous work in the convenience store department during 2001 and 2002. A Pepsi HR representative and two union agents held a grievance hearing and determined that plaintiff suffered no contract violations pertaining to this claim. Because plaintiff did not appear at this hearing, the Union mailed her a letter explaining its decision that the grievances lacked merit and would not proceed to arbitration. The letter informed plaintiff of her right to file an appeal with the Union, which plaintiff did not exercise. (Id.)

- Grievance No. 2809 (June 2, 2004). Plaintiff asserted that the "bumping rights" she earned through seniority were denied to her. Plaintiff, Pepsi management representatives, and a union agent attended a grievance hearing but did not resolve the matter. After the hearing, the Union determined that plaintiff's claim lacked merit and would not proceed to arbitration. The Union again informed plaintiff of her right to appeal the matter, which again she chose not to exercise. (Id.)

Plaintiff filed a charge of discrimination against the Union on April 22, 2003. (D.I. 1, ex. B) Plaintiff disputed her assigned seniority date and alleged inadequate and

16

untimely representation from the Union. (Id.) The DOL concluded its investigation on December 19, 2003, and issued plaintiff a right-to-sue letter against the Union along with the right-to-sue letter she also received against Pepsi. (Id., ex. D)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for a denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails

to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." Revis v. Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)).

## IV. DISCUSSION

### A. The Union's Summary Judgment Motion

Because the complaint does not specify which counts are directed towards which defendants, the Union responded to all of plaintiff's counts – racial discrimination, gender discrimination, discriminatory failure to promote, and retaliation under Title VII; racial discrimination under 42 U.S.C. § 1981; violation of the FLSA; and violation of the Equal Pay Act. (D.I. 1; D.I. 106; D.I. 112) Plaintiff filed just one answering brief in response to the respective summary judgment motions of Pepsi and the Union, in which she addressed each of Pepsi's arguments but none of the Union's arguments.[30] (D.I.

_____

[30]The second page of plaintiff's answering brief acknowledges this failure to address any of the Union's arguments for summary judgment. The brief reads:

> Plaintiff does not specifically address in this brief, the points raised by [the union] in its motion. However, because several factual issues are joint and overlap between defendants, and portions of [the union's] record in appendix bear on several of the core facts involving plaintiff's claims against Pepsi, plaintiff opposes [the union's] motion on her record and appendix submitted

18

115) While plaintiff states that she opposes the Union's summary judgment motion, her failure to dispute a single issue of material fact leaves the court little choice but to grant the Union's motion. See Fed. R. Civ. P. 56(c).

The Union has neither the responsibility nor the authority to influence which Pepsi employees are placed in union positions. (D.I. 107 at A84-A85)  The Union is responsible for advancing the interests of union members, but Pepsi employees become union members only when Pepsi places them in union positions.[31] (Id.)  Before Pepsi transferred plaintiff to a union position, she was not entitled to any union protection under the CBA. (Id.)  Therefore, plaintiff may not challenge a lack of union representation before she became a union member.

### 1. Title VII discrimination claims

A plaintiff alleging a union's violation of Title VII must show that:  (1) the employer breached the CBA with respect to her; (2) the union violated its duty of fair representation by permitting the breach to go unrepaired; and (3) there is some indication that the union's actions were motivated by a discriminatory animus (the "Title VII test").  See Walker v. Pepsi-Cola Bottling Co., No. Civ. A. 98-225, 2000 WL 1251906, at *8 (D. Del. Aug. 10, 2000) (citing York v. Am. Tel. & Telegraph, 95 F.3d 948, 955-56 (10th Cir. 1996)); Babrocky v. Jewel Food Co. & Retail Meatcutters Union,

---

herewith, [and] requests equivalent relief against both defendants.

(D.I. 115)

[31]Count V of the complaint, which alleges discriminatory failure to promote, has no relevance to the Union because the Union has no input regarding promotions, hires, or any other personnel determinations. (D.I. 107 at A84-A85)  Plaintiff concedes this point in her deposition. (Id. at A19)  This count, therefore, is dismissed.

19

773 F.2d 857, 868 (7th Cir. 1985).

The court will not examine the first two prongs of the Title VII test because plaintiff cannot survive summary judgment with respect to the third prong. See Walker, 2000 WL 1251906, at *8 (declining to examine all three prongs when one prong was not met). The third prong requires an indication that the Union's actions were motivated by a discriminatory animus; however, there is no such indication in the record. Plaintiff has not established any facts to demonstrate that race played a factor in any of the Union's decisions regarding her representation. (D.I. 106 at 15) The court agrees with the Union that plaintiff "simply sets forth a series of conclusions and assumptions regarding the [U]nion's conduct to which she attributes racial motivation." (Id.) When asked if she had any evidence that the Union misrepresented her because of her race, plaintiff answered in the negative.[32] (D.I. 107 at A24-A27)

Plaintiff's Title VII claim for gender discrimination is deficient for similar reasons. While plaintiff argues that her grievances were not heard or resolved as quickly and effectively as the grievances of her male co-workers, her arguments are not based in fact. (Id. at A26-A27) Specifically, plaintiff has no information on how the Union handled the grievances of any other union members, leaving the court no opportunity to compare plaintiff's experience with the experiences of her male co-workers. (Id.) In short, plaintiff has not only failed to present an issue of material fact; she has admitted

_____

[32]"In the Third Circuit, the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim." Schurr v. Resorts Inter. Hotel, Inc., 196 F.3d 486, 499 (3d Cir. 1999). The court, therefore, grants summary judgment to the Union on plaintiff's § 1981 claim. Further, the court notes that 23 of the 56 union members at Pepsi's Wilmington facility are African-American. (D.I. 107 at A21)

that she is unable to do so.  (Id.)  Plaintiff's Title VII discrimination counts are dismissed.

## 2. Title VII retaliation claim

To establish a claim of retaliation under Title VII, plaintiff must establish that:  (1)
she was engaged in activity protected by Title VII; (2) the Union took an adverse action
against her; and (3) there was a causal connection between her participation in the
protected activity and the adverse action.  See Robinson v. City of Pittsburgh, 120 F.3d
1286, 1299 (3d Cir. 1997).  In the complaint, plaintiff makes six allegations that are the
basis of her retaliation claim.[33]  (D.I. 1 at ¶ 88)  However, the first five of these
allegations are outside the Union's realm of responsibility.  (D.I. 107 at A31-68)  The
Union has no direct role in preventing work place hostility, granting pay or benefits,
creating attendance policies, disciplining employees upon misconduct or firing
employees.  (Id.)

