## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MARLAYNA G. TILLMAN, | : | |
|  | : | |
| Plaintiff, | : | C.A. No.:  04-1314-SLR |
|  | : | |
| v. | : | |
|  | : | |
| THE PEPSI BOTTLING GROUP, INC., | : | |
| and TEAMSTERS LOCAL UNION 830, | : | |
|  | : | |
| Defendants. | : | |

---

## APPENDIX OF EXHIBITS OF DEFENDANT BOTTLING GROUP, LLC IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

---

Leslie C. Heilman (DE Bar. No. 4716)
Ballard Spahr Andrews & Ingersoll, LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Telephone:  (302) 252-4465
Facsimile:  (302) 252-4466
Email:  heilmanl@ballardspahr.com

OF COUNSEL:
Daniel V. Johns
Lucretia C. Clemons
Aisha M. Barbour
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103-7599
(215) 665-8500

Dated:  April 2, 2008

DMEAST #10010393 v3

## INDEX TO APPENDIX OF EXHIBITS

**Exhibit No.**

Relevant Portions of the Deposition of Marlayna G. Tillman on December 13, 2005 ................... 1

Verification of Sara (Swartz) Altman, dated March 26, 2007 ........................................................ 2

Relevant Portions of the Deposition of Sara Swartz on February 28, 2007 ................................... 3

# EXHIBIT 1

1

1

2          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
3
                    - - -
4
      MARLAYNA G. TILLMAN,    :  CIVIL ACTION
5              Plaintiff,     :

6              vs.            :
                                  **ORIGINAL**
7      THE PEPSI BOTTLING GROUP,:
       INC., and TEAMSTERS LOCAL:
8      UNION 830              :
                Defendants.   :  No. 04-1314
9

10                  - - -

11             Wilmington, Delaware
               Tuesday, December 13, 2005
12
                    - - -
13

14          Deposition of MARLAYNA G. TILLMAN,

15     taken pursuant to notice, at the law offices of

16     Ballard Spahr Andrews & Ingersoll, LLP, 919 Market

17     Street, 12th Floor, Wilmington, Delaware, on the above

18     date, beginning at 10:25 a.m., before Donna A.

19     Bittner, RMR-CRR.

20                  - - -

21

22
                DONNA A. BITTNER REPORTING
23          REGISTERED PROFESSIONAL REPORTERS
                      61 Penn Road
24          Voorhees, New Jersey  08043
                    (856) 768-6619

Marlayna G. Tillman                     136

1    Q.    It's the Charge of Discrimination.

2    Q.    Do you have that now?

3    A.    Yes.

4    Q.    Starting at the beginning of the document it
5    says, "I am a black female individual who has been
6    employed by respondent since May 8th, '01." Then it
7    says, "Since or about October 1, '01 and continuing
8    to present, the respondent has denied me various
9    promotional opportunities, particularly for driver
10   positions."

11                Please describe to me every promotional
12   opportunity that you contend you were denied while
13   working at Pepsi.

14   A.    There were several different driver
15   positions. Delivery driver position was posted.

16   Q.    Tell me when they were posted and what the
17   positions were.

18   A.    I don't know the exact dates of when they
19   were posted.

20   Q.    Give me an approximation or something.  You
21   filed a claim saying you were denied a promotion.
22   We have to be able to defend that claim, therefore
23   we have to know what you're claiming you were
24   denied, so you have to tell me what it is that this

1  claim is based on.

2      A.   Again, there were driver positions that were
3  posted that --

4      Q.   Which year?  Around what time?  What position
5  were you in?  You have to give me something more
6  than positions that were posted.

7      A.   Okay.  Driver positions in 2001, 2002, 2003
8  and actually 2004.  Eventually we got to the part
9  where I did get the position.

10     Q.   Are these transport driver positions?

11     A.   No.   There were some that were delivery
12 driver positions, also transport.  There were other
13 postings that I applied for during all those years.

14     Q.   I'm not talking about, I want to talk about
15 the driver positions one at a time.  Let's do it one
16 at a time.

17              You said delivery driver position?

18     A.   Um-hum.

19     Q.   When did you apply for that position?

20     A.   Again, I have that information, but I don't
21 have it at hand.

22              MS. BREWINGTON:   Can I interject?

23              MS. CLEMONS:   Yes.

24              THE WITNESS:   Do you want me to make it

Marlayna G. Tillman                    138

1    up?