The only allegation that involves the Union is plaintiff's charge that the Union
"refused to provide [her] with union representation in support of her numerous
complaints filed with management, HR, and the [U]nion."  (Id.)  This charge is not
supported by the record.  After becoming a union member, plaintiff filed nine separate
grievances with the Union.  (D.I. 106 at 8-11; D.I. 107 at A72-A82)  Seven of these
grievances were addressed in grievance hearings, each hearing attended by at least

---

[33]Plaintiff claims that defendants subjected her to a hostile work environment;
denied her equal pay, benefits and promotional opportunities; subjected her to different
performance and attendance standards; refused to enforce any disciplinary actions
against various co-employees despite her complaints; laid her off on September 18,
2002 after she filed a Charge of Discrimination with the DOL; and refused to provide
her with union representation in support of her numerous complaints filed with
management, HR, and the Union.  (D.I. 1 at ¶ 88)

21

one union agent and a Pepsi management representative. (Id.) The Union found the other two grievances to be without merit. (Id.) With these two grievances, the Union sent plaintiff a letter explaining its reasons for finding the grievance without merit. (Id.) On both occasions, the Union advised plaintiff of her right to appeal the decision. Plaintiff failed to appeal either decision. (Id.)

Based on this history, the record indicates that plaintiff received adequate representation.[34] Out of the nine grievances plaintiff filed, she was directly represented for all but two. (Id.) The Union determined that the other two grievances were meritless and told plaintiff of her right to appeal the respective decisions. (Id.) Plaintiff has not presented any genuine issue of material fact suggesting that the Union "refused to provide her with representation" and, therefore, her Title VII retaliation count is dismissed.

### 3. FLSA

The FLSA defines "employer" as any "person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. § 203(d). Because the FLSA specifies that a labor organization, such as the Union, is not an employer for the purposes of the challenged sections, §§ 207 and 215(a)(2), this count is dismissed.

---

[34]On November 20, 2002, as a direct result of union representation during a grievance hearing, plaintiff received pay and benefits for the entire month she was out of work. (D.I. 107 at A24, A83)

22

### 4. Equal Pay Act

The Equal Pay Act includes a provision that "no labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee." 29 U.S.C. § 206(d)(2). The Third Circuit has not interpreted this provision as allowing an employee to bring an action for back pay against a union. See Denicola v. G.C. Murphy Co., 562 F.2d 889, 893 (3d Cir. 1977); Bowe v. Judson C. Burns, Inc., 137 F.2d 37, 39 (3d Cir. 1943); Lyon v. Temple Univ. Sys. of Higher Educ., 507 F. Supp. 471, 475 (E.D. Pa. 1981).

In Denicola, the Third Circuit addressed the issue at bar – whether a labor organization may be liable to an employee for discrimination under the Equal Pay Act. See Denicola, 562 F.2d at 893. After an examination of both the congressional intent and the pattern of the statute, the court in Denicola found that an employee may bring an action for back pay under the Equal Pay Act "only against his or her employer." Id. The court interpreted the statute as allowing an employer to seek contribution from a labor organization when that employer is being sued under the Equal Pay Act. Id. In Lyon, the Eastern District of Pennsylvania echoed the Third Circuit, holding that the Equal Pay Act is clear that the aggrieved employees have a cause of action against their employer only. See 507 F. Supp. at 475. Because of this clear precedent, the court holds that this count is improperly brought against the Union and, therefore, this count is dismissed.

When a party moves for summary judgment, the moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita, 475 U.S. at 586

23

n.10 (1986). For the preceding reasons, the court finds that the Union has met this burden. Plaintiff has not responded by coming forward with "specific facts showing that there is a genuine issue for trial." Id. at 587 (quoting Fed. R. Civ. P. 56(e)). Instead, plaintiff failed to respond to any of the Union's claims in its summary judgment motion. (D.I. 115) All counts against the Union, therefore, are dismissed and the Union's motion for summary judgment is granted.

### B. Pepsi's Summary Judgment Motions

#### 1. FLSA

Section 7(a)(1) of the FLSA directs that an employee must "receive compensation for [her] employment in excess of the hours above specified at a rate no less than one and one-half times the regular rate at which [she] is employed." 29 U.S.C. § 207(a)(1). Plaintiff concedes that Pepsi paid her one and one-half times her normal hourly rate for all hours worked in excess of the forty hour work week. (D.I. 113, ex. 3 at 226:4-24) Plaintiff's claim is that she should have received a higher hourly rate because of the nature of the work she performed, the same rate that Pepsi extended to its relief drivers. (Id.) The FLSA protects employees from working over forty hours in a single work week without receiving one and one-half times their hourly rate, not employees who seek a higher hourly rate. See Vadino v. A. Valley Eng'rs, 903 F.2d 253, 266 (3d Cir. 1990) (concluding that a claim "which rested on interpretations of the underlying CBA must be resolved pursuant to the procedures contemplated under the Labor Management Relations Act ("LMRA")). The facts of Vadino are virtually identical to those currently before the court. An employee brought suit under the FLSA, conceding that he received

24

overtime pay based on his hourly rate but asserting that, based upon a CBA, that hourly

rate was too low . See Vadino, 903 F.2d at 264.  After explaining that plaintiff's

remedies lay in the LMRA, not the FLSA, the Third Circuit granted summary judgment to

the defendant employer.  Id.  For the same reason, the court grants Pepsi's summary

judgment on this count.

### 2. Equal Pay Act

#### a. Two Step Burden-Shifting Paradigm

A claim under the Equal Pay Act follows a two step burden-shifting paradigm.

See Stanziale v. Jargowsky, 200 F.3d 101, 107 (3d Cir. 2000); EEOC v. Delaware Dep't

of Health and Human Servs., 865 F.2d 1408, 1413-14 (3rd Cir. 1989).  To establish a

prima facie case of unequal pay, a plaintiff must demonstrate that she and a member of

the opposite sex:  (1) worked in the same establishment; (2) received unequal wages;

(3) for work that was equal in terms of skill, effort, and responsibility; and (4) that was

performed under similar working conditions ("prima facie unequal pay test").  See 29

U.S.C. § 206(d)(1).  The burden then shifts to the employer to demonstrate the

applicability of one of four affirmative defenses.  See Stanziale, 200 F.3d at 107;

Delaware Dep't of Health and Human Servs., 865 F.2d at 1413-14.