2               MS. BREWINGTON:   No.  Would reviewing

3    the Complaint help refresh your recollection?

4               THE WITNESS:  No, because it's not

5    listed in there.  It's not listed.  But again, like

6    I said, there were positions posted in 2001, '2,

7    2002, 2003.

8    BY MS. CLEMONS:

9    Q.   Are you telling me you applied for every

10   delivery driver position that was posted in those

11   years?

12   A.   There were probably only two and I did apply

13   for them.  There was a full service vending position

14   that was posted.

15   Q.   I want to take it position by position.  I

16   need you to do it the way --

17   A.   That requires driving.

18   Q.   Is it considered a delivery?  You said a

19   delivery driver position.  Is that the title of the

20   position or is that just --

21   A.   Yes.  That's the title of one of the driving

22   positions, yes.

23   Q.   You say you think you applied for that job

24   twice?

Marlayna G. Tillman                    139

1      A.    Yes.

2      Q.    You don't remember which of the four years we

3    just went through that you applied for those

4    positions?

5      A.    I think one was in 2001 and one was in 2002.

6      Q.    Okay.  How did you apply for the position?

7      A.    With a bid form.

8      Q.    In 2001 you applied with a bid form?

9      A.    I believe so.

10     Q.    Were you a member of the union in 2001?

11     A.    I should have been, but no, I wasn't.

12     Q.    My question was, were you a member of the

13   union in 2001?

14     A.    And my answer was I should have been, but I

15   was not.

16     Q.    Were you a dues paying member of the union?

17     A.    No, because I was not allowed to become one.

18     Q.    Did you pay any dues?

19     A.    No, because I wasn't allowed to become a

20   member of the union.

21     Q.    So you submitted a bid form in '01?

22     A.    Yes.

23     Q.    In what other year?

24     A.    I believe 2002.

Marlayna G. Tillman                140

1    Q.   Any other position other than the delivery

2    driver that you applied for that you claim you were

3    denied a promotional opportunity?

4    A.   Full service vending driver.

5    Q.   When did you apply for that job?

6    A.   I believe that was in 2002.

7    Q.   And how did you apply for that job?

8    A.   Bid form.

9    Q.   By the way, who was awarded the delivery

10   driver positions?

11   A.   I don't know off the top of my head.

12   Q.   Were they people already within the union?

13   A.   I'm not sure.  It might have been.  I'm not

14   sure.

15   Q.   To your knowledge are jobs awarded based on

16   seniority in union positions?

17   A.   I believe so.

18   Q.   Any other jobs you applied for that you claim

19   you were denied promotional opportunity?

20   A.   I applied for, I'm not sure of the title, the

21   exact title, but I believe it was jockey.

22   Q.   In what year did you apply for that job?

23   A.   I think that was also 2002.

24   Q.   And how did you apply for that job?

1    A.   I can't --
2    Q.   If you don't know, then the answer is I don't
3    know, but that's my question.
4    A.   Well, I don't know.
5    Q.   Okay.  That's a perfectly acceptable answer.
6              Did you lose any seniority as a result
7    of this incident?
8    A.   Not to my knowledge.
9    Q.   The last thing you told me about was you said
10   there was a transfer request you made to Tracey.
11   Tell me about that.
12   A.   A couple of times.  I also made that same
13   request to Scott Steiger.
14   Q.   You said Tracey first, so tell me first about
15   when you made the request to Tracey.
16   A.   That's when Tracey first came to the
17   Wilmington facility.  She knew about some of the
18   problems that I was having with management and I
19   told her I just didn't feel comfortable being the
20   only female at the plant.  I felt like I was in a
21   hostile work environment.  I felt like I wasn't
22   wanted there and I wasn't wanted there by the
23   supervisors, and I asked her to visit the
24   possibility of me getting a transfer to anywhere,

Marlayna G. Tillman                163

1   any other Pepsi, just, you know, I just wanted to go
2   somewhere else where I wouldn't be the only female
3   in the department.
4       Q.   And you're saying this was during a
5   conversation with Tracey?
6       A.   Yes.
7       Q.   And what did Tracey say in response to that?
8       A.   That was something that she could look into.
9       Q.   You're saying this is when Tracey first
10  arrived?
11      A.   Yes.  And we had another conversation about
12  it also with Scott Steiger where we had a meeting
13  together.
14      Q.   Hold on.  Let's finish up the first
15  conversation with Tracey.
16               What did she say?  What did she say she
17  would do?  What was the result of the conversation?
18      A.   There was no result.  If you're talking about
19  an action, a course of action, there was none.  She
20  said she would look into it and she just never got
21  around to doing anything about it obviously because
22  I'm still there.
23      Q.   Did you apply for positions anywhere else?
24      A.   No, not -- well, you know what, I looked into