The employer must show that the unequal pay resulted from a seniority system, a

merit system, a system that measures earnings by quantity or quality of production, or

from any other factor other than sex.  See 29 U.S.C. § 206(d)(1).  For an employer to

prevail at the summary judgment stage, the employer must prove at least one affirmative

defense "so clearly that no rational jury could find to the contrary."  Delaware Dep't of

25

Health and Human Servs., 865 F.2d at 1413-14. Not only must the employer produce
sufficient evidence from which a reasonable fact finder could conclude that the proffered
reasons could explain the wage disparity, but the employer must produce sufficient
evidence from which a reasonable fact finder could conclude that the proffered reasons
actually motivated the wage disparity. See Stanziale, 200 F.3d at 108-09.

### b. First step – plaintiff's prima facie case

The court must first address whether plaintiff has succeeded in establishing a
prima facie case of unequal pay. When plaintiff assisted the convenience store
department, she worked in the same establishment as male employees in the
convenience store department and received a lower hourly wage. (D.I. 116 at B012 ¶
15, B075) Although the first two prongs and the fourth prong of the prima facie equal pay
test have been conceded by both parties, plaintiff must still establish that she performed
work that was "equal in terms of skill, effort, and responsibility."[35]  29 U.S.C. § 206(d)(1).

Pepsi stresses that "substantial identity of job functions" should be considered in
combination with "skill, effort, and responsibility." See Angelo v. Bacharach Instrument

---

[35]In Pepsi's brief in support of its summary judgment motion, the only element of
the prima facie equal pay test that Pepsi addressed in depth was whether plaintiff's
work was equal in terms of skill, effort, and responsibility. (D.I. 112) Although Pepsi
challenged whether plaintiff's work was performed under similar working conditions (id.
at 16), Pepsi included this element in a single heading of a section that almost entirely
addressed whether plaintiff's work was equal in terms of skill, effort, and responsibility.
(Id.) Pepsi does not allege that, for some reason, the conditions within the convenience
store department ever differed. (Id.) A plaintiff who successfully establishes that she
performed equal work almost always establishes that the work was performed under
similar working conditions. See 29 C.F.R. § 1620.18(b). The court, therefore, will
combine the fourth element of the prima facie equal pay test with the third element of
whether the work plaintiff performed in the convenience store department was equal to
that of her male co-workers.

Co., 555 F.2d 1164, 1174 (3d Cir. 1977) (holding that the requirement of equality of job content inheres in the statutory term "equal work"); Sec'y of Labor v. Washington Hosp., 475 F. Supp. 1242 (W.D. Pa. 1979) ("By substituting the term "equal work" for "comparable work," which was originally suggested, Congress manifested its intent to narrow the applicability of the Act . . . to address . . . substantial identity of job functions."). Pepsi is correct that the court can consider "substantial identity of job functions" along with "skill, effort, and responsibility"; however, Pepsi overstates the importance of this factor.

The Equal Pay Act does not require that the jobs in question be identical, only that they must be substantially equal. See Shultz v. Wheaton Glass Co., 421 F.2d 259, 265 (3d Cir. 1970). Any other interpretation would "destroy the remedial purposes of the Equal Pay Act."[36] Id. Differences in job classifications were "expected to be beyond the coverage of the Equal Pay Act." Id. This was because, "in the case of genuine job classifications the differences in work necessarily would be substantial and the differences in compensation therefore would be based on the differences in work which justified them." Id. "Congress never intended, however, that an artificially created job classification . . . could provide an escape for an employer from the operation of the Equal Pay Act." Id. As the Third Circuit opined in Shultz, this "would be too wide a door through which the content of the Act would disappear." Id.

---

[36]The Equal Pay Act was "intended as a broad charter of women's rights in the economic field. It sought to overcome the age-old belief in women's inferiority and to eliminate the depressing effects on living standards of reduced wages for female workers and the economic and social consequences which flow from it." Shultz, 421 F.2d at 265.

Therefore, when determining if plaintiff performed equal work to the males in the convenience store department, the court will not place substantial weight on the fact that, technically, plaintiff was a merchandiser with different job responsibilities than the male employees whom she was assisting for eight months. To satisfy the prima facie equal pay test, plaintiff is not required to show that Pepsi assigned her work equal to her male co-workers; rather, it is sufficient to establish that she performed equal work and that Pepsi knew she was doing so. See 29 C.F.R § 1620.13(a).

Plaintiff contends that she did the same work as relief drivers, including driving a Pepsi van and pick-up trucks and making deliveries to convenience stores by herself. (D.I. 116 at B002, B009, B011, B017) In other words, plaintiff contends that, regardless of titles and classifications, she performed equal work and was as valuable to management as any other employee in the convenience store department for the eight months she was assigned to assist that department. Pepsi is correct that plaintiff neither satisfied every internally listed prerequisite for the position nor performed every single job function typical to relief drivers. (D.I. 112 at 18) Notably, plaintiff did not have the requisite CDL-A license for relief drivers when she assisted the convenience store department. (D.I. 113, ex. 3 at 241, ex. 8 at ¶ 6, ex. 9) Plaintiff never collected revenue and never detailed transactions in a route book despite the undeniable fact that Pepsi's job postings listed these as relief driver functions. (Id., ex. 3 at 241, ex. 9) Equally undeniable, however, is that plaintiff merchandised and serviced customers on an assigned route and fulfilled miscellaneous duties assigned by her managers, responsibilities listed in the exact same job posting. (Id., ex. 9; D.I. 115 at 19)

The court must review all facts and inferences to be drawn therefrom in the light

28

most favorable to the plaintiff. See Revis, 814 F. Supp. at 1215 (quoting Hankins, 829

F.2d at 440). In order to pass the prima facie equal pay test, the work must only be

substantially equal, not identical. See Shultz, 421 F.2d at 265. The court finds that,

viewing facts and inferences in the light most favorable to plaintiff, she has satisfied this

prong of the prima facie equal pay test; Since this is the sole prong in question, plaintiff

has established a prima facie case for unequal pay under the Equal Pay Act.