Marlayna G. Tillman                    164

1   going, the possibility of going to West Chester, and
2   I remember trying to set up something where I could
3   talk to John West, but that never came to fruition
4   either, so --
5      Q.   I'm confused by your answer.  Did you apply
6   for a position at West Chester?
7      A.   No, I didn't formally apply.  I was basically
8   just trying to get information on what was available
9   at the West Chester plant.
10     Q.   Did you ever meet with him?
11     A.   No.
12   .  Q.   So have you told me everything you recall
13   about this first request to Tracey for information
14   about a transfer?
15     A.   As far as I know.
16     Q.   Did you make any additional requests to
17   Tracey for information about a transfer?
18     A.   Not until we had a meeting with Scott
19   Steiger.
20     Q.   And when was that?
21     A.   I think it was some time in August, August
22   2002.  I'm not real clear on that.
23     Q.   And what happened at that meeting?
24     A.   Basically we were just discussing, you know,

Marlayna G. Tillman                165

1    Q.    I want you to tell me what the conversation
2    was about transfer, what you said, what they said,
3    and if you don't know verbatim, that's fine, but
4    give me the gist of what the conversation was.

5    A.    As far as transfer goes?

6    Q.    Yes.

7    A.    I talked with Scott.  Tracey really didn't
8    have anything to say at that meeting, it was
9    basically Scott.

10         Scott told me that he felt a transfer
11   was not needed, I just needed to resolve whatever
12   issues that I had at the Wilmington plant, and so
13   therefore, you know, a transfer wasn't really a
14   viable solution.

15   Q.    Did Scott tell you that you wouldn't be
16   permitted to transfer?

17   A.    No, but by the tone and the way he spoke to
18   me in the conversation it seemed like he was
19   alluding to that, you know, there was no chance for
20   me to get a transfer.

21   Q.    Did he ever tell you not to apply for
22   positions at other plants?

23   A.    No.

24   Q.    Did you ever --

Marlayna G. Tillman                    166

1      A.    But I never asked him could I either.

2      Q.    Did you ever apply for any other positions

3    outside of the Wilmington plant?

4      A.    No.   I applied for everything else inside the

5    plant, trying to get out of the warehouse.

6                 (Exhibit Tillman-17 was marked for

7    identification.)

8    BY MS. CLEMONS:

9      Q.    I'm showing you what's been marked Deposition

10   Exhibit 17.

11                Take a minute and review that.

12                (Pause.)

13     Q.    Have you had a chance to read the first

14   paragraph of this document, the paragraph titled

15   one, Miss Tillman?

16     A.    Um-hum, yes.

17     Q.    Does this refresh your recollection as to a

18   conversation you had with Tracey about moving to a

19   different facility?

20     A.    Yeah.   That was much later than the first

21   conversation, but yes.

22     Q.    So is this a separate conversation from the

23   two you've already told me about?

24     A.    Yeah.

Marlayna G. Tillman                    247

1    who did not have a Class A CDL?

2        A.    I don't know.

3        Q.    So you don't know of anyone?

4        A.    I don't know the answer.  No, I don't have an

5    answer to that.

6        Q.    So if there were other people who were denied

7    the ability to apply for the position who were white

8    men, would you have any basis to dispute that?

9        A.    Say that again.

10       Q.    Okay.

11                   If there are white men who will testify

12   that they were not permitted to apply or bid on this

13   position because they did not have a CDL, would you

14   have any reason to dispute that?

15                   MS. BREWINGTON:   I'm going to object,

16   calls for speculation, but you can answer.

17                   THE WITNESS:   I don't even know how to

18   answer that.

19   BY MS. CLEMONS:

20       Q.    I'm just saying, do you know of anything that

21   would contradict that?