### b. Second step – Pepsi's affirmative defense

Under the two step burden-shifting paradigm, the burden now shifts to Pepsi to

demonstrate the applicability of one of the four affirmative defenses available under the

Equal Pay Act. See 29 U.S.C. § 206(d)(1). Pepsi asserts that the wage disparity is

attributed to a factor other than sex – the CBA between Pepsi and the Union. (D.I. 112

at 19) Pepsi claims that, because the relief driver position is covered and paid in

accordance with the CBA while the merchandiser position is not, the decision to pay

plaintiff less is justified on that ground. (D.I. 112 at 18-20)

Pepsi cites multiple cases to support its assertion that the CBA constitutes a

differential based on a factor other than sex. See Lang v. Kohl's Food Stores, Inc., 217

F.3d 919 (7th Cir. 2000); Visnikar v. Dep't of Envtl. Prot., No. Civ. A. 02-963, 2004 WL

438688 (W.D. Pa., Jan. 27, 2004); Lissak v. U.S., 49 Fed. Cl. 281 (Fed. Cl. 2001). The

Third Circuit has not addressed whether, after a plaintiff establishes a prima facie case

of unequal pay, a defendant employer who pays employees in accordance with a CBA

may assert that this reason alone constitutes an acceptable differential based on "any

factor other than sex." See Visnikar, 2004 WL 438688, at *14. This issue has resulted

in judicial disagreement.[37]

The facts of the case at bar differ significantly from the facts of Visnikar or Lang,
the cases upon which Pepsi relies. In the case at bar, the CBA provides that the "extra
man (relief driver)" position should receive an hourly rate at some amount between
$15.78 and $17.03 per hour. (D.I. 113, ex. 5 at 28) For the eight months plaintiff
regularly assisted the convenience store department, her official job title was
merchandiser. (Id., ex. 3 at 107:22-108:1) The CBA does not affect or govern the
hourly rates of merchandisers at all.[38] (Id., ex. 5 at 28) Pepsi claims that, because it
pays its employees the agreed-upon hourly wages specified in the CBA, the decision to

_____

[37]In Lang, the Seventh Circuit affirmed the decision of a district court's grant of
summary judgment on a plaintiff's Equal Pay Act claims where "classifications and
wages are the result of collective bargaining . . . . [L]abor agreements frequently apply
to all of an employer's sites, and these agreements are 'factors other than sex . . . .'"
217 F.3d at 925. In Visnikar, the Western District of Pennsylvania expressed support
for the conclusion of Lang, saying that, although the Third Circuit has not addressed
this issue, "the undersigned finds the reasoning of these decisions persuasive, and
chooses to follow them." Visnikar, 2004 WL 438688, at *14. However, the court in
Brennan v. Bd. of Ed., Jersey City, New Jersey, 374 F. Supp. 817, 830 (D.N.J. 1974),
disagreed, endorsing the ruling that "no agreement between a union and a company,
even if arrived at as a result of collective bargaining negotiations, can be used as a
defense by . . . [an employer] to the statutory requirements of the [Equal Pay Act]."
Hodgson v. Sagner, 326 F. Supp. 371, 375 (D. Md. 1971), aff'd sub nom. Hodgson v.
Baltimore Reg'l Joint Bd, Almalgamated Clothing Workers of America, 462 F.2d 180
(4th Cir. 1972).

[38]The CBA lists each union position and identifies the position's hourly rate in
Appendix A. (D.I. 113, ex. 5 at 28) The listed union positions include the listing for
"extra man (relief driver)." (Id.) Article II of the CBA, titled "Union Recognition: Scope
of Agreement," provides that the CBA "shall not be construed to extend to nor effect in
any way executive or supervisory help or any other classification of employee not
expressly covered in [Appendix A]." (Id., ex. 5 at 4) Article II also specifies that the
terms "employee" or "employees," as used in the CBA, "shall be construed to include
only the classifications of employees covered in Schedule A." (Id.) Merchandisers,
therefore, are completely independent from any provisions in the CBA.

pay plaintiff less per hour than the relief drivers is valid on this gender-neutral ground. (D.I. 112 at 18-20)  However, as the provisions of the CBA make clear, plaintiff's hourly rate determination lies within the sole discretion of Pepsi.  Pepsi would not violate the CBA by paying plaintiff minimum wage or by paying her $25.00 per hour – an hourly rate higher than the CBA extends to any union position.

In Visnikar, plaintiff worked at the Department of Environmental Protection ("DEP") as a geologist.  Visnikar, 2004 WL 438688, at *13-15.  The DEP initiated a new employee classification system, creating various paygrade levels and assigning employees to different paygrade levels based upon their new classifications.  Id.  Plaintiff and the male DEP employees who received higher pay were all individual parts of one comprehensive system and the CBA addressed the new classifications, the paygrade levels, and requirements needed to obtain each job classification.  Id.  The court ruled that the CBA between the DEP and the union constituted a reason other than sex for the wage disparity, because all relevant classifications and pay rates were specified by the CBA.  Visnikar, 2004 WL 438688, at *13-15.  In Lang, the situation was similar to Visnikar.  The CBA included the job titles of "department clerk" and "regular clerk."  See Lang, 217 F.3d at 925.  Both positions were described and identified within the CBA. See id.  Therefore, the employer could show any employee a copy of the CBA and explain that hourly wages were determined strictly upon the classifications within.

The facts of Visnikar and Lang stand in sharp contrast to the relationship between Pepsi and the Union in the case at bar.  Pepsi's workforce contains some union positions that are governed by the CBA and other positions that are independent of the CBA's regulations and protections.  (D.I. 113, ex. 5)  Therefore, Pepsi has not met its

31

burden of showing, so clearly that no rational jury could find otherwise, that payment

provisions within the CBA actually motivated the wage disparity between plaintiff and the

permanent convenience store workers she assisted for eight months. See Stanziale,

200 F.3d at 108-09. Plaintiff established a prima facie case that Pepsi violated the

Equal Pay Act. Pepsi failed to adequately assert an affirmative defense to establish that

no genuine issues of material fact exist or that Pepsi is entitled to summary judgment as

a matter of law. See Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).