22       A.    I can't answer that.

23       Q.    When did you get your CDL license?

24       A.    September 2004.

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MARLAYNA G. TILLMAN,        :
                                      :
        Plaintiff,            :         C.A. Number:  04-1314
                                        :
        v.                      :
                                        :
THE PEPSI BOTTLING GROUP, INC.,    :
and TEAMSTERS LOCAL UNION 830    :
                                        :
        Defendants.        :

## VERIFICATION OF SARA (SWARTZ) ALTMAN

I, Sara (Swartz) Altman, pursuant to 28 U.S.C. § 1746, state the following based upon my personal knowledge:

        1.     I was employed by Defendant Bottling Group, LLC ("PBG") as the Human Resources Representative (or Coordinator) for PBG from November 7, 2000 until I resigned on March 3, 2006.

        2.     On or about May 8, 2001, PBG hired Plaintiff, Marlayna Tillman, as a Merchandiser in its Wilmington, Delaware facility.

        3.     The Merchandiser position is a non-union position.  Merchandisers generally work in bulk, a sub-department of the Sales department, which primarily services large retail establishments like grocery stores.

        4.     In or around November 2001, Plaintiff was temporarily assigned to perform merchandising duties in the conventional sub-department of the Sales department to assist with the Space Race campaign.

        5.     The "Space Race" campaign was an incentive program offered by PBG to its convenience store customers.  Under the program, PBG provided incentives to customers in exchange for enhanced product placement within their stores.  As part of the program, PBG agreed to reset (clean and reorganize) and merchandise the coolers in customers' stores which displayed Pepsi-Cola.

        6.     A key position in the Sales department is the Relief Driver position, commonly called other names including extra man.  The Relief Driver position is covered by the collective bargaining agreement between PBG and Teamsters Local Union 830 ("the Union").  Relief Drivers cover for delivery drivers and are required to single-handedly sell and deliver product to stores and other retail establishments.

7.    While performing merchandising duties in the conventional sub-department of the Sales department, Plaintiff expressed an interest in learning to drive a tractor trailer truck and obtaining a Class A Commercial Drivers License ("CDL-A license").

8.    Plaintiff took and failed the written test for a CDL-A in or about May 2002.

9.    Over the next few years, PBG offered Plaintiff additional opportunities to train for her CDL. Specifically, PBG offered Plaintiff the use of a PBG truck to train during her non-working hours. Plaintiff was also required to drive trucks in PBG's yard in the course of performing her duties. Additionally, PBG researched local truck driving schools for Plaintiff and agreed to permit her to take a leave of absence to attend one of the schools. Plaintiff declined this offer.

10.    In or around September 2004, Plaintiff obtained a CDL-A license. Shortly thereafter, Plaintiff bid for and was accepted for a driving position at PBG. On September 19, 2004, Plaintiff transferred to the position of Transport Driver.

11.    In or around June 2002, Plaintiff applied for and accepted a position as a Warehouse Person. Plaintiff was not transferred to the warehouse until approximately July 29, 2002. Between Memorial Day and Labor Day, the demand for PBG's products increases dramatically. As a result, Plaintiff's transfer was delayed slightly based on business needs. She was not the only employee so affected. Like Plaintiff, John Osciak (Caucasian Male), was awarded a job bid on May 27, 2002, but was not moved into his new position until August 6, 2002.

12.    Pursuant to the collective bargaining agreement between the Union and PBG, Plaintiff became a dues paying member of the Union when she transferred to the position of Warehouse Person. Also pursuant to the contract, Plaintiff's rate of pay at the time of transfer was $12.68 or 80% of the contract rate of $15.75. Two other employees who transferred to the warehouse at approximately the same time, Stan Coleman (Black male) and Bill Becker (Caucasian male), were paid at the same rate. Nevertheless, based on Plaintiff's request, and because Plaintiff, Mr. Coleman and Mr. Becker were all internal transfers, Phil Weber, plant manager at the time, agreed to retroactively pay all three employees the full union rate as of the date of transfer.

13.    On or about November 6, 2003, Plaintiff injured herself at work. As a result of this injury, Plaintiff was out of work from November 6, 2003 until April 19, 2004.

14.    During this time, in March 2004, Plaintiff applied for and accepted employment with RJM Vending. Plaintiff did not advise PBG that she was working for RJM while still employed by PBG.

15.    On or about June 1, 2004, Plaintiff allegedly reaggravated her injury and was again out of work until June 24, 2004.

16.    Plaintiff began working for Cott Beverage. Plaintiff did not advise PBG that she was working for Cott Beverage while still employed by PBG.

17.    In or about December 2005, PBG discovered Plaintiff was working for yet another company, J.B. Hunt, while still employed by PBG.