Pepsi's motion for summary judgment on this count is denied.[39]

### 3. Title VII claims

When a plaintiff does not present direct evidence of discriminatory animus, courts

analyze a plaintiff's claims pursuant to a pretext theory of discrimination. In Title VII

employment discrimination actions invoking the pretext theory of discrimination, courts

apply the McDonnell Douglas burden shifting analysis.[40] McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973). Pursuant to McDonnell Douglas, a plaintiff has the initial

burden to establish a prima facie case of discrimination. Id. at 802. To establish a

prima facie case of discrimination, plaintiff must provide evidence that: (1) She was a

member of a protected class; (2) she was qualified for the position(s) applied for; and (3)

---

[39]Similarly, "a prima facie showing of an EPA claim is also a prima facie showing of a Title VII violation;" therefore, the court denies Pepsi's motion for summary judgment with respect to plaintiff's Title VII salary discrimination claim. See Miller v. Beneficial Management Corp., 977 F.2d 834, 846 (3d Cir. 1992) (noting that a violation of the EPA is also a violation of Title VII).

[40]The parties do not dispute that adjudication of plaintiff's claims requires application of the McDonnell Douglas burden-shifting framework. (D.I. 112 at 21; D.I. 115 at 23)

another person outside of the protected class was treated more favorably.

Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d

Cir. 2006) (citing McDonnell Douglas, 411 U.S. 792 at 802-03). If plaintiff succeeds in

establishing her prima facie case, the burden shifts to defendant employer to proffer

"legitimate non-discriminatory" reason for its actions. See Woodson v. Scott Paper Co.,

109 F.3d 913, 920 n.2 (3d Cir. 1997). If defendant meets this burden, the burden again

shifts to plaintiff to demonstrate, by a preponderance of the evidence, that the

employer's rationale is pretextual. Id. at 804. To do this, plaintiff must "point to some

evidence, direct or circumstantial, from which a factfinder could reasonably either (1)

disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious

discriminatory reason was more likely than not a motivating or determinative cause of

the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). If a

defendant carries this burden, the presumption of discrimination drops from the case,

and plaintiff must "cast sufficient doubt" upon defendant's proffered reasons to permit a

reasonable fact finder to conclude that the reasons are fabricated. See Sheridan v. E.I.

DuPont de Nemours and Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc).

### a. Failure to promote

### 1. Exhaustion of administrative remedies

Title VII requires exhaustion of administrative remedies prior to filing suit in

federal court. See 42 U.S.C. § 2000e-5(e)(1). The purpose of this requirement is to

provide the EEOC the chance to investigate, mediate and take remedial action with

respect to a charge of discrimination. See Ostapowicz v. Johnson Bronze Co., 541 F.2d

33

394, 398-99 (3d Cir. 1976).  The ambit of a civil complaint, once a right-to-sue letter is issued by the EEOC, is "'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of a charge of discrimination,' regardless of the actual scope of the EEOC investigation."  Hicks v. ABT Assoc., Inc., 572 F.2d 960, 966 (3d Cir. 1978) (quoting Ostapowicz, 541 F.2d at 398-99).  "The relevant test in determining whether [plaintiff] was required to exhaust her administrative remedies, therefore, is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom."  Waiters v. Parsons, 729 F.2d 233 (3d Cir. 1984); see also Ostapowicz, 541 F.2d at 398-99.  Courts have allowed claims not specifically mentioned in the EEOC charge where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaint.  See Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984); see also Ostapowicz, 541 F.2d at 398-99.  In addition, because these charges are often drafted by one without legal training, the scope of the original charge is liberally construed.  See Hicks, 572 F.2d at 965.

In the case at bar, Pepsi argues that plaintiff failed to exhaust her administrative remedies with respect to her failure to promote claim because her charge of discrimination did not contain allegations relating to the loader or jockey positions.  (D.I. 112 at 23)  Plaintiff's charge of discrimination, filed on August 28, 2002, alleges that Pepsi "denied [her] various promotion opportunities . . . ."  (D.I. 113, ex. 11)  In addition, plaintiff's charge letter asserts that "Pepsi is determined to assure that I do not receive equal or fair treatment in the areas of employment or **advancement**."  (D.I. 116 at B028) (emphasis added).  Plaintiff also wrote a letter to the DOL on October 17, 2002

34

expressing her belief that Pepsi was retaliating against her and asking the DOL to investigate the matter further. (D.I. 117 at B089-B090) Subsequent to her letter to the DOL, plaintiff applied for the jockey and loader positions in April and May 2003. (D.I. 113, ex. 3 at 140:1-142:16; D.I. 115 at ¶¶ 33, 36) On July 1, 2004, the DOL issued two right to sue letters. (D.I. 116 at B015) Given plaintiff's initial charge and subsequent letter, the loader and jockey failure to promote claims can reasonably be expected to grow out of initial charge of discrimination and to be included within the DOL's investigation.[41] See Ostapowicz, 541 F.2d at 398.

## 2. Prima facie case

Plaintiff contends that Pepsi unlawfully discriminated against her on the bases of sex and gender with respect to the decisions to not promote her to three positions: (1) an April 2003 jockey position in the transport department; and (2) two route loader

---

[41]Pepsi, relying on several cases, also contends that plaintiff was required to file a separate charge of discrimination for each alleged instance of Pepsi's discriminatory failure to promote because each failure to promote is considered a "discrete" act. (See D.I. 112 at 23-24) Pepsi's argument confuses two distinct issues with respect to a plaintiff's charge of discrimination: (1) that it be timely; and (2) the scope of a subsequent suit resulting from it. In particular, failure to promote claims are considered "discrete" for the purpose of determining whether plaintiff's charge of discrimination was timely filed. See Rush v. Scott Speciality Gases, Inc., 113 F.3d 476, 483-84 (3d Cir. 1997) (discussing discrete nature of failure to promote claims and continuing violations doctrine); Ryan v. General Machine Products, 277 F. Supp. 2d 585, 593 (E.D. Pa. 2003) (noting that plaintiff's claims were filed outside the limitations period and that the continuing violation theory could not "resuscitate" them); Kovoor v. School District of Philadelphia, 211 F. Supp. 2d 614, 622 (E.D. Pa. 2002) (discussing continuing violations theory); Allen v. Best Foods Baking Co., No. Civ. A. 02-CV-3663, 2003 WL 22858351, at *4 (E.D. Pa. Oct. 22, 2003) (same). Pepsi fails to allege that plaintiff's charge of discrimination was untimely filed and, as such, its argument is without merit.