18.    By letter dated January 5, 2005, I notified Plaintiff that PBG was terminating her employment retroactive to December 2, 2004.

19.    Plaintiff has alleged that she was verbally reprimanded by Thomas Riley and Glenn Mathews for: "walking the dog"; not being a team player; and leaving work without checking with her supervisor. "Walking the Dog" is the unsafe act of walking in front of motorized equipment (typically a forklift), which violates PBG's safety rules.

20.    Caucasian and/or male employees have been counseled for the same infractions.

21.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 26th day of March 2007.

Sara (Swartz) Altman

# EXHIBIT 3

USDC, District of Delaware
Civil Action No. 04-1314

Tillman v. The Pepsi Bottling Group, Inc., et al
Deposition of Sara Swartz Altman

Wednesday
February 28, 2007

Page 1

1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
2               CIVIL ACTION NO. 04-1314
3

MARLAYNA G. TILLMAN,
4               Plaintiff,
5           vs.
6  THE PEPSI BOTTLING GROUP, INC.
   AND TEAMSTERS LOCAL UNION 830,
7               Defendants.
8
                  ------------
9          WEDNESDAY, FEBRUARY 28, 2007
                  ------------
10
11          Oral sworn deposition of SARA SWARTZ
   ALTMAN, taken at the law offices of BALLARD, SPAHR,
12 ANDREWS & INGERSOLL, 1735 Market Street,
   Philadelphia, Pennsylvania, on the above date,
13 commencing at 10:00 a.m., there being present:
14
           J. STEPHEN WOODSIDE, ESQUIRE
15         One Montgomery Plaza, suite 605
           Norristown, Pennsylvania 19401
16         Attorney for Plaintiff.
17
                - - - - - -
18
19
                 TATE & TATE
20        The Lexington Building, Suite 5
               180 Tuckerton Road
21         Medford, New Jersey  08055
           (856) 983-8484 - (215) 735-9088
22
23
24
25

USDC, District of Delaware
Civil Action No. 04-1314
Tillman v. The Pepsi Bottling Group, Inc., et al
Deposition of Sara Swartz Altman
Wednesday
February 28, 2007

Page 126

1  A.    I'm not confused.
2  Q.    Are you confused about the date?
3        MS. CLEMONS: Are you going to take
4  this tone? Your tone is rude, condescending and
5  unnecessary.
6        MR. WOODSIDE: Stop peppering up the
7  transcript like you always like to do. I have done
8  nothing.
9        MS. CLEMONS: If you don't change your
10 tone, we will not continue this deposition. You
11 will not harass and you will not be rude to my
12 witness. Do you understand me?
13       MR. WOODSIDE: Listen, let me say
14 something before we go on. You are not going to
15 pepper up and patronize the transcript by saying
16 misstatements and untruths, okay. We have been very
17 kind and generous and considerate here. I'm only
18 trying to get information. You just have some
19 attitude about everybody.
20 Q.    Let's go back. November of 2001, do you
21 know where you got the date from?
22 A.    Memory, something I would have put in my
23 notes.
24 Q.    Well, you are taking a verification. That
25 means that you are declaring under penalty of

Page 127

1  perjury that the foregoing is true and correct?
2  A.    Yes.
3        MS. CLEMONS: She said to the best of
4  her memory that's what she has.
5        MR. WOODSIDE: I'm asking her about
6  paragraph 21.
7  Q.    Can you look at that. Look at paragraph
8  21. Is this the terms under which you signed this
9  document?
10 A.    Yes.
11 Q.    So you are saying under penalty of perjury,
12 you know what that is?
13 A.    Yes.
14 Q.    I mean that means something could happen —
15       MS. CLEMONS: You know what, knock it
16 off with that. Stop trying to intimidate my
17 witness. You are trying to intimidate her and I'm
18 not going to allow it.
19 Q.    Did you sign?
20       MS. CLEMONS: She said she signed it.
21 It says what it says and we're not going to keep
22 going over that.
23 Q.    Did you write this, Altman, Sara Swartz
24 Altman who signed it, did you write this
25 verification?