positions in May 2003.[42] (D.I. 115 at 31)  Plaintiff at bar must first establish a prima facie case of discrimination by proving that:  (1) she is a member of a protected class; (2) that she is qualified for the positions; (3) that she suffered an adverse employment action; and (4) that the actions occurred under circumstances that give rise to an inference of unlawful discrimination, such as might occur when a similarly situated person not of the protected class is treated differently.  See Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999); Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 409 (E.D. Pa. 2000).  For purposes of this motion, Pepsi concedes that plaintiff established the first prong of a prima facie case.  (D.I. 112 at 24)  In addition, Pepsi does not challenge plaintiff's qualifications for the positions at issue nor does Pepsi dispute that she did not receive them, thus establishing the second and third elements of the prima facie test.  (See id. at 25-29)

With respect to the fourth element, plaintiff argues an inference of discrimination is present, based on the following:  (1) Pepsi's employee rosters during plaintiff's tenure demonstrate that plaintiff was one of two women who worked in the warehouse and that the Wilmington plant's workforce was comprised of 7% women (D.I. 116 at B003, B012; D.I. 117 at B107-B131); (2) Tom Riley ("Riley"), a Pepsi supervisor who allegedly had hiring authority for the jockey position, failed to stop inappropriate remarks made by co-workers to plaintiff based on her sex (D.I. 116 at B002-004 ¶¶ 13-14, 21, 23, B013 ¶ 23);

---

[42]Although plaintiff testified in her deposition that she wrongfully did not receive driver positions (D.I. 113, ex. 3 at 136:11-14:17), these failure to promote claims are not addressed in plaintiff's answering brief and, therefore, the court does not address them. (See D.I. 115 at 28-30)  Similarly, plaintiff's brief does not address any alleged discriminatory failure to transfer and, consequently, neither does the court.  (See id.)

(3) Riley's statements that plaintiff would be a "problem" if she transferred to the warehouse (id. at B003 ¶ 21); (4) the comments of supervisors Glenn Matthews and Bob Grundy that they did not want plaintiff working in the warehouse (id. at B003 ¶ 17); (5) HR and Pepsi's management failure to respond to plaintiff's complaints that she was subjected to inappropriate sexual remarks while working in the warehouse (id. at B012 at ¶ 19); (6) Staib's and Clayton's (production managers) comments that they did not want plaintiff working in the warehouse because they did not like her (id. at B005 ¶ 5, B006 ¶ 7); (7) Riley "forced" DiProsperous to take the jockey position when he and plaintiff were the only two remaining candidates (id. at B003 ¶¶ 19, 21); (8) Riley's statement that he did not want to train plaintiff even though training would have been provided by a different employee in the fleet department (id. at B013 ¶ 24); (9) HR ignored plaintiff's complaints about Riley (id. at B040-41); and (10) Pepsi, in May 2002, responded to plaintiff's request for a warehouse position by transferring her back to merchandising and hiring three male employees who were able to surpass her in seniority (D.I. 115 at 32). (See id. at 29-32)  In contrast, Pepsi asserts that plaintiff has offered nothing more than her own speculation to support her claims.  At her deposition, plaintiff testified that she based her allegations of race and gender discrimination solely on "the fact that I was the only female in that department" who applied with experience from the convenience store department and "that it was always awarded to someone other than myself."  (D.I. 113, ex. 3 at 145-46)

Given the foregoing assertions, plaintiff has established a prima facie case with respect to gender discrimination. See Jones, 198 F.3d at 412 (stating that, at the prima facie stage, the determination is whether plaintiff has presented sufficient evidence to

consider defendant's proffered reasons for its decision). However, the court finds that plaintiff has failed to proffer any evidence to support her Title VII race discrimination claims and, as such, Pepsi is entitled to summary judgment on those claims.[43] See id. at 410-11.

### 3. Legitimate non-discriminatory reasons and pretext

Pepsi contends that gender played no role in its decisions and asserts that it did not promote plaintiff to those positions because she had lower seniority than the other candidates who applied. (D.I. 112 at 29) Specifically, DiProsperos, Eastlack and Lewis all possessed more seniority than plaintiff and the CBA mandated that hiring correspond with union seniority.[44] (See D.I. 113, ex. 5 at 118) Pepsi's proffered reason is both legitimate and non-discriminatory. See Campbell v. Pennsylvania College of Optometry, Civ. A. No. 95-0073, 1995 WL 489134, at *6 (E.D. Pa. Aug. 15, 1995) (finding that hiring employee with greater seniority pursuant to a contractual mandate was a legitimate non-discriminatory reason). To survive summary judgment, plaintiff must now "cast sufficient doubt" upon defendant's proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. See Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc). Plaintiff argues that Pepsi's reasons are pretextual based on the same reasons discussed supra in connection with her prima

---

[43]"In the Third Circuit, the elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim." Schurr v. Resorts Inter. Hotel, Inc., 196 F.3d 486, 499 (3d Cir. 1999). The court, therefore, grants summary judgment to Pepsi on plaintiff's § 1981 claim.

[44]Plaintiff does not dispute that DiProsperos, Eastlack and Lewis had more seniority than her; instead, she argues that their seniority is the result of gender discrimination that occurred in 2002 and 2003. (D.I. 115 at 32)

facie case. The court addresses each of plaintiff's assertions in turn.

First, "[s]tatistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext." Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 542 (3d Cir. 1992). In order to be relevant, such statistical data should be accompanied by an analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period. See id. at 543. As such, the composition of Pepsi's Wilmington plant cannot support pretext in this instance because it merely evidences a general under-representation of women in the field and does not account for the varying needs of one department to another. See id. (citing Molthan v. Temple University of the Commonwealth System of Higher Education, 778 F.2d 955, 963 (3d Cir. 1985)); (see also D.I. 117 at 107-131 (listing positions outside of warehouse)). Similarly, plaintiff's evidence of the qualified applicant pool (i.e., that she was the only woman who applied) cannot be considered because it fails to account for the individual qualifications and employment histories of the applicant pool. See Ezold, 983 F.2d at 543; see also Haley v. City of Plaintfield, 169 Fed. Appx. 670, 674 (3d Cir. 2006) (non-precedential) (finding that a mere summary of demographic composition of the applicant pool is insufficient).