Page 128

1  A.    I don't know what you mean by write.
2  Q.    Did you write out this information or type
3  out this information yourself?
4  A.    No.
5  Q.    Who typed it?
6  A.    I don't know.
7  Q.    Well, did you —
8  A.    I don't know who typed it.
9  Q.    Did you provide this information to
10 somebody who typed it out?
11       MS. CLEMONS: Objection.
12 Attorney/client privilege.
13       MR. WOODSIDE: You are asserting a
14 privilege?
15       MS. CLEMONS: As a privilege as to who
16 she provided information to and who drafted this,
17 yes.
18 Q.    You are still signing this under penalty,
19 so therefore it's true and correct, right, this
20 information?
21 A.    Yes.
22 Q.    You say the plaintiff was temporarily
23 assigned to perform merchandising duties in the
24 conventional department. I will ask you how long
25 was she temporarily assigned?

Page 129

1  A.    To the best of my knowledge, five or six
2  months.
3  Q.    That's a temporary assignment?
4  A.    Yes.
5  Q.    Can you think of any other employee who was
6  doing merchandising work like Tillman who was
7  temporarily assigned to perform these kinds of
8  duties in the conventional department that you have
9  described here? Anybody else?
10 A.    Yes.
11 Q.    Who?
12 A.    Matt Fields.
13 Q.    Matt Fields?
14 A.    Uh-huh.
15 Q.    Spell his name please.
16 A.    F-I-E-L-D-S.
17 Q.    Where is he today?
18 A.    I don't know.
19 Q.    Is he with Pepsi?
20 A.    Not to my knowledge.
21 Q.    Do you know when he left?
22 A.    Maybe 2001.
23 Q.    Did he perform the same kind of duties you
24 are describing Tillman did here during the time
25 Tillman did it?

Page 130

1  A.    He did not do the space race.
2  Q.    Was Tillman the only one doing the space
3  race as you described here in paragraph four?
4  A.    What do you mean by as described?
5  Q.    Well, you described she is assisting with
6  the space race campaign. During the time Tillman
7  was temporarily assigned was she the only one?
8  A.    She was not the only person.
9  Q.    Matt Fields was there also?
10 A.    Matt Fields was not there.
11 Q.    Who else was doing the space race with Miss
12 Tillman?
13 A.    Craig Nelson.
14 Q.    Craig Nelson.
15      You gave me Craig Nelson as a sales
16 manager?
17 A.    Uh-huh.
18      MS. CLEMONS: You have to say yes or
19 no.
20 A.    Yes.
21 Q.    He was a sales manager?
22 A.    He was a territory coordinator.
23 Q.    He wasn't in the union, was he?
24 A.    No.
25 Q.    He was also a sales manager when he was

Page 131

1  assisting in space race?
2  A.    He was a territory coordinator. He
3  assisted in the space race.
4  Q.    Is this a manager?
5  A.    He managed others.
6  Q.    What was he managing himself when he was
7  performing in the space race?
8  A.    Was he managing himself?
9  Q.    Was he managing himself?
10 A.    I'm not sure what you mean by that
11 question.
12 Q.    Who was he managing union or non-union?
13 A.    He was managing both union and non-union.
14 Q.    In the space race, both union and non-union
15 at the time? Was he managing both union and
16 non-union at the time that he was working in space
17 race with Tillman?
18      MS. CLEMONS: Objection, compound.
19 Q.    Was he?
20      MS. CLEMONS: I don't understand what
21 the question is after all that.
22 Q.    Was he managing union and non-union
23 employees at the time that he was working space race
24 with Tillman or during the time she was working?
25 A.    Yes.

Page 132

1  Q.    Do you know whether the union complained
2  that a supervisor was performing union work at the
3  time?
4  A.    Do I know if?
5  Q.    Did that come up?
6  A.    I don't remember.
7  Q.    Does that violate any part of the
8  bargaining unit, do you know, if a supervisor who
9  was supervising union work or union employees would
10 be performing work that other union members should
11 be doing?
12      MS. CLEMONS: Objection. There is no
13 fact in evidence that it was union work. Where does
14 it say space race was union work? Where do you get
15 that?
16      MR. WOODSIDE: I'm getting there.
17      MS. CLEMONS: I think that's the
18 union's portion to assert, certainly not Miss
19 Tillman's.
20 Q.    At the time she is doing this for how many
21 months did you tell me she did it, five?
22 A.    I told you that she worked with Craig
23 Nelson's realm for approximately five months.
24 Q.    She was reporting to Mr. Nelson at the time
25 that she was working on space race?