Second, the supervisors' statements that allegedly indicate they did not want plaintiff in the warehouse, that she would be a "problem," and that they did not like her are hearsay. Hearsay statements may be considered in the summary judgment context when they are likely admissible at trial. See Lexington Insurance Co. v. Western Pennsylvania Hospital, 423 F.3d 318, 328 (3d Cir. 2005). While the court reserves judgment on the admissibility of such statements at trial, it notes that even if these

statements were admissible, they are not indicative of discriminatory animus because they do not implicate plaintiff's gender. Moreover, the reasons behind these statements are unknown. See DiFederico, 201 F.3d at 206 (noting that the pretext analysis is designed "to focus the court's attention on whether the defendant's proffered reason is the real reason"); (see also D.I. 116 at B003 ¶ 21, B005 ¶ 5) Similarly, Riley's alleged reason for "forcing" DiProsperous into the jockey position is hearsay and lacks an indication of discriminatory animus. (See id. at B003 ¶¶ 19, 21 (Merrill Matthews stating that DiProsperos told him that Riley had "forced" him into the jockey loader position because Riley "did not want to deal with her."))

Third, plaintiff argues that HR failed to respond to her complaints about working in the warehouse and that HR ignored plaintiff's complaints about Riley. The only evidence presented by plaintiff to support these claims is her own testimony and a copy of an email plaintiff wrote to HR complaining about Riley and the award of the jockey position to DiProsperous. (See id. at B013, B040-41) Contrary to plaintiff's assertions, the email indicates that HR did not ignore plaintiff and even offered to meet with plaintiff within a week of her initial complaint to HR. (Id. at B040) In light of this documentary evidence, a reasonable jury could not credit plaintiff's testimony that HR ignored her complaints.

Fourth, plaintiff asserts that summary judgment is inappropriate because Pepsi discriminatorily denied plaintiff's entry into the warehouse by hiring three male employees before her, thus blocking her earlier entry into the union. In other words, the higher seniority of Eastlack and Lewis upon which Pepsi now relies as its legitimate non-discriminatory reason was effectuated through discrimination, which prevented plaintiff

40

from receiving the route loader positions in 2003. In response, Pepsi produced a
verification by one of its HR employees demonstrating that plaintiff applied for and was
granted a warehouse position in April 2002. (D.I. 119, ex. 36 at ¶ 1) For reasons
unknown to Pepsi, plaintiff withdrew her application and chose to remain in the sales
department. (Id.) Under these circumstances, a reasonable jury could not credit
plaintiff's testimony that Pepsi discriminatorily denied her entry into the warehouse by
hiring Eastlack and Lewis before her in May 2002 when Pepsi had granted plaintiff a
warehouse position prior to their hiring.

Lastly, Riley's inaction with respect to plaintiff's co-workers' inappropriate sexual
remarks could be evidence of discriminatory animus if Riley made the hiring decisions
for the positions at issue. With respect to the jockey position, plaintiff produced a job
posting listing Riley as the hiring manager. (D.I. 116 at B034) In addition, plaintiff
provided an email from Sara Schwartz ("Schwartz"), Pepsi's HR Coordinator for its
Wilmington facility, to Riley which instructed Riley to post an attached job bid form for
the jockey position. (D.I. 116 at B035, B040) Regarding the route loader positions,
plaintiff presented the verification of Merrill Matthews, a former shop steward for Pepsi,
to demonstrate Riley's hiring authority. (Id. at B004 ¶ 23) Pepsi disputes that Riley had
hiring authority and asserts that HR determined whether employees were qualified and
had enough seniority to be awarded a job bid for union positions. (D.I. 119, ex. 36 at ¶
2) Because Riley may have had hiring authority and a reasonable jury could find Riley's
inaction indicative of pretext, a genuine issue of material fact exists; therefore, summary
judgment is denied with respect to plaintiff's failure to promote claims.

### b. Retaliation

41

To establish a prima facie case of retaliation, plaintiff must show that: (1) she engaged in protected employee activity; (2) the employer took an adverse employment action either after or contemporaneous with the employee's protected conduct; and (3) a causal connection between the employee's protected activity and the employer's adverse action. See Weston v. Commonwealth of Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001). Plaintiff's retaliation claims stem from Pepsi's alleged failure to promote her to the loader and jockey positions and that she was the last to be called back after being laid off in September 2002.[45] (D.I. 115 at 33)

Pepsi argues that plaintiff has failed to establish an adverse employment action. (D.I. 112 at 37) An adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." See Weston, 251 F.3d at 430-31 (quoting Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 749 (1998)) (internal quotations omitted). Plaintiff's failure to promote claims constitute adverse actions. See id. With respect to plaintiff's lay off in September 2002 and subsequent recall, Pepsi argues that this is not an adverse employment action because she suffered no loss of pay, seniority or other benefits. (D.I. 112 at 37) Plaintiff asserts that her seniority was permanently and

---

[45]Plaintiff also alleges that she suffered "gender animus" while working in the can filler room and production departments in 2003 and 2004. Plaintiff's allegations include that supervisors made derogatory comments and created a disciplinary file on her, which included reprimands for violations for which other male employees were not disciplined for. Even when taking as true these allegations, they do not constitute an adverse employment action. See Weston, 251 F.3d at 430-31 (finding an adverse employment action requires a significant change in employment); Caver v. City of Trenton, 420 F.3d 243, 256 (3d Cir. 2005) ("[U]nsubstantiated oral reprimands" and "unnecessary derogatory comments" are not serious and tangible enough to constitute adverse employment actions.").

adversely affected by the direct hiring of Eastlack, Lewis, and Robles into the warehouse before she began working there. (D.I. 115 at 33) As discussed above, the underlying discrimination which plaintiff alleges prevented her promotion to the warehouse is refuted by Pepsi's evidence regarding plaintiff's acceptance and subsequent withdrawal for a warehouse position in April 2002 such that a reasonable jury could not credit plaintiff's allegation. Even if this constituted an adverse employment action, it did not occur contemporaneously or after plaintiff's protected activity because Pepsi hired Eastlack, Lewis and Robles into the warehouse in May or June of 2002 before plaintiff filed her charge of discrimination on August 28, 2002. See Weston, 251 F.3d at 430.