Page 133

1  A.    I believe he was one of the people that she
2  reported into.
3  Q.    Who else was working with Miss Tillman who
4  would be on the non-union side of the sales work
5  force during the period she did space race?
6  A.    In an hourly capacity?
7  Q.    Hourly or salary.
8  A.    No one else that I can think of.
9  Q.    Was Nelson, could we call him a supervisor
10 during that time period?
11 A.    Yes.
12 Q.    He was also in that regard a manager,
13 right?
14 A.    He managed others.
15 Q.    Both union and non-union?
16 A.    Yes.
17 Q.    Did he work the entire five months that
18 Miss Tillman was working in space race?
19 A.    Did he work the entire five months?
20 Q.    Yes, in a similar capacity that Miss
21 Tillman would have been working space race?
22 A.    Are you asking if he was employed or are
23 you asking what job duty he held?
24 Q.    Was he doing the things that Tillman was
25 doing in space race during the same five months

34 (Pages 130 to 133)

Page 142

1  Q.    Is that because --
2  A.    Maybe if you break it up into smaller
3  pieces.
4  Q.    I have a conventional rep on the sales, in
5  the sales department getting a union rate under the
6  bargaining unit agreement. That's a union job,
7  right?
8  A.    The duties I described are union job, the
9  conventional rep.
10 Q.    And for this limited period of time when
11 the rep can't do that work, I've got what you
12 described as a helper doing the same work that the
13 rep can't do because of some circumstance or injury
14 or temporary assignment, right?
15 A.    As I said before, they are not doing all
16 the duties.
17 Q.    But they are doing some of those duties.
18 They are doing the work the rep can't do. Let's
19 stick with that hypothetical, right?
20 A.    So hypothetically they are performing
21 duties that a restriction from the doctor says that
22 the rep can't do?
23 Q.    Well, or other reasons that you gave me
24 earlier about why there would be a helper needed,
25 right?

Page 143

1          MS. CLEMONS: It is your question,
2  frame it. Ask her a question.
3  Q.    Just follow me. We have a helper now who
4  is now doing the conventional rep work for whatever
5  reason, right?
6  A.    No.
7  Q.    No. He is doing some of the work the rep
8  can't do. You have told me that already.
9  A.    Yes, he is doing some of the work.
10 Q.    And so for the time period that person is
11 doing some of that work, for the length of that
12 assignment, have you ever known Pepsi to have that
13 helper go into the union or require that the worker,
14 that employee going into the union because of the
15 work that she or he is doing?
16 A.    Have I ever known Pepsi to require a
17 non-union helper to go into the union?
18 Q.    Because they are doing the work that the
19 rep can't do?
20        MS. CLEMONS: Objection. Same
21 objection.
22 Q.    Has that ever happened?
23 A.    I have never known, to the best of my
24 knowledge, of a non-union employee being a helper
25 and Pepsi required them to go into the union because

Page 144

1  they were helping.
2  Q.    That's the reason why, they are helping?
3  A.    I have never known Pepsi to require to the
4  best of my knowledge, a non-union employee to go
5  into the union.
6  Q.    Well, when that non-union employee starts
7  doing bargaining union work under one of the many
8  categories, isn't that employee required to enter
9  the union under the bargaining agreement between
10 Pepsi and the union?
11        MS. CLEMONS: Objection. Objection.
12 A.    If an employee is doing union work as
13 agreed upon by the union with the job description
14 then the employee is a union employee. I think we
15 said earlier the union may argue that if there is a
16 gray line there, but we don't require people, if you
17 are not in a union job description, we don't require
18 you to pay union dues.
19 Q.    Well, union dues is only one piece. You
20 require, the union would require entering the union
21 right? That's what the union would be taking the
22 position on?
23        MR. GELMAN: Let's go off the record
24 for a second.
25        (Discussion off the record.)

Page 145

1          (At which time a lunch break was
2  taken.)
3  Q.    We're back on and do you have Altman 11 in
4  front of you?
5  A.    Yes.
6  Q.    I just want to go over something you said
7  earlier. Aside from Matt Fields and Craig Nelson,
8  there were no other non-union employees in the
9  Wilmington plant working on the space race campaign
10 during the time that Miss Tillman worked on it?
11 A.    No.
12        MS. CLEMONS: Objection. Go ahead.
13 It misstates her previous testimony.
14 A.    Yes. When I was giving the list of names
15 with Matt Fields you asked me who else worked as a
16 helper that was non-union. To the best of my
17 knowledge, Marlayna Tillman was the only
18 merchandiser that worked in the space race.
19 Q.    What was Matt Fields' position?
20 A.    Merchandiser.
21 Q.    He was a non-union merchandiser?
22 A.    Yes.
23 Q.    And Craig Nelson is the other person that
24 we talked about, right?
25 A.    Yes.