The court also finds that plaintiff's attempt to establish a prima facie case of retaliation fails because there is nothing in the record to suggest a relationship between the decision to not promote her and her prior protected activity. See Sarullo v. United States Postal Service, 352 F.3d 789, 800 (3d Cir. 2003). Plaintiff argues that her "retaliation claim must be viewed within the context that Pepsi's reasons for not promoting are pretext, under a strong inference of gender discrimination pervading the warehouse, production, manufacturing and transport areas of the Wilmington plant." (D.I. 115 at 34 (parenthetical text omitted)) She asserts that the "strong inference of gender discrimination" created by her supervisors in 2003-2004 and Pepsi's own internal investigation into her initial DOL charge create a genuine issue of material fact with respect to the causation element of her retaliation claim. (Id. at 33)

The court disagrees. Specifically, the discrimination (if any) that plaintiff may have suffered while in the production and can line filler positions is not tied to her filing of the charge of discrimination other than the fact that it occurred after plaintiff's filing. See

Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 177-78 (3d Cir. 1997) ("It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn."). Moreover, plaintiff has not demonstrated that all the supervisors charged with discriminatory conduct knew of her discrimination complaint. See Sarullo, 352 F.2d at 801. She attempts to show knowledge by asserting that Pepsi's internal investigation "reached into Pepsi's management to investigate the conduct" of Riley, Glenn Matthews, and Weber. (D.I. 115 at 33) However, the report only mentions Riley and, as discussed above, plaintiff has not produced any evidence of retaliatory motive.[46] The record in the case at bar is insufficient to allow a reasonable jury to conclude that the decision not to promote plaintiff was somehow tainted or influenced by plaintiff's protected activity. Summary judgment for Pepsi on plaintiff's retaliation claims is granted.

### 4. Fraud and unjust enrichment

To prove its claim for common law fraud, Pepsi must demonstrate: (1) a false representation, usually one of fact, made by plaintiff; (2) plaintiff's knowledge or belief that the representation was false, or was made with requisite indifference to the truth; (3) plaintiff's intent to induce Pepsi to act or refrain from acting; (4) Pepsi acted or did not act in justifiable reliance on the representation; (5) Pepsi suffered damages as a result of such reliance. See H-M Wexford LLC v. Encorp. Inc., 832 A.2d 129, 144 (Del. Ch.

---

[46]Plaintiff cites to her October 18, 2002 letter to the DOL in which she stated her belief that she had been laid off in retaliation for filing her charge of discrimination. (D.I. 117 at B089-B090) The relevance of this document, with respect to either retaliatory motive or plaintiff's supervisors' knowledge of the charge, is unclear to the court.

2003). Alternatively, on the first factor, Pepsi may demonstrate common law fraud "through deliberate concealment of material facts, or by silence in the face of a duty to speak." Stephenson v. Capano Development, Inc., 462 A.2d 1069, 1074 (Del. 1983). That is, "one is equally culpable of fraud who by omission fails to reveal that which it is his duty to disclose in order to prevent statements actually made from being misleading." Id.

For its fraud claim, Pepsi asserts that plaintiff falsely represented that she was totally disabled between November 6, 2003 and April 18, 2004 based on several documents produced by Bove regarding plaintiff's workers' compensation claim. (D.I. 110 at 11) In response to this court's order, Bove produced several documents relating to plaintiff's workers' compensation claim, including: (1) an Agreement to Compensate; (2) a State of Delaware Office of Worker's Compensation receipt for Compensation Paid; and (3) a Distribution of Proceeds. (D.I. 113, ex. 32) Two documents, the agreement to compensate and the receipt for compensation paid, indicate that the settlement was for "total" disability and were signed by plaintiff. (Id.) Plaintiff does not dispute that during the time covered by the settlement she worked for RJM, nor does she contest that she failed to tell Pepsi about her employment with RJM.

Instead, plaintiff asserts that she never made false representations to Pepsi about her injury and argues that she was totally disabled for the stated period. (D.I. 115 at 35-36) She contends that she applied to RJM based on her attorney's advice to mitigate damages and points out that she had no income during this period because Pepsi had

not processed her workers' compensation claim.[47]  (Id.)  Further, plaintiff asserts that she quit RJM after only one week due to her injury.  (Id.)  Based on plaintiff's assertion that she quit RJM after one week, a genuine issue of material fact exists with respect to whether plaintiff was "totally disabled" as she represented in the settlement agreements.

With respect to whether plaintiff knew that her representations were false, plaintiff contends that she did not understand the terms of her settlement because her attorney never explained these terms to her.  The documents produced by Bove in response to the court's order directly refute this contention.  (D.I. 113, ex. 32) Specifically, the agreement to compensate and the receipt for compensation paid contain notations that plaintiff disputed the amount of compensation she was to receive. (See id.)  In light of this evidence, a reasonable jury could not credit plaintiff's testimony that she was unaware of the settlement terms and, if plaintiff is found to not have suffered total disability, Pepsi has established this element.

Similarly, Pepsi also has established the remaining elements of a fraud claim. There is no question that plaintiff's representation of total disability in the settlement agreement was made with the intent to induce Pepsi to provide her with monetary compensation.  Moreover, Pepsi acted in justifiable reliance to its detriment by acting on plaintiff's representations.  Because a genuine issue of material fact exists with respect to the first element of Pepsi's fraud claim, however, Pepsi's motion for summary

---

[47]The court notes that Pepsi has produced evidence demonstrating that plaintiff received short term disability payments during this period.  (D.I. 113, ex. 32 at PBG 01691)

46

judgment is denied.[48]   (See D.I. 110 at 14 (arguing that plaintiff was unjustly enriched as a result of her fraud)).

## V. CONCLUSION

For the reasons stated above, the Union's motion for summary judgment (D.I. 105) is granted.  Pepsi's motion for summary judgment on plaintiff's claims (D.I. 111) is denied in part and granted in part.  Pepsi's motion for summary judgment on its counterclaims (D.I. 109) is denied.  An appropriate order shall issue.

---

[48]Pepsi's motion for summary judgment on unjust enrichment also is denied because Pepsi's argument for unjust enrichment presumes the existence of a fraud. (See D.I. 110 at 14 (arguing that plaintiff was unjustly enriched as a result of her fraud)). In addition, Pepsi's motion for sanctions is denied because it is based on Pepsi's belief that plaintiff's defenses to its fraud and unjust enrichment claims are untrue, a determination the court is unable to make at this juncture.  (See D.I. 110 at 15)