37 (Pages 142 to 145)

USDC, District of Delaware
Civil Action No. 04-1314

Tillman v. The Pepsi Bottling Group, Inc., et al
Deposition of Sara Swartz Altman

Wednesday
February 28, 2007

Page 146

1  Q.    Those are the three people, three employees
2  in the Wilmington plant who worked the space race
3  campaign?
4          MS. CLEMONS: Objection. Misstates.
5  Q.    Who were non-union workers during the time
6  that Tillman was working?
7          MS. CLEMONS: Objection. Misstates
8  her testimony. Go ahead.
9  A.    No. Matt Fields did not work on the space
10  race. I said to the best of my knowledge Marlayna
11  Tillman was the only merchandiser that worked on the
12  space race.
13  Q.    What was Fields' department?
14  A.    Fields did not work space race.
15  Q.    But Fields worked -- where was Fields
16  working when you gave me his name along with Craig
17  Nelson? For the five months Tillman was working
18  space race you gave me Matt Fields' name and some
19  category. What was it?
20          MS. CLEMONS: Objection. Misstates
21  her testimony.
22  Q.    I just asked you a question.
23  Q.    Can you repeat it?
24  Q.    You gave me Matt Fields as a name during
25  the five months that Marlayna Tillman was working

Page 147

1  space race as a merchandiser and non-union
2  merchandiser. What was Matt Fields' position and
3  was he union or non-union during that period of
4  time?
5          MS. CLEMONS: Objection. That's not
6  what she said.
7  Q.    I just asked you a question.
8          MS. CLEMONS: You can ask her a
9  question which doesn't state what she didn't say.
10  You are misleading her, but you can answer if you
11  understand, Sara.
12  A.    Again, I did not say Matt Fields worked on
13  the space race.
14  Q.    I know that. I wrote that down.
15  A.    He wasn't employed during those months. I
16  gave you the context of you asked me if other people
17  who were non-union that helped drivers.
18          MS. CLEMONS: She is one of the
19  people, you asked her for one person. She gave you
20  one person. There are others. Do you want to ask
21  her that.
22          MR. WOODSIDE: Why are you hitting the
23  table?
24          MS. CLEMONS: Why are you asking
25  questions not based on facts.

Page 148

1          MR. WOODSIDE: What's the matter over
2  there?
3          MS. CLEMONS: You know what,
4  Mr. Woods, asked your questions and move on.
5  Q.    Who else besides Matt Fields who was
6  helping conventional reps in their work in 2001,
7  2002, 2003, 2004?
8  A.    Mark Maragus.
9  Q.    Can you spell his name please?
10  A.    M-A-R-A-G-U-S. I could be wrong though.
11  Q.    Who else?
12  A.    Dave Zimbala. I can't remember how to
13  pronounce it.
14  Q.    Anybody else?
15  A.    That I can remember.
16  Q.    What department or job title did Mark
17  Maragus have?
18  A.    Job title, merchandiser.
19  Q.    Non-union?
20  A.    Yes.
21  Q.    What about Dave Zimbala?
22  A.    Non-union merchandiser.
23  Q.    Do you know what time period Mr. Maragus is
24  doing this work as helper?
25  A.    I don't remember the time period.

Page 149

1  Q.    How about Mr. Zimbala?
2  A.    I don't remember the time period.
3  Q.    Was it one of the four years that I gave
4  you?
5  A.    Yes.
6  Q.    Were they both paid at non-union rates?
7  A.    They were paid the merchandiser rate.
8  Q.    The same rate as Tillman?
9  A.    I don't know.
10  Q.    What did Pepsi establish as a seniority
11  date for a particular employee?
12  A.    It depends.
13  Q.    Are there different seniority dates for
14  different employment events?
15  A.    Well, if you want to clarify the question
16  what you mean by seniority.
17  Q.    Is your seniority on the non-union side in
18  the sales department?
19  A.    There would be for pension and vacation
20  purposes, there is time and job or hire date.
21  Q.    How about for applying for another position
22  at Pepsi, would there be seniority date for that
23  non-union employee?
24  A.    I don't know what you are asking.
25  Q.    Well, if a non-union employee applied for a

38 (Pages 146 to 149)